No. 21-16499

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ROSEMARIE VARGAS; KISHA SKIPPER; JAZMINE SPENCER;
DEILLO RICHARDS; JENNY LIN, on behalf of themselves
individually, and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

and

NEUHTAH OPIOTENNIONE; JESSICA TSAI,
*Plaintiffs,*

v.

FACEBOOK, INC.,
*Defendant-Appellee.*

_____

On Appeal From the United States District Court
for the Northern District of California
Case No. 3:19-cv-5081 | Hon. William H. Orrick

_____

## ANSWERING BRIEF OF FACEBOOK, INC.

_____

Rosemarie T. Ring                    Theodore J. Boutrous Jr.
Ryan Azad                            Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP          Matt Aidan Getz
555 Mission Street, Suite 3000       GIBSON, DUNN & CRUTCHER LLP
San Francisco, CA 94105              333 South Grand Avenue
Telephone: (415) 393-8200            Los Angeles, CA 90071
                                     Telephone: (213) 229-7000

*Counsel for Defendant-Appellee*
*Facebook, Inc. (now known as Meta Platforms, Inc.)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Meta Platforms, Inc. (formerly known as Facebook, Inc.) states that it is a publicly traded corporation; that it has no parent corporation; and that to its knowledge, no publicly held corporation owns 10% or more of its stock.

Dated: March 21, 2022                    Respectfully submitted,

                 s/ Theodore J. Boutrous Jr.
                Theodore J. Boutrous Jr.

                *Counsel for Defendant-Appellee*
                *Facebook, Inc. (now known as Meta*
                *Platforms, Inc.)*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................. 1

STATEMENT OF THE ISSUES ....................................................... 6

STATEMENT OF THE CASE ............................................................ 8

I.  Facebook Offers Audience Selection Tools for Third-Party
    Advertisers Placing Ads on Its Platform. ...................................... 8

II. Plaintiffs Sue Facebook, Claiming Unlawful Exclusion from
    Housing Ads. ............................................................................... 10

III. The District Court Dismisses Plaintiffs' Complaint ...................... 13

    A.  The District Court Dismisses the Second Amended
        Complaint with Leave to Amend. ......................................... 13

    B.  The District Court Dismisses the Third Amended
        Complaint with Prejudice. ................................................... 15

SUMMARY OF ARGUMENT ................................................... 19

STANDARD OF REVIEW ........................................................... 22

ARGUMENT ............................................................................. 23

I.  Plaintiffs Failed to Adequately Allege Article III Standing .......... 23

    A.  Plaintiffs Did Not Plausibly Allege Injury in Fact. ............... 25

        1.  Plaintiffs' Complaint Relies on Speculation, Not
            Plausible Factual Allegations. ...................................... 27

        2.  None of the Theories of Article III Injury
            Plaintiffs Offer Excuses the Lack of Plausible
            Allegations of Actual Injury ........................................ 34

B.    Plaintiffs Did Not Plausibly Allege That Any Injury Was Traceable to Facebook....................................43

II.    The District Court Did Not Abuse Its Discretion in Denying Jurisdictional Discovery..................................46

III.    Plaintiffs' Claims Are Barred by Section 230 of the Communications Decency Act.....................................52

A.    Plaintiffs' Claims Treat Facebook as a Publisher. ..............55

1.    Facebook's Audience Selection Tools Are Neutral Tools Protected Under Section 230.............................56

2.    *Roommates* Is Distinguishable. ...................................62

B.    Plaintiffs' Claims Seek to Hold Facebook Liable for Publishing Others' Content. .................................66

CONCLUSION .............................................69

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allen v. Wright,*
    468 U.S. 737 (1984)................................................. 4, 20, 24, 41, 44, 45

*Am. W. Airlines, Inc. v. GPA Grp., Ltd.,*
    877 F.2d 793 (9th Cir. 1989).......................................................... 50

*Ascon Props., Inc. v. Mobil Oil Co.,*
    866 F.2d 1149 (9th Cir. 1989)..................................................... 29, 51

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................. 23, 51

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009)................................................. 54, 55, 67

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................... 31

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................. 45, 46

*Boschetto v. Hansing,*
    539 F.3d 1011 (9th Cir. 2008)............................................... 21, 47, 52

*Braunstein v. Az. Dep't of Transp.,*
    683 F.3d 1177 (9th Cir. 2012)........................................................ 37

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986).......................................................... 52

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119 (9th Cir. 2003)................................... 52, 57, 61, 63, 64

*Carrico v. City & County of San Francisco,*
    656 F.3d 1002 (9th Cir. 2011)........................................................ 29

iv

*Carroll v. Nakatani*,
  342 F.3d 934 (9th Cir. 2003)................................................. 18, 37, 41

*Chapman v. Krutonog*,
  256 F.R.D. 645 (D. Haw. 2009)........................................................ 48

*Cierco v. Mnuchin*,
  857 F.3d 407 (D.C. Cir. 2017)........................................................ 46

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).................................................................... 45, 46

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019)................................. 19, 20, 31, 33, 36, 51

*Data Disc, Inc. v. Sys. Tech. Assocs.*,
  557 F.2d 1280 (9th Cir. 1977).............................................. 21, 23, 47

*Dichter-Mad Fam. Partners, LLP v. United States*,
  709 F.3d 749 (9th Cir. 2013)............................................................. 48

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019)..........................23, 53, 54, 58, 59, 60, 62

*Embassy of the Arab Republic of Egypt v. Lasheen*,
  603 F.3d 1166 (9th Cir. 2010)........................................................... 19

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc).................................... passim

*Fair Hous. Council of Suburban Phila. v. Main Line Times*,
  141 F.3d 439 (3d Cir. 1998) ............................................................. 26

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d. Cir. 2019) ................................................... 60, 68, 69

*Getz v. Boeing Co.*,
  654 F.3d 852 (9th Cir. 2011)............................................................ 23

*Gladstone Realtors v. Village of Bellwood*,
  441 U.S. 91 (1979)........................................................................... 40

*Gomez v. Elite Lab. Servs. Weeklys, Ltd.*,
  2021 WL 4992625 (N.D. Cal. Mar. 16, 2021) ...................................... 51

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ..................................... 6, 22, 56, 57, 64, 65

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...................................................................... 34, 35

*Kimzey v. Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ........................................... 59, 61, 68, 69

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) .......................................................... 67

*Kwikset Corp. v. Superior Ct.*,
  51 Cal. 4th 310 (2011) ........................................................................ 26

*Lambert v. CalPortland Co.*,
  2020 WL 6802028 (C.D. Cal. Nov. 19, 2020) ..................................... 51

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ............................................................. 26

*Laub v. U.S. Dep't of the Interior*,
  342 F.3d 1080 (9th Cir. 2003) ....................................................... 48, 51

*Laufer v. Looper*,
  22 F.4th 871 (10th Cir. 2022) ............................................................. 35

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ............................................................. 50

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................. 19, 24, 30, 43, 46

*Martel v. County of Los Angeles*,
  56 F.3d 993 (9th Cir. 1995) (en banc) ................................................ 48

*McGee v. S-L Snacks Nat'l*,
  982 F.3d 700 (9th Cir. 2020) ......................................................... 23, 24

*Mobil Oil Corp. v. Syracuse Indus. Dev. Agency*,
   559 N.E.2d 641 (N.Y. 1990) ................................................................. 26

*Mont. Env't Info. Ctr. v. Bernhardt*,
   2020 WL 6042291 (D. Mont. Oct. 13, 2020) ...................................... 50

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
   926 F.3d 528 (9th Cir. 2019) ................................................................ 42

*Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ................................................................ 53

*Opiotennione v. Bozzuto Mgmt. Co.*,
   2021 WL 3055614 (D. Md. July 20, 2021) ......................................... 41

*Opiotennione v. Facebook, Inc.*,
   2020 WL 5877667 (N.D. Cal. Oct. 2, 2020) ...................................... 42

*Palmer v. Occidental Chem. Corp.*,
   356 F.3d 235 (2d Cir. 2004) ................................................................ 41

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ........................................................ 52, 53

*Sahni v. Am. Diversified Partners*,
   83 F.3d 1054 (9th Cir. 1996) ................................................................ 22

*Schmier v. U.S. Ct. of Appeals for the Ninth Circuit*,
   279 F.3d 817 (9th Cir. 2002) ................................................................ 30

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ........................................................................... 43, 44

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ......................................................................... 19, 25

*Spy Optic, Inc. v. AreaTrend, LLC*,
   843 F. App'x 66 (9th Cir. 2021) .......................................................... 48

*St. Clair v. City of Chico*,
   880 F.2d 199 (9th Cir. 1989) ............................................................... 50

vii

*Terracom v. Valley Nat'l Bank*,
49 F.3d 555 (9th Cir. 1995)..................................................................47

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972)................................................................... 39, 40

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)..................................................... 1, 25, 26, 33

*United States v. Wahchumwah*,
710 F.3d 862 (9th Cir. 2013)...................................................... 61, 62

*Videx, Inc. v. Micro Enhanced Tech., Inc.*,
2012 WL 1597380 (D. Or. May 4, 2012)........................................... 51

*Warth v. Seldin*,
422 U.S. 490 (1975)............................................................................29

*Warth v. Seldin*,
495 F.2d 1187 (2d Cir. 1974) ............................................................39

*White v. Square, Inc.*,
7 Cal. 5th 1019 (2019).......................................................................26

*Wilson v. Glenwood Intermountain Props., Inc.*,
98 F.3d 590 (10th Cir. 1996)................................................ 37, 38, 42

*In re Wrightwood Guest Ranch, LLC*,
896 F.3d 1109 (9th Cir. 2018)...........................................................19

*Zango, Inc. v. Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009)...........................................................61

## Constitutional Provisions

U.S. Const. art. III........................................................................ passim

## Statutes

42 U.S.C. § 3604(a).............................................................................16

42 U.S.C. § 3604(c) .............................................................................16

47 U.S.C. § 230 ........................................................5, 7, 18, 22, 23, 58, 69

47 U.S.C. § 230(c)(1) ............................................................ 16, 21, 53, 66

47 U.S.C. § 230(f)(3) .................................................................................. 67

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................ 13

Fed. R. Civ. P. 12(b)(6) ...................................................................... 13, 19

## INTRODUCTION

Federal courts lack the power to decide claims brought by plaintiffs who did not suffer a concrete, particularized injury that is fairly traceable to the defendant. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). That fundamental limitation, grounded in the separation of powers, ensures that federal courts do not stray into deciding "hypothetical or abstract disputes." *Id.* This case presents exactly such a dispute and is therefore not subject to federal jurisdiction.

Facebook provides a platform on which advertisers place ads for all types of products and services. Advertising, whether through traditional or digital media, is all about reaching people who may be interested in a product or service. Fashion designers, for instance, may choose to advertise in *Vogue* and *GQ*, but not *Sports Illustrated*. Similarly, manufacturers of arthritis drugs may choose to place ads during the nightly news, but not during Saturday morning cartoons. Consistent with this established practice, Facebook's platform provides tools advertisers can use, if they so desire, to direct their ads to preferred audiences—ads for video games to teenagers, for athletic shoes to people interested in fitness, and so on. Those audience selection tools are

1

optional, and Facebook's policies make clear that advertisers must not use the tools in any discriminatory ways.

Plaintiffs here are Facebook users who claim to have been injured because some third-party advertisers allegedly used audience selection tools to unlawfully exclude them from seeing unspecified ads for housing on Facebook. Based on those allegations, plaintiffs seek damages under the Fair Housing Act and analogous state statutes from Facebook, not from the third-party advertisers who allegedly engaged in this discriminatory conduct. But despite four attempts, plaintiffs failed to plausibly allege that they suffered any actual and concrete injury in connection with their use of Facebook, much less any injury fairly traceable to Facebook itself rather than the independent advertisers plaintiffs allege chose to exclude them from seeing housing ads.

Plaintiffs' theory of Article III standing rests on nothing more than speculation. They allege that when they searched for housing on Facebook, they did not find ads for housing of the size, price, and location they wanted—for instance, "a three-bedroom apartment located in lower Manhattan in the rental price range of $1,700.00 per month," 2-ER-255 ¶ 85. They also allege that Facebook's audience selection tools made it

*possible* for third parties to target housing ads to exclude certain groups. Based on these two allegations, plaintiffs make a speculative leap: They assume they did not see ads for housing they wanted *because* third-party advertisers used audience selection tools to exclude them based on personal characteristics.

Plaintiffs do not allege any facts that would justify that leap. They do not allege that any housing meeting their requirements existed. They do not allege that they were interested in and qualified to rent that housing. They do not allege that any third-party advertiser placed ads for that housing on Facebook's platform. And they do not allege that any third-party advertiser used the audience selection tools to exclude users from seeing those ads, either in general or based on protected characteristics that plaintiffs share. All plaintiffs have is speculation that they *could* have been injured by the audience selection tools, *if* there was housing available that they would have been interested in and qualified to rent, *if* independent advertisers paid to advertise that housing on Facebook's platform, and *if* those advertisers used the audience selection tools to exclude plaintiffs from seeing the ads in a

3

discriminatory manner. The district court correctly found that was insufficient to plausibly allege an injury.

Plaintiffs likewise failed to plausibly allege that any injury would be fairly traceable to *Facebook's* conduct, rather than the conduct of third-party advertisers. Article III requires a causal connection between the conduct about which a plaintiff complains and the injury she claims she suffered. If a plaintiff's theory depends on "independent decisions" of "numerous third parties," that connection is broken. *Allen v. Wright*, 468 U.S. 737, 759 (1984). Here, plaintiffs claim they were injured because they were unlawfully excluded from housing ads, but such injuries could occur only if third-party advertisers made the independent choice to use Facebook's neutral tools to unlawful ends. If advertisers instead used the tools in any of the many lawful ways they could be used, plaintiffs would have no injury even under their theory of the case. That makes any injuries traceable not to Facebook, but to the alleged unlawful conduct of independent advertisers who plaintiffs have neither identified nor attempted to sue. For this reason, too, the district court was correct to dismiss plaintiffs' complaint for lack of standing.

4

Plaintiffs fall back on the argument that even though they have not plausibly alleged standing, they should have been allowed unspecified jurisdictional discovery to try to bolster their allegations. But whether to grant jurisdictional discovery is committed to the district court's broad discretion, and plaintiffs cannot show any abuse of that discretion here. Plaintiffs offer little more than an abstract hope that discovery would fill the numerous gaps in their case for standing. In any event, no amount of discovery could solve the fundamental flaw that any purported injury would stem from the independent acts of third-party advertisers, and thus would not be fairly traceable to Facebook.

Dismissal was appropriate for another, independent reason: Plaintiffs' claims against Facebook are barred by section 230 of the Communications Decency Act. Section 230 shields from liability any interactive computer service like Facebook that a plaintiff seeks to treat as a publisher of third-party content. That is this case in a nutshell: Plaintiffs want to hold Facebook liable on the theory that it published allegedly unlawful housing ads created by third-party advertisers.

Attempting to avoid section 230, plaintiffs argue Facebook is more like a content creator than a publisher because advertisers allegedly used

5

tools Facebook had designed. That argument runs aground on precedent. *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 893–95 (9th Cir. 2021). An interactive computer service that gives users neutral tools does not lose section 230 protection even if those tools can be used in unlawful in addition to lawful ways. Only if the service *requires* users not just to use its tools, but to use them unlawfully, does it become a content creator and therefore lose the protections of section 230. Facebook falls firmly in the former category: The audience selection tools are optional and available for *all* types of ads, not just housing ads, and are used by advertisers in lawful ways (or indeed not used at all). Section 230 therefore shields Facebook from the claims plaintiffs seek to assert, and the district court correctly dismissed the complaint on that basis as well.

## STATEMENT OF THE ISSUES

1.     Plaintiffs sued Facebook under the Fair Housing Act and related state statutes, claiming they were injured because advertisers allegedly used audience selection tools to place housing ads they were excluded from seeing. Plaintiffs allege that they unsuccessfully used Facebook's platform to search for housing, but they do not allege that any housing of the size, location, and price they wanted was available, that

such housing was being advertised on Facebook, or that any advertisers had used the audience selection tools to exclude them from seeing such ads. Did the district court correctly dismiss plaintiff's complaint for lack of standing?

2.    Plaintiffs argue that if they have not plausibly alleged standing, they should be granted jurisdictional discovery. But they have not identified any basis to think discovery will produce evidence of injury and have not explained how such evidence would resolve independent defects in their theory of standing. Was the district court's decision denying jurisdictional discovery an appropriate exercise of its broad discretion?

3.    Plaintiffs seek to hold Facebook liable because third-party advertisers allegedly used its audience selection tools to exclude plaintiffs from seeing housing ads. But section 230 of the Communications Decency Act protects interactive computer services from liability when they publish content created by others, even if others choose to use the service's neutral tools in an unlawful way. Did the district court correctly conclude that plaintiffs' claims against Facebook are barred by section 230?

7

## STATEMENT OF THE CASE

### I.  Facebook Offers Audience Selection Tools for Third-Party Advertisers Placing Ads on Its Platform.

Facebook is a technology and social networking company that "owns and operates the world's largest social media platform."[1]  2-ER-242 ¶ 33.  One of the ways Facebook generates revenue is by selling space for ads on its platform.  2-ER-243–44 ¶ 40.  Facebook's advertising resources are available to "advertisers in many industries," including (but not limited to) "housing and housing-related services."  2-ER-245 ¶ 44.

This case involves tools on Facebook's advertising platform that allow—but do not require—advertisers to select "eligible audience[s]" for their ads.  2-ER-248 ¶ 53.  Advertisers have many options from which to choose.  If an advertiser chooses to target its ads to a specific audience (for example, to men in a certain age range who are interested in basketball), Facebook directs the ads to people in that target audience, based on data it collects from users.  2-ER-247 ¶¶ 47–49, 2-ER-249 ¶ 54.

---

[1] After plaintiffs filed their third amended complaint, Facebook, Inc. changed its name to Meta Platforms, Inc.  This brief refers to that entity as Facebook.

8

The audience selection tools can be useful to advertisers and consumers alike in a wide range of contexts. Advertisers promoting a back-to-school sale might select "moms of grade school kids" or users with an interest in "parenting." 2-ER-249 ¶ 54. To reach a wider audience, advertisers may choose to run two substantively identical ads: one in English, and a second in Spanish that is targeted to Spanish speakers. *Id.* And organizations that offer resources for people with disabilities may decide to target their ads to Facebook users with an interest in "accessibility" or "service animal[s]." *Id.*

Plaintiffs take issue with a narrow subset of ads on Facebook's platform: They claim Facebook's audience selection tools made it possible for unidentified advertisers to exclude certain groups from seeing ads for housing. 2-ER-249 ¶ 54. Although Facebook's policies expressly forbid advertisers from discriminating based on protected characteristics (2-ER-170, -173), plaintiffs allege that the audience selection tools "empowered" third-party advertisers to target ads for housing in a discriminatory manner. 2-ER-249–50 ¶¶ 56–57. Plaintiffs further allege that independent, unidentified advertisers chose to use the tools in this

9

way, excluding protected groups "from the audience of housing advertisements." 2-ER-252 ¶ 66.

The audience selection tools plaintiffs challenge are a thing of the past. In 2019, following litigation brought by the ACLU and National Fair Housing Alliance and a discrimination charge filed by the Department of Housing and Urban Development (2-ER-234 ¶ 3, -291–97), Facebook made industry-leading changes to its advertising platform, eliminating certain audience selection tools (including those at issue here) for housing ads. 2-ER-203; 2-ER-248 n.15.

## II. Plaintiffs Sue Facebook, Claiming Unlawful Exclusion from Housing Ads.

Plaintiffs are five Facebook users. 2-ER-255 ¶ 79, -258 ¶ 102, -260 ¶ 115, -261 ¶ 128, -263 ¶ 140. They claim Facebook's audience selection tools, insofar as they "enable[d] housing advertisers to steer advertisements" away from certain groups, violated the Fair Housing Act as well as New York's Human Rights Law and California's Unruh Civil Rights Act and Unfair Competition Law. 2-ER-234 ¶ 1, -236 ¶ 9, -278–85 ¶¶ 203–52.

Plaintiffs allege they are members of various protected classes. 2-ER-255–56 ¶¶ 79, 87 (Rosemarie Vargas); 2-ER-258 ¶ 102 (Kisha

Skipper); 2-ER-260 ¶ 115 (Jazmine Spencer); 2-ER-261 ¶ 128 (Deillo Richards); 2-ER-263 ¶ 140 (Jenny Lin). They each allege, without elaboration, that because of Facebook's "amassing of detailed demographic data about each user," their personal characteristics must have been "known to Facebook." 2-ER-257 ¶ 98, -259 ¶ 111, -261 ¶ 124, -262 ¶ 136, -264 ¶ 149.

Plaintiffs allege that at various points from 2016 through mid-2019, they used Facebook's platform to search for housing but did not see ads for housing of the size, location, and price they hoped for. Vargas searched for a "three-bedroom apartment located in lower Manhattan in the rental price range of $1,700.00 per month." 2-ER-255 ¶ 85. Her searches produced results only in "neighborhoods outside of Manhattan, like the Bronx." 2-ER-256 ¶ 91. Skipper searched for but did not find ads for a two- to three-bedroom single family home or apartment in Yonkers or Westchester County ranging from "$1,000 to $2,000" per month. 2-ER-258–59 ¶ 107. Spencer sought two-bedroom units in New York City or New Jersey with monthly rent from $750 to $1450; she received ads for housing "in Newark, New Jersey," but that area has "high crime rates" and was not of interest to her. 2-ER-260 ¶¶ 120–21.

11

Richards sought two- to three-bedroom units for under $1,250 in Yonkers or the Bronx, but his searches turned up only "studio apartments" that "did not meet his housing needs." 2-ER-262 ¶¶ 132–33. And Lin's searches of a Facebook group called "Inspired Women of L.A. Housing" for rooms under $1,100 in Mid-City or Culver City, Los Angeles, were likewise unsuccessful. 2-ER-263–64 ¶¶ 143, 146.

Plaintiffs do not allege that any housing of the size, location, and price they wanted was available during the periods they searched Facebook's platform. But they generally allege that had they located such housing, they were "ready" and "able" or "prepared" to move. 2-ER-255 ¶ 81, -258 ¶ 105, -260 ¶ 117, -262 ¶ 130, -264 ¶ 147.

Plaintiffs also do not allege that any housing of the type they were looking for was being advertised on Facebook through paid ads during the relevant time periods. They assert, however, that they must have been "prevented from" seeing such ads *because* Facebook's advertising tools allowed advertisers to exclude groups of which they were members from seeing the ads. 2-ER-257 ¶ 99, -259 ¶ 112, -261 ¶ 125, -262 ¶ 137, -264 ¶ 50.

12

## III. The District Court Dismisses Plaintiffs' Complaint.

Facebook moved to dismiss plaintiffs' complaint for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The district court initially dismissed plaintiffs' second amended complaint with leave to amend (1-ER-20) and subsequently dismissed the third amended complaint with prejudice (1-ER-2, -10).

### A. The District Court Dismisses the Second Amended Complaint with Leave to Amend.

After Facebook moved to dismiss plaintiffs' initial complaint, plaintiffs opted to amend rather than oppose the motion. 3-ER-312–13. Plaintiffs amended their complaint again a month later. 3-ER-313–14. Plaintiffs had therefore filed three complaints by the time the district court first addressed Facebook's arguments for dismissal. Because Facebook brought a "facial attack on the sufficiency of the allegations" in the complaint, the district court's review was confined to its four corners, and the court would accept the allegations as true and draw reasonable inferences in plaintiffs' favor but disregard "'conclusory'" allegations and "'unreasonable inferences.'" 1-ER-14.

13

The district court dismissed plaintiffs' complaint, with leave to amend, after concluding plaintiffs had failed to sufficiently allege standing. As the court explained, although plaintiffs assert that "some unidentified housing advertisers may have used the Facebook tools that were available to target housing advertisements away from them" and that this "may" have led plaintiffs to miss seeing housing ads that others saw, they did not allege facts showing that was true. 1-ER-15. Because plaintiffs alleged only that they "could *theoretically* have been injured *if* housing advertisers in fact used the [audience selection] tools to exclude users with *plaintiffs'* characteristics from ads that *might* have been within plaintiffs' spheres of interest," it was purely "speculative" whether plaintiffs "were plausibly injured personally" by the audience selection tools they challenge. 1-ER-18–19.

The district court invited plaintiffs to plead additional facts "with respect to their use of Facebook to look for housing" and reserved the question whether additional allegations of that kind would raise a plausible inference of Article III injury. 1-ER-19.

14

**B.    The District Court Dismisses the Third Amended Complaint with Prejudice.**

Plaintiffs' third amended complaint added additional details about the periods during which they allegedly searched for housing and the sorts of housing they were looking for.  2-ER-255–65.  But plaintiffs did not allege any additional facts about whether such housing was available, whether it was being advertised on Facebook at the time, whether those ads were paid and thus subject to the audience selection tools, whether any advertisers used those tools to exclude groups from seeing the ads, or whether those choices affected plaintiffs' experience on Facebook.

Facebook again moved to dismiss (2-ER-188), raising three main arguments.  *First*, plaintiffs' fourth complaint "still contain[ed] no facts whatsoever plausibly suggesting that the housing searches allegedly conducted by the named plaintiffs were affected by alleged advertiser targeting in any respect."  2-ER-204.  Plaintiffs' allegations that they "searched for housing with particular location, size, and price characteristics and did not find it" were "not enough" to show they were injured by the audience selection tools.  *Id.*  Plaintiffs also did not allege any injury that would be fairly traceable *to Facebook*, because to

15

whatever extent plaintiffs were injured, that would be the result only of "advertisers' independent targeting choices." 2-ER-207–08.

*Second*, Facebook argued that plaintiffs' claims are barred by section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). 2-ER-208–13. Facebook's publication of housing ads created by third-party advertisers, which plaintiffs claim were discriminatory because of the way those unidentified advertisers allegedly chose to target them using neutral tools on Facebook's platform, did not strip Facebook of protections under section 230. 2-ER-211 (citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008) (en banc)).

*Third*, Facebook argued that plaintiffs had failed to state claims under the Fair Housing Act or any state statutes. With respect to the FHA, Facebook explained that plaintiffs did not allege any housing ads that facially "indicate[]" an unlawful preference, 2-ER-213–18 (quoting 42 U.S.C. § 3604(c)); did not allege that Facebook made housing "unavailable," 2-ER-218–20 (quoting 42 U.S.C. § 3604(a)); and did not provide any other basis to hold Facebook liable, 2-ER-220–23. Plaintiffs' state-law claims similarly failed for a host of reasons: Plaintiffs did not

plausibly plead intentional or invidious discrimination (2-ER-223–24); failed to identify any unfair conduct *by Facebook* that offends public policy (2-ER-224–25); and asserted New York claims in contravention of a valid choice-of-law clause, against an improper defendant, and based on a groundless legal theory (2-ER-225–26).

The district court again dismissed plaintiffs' complaint for lack of Article III standing, explaining that plaintiffs' amendment merely "add[ed] details about the types (costs, size, location and other 'criteria') of housing searches they conducted using Facebook." 1-ER-5. Plaintiffs still failed "to allege that housing *was generally available* in their desired markets" that satisfied that criteria, let alone that ads for such housing "*were being placed [o]n Facebook*." 1-ER-6. Although Vargas alleged that she and a white friend "sat side-by-side" and conducted similar searches but received different results (2-ER-257 ¶ 95), she did not allege that any additional ads her friend saw were *paid* ads (and thus subject to audience selection tools) rather than "consumer-placed ads" (which "did not utilize [any] 'targeted criteria'"). 1-ER-6–7.

Ultimately, the district court explained, plaintiffs "*assume* (but plead no facts to support)" that "unidentified advertisers theoretically

used Facebook's [audience selection] tools to exclude them based on their protected [characteristics]" from seeing ads "that they assume (again, with no facts alleged in support) were available and would have otherwise met their criteria." 1-ER-7–8. Without concrete allegations that they were "personally" injured by the tools they challenge, they have not plausibly pleaded Article III injury. 1-ER-8 (quoting *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003)).

The district court further ruled that even if plaintiffs had plausibly alleged standing, their claims would be subject to dismissal under section 230. 2-ER-8. Facebook's audience selection tools "are neutral"; they provide merely "a framework that could be utilized for proper or improper purposes," depending on the independent choices of the advertisers who decide whether and how to use them. 2-ER-10 (quoting *Roommates*, 521 F.3d at 1172). As a result, the court held that Facebook is protected from liability from plaintiffs' claims, which treat Facebook as the publisher of third-party advertisements. 2-ER-8–10.

Because it dismissed plaintiffs' complaint for lack of standing and as barred by section 230, the district court did not reach the other, independent grounds for dismissal under Rule 12(b)(6). 1-ER-10 n.11.[2]

## SUMMARY OF ARGUMENT

**I.** Article III's "indispensable" standing requirement demands that plaintiffs show actual, concrete injury that is fairly traceable to the defendant's challenged conduct. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, plaintiffs' allegations must raise a "plausible inference" of standing that "is more than speculative." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019). The district court correctly dismissed plaintiffs' complaint because they failed to adequately allege that they have Article III standing.

**A.** Plaintiffs have not plausibly alleged injury in fact, the "foremost" requirement of Article III standing. *Spokeo, Inc. v. Robins*,

---

[2] Although this Court can "affirm the district court's dismissal 'on any basis supported by the record even if the district court did not rely on that basis,'" *In re Wrightwood Guest Ranch, LLC*, 896 F.3d 1109, 1113 (9th Cir. 2018), if it were to disagree with the rulings on standing and section 230, the proper outcome would be to remand for the district court to consider those alternative grounds for dismissal in the first instance. *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1172 (9th Cir. 2010).

578 U.S. 330, 338–39 (2016). They allege that when they used Facebook's platform to search for housing in particular areas, matching certain characteristics, and at specific price points, they did not see ads satisfying those demands. They then ask the Court to assume they did not see ads *because* unidentified third-party advertisers used Facebook's audience selection tools to exclude them based on their personal characteristics. Plaintiffs' assertion of injury rests on nothing more than speculation, and that cannot satisfy Article III. *Bernhardt*, 946 F.3d at 560.

**B.** Plaintiffs also have not plausibly alleged that any injury would be fairly traceable to Facebook. Article III standing requires a causal link between a plaintiff's asserted injuries and the defendant's conduct, and if the theory of injury depends on "independent decisions" of "numerous third parties," that link is broken. *Allen v. Wright*, 468 U.S. 737, 759 (1984). Even if plaintiffs could plausibly allege injury, they would be injured only because third-party advertisers made an independent choice to use the audience selection tools in an unlawful way. Nothing on Facebook's platform required the advertisers to do so— to the contrary, Facebook's rules *forbid* discrimination in advertising—

20

and for that reason too the district court was correct to dismiss plaintiffs' complaint for lack of standing.

**II.** Plaintiffs argue that even if they failed to allege standing, they should have been given a chance to conduct unspecified jurisdictional discovery. Whether to grant jurisdictional discovery is committed to the district court's "broad discretion," *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977), and the district court did not abuse its discretion in denying discovery here. Plaintiffs' request for discovery rests on nothing "more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008). Even if discovery could produce housing ads of the sort plaintiffs speculate *might* exist, that would not resolve the independent flaw that plaintiffs' complaint fails to allege injury traceable *to Facebook* rather than third-party advertisers. And jurisdictional discovery would be futile in any event because plaintiffs' claims are barred under section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1).

**III.** Section 230 shields interactive computer services like Facebook from claims seeking to hold them liable for publishing content

21

created by third parties. Here, plaintiffs do not contest that they are trying to hold Facebook liable for housing ads that third-party advertisers created. Instead, they argue Facebook should be treated as the creator of those ads because unidentified advertisers allegedly used Facebook's audience selection tools to unlawfully exclude groups from seeing them. This Court has held, however, that an interactive computer service that gives users "neutral tools" does not lose section 230 protection even if users put the tools to unlawful use. *Gonzalez v. Google LLC*, 2 F.4th 871, 893–95 (9th Cir. 2021). Only if the service "requir[es]" users to generate unlawful content can it be treated as the content's creator, *id.* at 894—but plaintiffs do not allege anything of the sort here. As a result, section 230 protects Facebook from liability for plaintiffs' claims, and the district court correctly dismissed plaintiffs' complaint on this basis as well.

## STANDARD OF REVIEW

In reviewing the dismissal of plaintiffs' complaint, the Court exercises de novo review both over the district court's conclusion that plaintiffs have not plausibly alleged standing, *Sahni v. Am. Diversified Partners*, 83 F.3d 1054, 1057 (9th Cir. 1996), and its alternative ruling

that plaintiffs' claims are barred by section 230, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). In both respects, the Court accepts the properly pleaded allegations in the complaint as true and determines whether they permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Dyroff*, 934 F.3d at 1096 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705–10 (9th Cir. 2020).

The Court reviews the district court's denial of jurisdictional discovery for abuse of discretion, *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011), bearing in mind that trial courts are "vested with broad discretion and will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice," *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977).

## ARGUMENT

## I.  Plaintiffs Failed to Adequately Allege Article III Standing.

Because Article III standing is an "indispensable part" of plaintiffs' case, they must demonstrate it "in the same way as any other matter on which [they] bear[] the burden of proof" and "with the manner and degree of evidence required at [each] successive stage[] of the litigation."

23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, that means plaintiffs "must clearly allege facts" indicating they "plausibly" suffered injury in fact traceable to Facebook. *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705–10 (9th Cir. 2020) (cleaned up). Plaintiffs fail to satisfy that burden for two reasons.

*First*, plaintiffs have not plausibly alleged injury in fact. They claim they were wrongfully excluded from seeing unspecified housing ads because of advertisers' use of audience selection tools. Yet their only allegations in support are that they searched for housing of particular sizes, locations, and prices but did not find anything. Conspicuously absent are any allegations that housing matching their preferred (and often unrealistic) criteria existed; that such housing was being advertised on Facebook; or that any advertiser actually used the tools to exclude them from seeing the ads. The most plaintiffs contend is that it is *theoretically possible* they were injured in the manner they hypothesize. Sheer speculation of that kind cannot satisfy Article III.

*Second*, plaintiffs have not plausibly alleged that any injury would be traceable to Facebook. Plaintiffs' theory of injury depends entirely on the "independent decisions" of "numerous third parties," *Allen v. Wright*,

24

468 U.S. 737, 759 (1984)—the unidentified advertisers plaintiffs allege chose to use audience selection tools to exclude them. So even if plaintiffs had plausibly alleged injury in fact, such injury would be fairly traceable only to those independent advertisers, not to Facebook.

### A.   Plaintiffs Did Not Plausibly Allege Injury in Fact.

"'[F]irst and foremost'" among Article III's requirements is injury in fact: the "'invasion of a legally protected interest'" that "is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). The injury-in-fact requirement serves vital interests. It ensures "that federal courts exercise 'their proper function in a limited and separated government'" and prevents them from resolving "hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

As the Supreme Court recently clarified, "under Article III, an injury in law is not an injury in fact," meaning "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant." *TransUnion*, 141 S. Ct. at 2205. Throughout their brief, plaintiffs fixate on the statutes under which they assert claims. *E.g.*, AOB 29. But alleged statutory violations alone are

25

insufficient to confer standing. Article III requires allegations of actual, concrete harm. *TransUnion*, 141 S. Ct. at 2205 ("'Article III . . . [is] not a freewheeling power to hold defendants accountable for legal infractions.'").[3]

Yet plaintiffs offer only speculation and conjecture of injury. They ask the Court to assume—without properly pleaded allegations in support—that certain housing properties exist, that those properties were advertised on Facebook, and that unidentified advertisers chose to use Facebook's audience selection tools to exclude plaintiffs from seeing

---

[3] Moreover, as the district court observed (1-ER-8 n.6, -20), the statutes plaintiffs invoked themselves require injury that is actual and concrete, not conjectural or hypothetical. *See, e.g.*, *Fair Hous. Council of Suburban Phila. v. Main Line Times*, 141 F.3d 439, 441–42 (3d Cir. 1998) (FHA requires "'distinct and palpable'" injury consistent with Article III); *White v. Square, Inc.*, 7 Cal. 5th 1019, 1025 (2019) (under California's Unruh Act, plaintiffs "'cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct'"); *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322–23 (2011) (California's Unfair Competition Law requires "'concrete and particularized'" and "'actual or imminent'" injury); *Mobil Oil Corp. v. Syracuse Indus. Dev. Agency*, 559 N.E.2d 641, 644 (N.Y. 1990) (private parties must show they "'sustained special damage, different in kind and degree from the community generally'"). Plaintiffs' failure to plausibly allege injury is thus as fatal to the causes of action they have advanced as it is to their Article III standing. *See, e.g.*, *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022).

their ads. As the district court correctly observed, the lack of allegations substantiating any, let alone all, of these layers of speculation "is fatal to plaintiffs' standing." 1-ER-6.

### 1. Plaintiffs' Complaint Relies on Speculation, Not Plausible Factual Allegations.

Plaintiffs' theory of injury depends on linking (1) allegations that they searched for and did not find housing they wanted on Facebook's platform with (2) their assertion that third-party advertisers must have used audience selection tools to exclude them from seeing unspecified housing ads based on their personal characteristics. But there is a chasm between those points, and plaintiffs have alleged nothing that crosses this inferential divide.

Plaintiffs allege that when they searched for housing on Facebook's platform, they did not encounter ads showing housing in their target locations, of ideal size, and at their preferred price points. For instance:

- Vargas alleges she searched Facebook for housing in hopes of finding a "three-bedroom apartment located in lower Manhattan in the rental price range of $1,700.00 per month." 2-ER-255 ¶ 85. She did not see any ads for housing of that sort. 2-ER-256 ¶ 93. So she "modified her search" to include housing in Brooklyn

but again was unsuccessful; the only ads she saw were for "neighborhoods outside of Manhattan, like the Bronx." *Id.* ¶¶ 91–94.

- Richards alleges he searched Facebook for a two- to three-bedroom apartment in Yonkers or the Bronx for "$1,000 to $1,250" in monthly rent. 2-ER-262 ¶¶ 131–32. Although he received ads for "studio apartments" in that price range, he felt those apartments "did not meet his housing needs." *Id.* ¶ 133.

- Skipper alleges she searched Facebook for a two- to three-bedroom "single family home" or apartment in Yonkers or Westchester County from "$1,000 to $2,000." 2-ER-258–59 ¶¶ 106–07. Skipper saw ads for housing in nearby locations, but nothing in Yonkers or Westchester. 2-ER-259 ¶¶ 108–10.

The other plaintiffs follow the same pattern. *See* 2-ER-260 ¶¶ 118–20 (Spencer: two-bedroom homes from $750 to $1,450 per month in New York City and New Jersey); 2-ER-264 ¶¶ 144–46 (Lin: room in Mid-City or Culver City at monthly prices ranging from $800 to $1,100).

Plaintiffs then assert that their personal characteristics *must* have been "known to Facebook" and that they must have not seen ads for

28

housing of the sort they wanted *because* advertisers used audience selection tools to exclude them. 2-ER-257–65 ¶¶ 98–101, 111–14, 124–27, 139–39, 149–52. But "without further elaboration," "conclusory allegation[s]" of this sort are "insufficient to establish standing." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011); *accord Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1155 (9th Cir. 1989) (dismissal for lack of standing is appropriate where "plaintiffs' allegations a[re] 'conclusory' and 'conjectural'" (quoting *Warth v. Seldin*, 422 U.S. 490, 503, 509 (1975))).

None of the inferential steps required to get from plaintiffs' experience on Facebook's platform to their theory of injury is supported by sufficient factual allegations:

- Plaintiffs do not allege that any housing matching their preferences for location, size, and price actually existed.

- Nor do they allege that any such housing was available during the specific time periods they claim they searched for housing on Facebook's platform.

- Because plaintiffs do not identify any available housing that matched their preferences, they naturally do not allege they

29

were interested in or qualified to rent such housing. Instead, the complaint includes only conclusory allegations that plaintiffs were "ready" and "able" to move if they "located suitable housing." 2-ER-255 ¶ 81, -258 ¶ 105, -260 ¶ 117, -262 ¶ 130, -264 ¶ 147.

- Nor do plaintiffs allege that, even if it existed and was available, such housing was being advertised on Facebook during the relevant periods.

- Plaintiffs also do not allege that any specific advertiser used audience selection tools to withhold particular ads from being viewed by groups of which plaintiffs were members. Plaintiffs do not even allege that any of the housing searches they contend they performed were affected by the use of audience selection tools (whether lawful or unlawful) at all.

Plaintiffs thus provide no "specific facts" to connect their experiences on Facebook's platform to the advertising tools about which they complain. *Schmier v. U.S. Ct. of Appeals for the Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002) (quoting *Lujan*, 504 U.S. at 560–61). What they offer instead are generalities—that the audience selection tools

30

made it possible for advertisers to include certain groups or exclude others (2-ER-235 ¶¶ 6, 11–12) and that unrelated advertisers used those tools in unlawful ways in instances not involving plaintiffs (2-ER-252–53 ¶¶ 67–69). But by failing to allege "facts raising a plausible inference" that advertisers used the tools to exclude *these plaintiffs* from seeing ads for housing matching their preferences, plaintiffs have "not 'nudged' [their] claim of injury 'across the line from conceivable to plausible.'" *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In reality, there are many reasons why plaintiffs might not have seen housing advertised on Facebook's platform. In Vargas's case, there may have been no "three-bedroom apartment[s] located in lower Manhattan in the rental price range of $1,700.00 per month," 2-ER-255 ¶ 85. (That would be unremarkable: The median price for a three-bedroom rental in New York City at the time was around $3,600 to $4,200 per month. 2-ER-206 n.1.) Richards may not have seen an ad for suitable housing because there were no two- to three-bedrooms in the Bronx or Yonkers for under $1,250 per month being advertised on Facebook during the months he was looking for housing, 2-ER-262 ¶¶ 131–32. And for

31

Lin, there is nothing to suggest that any of the posts in the Facebook group "Inspired Women of L.A. Housing" she used to search were paid ads for which the advertisers could have used the audience selection tools, 2-ER-263 ¶ 143. Plaintiffs' allegations leave the Court to construct a speculative chain of inferences from nothing more than guesswork.

The only allegations plaintiffs offer with *any* degree of specificity state that Vargas "sat side-by-side" with "a Caucasian friend" of hers and searched for housing on Facebook "using the same search criteria." 2-ER-257 ¶ 95. According to Vargas, her friend "received more ads for housing in locations that were preferable" than she did. *Id.* For two reasons, those allegations cannot solve the problem.

*First*, the complaint does not allege even the most basic facts about the ads for "preferable" housing that Vargas's friend allegedly received. For example, there is no allegation that any ads the friend saw were for housing that satisfied Vargas's preferences or that she was qualified to rent. In fact, the only inference that can be drawn from plaintiffs' allegations is that Vargas was *not* interested in or eligible for whatever housing she and her friend saw that day, because plaintiffs insist Vargas

32

was "never able to locate suitable housing" on the platform. 2-ER-257 ¶ 96.

*Second*, the complaint fails to allege that any of the ads Vargas's friend observed were *paid* ads subject to the audience selection tools. That distinction is critical: As the district court explained, by failing to "distinguish between consumer-placed ads (that plaintiffs admit did not utilize the 'targeted criteria' plaintiffs claim are discriminatory) and paid [a]ds covered by the claims in this case," plaintiffs offer no plausible basis to infer that Vargas was affected by the audience selection tools at all. 1-ER-6–7.

Even at the pleading stage, a plaintiff cannot rely on "speculative" allegations that allow the court to infer only "'the mere possibility of injury.'" *Bernhardt*, 946 F.3d at 560 (cleaned up). Although plaintiffs' allegations arguably indicate it is *possible* they were affected by unknown advertisers' use of audience selection tools, they have not provided any concrete allegations indicating they have a genuine "personal stake" in this case that would permit them to invoke the jurisdiction of the federal courts. *TransUnion*, 141 S. Ct. at 2203.

> **2.** **None of the Theories of Article III Injury Plaintiffs Offer Excuses the Lack of Plausible Allegations of Actual Injury.**

Plaintiffs' brief is dedicated to trying to shoehorn their insufficient allegations into distinct theories of Article III injury courts have recognized in other cases. But none of those theories can cloak the fact that plaintiffs' allegations of injury rest on mere speculation.

***Truthful Information.*** Plaintiffs claim a violation of their "right to 'truthful information concerning the availability of housing.'" AOB 26 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)). This case is nothing like the sorts of disputes for which that is a viable theory.

In *Havens Realty*, the Supreme Court held that a "tester" who actually received unlawful misrepresentations about available housing— including being repeatedly told that specific apartments "were not available" when in fact they were—had standing to sue. 455 U.S. at 373– 74. But with respect to a tester who "made no allegation" that the apartment owners actually "misrepresented to him that apartments were unavailable," the Court held there was *no* standing to sue. *Id.* at 374–75.

The lesson of *Havens Realty* is simple. To plead standing, it is not enough for plaintiffs to allege that the defendant had a general practice

34

of giving allegedly inaccurate information. Rather, they must plead facts showing they were *actually subjected to* that practice. *Havens Realty*, 455 U.S. at 375.

The Tenth Circuit recently elaborated on this distinction in *Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022). There, the plaintiff, who uses a wheelchair, sued an inn because its website failed to provide sufficient information detailing its accessibility features. *Id.* at 874–75. Although the plaintiff had no plans to book a room, she claimed to have been "injured in much the same way as the . . . 'tester' in *Havens Realty*." *Id.* at 878. The court disagreed. As it explained, the tester in *Havens Realty* "suffered a 'distinct and palpable injury'" in that she was repeatedly "given false information because of her race." *Id.* at 878–79. But that theory does not apply where the plaintiff identifies only "'some amorphous interest in receiving unusable housing information'" and does not show she "'personally experience[d]'" any discrimination. *Id.* at 879– 80. Particularly after the Supreme Court's recent decision in *TransUnion*, nothing else would satisfy Article III's injury-in-fact requirement. *Id.* at 876–78, 880–81.

The district court here correctly applied this distinction. As it explained, *Havens Realty* can support Article III standing only when there are concrete allegations of "injuries in fact stemming directly from the defendants' conduct." 1-ER-18. But nothing in *Havens Realty* or any case since supports standing where the assertion of having received false information is itself "facially speculative." *Id.* And here, plaintiffs' allegations do not identify even a single ad for housing that satisfied their preferences but that, because of the audience selection tools, was not delivered to them. Plaintiffs ask the Court to *speculate* that they were excluded from seeing ads because unidentified advertisers chose to use the tools to exclude plaintiffs from the audience of unspecified housing ads in allegedly unlawful ways—but such speculation is not enough. *Bernhardt*, 946 F.3d at 560.

***Housing Opportunities.*** Plaintiffs also contend the audience selection tools "denied them the opportunity" to "obtain the same housing that members of non-protected classes enjoy." AOB 34. They have not alleged the facts necessary to support that theory.

Plaintiffs claim the optional advertising tools imposed "a barrier to marketplace access," preventing certain groups from seeing ads. 2-ER-

36

252 ¶ 65.  But the "'existence'" of an alleged discriminatory barrier "'is not enough to establish standing, without a plaintiff's showing that she has been subjected to such a barrier.'"  *Braunstein v. Az. Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012) (cleaned up).  Absent allegations indicating they were individually harmed by the alleged ad targeting about which they complain, plaintiffs' suit amounts to only a "generalized grievance against allegedly illegal . . . conduct," which is not enough "to confer standing."  *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003).

The decision in *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590 (10th Cir. 1996), is instructive.  There, a young man who was not a Brigham Young University student sued for gender discrimination under the Fair Housing Act after he was denied apartments "in off-campus BYU-approved student housing that was reserved for women."  *Id.* at 592.  The Tenth Circuit held that he lacked standing.  *Id.*  As it explained, because nothing in the Act forbids landlords from preferring students over non-students, the plaintiff would not have been eligible for an apartment absent the allegedly unlawful gender preference.  *Id.* at 593–94.  Because the discrimination complained of did not "deprive [the

37

plaintiff] of the ability to compete for the benefit on an equal footing," he failed to show standing. *Id.*

Plaintiffs' denial-of-opportunity-to-compete theory therefore fails for the same reason as their informational-injury theory: They fail to allege facts plausibly showing they were denied access to housing ads because of unlawful uses of audience selection tools.

Rather than confront this problem, plaintiffs attack a straw man, arguing that "'[c]ertainty of success in seeking to exploit th[e] opportunity [i]s not required.'" AOB 35 (emphasis omitted). But the problem here is not that plaintiffs failed to allege that they were *certain* to obtain housing but for the audience selection tools. Rather, plaintiffs failed to allege they were subject to any barrier *at all* because their complaint does not identify any ads for housing matching their very specific (and unrealistic) preferences for housing for which they were ready and able to apply.

***Living in an Integrated Community.*** Plaintiffs next claim they were deprived of the benefits of living in an "integrated community." AOB 35–36. To plead Article III injury of this ilk, plaintiffs would have to plausibly allege not only that they were deprived of access to ads for available housing of the size, location, and price in which they were

interested and for which they were ready and able to apply, but *also* that they would have applied, that their applications would have been accepted, that they would have decided to move, and that in doing so they would have joined a more "integrated" community. None of the links in that chain is supported by any factual allegations.

Plaintiffs largely ignore the flaws in their case and instead focus on two decades-old Supreme Court decisions recognizing standing under this theory. But "generalizations about standing" based on cases with different factual features "are largely useless," *Warth v. Seldin*, 495 F.2d 1187, 1193–94 (2d Cir. 1974), *aff'd*, 422 U.S. 490 (1975), and those cases bear no resemblance to this one.

In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), tenants of a large apartment complex alleged that the owner discriminated against minority applicants "in numerous ways," including by "manipulating the waiting list" and "delaying action on their applications." *Id.* at 207–08. The tenants further alleged that as a result, the complex was disproportionately white. *Id.* at 208 & n.5. Those allegations together plausibly supported the conclusion that the tenants

were deprived of "important benefits from interracial associations" they would have enjoyed absent the landlord's practices. *Id.* at 209–10.

Similarly, in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), homeowners sued real estate firms after testers discovered the firms were steering minority purchasers into a "target area" away from "predominately white areas." *Id.* at 94–95. Following *Trafficante*, the Court in *Gladstone* held that homeowners in the target area had plausibly alleged that the firms' practices had deprived them of the opportunity to "liv[e] in an integrated community." *Id.* at 111–12.

*Trafficante* and *Gladstone* share a core feature: Concrete allegations of discriminatory housing practices that directly affected the parties seeking judicial review, by taking the buildings or areas in which they lived and excluding certain groups from them. Plaintiffs, however, claim injury under this theory (AOB 35–36) without any allegations plausibly showing they were affected by the audience selection tools at all. With no properly pleaded allegations "that they were deprived of any benefits of interracial association or otherwise actually injured," plaintiffs are nothing like the tenants in *Trafficante* or homeowners in

40

*Gladstone* and do not have standing under that line of cases. *Palmer v. Occidental Chem. Corp.*, 356 F.3d 235, 238 (2d Cir. 2004).

**_Stigmatic Injury._** Plaintiffs make a passing assertion of a "stigmatic" injury based on "discrimination itself." AOB 36. There is a good reason this theory receives scant attention in their brief: Nothing in the complaint supports it.

Courts have "repeatedly refused to recognize a generalized grievance" against discriminatory conduct. *Carroll*, 342 F.3d at 940. Even racial discrimination "accords a basis for standing only to those persons who are *personally denied* equal treatment." *Id.* (quoting *Allen*, 468 U.S. at 755). Stigmatic harm, in other words, is not a panacea for plaintiffs with nothing but a generalized disagreement with a practice they believe to be discriminatory.

Although plaintiffs argue that Facebook's former audience selection tools were discriminatory, they have alleged nothing more than a theoretical possibility that those tools affected them (or anyone) personally. As multiple courts have explained in this context, vague allegations of "stigmatic harm" are no substitute for properly pleaded allegations showing actual, concrete injury. *Opiotennione v. Bozzuto*

41

*Mgmt. Co.*, 2021 WL 3055614, at \*5 (D. Md. July 20, 2021), *appeal filed*, No. 21-1919 (4th Cir. Aug. 23, 2021); *Opiotennione v. Facebook, Inc.*, 2020 WL 5877667, at \*5 (N.D. Cal. Oct. 2, 2020) (stigmatic harm "requires a personal denial of equal treatment" (citing *Wilson*, 98 F.3d at 596)).

***Increased Search Costs.*** Separately, amici put forward a theory of injury found nowhere in plaintiffs' complaint or briefing: "[i]ncreased search costs occasioned by not competing on equal footing." ACLU Br. 17, 19. The best indication that there is no merit to amici's theory is that plaintiffs themselves do not mention it. Plaintiffs have thus forfeited that argument, *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019), and amici's efforts to inject it into this case are unavailing.

Amici's speculation about increased search costs also lacks any grounding in any of the complaint's 250-plus paragraphs. The most amici can point to are stock sentences alleging that plaintiffs experienced an "increased amount of time spent looking for housing." 2-ER-259 ¶ 114, -261 ¶ 127, -263 ¶ 139, -264 ¶ 152. Those allegations are vague and undifferentiated, and in any event they have nothing to do with the

"economic injury" amici contend is the basis for this Article III standing. ACLU Br. 18.

## B. Plaintiffs Did Not Plausibly Allege That Any Injury Was Traceable to Facebook.

The district court correctly dismissed plaintiffs' complaint for lack of standing for another, independent reason: They have not plausibly alleged that any injuries are "'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (cleaned up).

Article III's causation requirement is not satisfied when the asserted injuries were caused by independent decisions of independent actors. In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), for instance, indigent plaintiffs sued the IRS, alleging that a ruling "allowing favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents" would "'encourage[]' hospitals to deny services" to them. *Id.* at 28, 42. The Court held that the complaint should have been dismissed for lack of standing. *Id.* at 37. Even if the Court were to "assume" the plaintiffs "ha[d] been denied service," it would remain "purely speculative whether the denials of service . . . can be traced to [the IRS's] 'encouragement' or instead result

43

from decisions made by the hospitals." *Id.* at 41–42. As a result, the plaintiffs' theory of injury could be traced only to the "independent action" of third-party hospitals "not before the court." *Id.* at 42.

The Court followed a similar path in *Allen v. Wright*, 468 U.S. 737 (1984), another challenge against the IRS, this time by parents alleging it had failed to "adopt[] sufficient standards and procedures . . . to deny tax-exempt status to racially discriminatory private schools" and that their children were being deprived of the right "to receive an education in desegregated public schools" as a result. *Id.* at 739–40. The Court again held the plaintiffs lacked standing, explaining there were too many "links in the chain of causation between the challenged [IRS] conduct and the asserted injury." *Id.* at 759. Specifically, the plaintiffs' theory of injury "involve[d] numerous third parties," including "officials of racially discriminatory schools," who "may not even exist in [the parents'] communities" and whose "independent decisions" had an uncertain effect on the "ability of public school students to receive a desegregated education." *Id.*

Here, too, plaintiffs' injuries—if any exist—depend on the "independent decisions" of "numerous third parties" not before the Court.

44

*Allen*, 468 U.S. at 759. Plaintiffs claim they were wrongfully excluded from seeing housing ads. But whether that is true depends entirely on decisions of an unspecified number of unidentified third-party advertisers. If those advertisers used Facebook's platform in any of the many lawful ways available to them—either by using the audience selection tools only with respect to nonprotected characteristics, or by opting not to use the tools at all—plaintiffs would have suffered no injury under their theory of the case. Only if the advertisers decided to use the tools to target their ads in a way that federal and state law prohibit would plaintiffs have suffered any injury. That independent choice of third-party advertisers breaks the necessary line of causation between plaintiffs' alleged injuries and Facebook. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013) (emphasizing that "independent decisionmakers" in the causal chain can preclude standing).

Article III permits a plaintiff to sue a defendant for an injury that a third party caused only where the defendant had a "determinative or coercive effect" on the third party's conduct. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). That underscores plaintiffs' lack of standing here. Even assuming the audience selection tools made it *possible* for advertisers to

45

exclude groups, plaintiffs do not allege that Facebook's platform forced or required them to do so; to the contrary, Facebook's policies (2-ER-170, -173) prohibited such conduct. *See Bennett*, 520 U.S. at 169 (finding standing where the third party would run a "substantial risk" if it defied the defendant). The choice remained the advertisers' to make, and this Court should be "disinclined 'to endorse standing theories that rest on speculation about the decisions of [such] independent actors.'" *Cierco v. Mnuchin*, 857 F.3d 407, 418 (D.C. Cir. 2017) (quoting *Clapper*, 568 U.S. at 414).

## II.    The District Court Did Not Abuse Its Discretion in Denying Jurisdictional Discovery.

Plaintiffs argue that even if they have not alleged the "irreducible constitutional minimum" of Article III standing, *Lujan*, 504 U.S. at 560, they should have been granted jurisdictional discovery to see if it might bolster their allegations. But whether to grant jurisdictional discovery is committed to the district court's discretion, and plaintiffs have failed to demonstrate an abuse of that discretion here. Plaintiffs fail to articulate what discovery they would have sought or how it would assist them in pleading a concrete injury. Nor would jurisdictional discovery have revealed any facts that could enable plaintiffs to demonstrate that any

alleged injury is traceable to Facebook. And even if plaintiffs could somehow overcome that hurdle, their claims against Facebook would remain barred by section 230 of the Communications Decency Act. For all these reasons, the district court rightly dismissed plaintiffs' complaint without permitting jurisdictional discovery.

District courts enjoy "broad discretion" to permit or deny jurisdictional discovery and "will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977). Where, as here, a plaintiff's demand for discovery is "based on little more than a hunch that it might yield jurisdictionally relevant facts," courts need not permit the discovery. *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008); *see also Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (district courts "'need not permit even limited discovery'" where a plaintiff's jurisdictional claim "'appears to be both attenuated and based on bare allegations'"). A district court may likewise decline to allow jurisdictional discovery when "'it is clear that further discovery would not

demonstrate facts sufficient to constitute a basis for jurisdiction.'" *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).

Plaintiffs have not satisfied their burden of demonstrating that the district court abused its discretion in denying jurisdictional discovery. *Dichter-Mad Fam. Partners, LLP v. United States*, 709 F.3d 749, 751 (9th Cir. 2013) (per curiam). Plaintiffs must offer more than "speculat[ion] that discovery would enable" them to establish jurisdiction. *Martel v. County of Los Angeles*, 56 F.3d 993, 996 (9th Cir. 1995) (en banc). Yet plaintiffs provide no "colorable basis" to expect their request for discovery would produce anything that would help them plead Article III standing. *Chapman v. Krutonog*, 256 F.R.D. 645, 649 (D. Haw. 2009). Nothing in plaintiffs' complaint alleges the existence of ads for available housing matching plaintiffs' preferences that were placed on Facebook's platform but withheld from plaintiffs because of their personal characteristics. Such a "fishing expedition in search of a jurisdictional hook" is no basis to order discovery. *Spy Optic, Inc. v. AreaTrend, LLC*, 843 F. App'x 66, 69 (9th Cir. 2021); *see Martel*, 56 F.3d at 996 ("[S]peculation [i]s not sufficient to make the 'clearest showing' of actual and substantial prejudice.").

Plaintiffs' argument in support of jurisdictional discovery rests on a mischaracterization of the district court's decision. They argue that discovery is necessary because the court "faulted" them only for failing to identify specific ads. AOB 45. But the actual reason the district court dismissed the complaint was that plaintiffs "assume[d] (but plead[ed] no facts to support) that no results were returned because unidentified advertisers theoretically used Facebook's [audience selection] tools to exclude them based on their protected class statuses from seeing paid Ads for housing that they assume[d] (again, with no facts alleged in support) were available and would have otherwise met their criteria." 1-ER-7–8. No amount of discovery could bestow Article III jurisdiction under these allegations because plaintiffs pleaded no facts supporting their theory that they were affected by the audience selection tools at all.

Moreover, plaintiffs' fishing expedition could not remedy the standing issue because no amount of discovery would change the fact that plaintiffs' purported injuries are not fairly traceable to Facebook. Plaintiffs' theory of injury hinges on the independent decisions of third-party advertisers. That would remain true even if plaintiffs were permitted to engage in discovery, and without any causal link to

49

Facebook, plaintiffs will never be able to allege Article III standing. That reason alone is sufficient to affirm the district court's denial of jurisdictional discovery. *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) (jurisdictional discovery is appropriate "only if it is possible that the plaintiff can demonstrate the requisite jurisdictional facts if afforded that opportunity").

Jurisdictional discovery is common in cases in which "pertinent facts bearing on the question of jurisdiction are in dispute." *Am. W. Airlines, Inc. v. GPA Grp., Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989). But as the district court recognized (1-ER-5), Facebook brought a *facial* motion to dismiss challenging not the veracity of the allegations in the complaint, but whether those allegations "are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Courts routinely reject jurisdictional discovery in cases where, as here, the defendant's motion to dismiss presents merely "a facial challenge" to standing rather than disputing the facts as alleged in the complaint. *See, e.g.*, *Mont. Env't Info. Ctr. v. Bernhardt*, 2020 WL 6042291, at *4 (D. Mont. Oct. 13, 2020).

Accepting plaintiffs' argument would allow virtually any plaintiff asserting a theoretical possibility of injury to "unlock the doors of discovery" despite being "armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). And that would defy decades of case law holding that more than "speculative," "conjectural" allegations of injury are required to proceed to discovery. *See, e.g.*, *Bernhardt*, 946 F.3d at 560; *Ascon Props.*, 866 F.2d at 1155. It would also render district courts' "broad discretion" in this area illusory. *Laub*, 342 F.3d at 1093. It is therefore unsurprising that district courts in this Circuit regularly deny plaintiffs' requests for jurisdictional discovery in hopes of establishing Article III standing. *See, e.g.*, *Gomez v. Elite Lab. Servs. Weeklys, Ltd.*, 2021 WL 4992625, at *6 (N.D. Cal. Mar. 16, 2021); *Lambert v. CalPortland Co.*, 2020 WL 6802028, at *4 (C.D. Cal. Nov. 19, 2020); *Videx, Inc. v. Micro Enhanced Tech., Inc.*, 2012 WL 1597380, at *2 (D. Or. May 4, 2012).

Plaintiffs' argument reduces to the contention that they are entitled to jurisdictional discovery because other courts (outside this Circuit) have afforded parties "an opportunity to conduct jurisdictional discovery prior to dismissal." AOB 39. But whether the district court *could* have ordered

51

discovery is not the relevant question. Instead, because whether to grant discovery is committed to the district court's "broad discretion," plaintiffs would have to demonstrate here that it was "an abuse of [that] discretion" for the district court to deny their request for discovery "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto*, 539 F.3d at 1015, 1020. They cannot meet that burden. *See Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540–41 (9th Cir. 1986) (no abuse of discretion where plaintiffs offered only "'belie[f]'" that discovery would allow them to demonstrate jurisdiction).

Jurisdictional discovery is also unwarranted here for yet another independent reason: Even if plaintiffs could somehow show Article III standing, their claims against Facebook would remain barred under section 230 of the Communications Decency Act, as explained below.

## III. Plaintiffs' Claims Are Barred by Section 230 of the Communications Decency Act.

Section 230 provides a "robust" form of protection to interactive computer services like Facebook. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). Under section 230, interactive computer services are shielded from "'any cause of action that would make [them] liable for information originating with a third-party user.'" *Perfect 10,*

*Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007); *see* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."). So if a plaintiff's claims seek to hold an interactive computer service liable because it published (or refused to publish) another's content, section 230 bars the claims. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162–64 (9th Cir. 2008) (en banc). And "[w]hen a plaintiff cannot allege enough facts to overcome Section 230 immunity, [his] claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019); *see, e.g.*, *Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (because section 230 "protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles'" in the first place, it should be resolved "at the earliest possible stage of the case" (quoting *Roommates*, 521 F.3d at 1175)).

Section 230's reach is "'broad.'" *Perfect 10*, 488 F.3d at 1118. It encompasses claims that seek to hold interactive computer services liable based on their exercise of "'traditional editorial functions—such as

deciding whether to publish, withdraw, postpone, or alter content,'" *Roommates*, 521 F.3d at 1184—as well as any "content-neutral tools" the services offer "to facilitate communications," *Dyroff*, 934 F.3d at 1096. In short, it covers "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates*, 521 F.3d at 1170–71.

In applying section 230, this Court has emphasized that "what matters is not the name of the cause of action" asserted but instead whether the claim "requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009). "[C]lose cases," moreover, "must be resolved in favor of immunity." *Roommates*, 521 F.3d at 1174. Because there will always be opportunities for a "clever lawyer" to argue that a website had "encouraged" third-party users to act unlawfully, any contrary rule would "cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Id.*

Section 230 provides an independent and alternative basis for affirming the dismissal of plaintiffs' claims. It applies when (1) the defendant is "a provider or user of an interactive computer service" that (2) a plaintiff seeks to treat "as a publisher or speaker" (3) of "information provided by another information content provider." *Barnes*, 570 F.3d at 1100–01. Plaintiffs do not dispute that Facebook provides an interactive computer service. AOB 48; *see Roommates*, 521 F.3d at 1162 n.6. And plaintiffs' claims seek to hold Facebook liable on the theory that it published allegedly discriminatory housing ads created by third-party advertisers or gave those advertisers neutral tools that they used to discriminate.

## A.  Plaintiffs' Claims Treat Facebook as a Publisher.

As the district court correctly held (1-ER-8–10), plaintiffs' claims seek to impose liability on Facebook as a publisher. Plaintiffs try to sidestep this straightforward result by characterizing Facebook as a content creator rather than publisher because it provided tools that third-party advertisers could choose to use in ways that plaintiffs claim are unlawful. AOB 46, 52. But plaintiffs do not dispute that these tools are optional, that they have many lawful uses, or that any allegedly

55

unlawful use results from decisions of third-party advertisers. Under this Court's precedent, an interactive computer service that gives its users neutral tools remains protected from suit under section 230 even if users put the tools to unlawful uses.

### 1. Facebook's Audience Selection Tools Are Neutral Tools Protected Under Section 230.

The heartland of "publishing" activity protected by section 230 is "'reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content.'" *Gonzalez v. Google LLC*, 2 F.4th 871, 892 (9th Cir. 2021). The conduct that underlies plaintiffs' claims against Facebook falls squarely within this definition. Plaintiffs claim Facebook created neutral tools that third-party advertisers allegedly used to target housing ads in discriminatory ways. Plaintiffs do not (and cannot) allege that Facebook created the ads—they were created by independent, third-party advertisers. Instead, plaintiffs allege that Facebook "published" housing ads that excluded certain groups from the audience. 2-ER-252 ¶ 67; *see also* 2-ER-245 ¶ 42 (advertisers "target ads to users" and Facebook then "publish[es] . . . ads to users"). This is precisely the type of conduct that section 230 protects. "[S]o long as a third party willingly provides the essential published content," the interactive computer

56

service "receives full immunity regardless of the specific editing or selection process." *Carafano*, 339 F.3d at 1124.

Plaintiffs suggest that because Facebook's tools allegedly made it possible for advertisers to target their ads unlawfully, Facebook should be treated as a creator or developer of the ads rather than their publisher. AOB 59–60. But as this Court has repeatedly made clear, an interactive computer service like Facebook "is not transformed into a content creator or developer by virtue of supplying 'neutral tools' that deliver content in response to user inputs." *Gonzalez*, 2 F.4th at 893 (quoting *Roommates*, 521 F.3d at 1171). The complaint concedes that Facebook's audience selection tools are neutral tools that third-party advertisers—not Facebook—decide whether and how to use. *E.g.*, 2-ER-249–50 ¶ 56 (Facebook's tools "empowered *housing advertisers* to target audiences by Facebook's pre-determined categories and enabled them to include or exclude certain categories from their audiences" (emphasis added)); 2-ER-250 ¶ 57 ("Facebook enabled *housing advertisers* to exclude categories of people from viewing advertisements" (emphasis added)). Section 230 covers these neutral tools even if they may be used for "proper or improper purposes." *Roommates*, 521 F.3d at 1172.

57

Case: 21-16499, 03/21/2022, ID: 12401034, DktEntry: 30, Page 68 of 82

This Court's decision in *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019), illustrates that principle. The plaintiff there sued a website that allowed users to post on various topics (including through anonymous accounts), recommended content through algorithms, and notified users of new content. *Id.* at 1094–95. The plaintiff sued after her son's heroin overdose, claiming her son had "posted in a heroin-related group," received "an email notification" of a response, and "connected off the site" to purchase heroin. *Id.* at 1095. This Court held that section 230 protected the website from the plaintiff's claims because the website's challenged "functions, including recommendations and notifications, were content-neutral tools used to facilitate communications." *Id.* at 1096. Those functions did not "require[]" users to seek out illegal drugs or themselves contribute "to the alleged unlawfulness of the content"; they were merely tools that users could use lawfully or unlawfully, and thus they did not deprive the website of the protections of section 230. *Id.* at 1098–99.

Like the notification and recommendation functions in *Dyroff*, Facebook's audience selection tools merely facilitate advertisers' communication with users. As the district court recognized, "[i]t is the

*users* 'that ultimately determine what content to post.'" 1-ER-10 (emphasis added). That Facebook "provide[s] a framework that could be utilized for proper or improper purposes" does not strip it of protections under section 230. *Roommates*, 521 F.3d at 1172.

Nor can plaintiffs evade section 230 by characterizing their claims as challenging Facebook's allegedly "discriminatory platform with 'exclude' choices." AOB 52. This Court consistently has rejected efforts to "plead around Section 230." *Dyroff*, 934 F.3d at 1098; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting "effort to circumvent the CDA's protections through 'creative' pleading").

*Dyroff*, again, is illuminating. The plaintiff there argued that section 230 did not apply because her claims were based not on specific third-party content but instead on the website's features—its content recommendations and post notifications—that "facilitated illegal drug sales." 934 F.3d at 1095–98. But this Court rejected that argument. It held that in providing the challenged features, the website "was acting as a publisher of others' content" because the challenged website features are merely "tools meant to facilitate the communication and content of others"; they "are not content in and of themselves." *Id.* at 1098. The

Court described the plaintiff's attempt to "fram[e] . . . website features as content" as an improper effort to "plead around Section 230." *Id.* Here, too, plaintiffs' claims targeting Facebook's audience selection tools are barred under section 230 because they facilitate *others*' communications; they are "not content" themselves.

The Second Circuit has also rejected the ploy plaintiffs attempt here. In *Force v. Facebook, Inc.*, 934 F.3d 53 (2d. Cir. 2019), the estates of victims of terrorist attacks sued Facebook for allegedly facilitating terrorism. *Id.* at 58–59. The plaintiffs argued that Facebook's algorithmic content and friend suggestion features "'develop' Hamas's content by directing such content to users who are most interested in Hamas and its terrorist activities." *Id.* at 68. But the Second Circuit rejected this argument to bypass section 230 through creative pleading, holding that "plaintiffs' allegations about Facebook's conduct do not render it responsible for the Hamas-related content" others chose to post to Facebook's platform. *Id.* at 69–70.

If this Court allowed plaintiffs to evade section 230 simply by framing their claim as challenging Facebook's neutral, communication-facilitating tools, the statute would be a dead letter. Parties could easily

bypass section 230 by reframing their claims as challenging features that facilitate third-party content rather than the third-party content itself. Allowing that sort of reframing would, as this Court has warned, "render the CDA's immunity provisions meaningless." *Kimzey*, 836 F.3d at 1269; *see also, e.g.*, *Carafano*, 339 F.3d at 1124 (holding section 230 applied where the defendant website's "questionnaire facilitated the expression of information" but "the selection of the content was left exclusively to the user").

Amici again try to inject an issue into the case not raised in plaintiffs' brief. They contend that section 230 does not reach Facebook's "algorithmic delivery system," which amici argue "contributes to discrimination regardless of any choices made by advertisers." ACLU Br. 14. Plaintiffs' brief, however, argues only that Facebook "carried out the discriminatory selections" that *advertisers* made. AOB 52. The Court should "not consider arguments raised only in amicus briefs." *United States v. Wahchumwah*, 710 F.3d 862, 868 n.2 (9th Cir. 2013). And because plaintiffs' opening brief does not present any arguments akin to the one amici advance, they have forfeited that argument and "that question is not before [the Court]." *Zango, Inc. v. Kaspersky Lab, Inc.*,

568 F.3d 1169, 1177 n.8 (9th Cir. 2009); *accord Wahchumwah*, 710 F.3d at 868 n.2.

Amici's argument is also meritless. As this Court has made clear, an interactive computer service that uses "features and functions, including algorithms," to analyze user interests and "recommend[]" third-party content based on those interests is "acting as a publisher of others' content" and thus is protected under section 230. *Dyroff*, 934 F.3d at 1098. And because Facebook treats all users within an advertiser's target audience as eligible to receive an ad, its ad-delivery system did not contribute to plaintiffs' "wholesale exclusion . . . from the possibility of seeing housing advertisements." 2-ER-253 ¶ 70.

## 2. *Roommates* Is Distinguishable.

Plaintiffs' argument that Facebook should be deemed a creator or developer rather than a publisher of content relies extensively on an attempted analogy to this Court's decision in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc). But *Roommates* is nothing like this case and doesn't support the weight plaintiffs hoist on it.

The defendant in *Roommates* was an online housing service "designed to match people renting out spare rooms with people looking for a place to live." 521 F.3d at 1161. The *Roommates* website *required* all potential subscribers, as a condition of using the service, to select from drop-down menus their own protected characteristics and the characteristics they would be willing to accept in a roommate—such as whether the user had children or was willing to live with children. *Id.* at 1161–62. These compelled answers were then used in display, matching, and search functions on the website. *Id.*

In holding that section 230 did not protect the website against the plaintiffs' claims, this Court emphasized that the website "requir[ed]" each and every user to provide the information "as a condition of accessing its service" and based on "a limited set of pre-populated answers." *Roommates*, 521 F.3d at 1165–66. That is what distinguished the website from others that "merely provide a framework that could be utilized for proper or improper purposes" and that are therefore protected under section 230. *Id.* at 1172.

*Roommates* illustrated this distinction using the Court's earlier decision in *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir.

63

2003), which concerned the unauthorized creation of a libelous profile impersonating an actress on a dating website. *Id.* at 1121. As *Roommates* explained, the plaintiff's state-law tort claims in *Carafano* were barred under section 230 because the dating website "provided neutral tools" that would "match romantic partners depending on their *voluntary inputs*." *Roommates*, 521 F.3d at 1172 (emphasis added). The website was not transformed into a creator of content merely because its matchmaking functionality allowed content to be more effectively disseminated. Instead, section 230 applied because a third party "willingly provide[d] the essential published content," and thus the website was protected from liability "regardless of the specific editing or selection process" it used. *Carafano*, 339 F.3d at 1124.

Were there any doubt about this Court's case law, it would be dispelled by the Court's recent decision in *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021). There, families of terrorist victims sued social media platforms whose features allegedly allowed ISIS to "communicate [its] message, to radicalize new recruits, and to generally further its mission." *Id.* at 879–80. The plaintiffs contended that these features "do[] more than merely republish content created by third parties" and

64

that the defendants should be deemed creators or developers as a result, but the Court concluded that argument was "precluded by [its] [section] 230 precedents." *Id.* at 892. As it explained, an interactive computer service does not lose section 230 protection even if the "neutral tools" it provides users "allow[] that content to be more effectively disseminated." *Id.* at 893. Only if, as in *Roommates*, the service "*require[s]* users to input [unlawful] content" can it be treated as a creator of that content. *Id.* at 894 (emphasis added).

Facebook's platform and audience selection tools are materially distinct from what this Court held to be outside the scope of section 230 in *Roommates*. Unlike the website in *Roommates*, Facebook doesn't require advertisers to select any particular subset of users to target for their ads—let alone in a manner that is discriminatory. *See Roommates*, 521 F.3d at 1173 (section 230 covered blank text box because it did not "require" unlawful content). Even assuming an "anonymous dastard" could choose to use Facebook's tools in a discriminatory way, that decision would be made "by the malevolent user," not by Facebook. *Id.* at 1171. In fact, just as in *Carafano*, discriminatory use of Facebook's tools is "contrary to the website's express policies." *Id.*; *see Gonzalez*, 2

65

F.4th at 893 (emphasizing that where user conduct violates a website's terms, the website is unlikely to be deemed the creator or developer of that conduct); *see also* 2-ER-170, -173 (Facebook's antidiscrimination policies).

Moreover, unlike the features at issue in *Roommates*, which were the website's own content and "unlawful" on their own, 521 F.3d at 1164–66, Facebook's neutral audience selection tools are used by independent third-party advertisers to identify the audience for *their* own content and thus are not inherently unlawful. The unlawful conduct arises, if it all, from third-party advertisers' decision to target their ads in discriminatory ways. Because third-party advertisers are solely responsible for that conduct—Facebook provides only neutral tools that facilitate the publication of ads—section 230 protects Facebook from liability arising from plaintiffs' claims.

### B. Plaintiffs' Claims Seek to Hold Facebook Liable for Publishing Others' Content.

Plaintiffs' claims also plainly arise from content of another "information content provider." 47 U.S.C. § 230(c)(1). Under section 230, that term refers to "any person or entity that is responsible, in whole or

in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

Plaintiffs concede that third-party advertisers, not Facebook, created the housing ads that plaintiffs claim were allegedly disseminated in discriminatory ways. AOB 46. Because those ads were "generated entirely by third parties," plaintiffs' claims fall well within the borders of section 230. *Barnes*, 570 F.3d at 1105; *see Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (applying section 230 where plaintiff's "complaint acknowledges that the objected-to information . . . was provided by third party users, not Facebook itself").

That should end the analysis. Plaintiffs nevertheless argue that "the actions challenged here do not originate from these 'information content providers' but from Facebook's own illegal activities." AOB 56. Yet plaintiffs never suggest Facebook does anything to create or modify the content of the allegedly discriminatory ads.

To the extent plaintiffs argue that Facebook's neutral audience selection tools transformed the content of third-party advertisers into Facebook's own content, that contention is foreclosed by this Court's precedent. This Court has held that these sorts of claims—targeting

neutral tools that facilitate communications among users of a platform—
are necessarily based on information provided by another information
content provider and are thus barred under section 230.

In *Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016), for example,
this Court rejected the argument "that Yelp transformed [a user review]
into its own 'advertisement' or 'promotion'" because Yelp "designed and
created [the] signature star-rating system" the user used to write the
review. *Id.* at 1269. "Simply put," this Court explained, "proliferation
and dissemination of content does not equal creation or development of
content." *Id.* at 1271. Accepting that theory "would render the CDA's
immunity provisions meaningless." *Id.* at 1269.

The Second Circuit has also rejected the type of argument plaintiffs
advance here. In *Force*, the court held that "Facebook's acquiring certain
information from users [does not] render it a developer" under
section 230. 934 F.3d at 70. Like plaintiffs here, the plaintiffs in Force
alleged that Facebook "arrang[ed] and display[ed] others' content to
users of Facebook through [its] algorithms," not that Facebook
"augment[ed]" such content "on the basis of its subject matter." *Id.* at 70
& n.24. Allegations of that sort were "not enough to hold Facebook

responsible as the 'developer' or 'creator' of that content." *Id.* at 70 (cleaned up).

Here, too, Facebook's allegedly "illegal activities"—its audience selection tools—do not strip it of protections under section 230. When they were in effect, Facebook's tools applied to *all* ads and were neutral on their face. 2-ER-234 ¶ 2, -240 ¶ 24, -248–49 ¶¶ 53–54. Use of such neutral tools by third parties does not transform a publisher into a creator or developer of content created by the third parties. *Roommates*, 521 F.3d at 1168. That is true "even if the users committed their misconduct using" those tools. *Id.* at 1169 n.24; *see Kimzey*, 836 F.3d at 1270 ("neutral" tools "operating on 'voluntary inputs' . . . d[o] not amount to content development or creation").

## CONCLUSION

This Court should affirm the district court's order dismissing plaintiffs' complaint with prejudice.

Dated: March 21, 2022

Respectfully submitted,

/s/ Theodore J. Boutrous Jr.

Rosemarie T. Ring
Ryan Azad
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone:  (415) 393-8200

Theodore J. Boutrous Jr.
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  (213) 229-7000

*Counsel for Defendant-Appellee*
*Facebook, Inc. (now known as Meta Platforms, Inc.)*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule 32(a)(7)(B)(i) and Circuit Rule 32-1(a) because it contains 13,450 words, excluding the portions exempted by Rule 32(f).

The brief complies with the typeface and type-style requirements of Rule 32(a)(5)(A) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, New Century Schoolbook font.

Dated: March 21, 2022                 Respectfully submitted,

                                              s/ Theodore J. Boutrous Jr.
                                          Theodore J. Boutrous Jr.

                                          *Counsel for Defendant-Appellee Facebook, Inc. (now known as Meta Platforms, Inc.)*

## CERTIFICATE OF SERVICE

I certify that on March 21, 2022, I filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: March 21, 2022                    Respectfully submitted,

                                    s/ Theodore J. Boutrous Jr.
                                    Theodore J. Boutrous Jr.

                                    *Counsel for Defendant-Appellee*
                                    *Facebook, Inc. (now known as Meta*
                                    *Platforms, Inc.)*