# MANTESE HONIGMAN, PC

### ATTORNEYS AND COUNSELORS
**www.manteselaw.com**

| New York Office | Michigan Headquarters | Missouri Office |
|---|---|---|
| 250 East 54th, #25A | 1361 E. Big Beaver Rd. | 518 S. Hanley Rd. |
| New York, NY 10022 | Troy, MI 48083 | Clayton, MO 63105 |
| 212-401-4008 | Ph. 248-457-9200 | Ph. 314-656-6927 |

Gerard V. Mantese***
David M. Honigman
Ian M. Williamson
Theresamarie Mantese
Douglas L. Toering
Terry Milne Osgood
Kathryn R. Eisenstein
Emily S. Fields

Michael S. Butterfield**
Nicole B. Lockhart
Brian P. Markham
Kristin K. Marschner
Kristen Y. James*
Kenneth Chadwell, of Counsel in MI
Robert J. Radice, of Counsel in MO
Jack M. Horas, of Counsel in MO

May 26, 2023

Molly C. Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

**Via ECF**

Re: ***Vargas v. Facebook, Inc.***, No. 21-16499
Argued July 28, 2022 (Owens, Graber & M. Murphy (10th Cir.), JJ.)

Dear Ms. Dwyer:

Appellants submit this Fed. R. App. P. 28(j) response to Facebook's May 25, 2023 letter:

Nothing in the United States Supreme Court's May 18, 2023 decisions in *Gonzalez v. Google LLC*, —S. Ct. —, 2023 WL 3511529 and *Twitter, Inc. v. Taamneh*, —S. Ct. —, 2023 WL 3511531 support Facebook's assertion that Section 230 of the Communications Decency Act protects its actions. Facebook materially participated in the discriminatory platform and thus forfeited any immunity under Section 230. Facebook itself: (1) categorized its user population according to race, sex, religion, and more; (2) created the discriminatory platform allowing housing advertisers to discriminate; and (3) delivered to its users personalized discriminatory choices selected by its sophisticated algorithms.

During the *Gonzalez* oral argument, two Justices (and Respondent Google's counsel) essentially acknowledged that illegal discrimination of this type would ***not*** be immunized by Section 230:

> JUSTICE SOTOMAYOR: How do I draw the line between not accepting your point about the thumbnails and going to the other extreme of active collusion? Because there has to be a line somewhere in between. It can't be merely because you're a computer person that you can create an algorithm that discriminates against people. You have no problem with that, right? …

All attorneys admitted to practice in MI unless otherwise noted
*Admitted to practice in IN only
**Admitted to practice in MI & MO
*** Admitted to practice in MI, MO, NY & FL

Business Litigation     Business Transactions     Corporate Law and Governance     Health Care Law     Criminal Defense     Real Estate and Land Use



Molly C. Dwyer
Clerk of Court
May 26, 2023
Page 2

MR. SCHNAPPER [Petitioners' counsel]: The writing of the algorithm would probably constitute aiding and abetting --

JUSTICE SOTOMAYOR: Exactly. If you write one that discriminated against people for a user, you're probably going to be liable.

[TR 40:21-41:9].

JUSTICE BARRETT: Ms. Blatt, what about Justice Sotomayor's dating hypothetical? The discrimination, like, oh, we're only going to – we're not going to match black people and white people, et cetera. What about that? Is that given 230's shield?

MS. BLATT [Google's counsel]: Absolutely not, because any disparate treatment claim or race discrimination is saying you're treating people different regardless of the content.

[TR 140:9-18].

Here, Facebook created the discriminatory content, and then delivered (or did not deliver) ads. Facebook designed, developed, and delivered the discrimination. Neither *Gonzalez* nor *Taamneh* change that result.

Respectfully submitted,

Gerard V. Mantese
Mantese Honigman, P.C.
*Counsel for Plaintiffs-Appellants*

Attachment

Business Litigation    Business Transactions    Corporate Law and Governance    Health Care Law    Criminal Defense    Real Estate and Land Use

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

REYNALDO GONZALEZ, ET AL.,        )

             Petitioners,      )

          v.            ) No. 21-1333

GOOGLE LLC,                 )

             Respondent.      )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 164

Place:  Washington, D.C.

Date:   February 21, 2023

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

```
 1     IN THE SUPREME COURT OF THE UNITED STATES
 2   - - - - - - - - - - - - - - - - - -
 3   REYNALDO GONZALEZ, ET AL.,          )
 4                    Petitioners,       )
 5             v.                        ) No. 21-1333
 6   GOOGLE LLC,                         )
 7                    Respondent.        )
 8   - - - - - - - - - - - - - - - - - -
 9
10                   Washington, D.C.
11              Tuesday, February 21, 2023
12
13       The above-entitled matter came on for oral
14   argument before the Supreme Court of the United
15   States at 10:03 a.m.
16
17   APPEARANCES:
18   ERIC SCHNAPPER, ESQUIRE, Seattle, Washington; on
19       behalf of the Petitioners.
20   MALCOLM L. STEWART, Deputy Solicitor General,
21       Department of Justice, Washington, D.C.; for
22       the United States, as amicus curiae, supporting
23       vacatur.
24   LISA S. BLATT, ESQUIRE, Washington, D.C.; on behalf of
25       the Respondent.
```

Official - Subject to Final Review

```
 1                    C O N T E N T S

 2   ORAL ARGUMENT OF:                        PAGE:

 3   ERIC SCHNAPPER, ESQ.

 4        On behalf of the Petitioners           3

 5   ORAL ARGUMENT OF:

 6   MALCOLM L. STEWART, ESQ.

 7        For the United States, as amicus

 8        curiae, supporting vacatur            70

 9   ORAL ARGUMENT OF:

10   LISA S. BLATT, ESQ.

11        On behalf of the Respondent          114

12   REBUTTAL ARGUMENT OF:

13   ERIC SCHNAPPER, ESQ.

14        On behalf of the Petitioners         161

15

16

17

18

19

20

21

22

23

24

25
```

Official Subject too Final Review

```
 1                    P R O C E E D I N G S
 2                              (10:03 a.m.)
 3            CHIEF JUSTICE ROBERTS:  We'll hear
 4      argument this morning in Case 21-1333, Gonzalez
 5      versus Google.
 6            Mr. Schnapper.
 7            ORAL ARGUMENT OF ERIC SCHNAPPER
 8              ON BEHALF OF THE PETITIONERS
 9            MR. SCHNAPPER:  Mr. Chief Justice, and
10      may it please the Court:
11            Section 230(c)(1) distinguishes
12      between claims that seek to hold an Internet
13      company liable for content created by someone
14      else and claims based on the company's own
15      conduct.  That distinction is drawn in each of
16      the three sections of the statute.
17            First, Section 230(c)(1) is limited to
18      claims that would treat the defendant as a
19      publisher of third-party content.  The statute
20      uses "publish" in the common law sense.  The
21      Fourth Circuit decision in Henderson correctly
22      interprets the statute in that manner and
23      concludes that it involves two elements:  the
24      claim must be based on the action of the
25      defendant in disseminating third-party content,
```

Official Draft, Subject to Final Review

4

1    and the harm must arise from the content itself.

2            Second, Section 231 -- 230(c)(1) is

3    limited to publication of information provided

4    by another content provider, which is often

5    referred to as third-party content.  The

6    statutory defense doesn't apply insofar as a

7    claim is based on words written by the defendant

8    or other content created by the defendant.  In

9    some circumstances, the manner in which

10   third-party content is organized or presented

11   could convey other information from the

12   defendant itself, as the government notes.

13           Third, Section 230(c)(1) only applies

14   insofar as a defendant was acting as an Internet

15   computer service.  Most entities that are

16   Internet computer services do other things as

17   well.  This Court technically is an interactive

18   computer service because of its website.  It

19   does other things, as it is doing today.

20   Conduct that falls outside that line of activity

21   is outside the scope of this statute.

22           A number of the briefs in this case

23   urge the Court to adopt a general rule that

24   things that might be referred to as a

25   recommendation are inherently protected by the

Official - Subject to Final Review

5

```
 1   statute, a decision which would require the

 2   Court to then fashion some judicial definition

 3   of "recommendation."

 4            We think the Court should decline that

 5   invitation and should instead focus on

 6   interpreting the specific language of the

 7   statute.

 8            I welcome the Court's questions.

 9            JUSTICE THOMAS:  Mr. Snapper --

10   Schnapper, just so we're clear about what we're

11   -- your claim is, are you saying that YouTube's

12   application of its algorithm is particular to --

13   in this case, that they're using a different

14   algorithm to the one that, say, they're using

15   for cooking videos, or are they using the same

16   algorithm across the board?

17            MR. SCHNAPPER:  It's the same

18   algorithm across --

19            JUSTICE THOMAS:  So --

20            MR. SCHNAPPER:  -- the board.

21            JUSTICE THOMAS:  -- so what is -- if

22   -- if it's the same algorithm, I think you have

23   to give us a clearer example of what your point

24   is exactly.  The same algorithm to present

25   cooking videos to people who are interested in
```

1    cooking and ISIS videos to people who are

2    interested in ISIS, racing videos to people who

3    are interested in racing.

4         Then I think you're going to have to

5    explain more clearly, if it's neutral in that

6    way, how your claim is set apart from that.

7         MR. SCHNAPPER:  Surely.  The -- if I

8    might turn to the practice of displaying

9    thumbnails, which is a major part of what's at

10   issue here, the problem -- and the issue is not

11   the manner in which YouTube displays videos.  It

12   actually displays, as you doubtless know from

13   having looked at, these little pictures, which

14   are referred to as thumbnails.  They are

15   intended to encourage the viewer to click on

16   them and go see a video.

17        It's the use of algorithms to generate

18   these -- these thumbnails that's at issue, and

19   the thumbnails, in turn, involve a -- involve

20   content created by the defendant.

21        JUSTICE THOMAS:  But the -- it's

22   basing -- the thumbnails, from what I

23   understand, is based upon what the algorithm

24   suggests the user is interested in.  So, if

25   you're interested in cooking, you don't want

Official Subject to Final Review

1    thumbnails on light jazz.  You -- so the -- it's

2    -- it's -- it's neutral in that sense.  You're

3    interested in cooking.  Say you get interested

4    in rice -- in pilaf from Uzbekistan.  You don't

5    want pilaf from some other place, say,

6    Louisiana.

7             The -- so the -- I don't see how that

8    is any different from what is happening in this

9    case.  And what I'm trying to get you to focus

10   on is if -- if the -- are we talking about the

11   neutral application of an algorithm that works

12   generically for pilaf and -- and it also works

13   in a similar way for ISIS videos?  Or is there

14   something different?

15            MR. SCHNAPPER:  No, I think that's

16   correct, but -- but our -- our view is that the

17   fact that a -- a -- an algorithm is neutral

18   doesn't alter the application of the statute.

19   The statute requires that one work through each

20   of the elements of the defense and see if it

21   applies.

22            The -- the lower courts, in a couple

23   of cases, have said that -- really disregarding

24   the requirements of the -- of the defense, that

25   as long as an algorithm is neutral, that puts

Official Subject to Final Review

1    the -- the conduct outside the -- within the

2    protection of the statute.

3         But that's not what the statute says.

4    The statute says you must be acting -- you must

5    be -- the claim must treat you as a publisher.

6         CHIEF JUSTICE ROBERTS:  Well, but, I

7    mean, the -- the -- the difference is that the

8    Google, You -- YouTube, they're still not

9    responsible for the content of the videos or --

10   or text that is transmitted.

11        Your focus is on the actual selection

12   and recommendations.  They're responsible that a

13   particular item is there but not for what the

14   item -- item says.  And I don't -- I -- I think

15   part -- it may be significant if the algorithm

16   is the same across -- as Justice Thomas was

17   suggesting, across the different subject

18   matters, because then they don't have a focused

19   algorithm with respect to terrorist activities

20   or -- or pilaf or something, and then I think it

21   might be harder for you to say that there's

22   selection involved for which they could be held

23   responsible.

24        MR. SCHNAPPER:  The -- the -- the

25   statute, I think, doesn't draw the distinction

9

1    that way.  The -- the claim here is about the
2    encouragement of -- of -- of users to go look at
3    particular content.  And that's the JASTA claim
4    that we'll hear about tomorrow.
5         And the underlying substantive claim
6    is encouraging people to go look at ISIS videos
7    would be aiding and abetting ISIS.  More on that
8    tomorrow.
9         But, if that's an actionable claim,
10   then the conduct here would fit within it,
11   the -- because certain individuals would be
12   shown these thumbnails, which would encourage
13   them to go look at those videos.
14        JUSTICE KAGAN:  So I think you're
15   right, Mr. Schnapper, that the statute doesn't
16   make that distinction.  This was a pre-algorithm
17   statute.  And, you know, everybody is trying
18   their best to figure out how this statute
19   applies, this statute which was a pre-algorithm
20   statute applies in a post-algorithm world.
21        But I think what was lying underneath
22   Justice Thomas's question was a suggestion that
23   algorithms are endemic to the Internet, that
24   every time anybody looks at anything on the
25   Internet, there is an algorithm involved,

Official Subject to Final Review

10

1    whether it's a Google search engine or whether

2    it's this YouTube site or -- or -- or a Twitter

3    account or countless other things, that

4    everything involves ways of organizing and

5    prioritizing material.

6            And -- and that would essentially mean

7    that, you know, 230 -- I guess what I'm asking

8    is, does -- does -- does your position send us

9    down the road such that 230 really can't mean

10   anything at all?

11           MR. SCHNAPPER:  I -- I -- I don't

12   think so, Your Honor.  The question -- as you

13   say, algorithms are ubiquitous, but the question

14   is what does the defendant do with the

15   algorithm.  If it uses the algorithm to direct

16   -- to encourage people to look at ISIS videos,

17   that's within the scope of JASTA.

18           It's not different than if back in

19   1996 a lot of clerks somewhere at Prodigy did

20   this manually and just had a bunch of file cards

21   and they figured out who was interested in what.

22           The statute would have meant the same

23   thing there that it does now.  It's automated,

24   it's at a larger scale, but it doesn't change

25   the nature of what they're doing with the

1      algorithm.  So --
2               JUSTICE SOTOMAYOR:  Can I -- I'm
3      sorry, finish.
4               MR. SCHNAPPER:  The -- the -- the
5      brief -- I think the brief for Respondent points
6      to a number of uses of algorithms, for example,
7      to pick the cheapest fare or things like that.
8      That's just outside the scope of the statute.
9      The algorithm is being used there to generate
10     additional content.
11              So the question is what you do with
12     the algorithm.  The fact that you did it with an
13     algorithm doesn't give -- yield a different
14     result than if you had a lot of hard-working
15     people in a -- in an office somewhere doing the
16     same thing.
17              JUSTICE SOTOMAYOR:  We seem --
18              JUSTICE KAGAN:  Well, I -- I -- I
19     guess I --
20              JUSTICE SOTOMAYOR:  Oh.
21              JUSTICE KAGAN:  -- I -- I take the
22     point -- if -- if I could just --
23              JUSTICE SOTOMAYOR:  No, no, go ahead.
24              JUSTICE KAGAN:  You know, I take the
25     point that there are a lot of algorithms that

Official Subject to Final Review

12

```
1   are not going to produce pro-ISIS content and

2   that won't create a problem under this statute,

3   but maybe they'll produce defamatory content or

4   maybe they'll produce content that violates some

5   other law.

6         And your -- your argument can't be

7   limited to this one statute.  It has to extend

8   to any number of harms that can be done by -- by

9   speech and -- and so by the organization of

10  speech in ways that basically every provider

11  uses.

12        MR. SCHNAPPER:  Well, if I might turn

13  to the example of what you said, referred to, an

14  algorithm that produces defamation.  I may be

15  paraphrasing that wrong.

16        If the -- if the -- let's say the

17  algorithm generates a recommendation -- a --

18  a -- a face -- a thumbnail that on its face

19  is -- is benign, it just says interesting

20  information about Frank, you go there, and it's

21  defamatory.

22        The defendant's not responsible -- or

23  excuse me -- the defense applies to the video

24  itself that you saw.  The question would be

25  whether the thumbnail was actionable.  And under
```

1    -- in most circumstances, thumbnails aren't

2    going to be actionable.

3            In addition, the -- the thumbnails

4    typically include a snippet from a -- a video or

5    a text or whatever.  If the snippet itself were

6    defamatory, again, the defense -- the statutory

7    defense would apply because what was being

8    displayed was third-party content.  And so the

9    statute still applies there.

10            JUSTICE ALITO:  Suppose that Google

11    could -- YouTube could display these thumbnails

12    purely at random.  But, if it does anything than

13    displaying them purely at random, isn't it

14    organizing and presenting information to people

15    who access YouTube?

16            MR. SCHNAPPER:  Yes, but --

17            JUSTICE ALITO:  All right.

18            MR. SCHNAPPER:  -- that doesn't put it

19    within the scope of the statute.

20            JUSTICE ALITO:  Well, does that --

21    does that constitute publishing?

22            MR. SCHNAPPER:  Yes.  So they would --

23            JUSTICE ALITO:  It does?

24            MR. SCHNAPPER:  -- they would be

25    publishing -- they would be publishing the --

1     the thumbnail.

2               JUSTICE ALITO:  Right.

3               MR. SCHNAPPER:  But -- but, if the --

4     if the thumbnail isn't itself -- if -- if the --

5     if the -- the way they're using it is -- is --

6     is encouraging people to engage --

7               JUSTICE ALITO:  Well, that's a

8     different question, though, isn't it?  I -- I

9     don't know where you're drawing the line.

10    That's the problem.

11              MR. SCHNAPPER:  Oh, I see, I see, I

12    see.

13              JUSTICE ALITO:  That's the problem

14    that I see.

15              MR. SCHNAPPER:  Oh.

16              JUSTICE ALITO:  Unless you're --

17    you're saying that the publishing -- the

18    publication requirement is satisfied under all

19    circumstances, unless the thumbnails are

20    presented purely at random.

21              MR. SCHNAPPER:  It's publication even

22    if it's at random, but the -- but the -- the --

23    the injury in the hypothetical we're talking

24    about about ISIS doesn't follow from the content

25    of the thumbnail.  The thumbnail would typically

1    be fairly benign.  The harm comes --

2              JUSTICE ALITO:  Yeah, but in every

3    instance, in those instances where the thumbnail

4    is benign, that's not a concern for purposes of

5    this case, but in all those instances where some

6    plaintiff might have some cause of action based

7    on the content of the video that has been posted

8    --

9              MR. SCHNAPPER:  There would have to be

10   a cause of action, as we assert there is in

11   JASTA, for encouraging people to go look at the

12   video.  That's a fairly uncommon form of cause

13   of action.

14             The cause of action -- insofar as the

15   plaintiff asserts a cause of action based on the

16   video itself, that's within the -- that you've

17   been sent to, that's within the scope of the

18   defense.

19             JUSTICE JACKSON:  And is that because

20   of the way in which you're interpreting the

21   statute?  I mean, can we -- can we back up a

22   little bit and try to at least help me get my

23   mind around your argument about how we should

24   read the text of the statute?

25             I took your brief to be arguing and

1      that of those who support you that the statute

2      really is about one kind of publishing conduct,

3      and that is the failure to block or screen

4      offensive content.

5               Am I right about that?  In other

6      words, what you say is covered by Section 230

7      and that Google could, like -- could rightly

8      claim immunity for is a claim that there was

9      something defective about their ability to

10     screen or block content, that the content is up

11     there and you should be liable for it?

12               MR. SCHNAPPER:  I -- I think we --

13     we've -- I -- I think that's not our claim.

14               JUSTICE JACKSON:  Okay.

15               MR. SCHNAPPER:  I think we are trying

16     to distinguish between liability for what's in

17     the content that's on their websites that you

18     could access and actions they take to encourage

19     you to go look at it.

20               JUSTICE JACKSON:  Yes, yes, that's

21     your claim.  I'm just trying to --

22               MR. SCHNAPPER:  If you encourage it,

23     then we're --

24               JUSTICE JACKSON:  -- understand how

25     you read the statute.  Your -- the statute, you

```
1    say, covers only scenarios in which the claim
2    that's being made is that there's offensive
3    content on the website, that you didn't take it
4    down, that, you know, you failed to screen it
5    out, but if you're making a claim that you're
6    encouraging people to look at this content,
7    that's something different, that's the claim
8    you're making, and it's not covered by the
9    statute.
10              MR. SCHNAPPER:  That's our -- that's
11   the distinction --
12              JUSTICE JACKSON:  All right.
13              MR. SCHNAPPER:  -- we're trying to
14   draw.  I mean, it -- the distinction is
15   illustrated by the e-mail in the Dyroff case,
16   which -- which is the precedent that -- that got
17   us here in the Ninth Circuit.
18              In that case, there was a, I think,
19   26-word -- 26-word e-mail from the website to an
20   individual which read something like there's
21   something new that's been posted to the question
22   where can I buy heroin in Jacksonville, Florida.
23   To access it, use this URL or use this URL.
24              It's our contention that that is
25   outside the protection of the statute.
```

Official Transcript, Subject to Final Review

18

```
1                JUSTICE JACKSON:  But is that really
2     different -- I guess I'm trying -- so they would
3     argue, I think, that even assuming that the
4     statute only covered the kinds of things that
5     you say it covers, you know, defective blocking
6     and screening, meaning there's still offensive
7     stuff on your website and you should be liable
8     for it, I think they would say that to the
9     extent your claim is talking about their way --
10    their algorithm that presents the information,
11    it's really the same thing, that you're -- that
12    it reduces -- it's tantamount to saying we
13    haven't, you know, blocked this information,
14    it's still on the website, because algorithms
15    are the way in which the information is
16    presented.
17                MR. SCHNAPPER:  So, if I may make
18    clear, as I may not have done that well, the
19    distinction we're drawing, our claim is not that
20    they did an inadequate job of block -- of
21    keeping things off their -- their computers that
22    you can access from -- from outside or from
23    failure to -- to block it.
24                It's that that's the -- that's the
25    heartland of the statute.  What we're saying is
```

```
 1    that insofar as they were encouraging people to

 2    go look at things, that's what's outside the

 3    protection of the statute, not that the stuff

 4    was there.

 5            If they stopped recommending things

 6    tomorrow and -- and all sorts of horrible stuff

 7    was on their website, as far as we read the

 8    statute, they're fine.  It's the recommendation

 9    practice that we think is actionable.

10            JUSTICE SOTOMAYOR:  Can I break down

11    your complaint a moment?  There -- the vast

12    majority of it is paragraph after paragraph

13    after paragraph that says they're liable because

14    they failed to take ISIS off their website.  I

15    think, as I'm listening to you today, you seem

16    to have abandoned that and -- and are saying

17    they don't have to take it off their website.

18            MR. SCHNAPPER:  That --

19            JUSTICE SOTOMAYOR:  Am I correct about

20    that?

21            MR. SCHNAPPER:  That's exactly right.

22    That -- that --

23            JUSTICE SOTOMAYOR:  So that can't be

24    --

25            MR. SCHNAPPER:  -- is the way we've
```

20

```
1    framed the question presented.
2              JUSTICE SOTOMAYOR:  So that can't be
3    --
4              MR. SCHNAPPER:  We did not advance
5    that claim.
6              JUSTICE SOTOMAYOR:  So you're
7    abandoning that claim, so that can't be aiding
8    and abetting.  So I think I'm listening to you,
9    and the only aiding and abetting that you're
10   arguing is the recommendation, correct?
11             MR. SCHNAPPER:  That's correct.
12             JUSTICE SOTOMAYOR:  You're not arguing
13   that they're -- some of these providers create
14   chat rooms or put people together, users
15   together.  You're not claiming that that's part
16   of what you're arguing about?  The social
17   networking, I want to call it.
18             MR. SCHNAPPER:  Well, that's not at
19   issue in this case.
20             JUSTICE SOTOMAYOR:  It's in --
21             MR. SCHNAPPER:  Face --
22             JUSTICE SOTOMAYOR:  -- tomorrow's
23   case?  All right.
24             MR. SCHNAPPER:  Face -- if I can be
25   more specific --
```

21

```
1            JUSTICE SOTOMAYOR:  All right.  So
2    you're limiting -- you're limiting your --
3            MR. SCHNAPPER:  -- I mean, Facebook --
4    Facebook does that.
5            JUSTICE SOTOMAYOR:  All right.
6            MR. SCHNAPPER:  Facebook recommends
7    people --
8            JUSTICE SOTOMAYOR:  Right.
9            MR. SCHNAPPER:  -- which is very
10   difficult to find within the four walls of the
11   statute.  Google's created a lot of things but
12   so far not --
13           JUSTICE SOTOMAYOR:  But you're not
14   claiming that in this case?
15           MR. SCHNAPPER:  Not in -- it's not
16   what --
17           JUSTICE SOTOMAYOR:  You're just
18   focusing --
19           MR. SCHNAPPER:  No.  This is about
20   content.  It's not about --
21           JUSTICE SOTOMAYOR:  This is about
22   content.  And I just want to focus your
23   complaint so I understand it very clearly.
24   You're saying the -- the YouTube or the "Next
25   up" feature of the algorithm that says you
```

Official Subject to Final Review

1    viewed this and so you might like this, it's
2    "you might like this" that's the aiding and
3    abetting?
4         MR. SCHNAPPER:  Uh --
5         JUSTICE SOTOMAYOR:  What -- what part
6    of what they're doing?  Because, I mean, you --
7    you -- whoever the user is types in something,
8    they get an ISIS video, you say that's okay --
9    they can't be liable for you, the -- me, the
10   viewer, looking at the ISIS vehicle.  But the
11   Internet providers can be liable for what?
12        MR. SCHNAPPER:  Okay.  So they're --
13   they're --
14        JUSTICE SOTOMAYOR:  For showing me the
15   next video that's similar to that?
16        MR. SCHNAPPER:  All right.  They're --
17   it would be helpful perhaps if I distinguish
18   between two kinds of practices that -- that go
19   on at YouTube.  The complaint doesn't describe
20   them in detail, but we're fairly familiar with
21   them.  So what we can talk --
22        JUSTICE SOTOMAYOR:  I'm glad, but I'm
23   going to be to look at complaint because it can
24   only survive if the complaint is adequate.  So
25   you're going to have to tell me where in the

1    complaint you're saying this if I'm going to

2    think about holding them liable.  So --

3                MR. SCHNAPPER:  I'm about three

4    questions --

5                JUSTICE SOTOMAYOR:  -- you're going to

6    have to separate out the two things then.

7                MR. SCHNAPPER:  Okay.  I'm about three

8    questions behind.  Let me ---

9                JUSTICE SOTOMAYOR:  All right.

10               MR. SCHNAPPER:  -- let me try and do

11   my best here.  So what we've been talking about

12   up until now is the use of -- of thumbnails to

13   encourage people to look at content -- people

14   who haven't clicked on any video yet.  And our

15   contention is the use of thumbnails is -- is the

16   same thing under the statute as sending someone

17   an e-mail and saying:  You might like to look at

18   this new video.

19               Now the "Up next" feature is a

20   different problem, and the problem there is --

21   is that when you click on one video and you pick

22   that one, YouTube will automatically keep

23   sending you more videos which you haven't asked

24   for.

25               That, in our view, runs afoul of a

1    different element of the statutory defense,

2    which is that they be acting as an interactive

3    computer service.  And when they go beyond

4    delivering to you what you asked for, to start

5    sending things you haven't asked for, our

6    contention is that they're no longer acting as

7    an interactive computer service.

8              JUSTICE SOTOMAYOR:  All right.  So,

9    even if I accept that you're right that sending

10   you unrequested things that are similar to what

11   you've viewed, whether it's a thumbnail or an

12   e-mail, how does that become aiding and

13   abetting?  I'm going back to Justice Thomas's

14   question, okay, which is, if they aren't

15   purposely creating their algorithm in some way

16   to feature ISIS videos, if they're -- I mean, I

17   can really see that an Internet provider who was

18   in cahoots with ISIS provided them with an

19   algorithm that would take anybody in the world

20   and find them for them and -- and do recruiting

21   of people by showing them other videos that will

22   lead them to ISIS, that's an intentional act,

23   and I could see 230 not going that far.

24              I guess the question is, how do you

25   get yourself from a neutral algorithm to an

25

1    aiding and abetting --

2              MR. SCHNAPPER:  Right.

3              JUSTICE SOTOMAYOR:  -- an intent,

4    knowledge?  There has to be some intent to aid

5    and abet.  You have to have knowledge that

6    you're doing this.

7              MR. SCHNAPPER:  Yes.

8              JUSTICE SOTOMAYOR:  So how do you get

9    there?

10             MR. SCHNAPPER:  So the -- the -- if --

11   if the algorithm recommends an ISIS video or it

12   automatically plays it, that -- as we'll see

13   tomorrow, that by itself isn't going to satisfy

14   aiding and abetting.

15             Aiding and abetting requires knowledge

16   that it's happening.  So the elements of the

17   aiding and abetting claim, which we'll be

18   talking about tomorrow, address the question

19   you're asking.

20             If -- if this was teed up, if they

21   didn't know it was happening, and the other

22   elements of an aiding-and-abetting claim were

23   present, they would not be liable for aiding and

24   abetting.

25             CHIEF JUSTICE ROBERTS:  Thank you,

1    counsel.

2              Just one short question.  Your -- your

3    friend on the other side presented an analogy

4    that she thought would be helpful, which -- a

5    book seller that has a table with sports books

6    on it, and somebody comes in and says, I'm

7    looking for the book about Roger Maris, and the

8    bookseller says, well, it's over there on the

9    table with the other sports books.

10             Isn't that analogous to what's

11   happening here?  You type in ISIS --

12             MR. SCHNAPPER:  I'm not sure -- I'm

13   not sure where that -- that gets us.  I mean, it

14   wouldn't be any different than sending an e-mail

15   saying that.

16             CHIEF JUSTICE ROBERTS:  Well, we'll

17   figure out where we get -- it gets us in a

18   minute.  But I just want to know if you think

19   that's a good -- a good analogy.

20             MR. SCHNAPPER:  I -- I -- I'm a little

21   concerned to know where it's taking me.  It's a

22   -- it's an analogy of --

23             (Laughter.)

24             MR. SCHNAPPER:  -- it's an analogy of

25   sorts.

```
1           CHIEF JUSTICE ROBERTS:  That's what we
2      call -- that's what we call questions.
3           MR. SCHNAPPER:  But -- but I still --
4      I mean, I'm going to -- at some point, I'm going
5      to go yes, but you still have to fit it within
6      the four walls of the statute.  Perhaps you
7      could -- you could tell me what lies ahead.  I
8      think I could -- I mean, sure, it's an analogy
9      of sorts, but --
10          (Laughter.)
11          CHIEF JUSTICE ROBERTS:  What lies
12     ahead is, I give up, Your Honor.
13          MR. SCHNAPPER:  -- but I would like to
14     know what it leads up to.  Yes.
15          CHIEF JUSTICE ROBERTS:  Yeah.
16          MR. SCHNAPPER:  Yeah.  But --
17          CHIEF JUSTICE ROBERTS:  No, what lies
18     ahead is the idea that you could look at that
19     and say it's not pitching something in
20     particular to the person who's made the request.
21     It is recognizing that it's a request about a
22     particular subject matter and it's there on the
23     table, and they might want to look at that or
24     they may not want to look at it.
25          But it's really just a 21st-century
```

1   version of what has taken place for a long time

2   in many contexts, which, when you ask a

3   question, people are putting together a group of

4   things, not necessarily precisely answering your

5   question.  I mean, if somebody said --

6           MR. SCHNAPPER:  Yes -- no, I -- all

7   right.  I think -- I think I know where we're

8   going here.

9           The -- insofar as I -- I go to YouTube

10  and I say show me a cat -- you know, it's a

11  little more complicated than this -- but show me

12  -- show -- tell me what cat videos you have, and

13  in responding to that, they're --

14          CHIEF JUSTICE ROBERTS:  Sure.  That's

15  an easy case.  They give you a bunch of cat

16  videos.  You don't have any complaint about

17  something like that.

18          In this case, if they put in

19  something, say, show me ISIS videos, they would

20  get a bunch of ISIS videos, and you don't have

21  any objection to that given the way the search

22  was phrased.

23          MR. SCHNAPPER:  It -- I have to answer

24  that with precision.  If I say, play for me an

25  ISIS video, and they just directly play the

1    video, then what they've done falls within the

2    language of the statute.  It's requested, it's

3    purely third-party content, and I would try and

4    be hold -- trying to be holding them liable for

5    displaying that content.

6         But what actually has happened -- and

7    this is maybe analogous to what goes on to some

8    extent at Twitter, where they might actually

9    literally just show you the thing.  But what's

10   happening at YouTube is they're not doing that.

11        I type in ISIS video, and there are

12   going to be a catalogue of thumbnails which they

13   created.  It's as if I went into the bookstore

14   and said, I'm interested in sports books, and

15   they said, we've got this catalogue which we

16   wrote of sports books, sports books we have

17   here, and handed that to me.  They created that

18   content.

19        And -- and -- and if you publish

20   content you've created, you're not within the

21   four walls of the statute.  So --

22        CHIEF JUSTICE ROBERTS:  But you would

23   not -- you would not -- under your theory, they

24   would not be liable for the content of the

25   books, they'd be liable for the catalogue?

Official Subject to Final Review

30

```
1              MR. SCHNAPPER:  By -- by -- by
2    providing the catalogue.
3              CHIEF JUSTICE ROBERTS:  Okay.  Thank
4    you.
5              Justice Thomas, anything further?
6              JUSTICE THOMAS:  What if the YouTube,
7    instead of automatically providing this list,
8    which is hard -- it's hard for me because I
9    don't see this as -- I see these as suggestions
10   and not really recommendations because they
11   don't really comment on them.
12             But what if you had to click on
13   something like "For more like this, click here"?
14   Would that also be, as far as you're concerned,
15   aiding and abetting or outside this statute?
16             MR. SCHNAPPER:  It's -- so you --
17   you've played one video and they say click here
18   to see another one?
19             JUSTICE THOMAS:  No, click here if you
20   want suggestions for more like this.
21             MR. SCHNAPPER:  No, suggestions are --
22   depending how it happens.  Let's say they say
23   send me more -- show me more thumbnails.  It's
24   outside the statute.
25             And if I might come back to an earlier
```

1    part of what's embedded in your question, we
2    aren't asking the Court to adopt a rule that's
3    about recommendations versus suggestions.
4            What we're suggesting -- what -- what
5    we're arguing is -- is that this -- is that you
6    take the normal standards in each of the
7    elements and you apply it to what's going on.
8    It doesn't -- it doesn't matter if they're
9    encouraging it.
10           If -- if -- in terms of aiding and
11   abetting, if someone comes to me and says what's
12   al-Baghdadi's phone call -- phone number, I'd
13   like to call him, and I give him the phone
14   number, I'm aiding and abetting even if I -- I
15   don't say, and I hope you'll join ISIS.
16           Whether we label it a recommendation
17   or not on our view is not the issue here.  We
18   tried to say that in our brief.
19           JUSTICE THOMAS:  Thank you.
20           MR. SCHNAPPER:  I don't -- was that
21   responsive?  I'm not --
22           JUSTICE THOMAS:  Well, it's
23   responsive, but I don't understand it.
24           (Laughter.)
25           JUSTICE THOMAS:  You called -- I mean,

1    if you called Information and asked for

2    al-Baghdadi's number and they give it to you, I

3    don't see how that's aiding and abetting.

4            And I don't understand how a neutral

5    suggestion about something that you've expressed

6    an interest in is aiding and abetting.  I just

7    don't -- I don't understand it.

8            And I'm trying to get you to explain

9    to us how something that is standard on YouTube

10   for virtually anything that you have an interest

11   in suddenly amounts to aiding and abetting

12   because you're in the ISIS category.

13           MR. SCHNAPPER:  Well, again, I'll be

14   answering that probably again tomorrow, but as

15   little -- what you describe without more

16   probably wouldn't.

17           But, as you'll -- as we'll learn

18   tomorrow, the circumstances are far different

19   than that, that these -- YouTube and these other

20   companies were repeatedly told by government

21   officials, by the media, dozens of times that

22   this was going on, and they didn't do any --

23   they did almost nothing about it.

24           That's very different than providing

25   one phone number through Information.

33

```
 1              JUSTICE THOMAS:  Well, I mean, did --
 2              MR. SCHNAPPER:  So it goes to the
 3    scope of JASTA, not to 230.
 4              JUSTICE THOMAS:  So we've gone from
 5    recommendation to inaction being the source of
 6    the problem.  And this is what I'm -- you know,
 7    the -- I understand you're putting it in
 8    context, but I -- it's hard for me also to
 9    understand where this obligation to take
10    specific actions can lead to an
11    aiding-and-abetting claim.
12              MR. SCHNAPPER:  Well, the
13    interconnection in this case is that -- that
14    we're focusing on the recommendation function,
15    that they're affirmatively recommending or
16    suggesting ISIS content, and it's -- and it's
17    not mere inaction.
18              Mere inaction might work under aiding
19    and abetting, but we'll get there tomorrow, but
20    -- but the claim that we're focusing on today is
21    that, in fact, they're affirmatively
22    recommending things.  You turn on your computer
23    and the -- and the -- the -- the computers at --
24    at YouTube send you stuff you didn't ask them
25    for.  They just send you stuff.  It's no
```

1    different than if they were sending you e-mails.

2    That's affirmative conduct.

3              CHIEF JUSTICE ROBERTS:  Justice Alito?

4              JUSTICE ALITO:  I'm afraid I'm

5    completely confused by whatever argument you're

6    making at the present time.

7              So, if someone goes on YouTube and

8    puts in ISIS videos and they show thumbnails of

9    ISIS videos -- and don't -- don't -- don't tell

10   me anything about the substantive underlying

11   tort claim -- if the person is -- if -- if

12   YouTube is sued for doing that, is it acting as

13   a publisher simply by displaying these

14   thumbnails of ISIS videos after a search for

15   ISIS videos?

16             MR. SCHNAPPER:  It is acting as a

17   publisher but of something that they helped to

18   create because the thumbnail is a joint creation

19   that involves materials from a third party and a

20   URL from them and some other things.

21             JUSTICE ALITO:  So, if YouTube uses

22   thumbnails at all, it is acting as a publisher

23   with respect to every thumbnail that it

24   displays?

25             MR. SCHNAPPER:  Yes.  Yes.  They're --

1    they're publishing the thumbnails.  And the

2    question is, are the thumbnails third-party

3    content, or are they content they've created?

4    And the problem is they are content.

5              JUSTICE ALITO:  Yeah, I mean, if

6    that's your argument, then you're really arguing

7    that -- that this statute does not provide

8    protection against a suit that is in substance

9    based on the third-party-provided content.

10             MR. SCHNAPPER:  No, we're -- we're

11   basing the -- I'm sorry.  I don't mean to be so

12   --

13             JUSTICE ALITO:  Okay.

14             MR. SCHNAPPER:  That -- that -- that

15   they -- the particular business model they have

16   involves using this -- these thumbnails, which

17   are materials they've in part created to --

18   to -- to operate.

19             Let me --

20             JUSTICE ALITO:  So they shouldn't use

21   thumbnails at all?  If they want protection

22   under the statute, they shouldn't use

23   thumbnails?

24             MR. SCHNAPPER:  Let me -- let --

25   that's -- that's the problem they have with the

Official Subject to Final Review

36

1    way the statute's written.  So, if I -- if I may
2    give a --
3            JUSTICE ALITO:  Is there any other way
4    they could organize themselves without using
5    thumbnails?  I suppose, if you type in "I want
6    ISIS videos," they can just put ISIS video 1,
7    ISIS video 2, and so forth.
8            MR. SCHNAPPER:  That's the technical
9    problem they have.
10           JUSTICE ALITO:  Well, would that be
11   acting as a publisher if they did that?
12           MR. SCHNAPPER:  Yes, but they'd be
13   publishing third-party content because the video
14   itself is the content.  If I might -- if I might
15   respond --
16           JUSTICE ALITO:  Okay.  I just -- I --
17   I -- I have one final question.  It's a
18   technical question and probably better addressed
19   to Ms. Blatt.
20           Is it your contention that everybody
21   who uses YouTube and searches for a video
22   involving a particular subject will be
23   automatically presented with thumbnails that are
24   related to that regardless of that user's
25   YouTube setting, preferences, preferences that

Official - Subject to Final Review

                                                                37

1       YouTube allows you to --

2                   MR. SCHNAPPER:  I -- I -- I don't -- I

3       don't know.  The practices are too varied.  I

4       don't know.  But, if I -- if I --

5                   JUSTICE ALITO:  You don't know if

6       somebody uses YouTube, they can -- can -- do

7       they have -- is there a function that allows

8       them not to be presented with similar videos?

9                   MR. SCHNAPPER:  I -- I don't know.  I

10      mean, I've gone onto -- on YouTube and never

11      seen that, but I -- I wouldn't --

12                  JUSTICE ALITO:  Uh-huh.  Okay.

13                  MR. SCHNAPPER:  The functions are

14      widely varied.  But if I might make a broader

15      point about the way you framed that question?

16                  JUSTICE ALITO:  Well, I -- I think

17      you -- you answered my question.  Thank you.

18                  CHIEF JUSTICE ROBERTS:  Justice

19      Sotomayor?

20                  JUSTICE SOTOMAYOR:  I -- I do.  This

21      has gone further than I thought or your position

22      has gone further than I thought.

23                  No provider or user of an interactive

24      computer service shall be treated as the

25      publisher or speaker of any information provided

Official - Subject to Final Review

1    by another information content provider.

2              And I thought that you started by

3    telling me, if I put in ISIS and they just give

4    me a download of information, the Internet

5    provider is not liable, correct, under (c)(1)?

6    I just read to you (c)(1), correct?

7              MR. SCHNAPPER:  It -- it depends what

8    the information is they give you.

9              JUSTICE SOTOMAYOR:  If they give me

10   everything that has --

11             MR. SCHNAPPER:  If they give you

12   information they created --

13             JUSTICE SOTOMAYOR:  No, they have --

14             MR. SCHNAPPER:  -- they're not

15   protected.

16             JUSTICE SOTOMAYOR:  So you are going

17   to the extreme.  Assume I don't think you're

18   right, I think you're wrong, that if I put in a

19   search and they give me materials that they

20   believe answers my search, no matter how they

21   organize it, that they're okay.  Do you

22   survive -- does your complaint survive if I

23   believe 230 goes that far?

24             MR. SCHNAPPER:  So it depends on what

25   materials they present you with.  If -- if all

Official Subject to Final Review

1    they presented you with -- Twitter would maybe

2    be a cleaner example -- is materials created by

3    third parties, they -- what they've published is

4    third-party materials, and they're good.

5            If they present you with things that

6    they wrote, at the other extreme, then they're

7    not protected because what they presented is not

8    third-party content.

9            JUSTICE SOTOMAYOR:  So why do you

10   think the thumbnails are -- I type it in, they

11   give me a thumbnail of everything they think

12   answers my inquiry, the suggestion box.

13           MR. SCHNAPPER:  Yes.

14           JUSTICE SOTOMAYOR:  Why are they

15   liable?

16           MR. SCHNAPPER:  Because a thumbnail is

17   not exclusively third-party material.  It's a

18   joint operation, and you can find -- if you look

19   at the thumbnail, it'll have a picture, which

20   comes from the third party, it has an embedded

21   URL, which comes from the defendant, and it

22   might have some information below the --

23           JUSTICE SOTOMAYOR:  The URL tells you

24   where to find it, correct?

25           MR. SCHNAPPER:  Sorry?

Official - Subject to Final Review

1            JUSTICE SOTOMAYOR:  The URL tells you
2    where to find it?  It's a computer language that
3    tells you this is where this is located?
4            MR. SCHNAPPER:  Yes, but it is
5    information within the meaning of the statute.
6    This is no different than an e-mail which writes
7    it out for you.
8            JUSTICE SOTOMAYOR:  If I don't accept
9    your line --
10            MR. SCHNAPPER:  Yeah.
11            JUSTICE SOTOMAYOR:  -- assume that
12    you've lost on the width of that line.
13            MR. SCHNAPPER:  Yes.
14            JUSTICE SOTOMAYOR:  I gave you an
15    example earlier of an Internet provider working
16    directly with ISIS and doing an algorithm that
17    -- teaching them how to do an algorithm that
18    will look for everybody who is just
19    ISIS-related.  There's more a collusion in the
20    creation than a neutral algorithm.
21            How do I draw the line between not
22    accepting your point about the thumbnails and
23    going to the other extreme of active collusion?
24    Because there has to be a line somewhere in
25    between.  It can't be merely because you're a

Official - Subject to Final Review

1    computer person that you can create an algorithm

2    that discriminates against people.  You have no

3    problem with that, right?  If a -- if a --

4             MR. SCHNAPPER:  The writing of the

5    algorithm would probably constitute aiding and

6    abetting --

7             JUSTICE SOTOMAYOR:  Exactly.  If you

8    write one that discriminated against people for

9    a user, you're probably going to be liable.

10             MR. SCHNAPPER:  I'm not sure, as we

11    describe it, it would fall outside the four

12    walls of the defense.  If you write an algorithm

13    that -- that in response -- that in -- that --

14    the -- the way you implement it's --

15             JUSTICE SOTOMAYOR:  If you write an

16    algorithm --

17             MR. SCHNAPPER:  -- going to put you

18    outside the defense.  Yes.

19             JUSTICE SOTOMAYOR:  -- if you write an

20    algorithm for someone that, in its structure,

21    ensures the discrimination between people, a

22    dating app, for example, someone comes to you

23    and says, I'm going to create an algorithm that

24    inherently discriminates against people, it

25    won't match black people to white people, Asian

1    people to Hispanics, it's going to discriminate,

2    you would say that Internet provider is

3    discriminating, correct?

4           MR. SCHNAPPER:  I would -- what they

5    did -- the way the distinction played out would

6    be important, though.  They would -- you know,

7    if -- if they're -- they would have to fall

8    outside of one of the elements of the claim.

9           It's hard to do this in the abstract.

10           JUSTICE SOTOMAYOR:  All right.

11           CHIEF JUSTICE ROBERTS:  Justice Kagan?

12           JUSTICE KAGAN:  Mr. Schnapper, can I

13    give you three kinds of practices and you tell

14    me which gets 230 protection and which doesn't?

15           So one is the YouTube practices that

16    you're complaining of, and we know you think

17    that that does not get 230 protection.

18           A second would be Facebook or Twitter

19    or any entity that essentially prioritizes

20    items.  So you're on Facebook and certain items

21    are prioritized on your news feed, or certain

22    tweets are prioritized on your Twitter feed, all

23    right, and that there's some algorithm that's

24    doing that and that's amplifying certain

25    messages rather than other messages on your

Official - Subject to Final Review

43

1    feed.  That's the second.

2              And then the third is just a regular

3    search engine.  You know, you put in a search

4    and something comes back, and in some ways, you

5    know, that's one giant recommendation system.

6    Here's the first item you should look at.

7    Here's the second item you should look at.

8              So are all three of those not

9    protected, or what happens to my second and

10   third?  Are they protected or not protected?

11   And if they're -- and if they are protected,

12   what's the difference between them and your

13   practices?

14             MR. SCHNAPPER:  Certainly.  So let me

15   -- let me start with the search engine.  The --

16   the -- there's a lot of discussion on search

17   engines, but there's not a specific provision in

18   the statute that says search engines are

19   protected.  The question is, do they fit within

20   the language of the statute?

21             So, if I ask a search engine for

22   stories about John Doe and it gives me a list

23   and, if I click on one of them, it turns out to

24   be defamatory, they're not liable because

25   they --

1          JUSTICE KAGAN:  Well, they just gave

2     it to you.  It's the first thing.  They just

3     prioritized it.  They think it's really a great

4     one to click on.

5          MR. SCHNAPPER:  The -- the mere prior

6     -- there are three -- there are multiple

7     questions here.  First, are they liable just

8     because what you -- you -- you clicked on turned

9     out to be defamatory?  The answer we think is

10    no.

11          Secondly, what if the snippet that

12    they took from the John Doe document said John

13    Doe is a shoplifter?  And the answer is they're

14    not liable because they didn't write that.  It's

15    publishing third-party content.

16          The third question is, could they be

17    liable for the way they prioritize things?  And

18    the answer is I think so.  It's going to depend

19    how -- what happened.  And the example, I could

20    --

21          JUSTICE KAGAN:  So even all the way to

22    the -- to the straight search engine, that they

23    could be liable for their prioritization system?

24          MR. SCHNAPPER:  Yes.  There was -- let

25    me --

Official Subject to Final Review

45

```
 1              JUSTICE KAGAN:  Okay.
 2              MR. SCHNAPPER:  If I might continue --
 3    if I --
 4              JUSTICE KAGAN:  No, I appreciate the
 5    -- the -- go ahead.  I'm sorry.
 6              MR. SCHNAPPER:  Those are the facts
 7    which led the European Union to fine Google 2.3
 8    billion euros, because they used prioritization
 9    to wipe out competition --
10              JUSTICE KAGAN:  Okay.  So here's --
11              MR. SCHNAPPER:  -- for things they
12    were selling.
13              JUSTICE KAGAN:  Yeah, so I don't think
14    that a court did it over there, and I think that
15    that's my concern, is I can imagine a world
16    where you're right that none of this stuff gets
17    protection.  And, you know, every other industry
18    has to internalize the costs of its conduct.
19    Why is it that the tech industry gets a pass?  A
20    little bit unclear.
21              On the other hand, I mean, we're a
22    court.  We really don't know about these things.
23    You know, these are not like the nine greatest
24    experts on the Internet.
25              (Laughter.)
```

Official Subject to Final Review

46

```
1              JUSTICE KAGAN:  And I don't have to --
2     I don't have to accept all Ms. Blatt's "the sky
3     is falling" stuff to accept something about,
4     boy, there is a lot of uncertainty about going
5     the way you would have us go, in part, just
6     because of the difficulty of drawing lines in
7     this area and just because of the fact that,
8     once we go with you, all of a sudden we're
9     finding that Google isn't protected.  And maybe
10    Congress should want that system, but isn't that
11    something for Congress to do, not the Court?
12             MR. SCHNAPPER:  Well, I -- I think the
13    -- the -- the -- the line-drawing problems are
14    real.  No one minimizes that.  I think that the
15    task for this Court is to apply the statute the
16    way it was written.
17             And if I might return to a point that
18    Justice Alito made, much of what goes on now
19    didn't exist in 1996.  The statute was written
20    to address one or two very specific problems
21    about defamation cases, and it drew lines around
22    certain kind of things and it protected those.
23             It did not and could not have
24    written -- been written in such a way to protect
25    everything else that might come along that was
```

47

1    highly desirable.  Congress didn't adopt a

2    regulatory scheme.  They protected a few things.

3    It will inevitably happen, it has happened, that

4    companies have devised practices which are maybe

5    highly laudable, but they don't fit within the

6    four walls of the statute.

7            That will continue to happen no matter

8    what happens -- what you do.  And the answer is,

9    when -- when someone devises some new -- some

10   new practice that may be highly desirable but

11   doesn't fit within the four walls of the

12   statute, the -- the industry has to go back to

13   Congress and say:  We need you to broaden the

14   statute because you wrote this to protect chat

15   rooms in 1996, and we want to do something that

16   doesn't fit within the statutes.

17           And -- and using thumbnails would be a

18   perfect example of that.

19           JUSTICE KAGAN:  Thank you.

20           CHIEF JUSTICE ROBERTS:  Justice

21   Gorsuch?

22           JUSTICE GORSUCH:  Mr. Schnapper, I

23   just want to make sure I understand, as you say,

24   the statutory language and how this case fits

25   with it, and if we could start with Section

Official Subject to Final Review

1    230(f)(4), which defines the term "access

2    software provider."  It includes, among other

3    things, picking, choosing, analyzing, or

4    digesting content.

5            And we might in another world in our

6    First Amendment jurisprudence think of picking

7    and choosing, analyzing or digesting content as

8    content providing, but the statute seems to

9    suggest that's not what it is, it's something

10   different in this context, in this statutory

11   context, and it's protected.

12           Do you agree with that?

13           MR. SCHNAPPER:  No.  Let -- and I --

14   if I might explain why?

15           JUSTICE GORSUCH:  Briefly.

16           MR. SCHNAPPER:  I'll do my best.

17   The -- the language that you refer to in

18   Section (f)(4) doesn't apply here.

19           JUSTICE GORSUCH:  No, I -- I -- I --

20   we'll get to that in a minute.  But let's just

21   take that as given, okay, that I think that

22   what, say, Google does in picking, choosing,

23   analyzing, or even digesting content just makes

24   it an access software provider.  Let's take that

25   as given, and so that would normally be

1    protected activity.

2            But (f)(3) carves out a scenario where

3    you become a content provider, and that's

4    something different in my mind to picking,

5    choosing, analyzing, or digesting content, okay?

6    Let's just take those two premises as given.

7            MR. SCHNAPPER:  Okay.

8            JUSTICE GORSUCH:  All right?  You got

9    to do something beyond picking, choosing, or

10   analyzing or digesting content, which is what

11   search engines typically do, even as I

12   understand it.  You've got to do something

13   beyond that.

14           As I take your argument, you think

15   that the Ninth Circuit's "neutral tools" rule is

16   wrong because, in a post-algorithm world,

17   artificial intelligence can generate some forms

18   of content, even according to neutral rules.

19           I mean, artificial intelligence

20   generates poetry, it generates polemics today.

21   That -- that would be content that goes beyond

22   picking, choosing, analyzing, or digesting

23   content.  And that is not protected.

24           Let's -- let's assume that's right,

25   okay?  Then I guess the question becomes, what

1  do we do about YouTube's recommendations?

2         And -- and as I see it, we have a few

3  options.  We could say that YouTube does

4  generate its own content when it makes a

5  recommendation, says "Up next."  We could say

6  no, that's more like picking and choosing.

7         Or we could say the Ninth Circuit's

8  "neutral tools" test was mistaken because, in

9  some circumstances, even neutral tools, like

10 algorithms, can generate through artificial

11 intelligence forms of content and that the Ninth

12 Circuit wasn't sensitive to that possibility and

13 remand the case for it to consider that

14 question.

15        What's wrong with that?

16        MR. SCHNAPPER:  Well, it's not our

17 theory, but it's --

18        (Laughter.)

19        MR. SCHNAPPER:  -- if the alternative

20 is what Ms. Blatt will be telling you, I'll --

21        JUSTICE GORSUCH:  I'm not asking you,

22 you know, hey, I'll win at any cost.

23        MR. SCHNAPPER:  No, there's nothing

24 wrong with it.

25        JUSTICE GORSUCH:  I'm asking you

Official Subject to Final Review

51

1       what's -- what's -- whether that is a correct
2       analysis of the statutory terms you keep
3       referring us to --
4                 MR. SCHNAPPER:  Yes.
5                 JUSTICE GORSUCH:  -- or whether it is
6       not.
7                 MR. SCHNAPPER:  Yes, yes, yes.  As --
8       as we've said, this now is close to something we
9       set out in our brief, which is that the -- that
10      the algorithm could create things on its own.
11      It can create a catalogue of ISIS videos, which
12      would be analogous to a compilation under
13      Section 101 of the Copyright Act.
14                A compilation is a distinct entity,
15      it's copyrightable, even if the elements of it
16      were not.  So, yes, absolutely, the software
17      could create something like that.  It would not
18      be third-party content, and, therefore, it would
19      fall outside the scope of the statute.
20                JUSTICE GORSUCH:  Thank you.
21                CHIEF JUSTICE ROBERTS:  Justice
22      Kavanaugh?
23                JUSTICE KAVANAUGH:  Just to pick up on
24      Justice Gorsuch's questions, the idea of
25      recommendations is not in the statute.  And the

Official Subject to Final Review

52

1    statute does refer to organization, and the

2    definition, as he was saying, of interactive

3    computer service means one that filters,

4    screens, picks, chooses, organizes content.

5         And your position, I think, would mean

6    that the very thing that makes the website an

7    interactive computer service also mean that it

8    loses the protection of 230.  And just as a

9    textual and structural matter, we don't usually

10   read a statute to, in essence, defeat itself.

11        So what's your response to that?

12        MR. SCHNAPPER:  My response is that

13   the text doesn't apply here.  Let me explain

14   why.  The -- the element in -- the -- the list

15   in -- in (f)(4) refers to only one of the three

16   kinds of interactive computer services in

17   (f)(2).

18        In (f)(2) -- and this is -- this is on

19   page 267 of the petition appendix.  (f)(2) says

20   an interactive computer service means -- and

21   there -- it gives you three candidates, you've

22   got one of them -- an information service, a

23   system, or an access software provider.

24        Now YouTube is one of the first two.

25   It doesn't -- it's not a software provider.  The

Official Subject to Final Review

```
 1    definition in (f)(4) only delineates who is an

 2    access software provider.  It doesn't apply to

 3    who's an information system or service.  And

 4    that was Congress's choice.

 5              Congress didn't say you're an

 6    interactive -- you're a service, an information

 7    service or a system if you do those things.  It

 8    said you're only -- those things only bring you

 9    within the four walls of interactive computer

10    service if you're -- if you're a software

11    provider.  And -- and that made sense in the

12    context of what was happening in 1996.

13              In 1996, if you wanted to go online,

14    you would typically sign up with CompuServe or

15    Prodigy and they would literally give you

16    diskettes.  They would sell -- they would be

17    selling you software.

18              And -- and this provision in (f)(4) is

19    about that activity.  That's not what's

20    happening here.

21              JUSTICE KAVANAUGH:  Well, just -- just

22    to go back to 1996 and maybe pick up on Justice

23    Kagan's questions earlier, it seems that you

24    continually want to focus on the precise issue

25    that was going on in 1996, but then Congress
```

Official Transcript, Subject to Final Review

54

1    drafted a broad text, and that text has been
2    unanimously read by courts of appeals over the
3    years to provide protection in this sort of
4    situation and that you now want to challenge
5    that consensus.
6            But the amici on the other side say:
7    Well, to do that, to pull back now from the
8    interpretation that's been in place would create
9    a lot of economic dislocation, would really
10   crash the digital economy with all sorts of
11   effects on workers and consumers, retirement
12   plans and what have you, and those are serious
13   concerns and concerns that Congress, if it were
14   to take a look at this and try to fashion
15   something along the lines of what you're saying,
16   could account for.
17           We are not equipped to account for
18   that.  So are the predictions of problems
19   overstated?  If so, how?  And are we really the
20   right body to draw back from what had been the
21   text and consistent understanding in courts of
22   appeals?
23           MR. SCHNAPPER:  Well, I -- our
24   position is that the text doesn't -- doesn't say
25   this.  With regard to the issue of what we've

Official Subject to Final Review

```
 1    come to call recommendations, this isn't a

 2    longstanding, well-established body of

 3    precedent.  It's really three decisions:  the

 4    decision in this case, the Dyroff decision, and

 5    Force.  And -- and of the eight Justices to --

 6              JUSTICE KAVANAUGH:  What about the

 7    implications then?  Go to that, the implications

 8    for the economy, that you have a lot of amicus

 9    briefs that we have to take seriously that say

10    this is going to cause a lot of economic

11    dislocation in the country.

12              MR. SCHNAPPER:  I mean, I'd say a

13    couple things in response to that.  The first

14    one is, on a close reading of the amicus briefs,

15    it's clear that they are urging the Court to

16    hold that a wide variety of different kinds of

17    things are protected.  They're -- they're

18    inviting the Court to adopt a rule that

19    recommendations are protected and that whatever

20    they're doing would qualify as a recommendation.

21              But you can't --

22              JUSTICE KAVANAUGH:  Well, I think

23    they're saying a recommendation is a

24    recommendation, something express.  I mean,

25    your -- your whole thing is the algorithms are
```

Official, Subject to Final Review

1          an implied recommendation.  And they're saying:

2          Well, they're not an express recommendation.

3          That -- that -- so --

4                    MR. SCHNAPPER:  I'm --

5                    JUSTICE KAVANAUGH:  But, in any event,

6          why don't we focus on the question.

7                    MR. SCHNAPPER:  Yes.  Yes.

8                    JUSTICE KAVANAUGH:  Do you -- do you

9          challenge the -- the basic point?

10                   MR. SCHNAPPER:  I think -- I think --

11         yes.  I -- I --

12                   JUSTICE KAVANAUGH:  And so --

13                   MR. SCHNAPPER:  We -- we do, on -- on

14         a couple grounds.  One of them is that I'm not

15         sure all these decisions -- these briefs are

16         distinguishing as we have today between

17         liability because of the content of third-party

18         materials and the recommendation function

19         itself.

20                   A -- a distinction between more and

21         less specific suggestions --

22                   JUSTICE KAVANAUGH:  What would the

23         difference be in liability, in damages?

24                   MR. SCHNAPPER:  I'm sorry, between

25         which two things?

1          JUSTICE KAVANAUGH:  The third-party
2     content and the recommendation.
3          MR. SCHNAPPER:  Well, most of the time
4     the recommendations isn't going to --
5          JUSTICE KAVANAUGH:  Like how would the
6     money at the end of the day differ if you are
7     successful?
8          MR. SCHNAPPER:  It might not be.  But
9     most recommendations just aren't actionable.  I
10     mean, there -- there is no cause of action for
11     telling someone to look at a book that has
12     something defamatory in it.
13          JASTA, the statute we're talking about
14     tomorrow, is unusual in that recommendations
15     could run you afoul of the statute.  But there
16     are very few claims that are like that, so
17     it's -- it's a very different kind of situation.
18     It's -- the implications of this are limited
19     because the kinds of circumstances in which a
20     recommendation would be actionable are limited.
21          JUSTICE KAVANAUGH:  Thank you.
22          CHIEF JUSTICE ROBERTS:  Justice
23     Barrett?
24          JUSTICE BARRETT:  I'd like to take you
25     back, Mr. Schnapper, to Justice Sotomayor's

58

1    questions about the complaint.  It seems to me

2    that the complaint in this case is materially

3    indistinguishable from the complaint in

4    tomorrow's case.  Do you agree?  Same aiding and

5    --

6              MR. SCHNAPPER:  The complaint in which

7    case?  I'm sorry.

8              JUSTICE BARRETT:  In tomorrow's case,

9    in the Taamneh case, the Twitter case, and this

10   one.

11             MR. SCHNAPPER:  Pretty much.

12             JUSTICE BARRETT:  So they're both

13   relying on the same aiding-and-abetting theory.

14   So, if you lose tomorrow, do we even have to

15   reach the Section 230 question here?  Would you

16   concede that you would lose on that ground here?

17             MR. SCHNAPPER:  No.  The -- there was

18   a motion to dismiss in tomorrow's case on JASTA

19   grounds.  It didn't get decided.  So, if we lose

20   tomorrow, they'll be -- the defense will be free

21   in this case to -- to move to dismiss, but we'd

22   be entitled to try to amend the complaint in

23   this case to satisfy whatever standard you

24   establish tomorrow.

25             JUSTICE BARRETT:  Okay.  Let me ask

1    you this.  I'm switching gears now.  So Section
2    230 protects not only providers but also users.
3    So I'm thinking about these recommendations.
4    Let's say I retweet an ISIS video.  On your
5    theory, am I aiding and abetting and does the
6    statute protect me, or does my putting the
7    thumbs-up on it create new content?
8                MR. SCHNAPPER:  I -- we don't read the
9    word "user" in -- that broadly.  There's not
10   been a lot of litigation about this.
11               We -- we think the word "user" is
12   there to deal with a situation in which one
13   entity accesses a -- a -- a server, YouTube, for
14   example, and then someone else uses that entity,
15   like when I go to FedEx Office, FedEx Office is
16   the user that is accessing my e-mail, and the
17   statute protects them when I look at the FedEx
18   computer and find the defamatory --
19               JUSTICE BARRETT:  Well, let's say that
20   I disagree with you.  Let's say I'm an entity
21   that's using the service -- the service, so I
22   count as a user.  You know, my computer is
23   accessing the servers when I retweet the image.
24   On your theory, could I be liable under JASTA
25   for aiding and abetting without -- do I lose 230

Official Subject to Final Review

60

```
1     protection?
2              MR. SCHNAPPER:  Right.  Right.  Right.
3              JUSTICE BARRETT:  Have I created new
4     content?
5              MR. SCHNAPPER:  The problem -- whether
6     it's enough for JASTA is a separate inquiry.
7              JUSTICE BARRETT:  Okay.  Right.  Fair
8     enough.
9              MR. SCHNAPPER:  The question is, is it
10    outside 230?
11             JUSTICE BARRETT:  Is it outside of
12    230.
13             MR. SCHNAPPER:  Right.  And our view
14    is the statute doesn't mean anyone who's a user
15    who re -- who tweet -- who -- who pub -- conveys
16    third-party libel is protected.  If you -- let's
17    say that you -- you read a book, and it says
18    John Doe is a shoplifter, and you send an e-mail
19    that says John Doe is a shoplifter, you're
20    using, you know, the Internet.  You're using the
21    -- the e-mail system.
22             But nobody thinks that -- that Section
23    230 gives -- is a blanket exemption for
24    defamation on the website as long as you're
25    quoting somebody else.
```

1          Retweeting is a very automatic way of

2     doing it, but if you start down that road, you'd

3     end up having to hold that as -- that anytime I

4     send a defamatory e-mail, I'm protected as long

5     as I'm quoting somebody else.  And I don't think

6     anybody --

7          JUSTICE BARRETT:  Well, I guess I

8     don't understand -- I mean, let's see, I guess I

9     don't understand logically why your argument

10    wouldn't mean that I was creating new content if

11    I retweeted or if I liked it or if I said check

12    this out.  Why --

13         MR. SCHNAPPER:  Well -- well, you --

14         JUSTICE BARRETT:   -- why wouldn't

15    that?

16         MR. SCHNAPPER:   -- you would be, but

17    I'm advancing an argument that gets to the same

18    place, which is you're -- you're not a user

19    within the meaning of the statute just because

20    you use -- you go on e-mail or -- or YouTube or

21    -- or on Twitter.

22         JUSTICE BARRETT:  Let's say I disagree

23    with you.  Let's say that I think you're a user

24    of Twitter if you go on Twitter and you're using

25    Twitter and you retweet or you like or you say

1    check this out.  On your theory, I'm not

2    protected by Section 230.

3              MR. SCHNAPPER:  That's content you've

4    created.

5              JUSTICE BARRETT:  That's content I've

6    created.  Okay.  And on the content creation

7    point, let's imagine -- it seems like you're

8    putting a whole lot of weight on the fact that

9    these are thumbnails, and so it's something that

10   YouTube separately creates.

11             MR. SCHNAPPER:  Yes.

12             JUSTICE BARRETT:  What if they just

13   screenshot?  They just screenshot the ISIS

14   thing.  They don't do the thumbnail.  Then are

15   they --

16             MR. SCHNAPPER:  That's -- that's pure

17   third-party content.

18             JUSTICE BARRETT:  That's pure third --

19   so this is just about how YouTube set it up?

20             MR. SCHNAPPER:  That's -- that's --

21   that's correct in this context.  And it gets

22   back to the conversation we were having earlier

23   about this is a new technology that didn't exist

24   in 1996, and rather than ask Congress to write

25   the statute to cover it, they just went ahead

Official - Subject to Final Review

63

1    and did it.

2                    JUSTICE BARRETT:  Okay.  And last

3    question, turning to the statutory text.  So it

4    seems to me that some the briefs in this case

5    are focusing on what it means to treat someone

6    as a publisher, treat an entity as a publisher.

7    You're not really focusing on that and the

8    traditional editorial functions argument.  I

9    mean, you're really focusing on the content

10   provider argument, correct?

11                   MR. SCHNAPPER:  No.  Well, we've

12   advanced views as to each element of the claim.

13   Our --

14                   JUSTICE BARRETT:  But today you've

15   really been honing in on this are you actually

16   creating content or just presenting third-party

17   content.

18                   MR. SCHNAPPER:  Well, I've been

19   answering -- that's where the questions --

20                   JUSTICE BARRETT:  Yes.

21                   MR. SCHNAPPER:  -- have taken us, but

22   -- but -- but our -- our view would be that

23   you're not being treated as a publisher of the

24   video just because you -- you publish the

25   thumbnail.

1          JUSTICE BARRETT:  Okay.  Thank you.

2          MR. SCHNAPPER:  You're not being

3   harmed by the thumbnail.

4          JUSTICE BARRETT:  Thank you.

5          CHIEF JUSTICE ROBERTS:  Justice

6   Jackson?

7          JUSTICE JACKSON:  So I guess -- I

8   guess I'm thoroughly confused, but let me -- let

9   me try to -- let me try to understand what your

10  argument is.  I think that the confusion that

11  I'm feeling is arising from the possibility that

12  we're talking about two different concepts and

13  conflating them in a way.

14          I thought that Section 230 and the

15  questions that we were asking in this case today

16  was about whether there was immunity and whether

17  Google could claim the defense of immunity and

18  that that's actually different than the question

19  of whether whatever it does gives rise to

20  liability.  That is, is there liability for

21  aiding and abetting?  That's tomorrow's

22  question.

23          And to the extent that you keep coming

24  back to this notion of creating content or

25  whatnot, I feel like we're conflating the two in

Official Subject to Final Review

65

 1    a way that I'd like to just see if I can clear
 2    up from my perspective.
 3           Your brief says that the immunity
 4    question, Section 230(c)(1)'s text is most
 5    naturally read to prohibit courts from holding a
 6    website liable for failing to block or remove
 7    third-party content.
 8           And I read the arguments in your brief
 9    and I read what you said about Stratton Oakmont
10    and the sort of background, and so I thought
11    your argument was that the -- that you can only
12    claim immunity, Google, if the claim that's
13    being made against you is about your failing to
14    block or remove third-party content.
15           To the extent we are making a claim
16    about recommendations or doing anything else,
17    any of the, you know, hypotheticals that people
18    have brought up, that's outside of the scope of
19    the statute because, really, the statute is
20    narrowly tailored in a way to protect Internet
21    platforms from claims about failing to block or
22    remove, right?  I mean, that's what I thought
23    was happening.
24           All right.  So, if that's true, then
25    all the hypotheticals and the questions about

Official Subject to Final Review

66

```
 1    are you aiding and abetting if Google, you know,

 2    has a priority list or if there's

 3    recommendations, maybe, but that's not in the

 4    statute because we're just talking about

 5    immunity.  We're just talking about whether or

 6    not you've made a claim for failing to block or

 7    remove in this case today related to Section

 8    230.

 9            Am I doing too much of a separation

10    here in terms of how I'm conceiving of it?

11            MR. SCHNAPPER:  Well, let me

12    articulate what -- what the contention is that

13    we are advancing, and I think it's not quite the

14    way you described it.  The contention we're

15    advancing is that a variety of things that we're

16    loosely characterizing as recommendations fall

17    outside of the statute.

18            JUSTICE JACKSON:  Why?

19            MR. SCHNAPPER:  Because, in some of

20    them, the defendant's not being treated as the

21    publisher; because, in some of them, third-party

22    content's being -- content is being created by

23    the defendant; because, in some of them, the

24    defendant's not acting as an interactive

25    computer service.
```

```
 1              JUSTICE JACKSON:  I see.  So I -- I

 2   thought -- I thought you were -- the answer to

 3   why was because the statute is limited, because

 4   the statute only focuses on certain kind of

 5   publisher conduct, and to the extent that --

 6   that they're doing anything else, recommending

 7   or whatever, that's not going to be covered by

 8   this statute.

 9              But you're sort of saying, well, let's

10   look at what they're actually doing and it may

11   fit in or it may not.  You're not sort of hewing

12   very closely to the understanding of the

13   original scope of the statute in terms of what

14   it is trying to immunize these platforms

15   against.

16              MR. SCHNAPPER:  I -- I -- I think

17   we're trying to do that in somewhat more of a

18   particularized way, that is, to -- to identify

19   -- to work our way through each of the three

20   specific elements of the statute, each tied to

21   particular language, to --

22              JUSTICE JACKSON:  But I've got to tell

23   you I don't see three elements in this.  I mean,

24   part of me -- part of this is all the confusion,

25   I think, that has developed over time about the
```

Official, Subject to Final Review

68

1    meaning of the statement in the statute, right?

2            I don't see three elements.  I see

3    literally a sentence, and the sentence in my

4    view reads as though they're trying to actually

5    direct courts to not impose publisher liability,

6    strict publisher liability, against the backdrop

7    of Stat -- of Stratton Oakmont.

8            So there's like some -- somehow we've

9    gotten to a world in which we've teased out

10   three elements and we're trying to fit it all

11   into that, when I thought there was sort of a

12   very simple, sort of straightforward way to read

13   the statute that you articulate in your brief,

14   which is this is really -- this statute, (c)(1),

15   is really just Congress trying to not

16   disincentivize these platforms for blocking and

17   screening offensive conduct.

18           And so what they said is let's look at

19   (c)(1).  Let's have (c)(2).  Let's have a system

20   in which a system -- a platform is not going to

21   be punished, strict liability for just having

22   offensive conduct on their website, and, if they

23   try -- if they try to screen out, we're not --

24   we're going to say you won't be responsible for

25   that either.  That's (c)(2).

Official - Subject to Final Review

69

```
 1          But it really doesn't speak to whether
 2    you do a recommendation or whether you have an
 3    algorithm that does priorities or any of these
 4    other things.  That's how I thought that -- that
 5    at least I was looking at the statute in light
 6    of its purposes and history and -- and -- and
 7    Stratton Oakmont and all of that, in which case
 8    I think you would win, unless your
 9    recommendations argument really is just the same
10    thing as saying they are hosting ISIS videos on
11    their website.
12          MR. SCHNAPPER:  Well, I -- I think --
13    I think we do have to be drawing that
14    distinction.
15          But, with regard to your question
16    about the three elements, the -- the text does
17    take you there.  It says, if you track the
18    briefs probably of either side, the -- part of
19    -- we're arguing about the meaning of "treat as
20    a publisher" because that's the first couple of
21    words of the statute.
22          Then we're arguing about did they
23    create the content because "publisher" has to be
24    of -- has to be of information provided by
25    another content provider.  So we have to parse
```

1    out the meaning of that.

2              And then it refers to the defendant as

3    an interactive computer service, and we have to

4    parse out the meaning of, well, what does that

5    mean?  So we -- we are forced to -- this --

6    this -- the language of the statute has those

7    three components, and it -- although the overall

8    purpose is I think as you described it, the

9    language is more complex and particularized.

10             JUSTICE JACKSON:  Thank you.

11             CHIEF JUSTICE ROBERTS:  Thank you,

12   counsel.

13             Mr. Stewart.

14             ORAL ARGUMENT OF MALCOLM L. STEWART

15          FOR THE UNITED STATES, AS AMICUS CURIAE,

16                   SUPPORTING VACATUR

17             MR. STEWART:  Thank you, Mr. Chief

18   Justice, and may it please the Court:

19             I'd like to begin by addressing the

20   Roger Maris hypothetical because I -- I think it

21   illustrates our position and the limits on our

22   position.

23             Imagine in a particular state there

24   was an unusually protective law that said no

25   booksellers shall be held liable on any theory

1    for the content of any book that it sells, and
2    then the scenario that the Chief Justice
3    described occurred, the person was asked where
4    is the Roger Maris book and said it's over on
5    that table with the other sports book -- books.
6            Now, if the bookseller was sued for
7    making that statement, our position would be
8    there's no way textually that the immunity
9    statute would apply.  This is a statement about
10   the book, not the contents of the book.
11           Now the statement "the book is over
12   there" is so obviously innocuous that it might
13   seem like pedantry to quibble about should the
14   dismissal of the suit be based on immunity or
15   for failure to state a claim.  But a court, in
16   thinking about the possibility of harder cases
17   down the road, should distinguish carefully
18   between liability for the content itself,
19   liability for statements about the content.
20           And the other one other thing I would
21   say is, if the consequence of saying "it's over
22   there" was that the bookseller lost its immunity
23   for the content of the book, that would be a big
24   deal.  But our position on 230(c)(1) is nothing
25   like that.

Official Draft, Subject to Final Review

1           Our position is that the Internet

2    service provider can be sued for its own

3    organizational choices, but the fact that it

4    makes organizational choices doesn't deprive it

5    of the protection it receives for liability

6    based on the third-party content.

7           I welcome the Court's questions.

8           JUSTICE THOMAS:  Well, I'm still

9    confused.  What if the bookseller said, "it's

10   over there on the table with the other

11   trustworthy books"?

12          MR. STEWART:  I mean, I think at that

13   point you would be asking could it conceivably

14   be an actionable tort to describe the book as

15   trustworthy.

16          JUSTICE THOMAS:  Well, we're putting a

17   lot of weight on organization.  But doesn't it

18   really depend on how we're organizing it and on

19   what the basis of the organization -- for

20   example, we could say this set -- you could

21   organize it on the basis of what's more

22   trustworthy than -- than something else.

23          MR. STEWART:  I think that might

24   matter with respect to whether there was

25   substantive liability under the underlying cause

Official Subject to Final Review

73

```
1    of action.  It -- it shouldn't matter for
2    purposes, either of the hypothetical immunity I
3    -- statute I described, which focuses
4    exclusively on the contents of the books, or for
5    230(c)(1).
6            Now Mr. Schnapper said in a colloquy
7    earlier that he thought the allegations in his
8    complaint are basically the same as those in the
9    Twitter complaint.  And the government is
10   arguing in Twitter that those allegations are
11   not sufficient to state a claim under the
12   Anti-Terrorism Act.
13           So our -- our interest in 230(c)(1) is
14   not in allowing this particular suit to go
15   forward.  It is in preserving the distinction
16   between immunity -- protection for the
17   underlying content and protection for the
18   platform's own choices.
19           JUSTICE THOMAS:  Well, I -- I just
20   think it's going to be difficult.  How would you
21   respond to Justice Gorsuch's hypothetical about
22   the artificial intelligence creating content
23   organizational decisions?
24           MR. STEWART:  I mean, I think the
25   organizational decisions could still be
```

```
 1    subjected to a suit.  Whether you think of them
 2    as recommendations or simply as the platform --
 3    the operation of the platform, it's still the
 4    platform's own choice.
 5           And if you ask how did a particular
 6    video wind up in the queue of a particular
 7    individual, it -- it could be some -- some sort
 8    of artificial intelligence that was making that
 9    choice, but it would have to do with the --
10    YouTube's administration of its own platform.
11    It wouldn't be a choice made by any third-party
12    who had posted it because third parties who post
13    on YouTube don't direct their videos to
14    particular recipients.
15           And -- and I -- I do want to emphasize
16    this -- this theory, this rationale applies even
17    in the most mundane circumstances.  For
18    instance, if you do a Google search on the name
19    for a famous person and you misspell the name
20    slightly, you still get lots of content about
21    that person.  Google knows that it's smarter
22    than we are and it knows that -- more about what
23    we want than the literal terms of our search
24    might suggest.
25           I went to the Court's website and used
```

1    the docket search function and typed in Google

2    and left off the -- the final E and I got a

3    message that said no items find -- found.  In

4    order to call up the docket for this case, you

5    have to spell Google exactly right.

6             Now the choice between those two modes

7    of operating the platform, it's extraordinarily

8    unlikely, almost inconceivable that it could

9    ever give rise to legal liability, but those are

10   choices made by the platforms themselves.  They

11   are not choices made by any third party.  They

12   just don't implicate 230(c)(1).

13            And the choice -- any conceivable

14   lawsuit about the decision to use one mode of

15   operation rather than another, presumably, would

16   be dismissed on the merits.  But --

17            JUSTICE KAGAN:  I -- I think the

18   problem, Mr. Stewart, with minimizing what your

19   position is is that in trying to separate the

20   content from the choices that are being made,

21   whether it's by YouTube or anyone else, you

22   can't present this content without making

23   choices.  So, in every case in which there is

24   content, there's also a choice about

25   presentation and prioritization.

1        And the whole point of suits like this

2    is that those choices about presentation and

3    prioritization amplify certain message --

4    messages and thus create more harm.

5        Now I appreciate what you're saying is

6    like, well, that doesn't mean that you're going

7    to have liability in every case, but -- but --

8    but still, I mean, you are creating a world of

9    lawsuits.  Really anytime you have content, you

10   also have these presentational and

11   prioritization choices that can be subject to

12   suit.

13       MR. STEWART:  Let -- let me say a

14   couple of things about that.  The first thing I

15   would say is you could make substantially the

16   same argument about employment decisions.  That

17   is, in order for YouTube to operate, it has to

18   hire employees.

19       But Ms. Blatt acknowledges in the --

20   the brief that employment decisions wouldn't be

21   shielded by 230(c)(1) if there was an allegation

22   of unlawful discrimination, for instance.

23       So the fact that the platform has to

24   make some sorts of organizational choices

25   doesn't mean it's immune from suit in the rare

1    instance where it might make a choice that

2    violates some other provision of law.

3          The second thing is the concern we

4    have in mind are things like imagine a

5    hypothetical job matching service like Indeed,

6    where job applicants can post their

7    qualifications and potential employers can post

8    their own listings and the website will match

9    them up.

10          And suppose it came to light that the

11    job -- the job search mechanism was routing the

12    high-paying, more professional jobs

13    disproportionately to the white applicants and

14    the lower-paying jobs to the black applicants

15    even when the qualifications were the same.

16          At -- at a general level, you could

17    describe that as choices about which content

18    would go to which users.  But, when we saw that

19    kind of stark impropriety in the criteria that

20    the platform was -- was using, I think we would

21    say there has to be -- assuming it violates

22    applicable law, 230(c)(1) really shouldn't be

23    protecting that.  That's not -- the complaint we

24    have here is not to the content itself or the

25    presence of the third-party job postings on the

Official - Subject to Final Review

78

1    platform.  The complaint is about the use of

2    illicit criteria to decide which users will get

3    which content.

4           And our point is, in the more

5    innocuous cases or in the borderline cases where

6    the criteria seem a little bit shaky, but it's

7    not clear whether they violate any applicable

8    law, that that choice ought to be made based on

9    the law that the plaintiff invokes as the cause

10    of action.  And the Court ought to be

11    determining, does the use of those criteria

12    violate that law?  And it --

13           CHIEF JUSTICE ROBERTS:  Well, I was

14    just going to say your -- the problem with your

15    analogies is that they involve -- I don't know

16    how many employment decisions are made in the

17    country every day, but I know that whatever it

18    is, hundreds of millions, billions of responses

19    to inquiries on the Internet are made every day.

20           And, as Justice Kagan suggested, under

21    your view, every one of those would be a

22    possibility of a lawsuit if they thought there

23    was something that the algorithm referred that

24    was defamatory, that, you know, whatever it is,

25    exposed them to harmful information.  And so

Official - Subject to Final Review

79

1    that may be the analogy doesn't fit the

2    particular -- particular context.

3        MR. STEWART:  I mean, I think it is

4    true that many platforms today are making an

5    enormous number of these choices.  And if

6    Congress thinks that circumstances have changed

7    in such a way that amendments to the statute are

8    warranted because things that didn't exist or

9    that weren't on people's minds in 1996 have

10   taken on greater prominence, that would be a

11   choice for Congress to make.

12       CHIEF JUSTICE ROBERTS:  Well, but

13   choice for Congress to make -- I mean, the --

14   the amici suggest that if we wait for Congress

15   to make that choice, the Internet will -- will

16   be sunk.  And so maybe that's not as persuasive

17   a outcome as it might seem in other cases.

18       MR. STEWART:  I -- I think the main

19   thing I would say is most of the amici that are

20   making that projection are making it based on a

21   misunderstanding of our position; namely, they

22   are misunding our -- misunderstanding our

23   position to be that once YouTube recommends a

24   video or once YouTube sends a video to a

25   particular user without the user requesting it,

Official Subject to Final Review

80

1    that YouTube is liable for any impropriety in

2    the content of the video itself.

3           And that's not our position.  Our

4    position is that YouTube's own conduct falls

5    outside of 230(c)(1).  It's unlikely in very

6    many instances to give rise to actual liability.

7           JUSTICE KAVANAUGH:  Why not?  Why --

8    why -- why wouldn't it be liable?  Explain that.

9           MR. STEWART:  I think the reason --

10   the reason we would say is for -- for -- in this

11   case in particular, to -- to look ahead a little

12   bit to the -- the Twitter argument tomorrow,

13   there were questions at the beginning of

14   Mr. Schnapper's presentation about the role that

15   neutrality played in the analysis, and our view

16   is neutrality is not part of the 230(c)(1)

17   analysis, but it's a big part of the

18   Anti-Terrorism Act analysis because we say a

19   person is much more likely to be liable for

20   aiding and abetting if it is due -- kind of

21   giving special treatment to the primary

22   wrongdoing, if it has taken --

23          JUSTICE KAVANAUGH:  Well, you -- keep

24   going.

25          MR. STEWART:  And -- and -- and so, if

Official Subject to Final Review

```
 1    it is, in fact, the case that YouTube is

 2    applying neutral algorithms, is simply showing

 3    more ISIS videos to people who've shown an

 4    interest in ISIS, just as it does more cat

 5    videos to people who've shown an interest in --

 6    in cats, that's much less likely to give rise to

 7    liability under the Anti-Terrorism --

 8            JUSTICE KAVANAUGH:  I mean, much less

 9    likely, I'm not sure based on what.  You seem to

10    be putting a lot of stock on the liability piece

11    of this rather than, as Justice Jackson was

12    saying, the immunity piece.  And I'm just not

13    sure -- you know, if we -- if we go down this

14    road, I'm not sure that's going to really pan

15    out.  Certainly, as Justice Kagan says, lawsuits

16    will be nonstop --

17            MR. STEWART:  I --

18            JUSTICE KAVANAUGH:   -- on defamatory

19    material, which there's a lot of, that is out

20    there and finds its way onto the websites that

21    host third-party conduct.

22            MR. STEWART:  And -- and --

23            JUSTICE KAVANAUGH:  There will be lots

24    of lawsuits.  You agree with that?

25            MR. STEWART:  I -- I wouldn't
```

Official Subject to Final Review

82

1    necessarily agree with there would be lots of

2    lawsuits, simply because there are a lot of

3    things to sue about, but they would not be suits

4    that have much likelihood of prevailing,

5    especially if the Court makes clear that even

6    after there's a recommendation, the website

7    still can't be treated as the publisher or

8    speaker of the underlying third-party content.

9            JUSTICE KAVANAUGH:  Well, just bigger

10   picture then to the Chief's question, isn't it

11   better for -- to keep it the way it is for us

12   and Congress -- to put the burden on Congress to

13   change that and they can consider the

14   implications and make these predictive

15   judgments?

16           You're asking us right now to make a

17   very precise predictive judgment that, don't

18   worry about it, it's really not going to be that

19   bad.  I don't know that that's at all the case,

20   and I don't know how we can assess that in any

21   meaningful way.

22           MR. STEWART:  I -- I think, with

23   respect, that that -- that characterization of

24   the existing case law overstates the extent to

25   which courts are in agreement that platform

1    design choices --

2              JUSTICE KAVANAUGH:  Assume they are.

3    Assume the status quo is against you in the law.

4    And you're asking us, well, the status quo is

5    wrong, okay, and this Court's the first time

6    we're getting to look at it.  But don't worry

7    about the implications of this because it's

8    really all going to be fine, there won't be many

9    successful lawsuits, there won't be really many

10   lawsuits at all.

11             And I -- I don't know how we can make

12   that assessment.

13             MR. STEWART:  I think, if the Court

14   thought that kind of the interpretive question,

15   looking at the plain language of the statute,

16   was on a knife's edge, it was an authentically

17   close call, then, yes, the Court could -- and

18   the Court perceived the existing case law to be

19   basically uniform, the Court could give some

20   weight to the interest in stability.

21             But I think, for us, neither of those

22   things is true.

23             JUSTICE BARRETT:  Mr. Stewart --

24             MR. STEWART:  That --

25             JUSTICE BARRETT:  Oh, sorry.  Please

Official Transcript, Subject to Final Review

1    finish.

2              MR. STEWART:  I was -- I was going to

3    say the statutory text really is not -- it -- it

4    may have a little bit of ambiguity at the

5    margins, but it is very clearly focused on

6    protecting the platform from liability for

7    information provided by another information

8    content provider, not by the platform's own

9    choices.

10             I'm sorry, Justice Barrett?

11             JUSTICE BARRETT:  Oh, no, no, no, I'm

12   sorry.

13             So speaking of this question of what

14   are the implications of this and Justice

15   Jackson's points about liability and immunity

16   overlapping, it seems like one of the responses

17   to should we worry about this is, well, it's

18   going to be the rare kind of claim that could be

19   based on recommendations.

20             So speaking of that, what is the

21   government's position, if you have one, on

22   whether, if the plaintiffs below lose tomorrow

23   in Twitter, should we just send this back?

24   Because there isn't -- I mean, you said the

25   government's position is that there is no claim.

Official Subject to Final Review

85

```
1    So --
2              MR. STEWART:  Certainly, our position
3    -- we haven't analyzed the -- the Gonzalez --
4              JUSTICE BARRETT:  Right.
5              MR. STEWART:  -- complaint in detail,
6    but that is our position as to the Twitter
7    complaint.  And Mr. Schnapper said he doesn't
8    perceive a material difference between the two.
9              Now, presumably, the Court granted
10   cert in both cases because it thought it would
11   at least be helpful to clarify the law both as
12   to the Anti-Terrorism Act and as to Section
13   230(c)(1).  But, if the Court no longer believes
14   that or if it resolves Twitter in such a way
15   that it seems evident that its decision on the
16   230(c)(1) issue wouldn't ultimately be
17   outcome-determinative in Gonzalez, then it could
18   vacate and remand for further analysis of the
19   ATA question.  That would be a permissible -- I
20   mean, a possible course of action.
21             JUSTICE BARRETT:  Okay.
22             CHIEF JUSTICE ROBERTS:  Thank you,
23   counsel.
24             We're talking about the prospect of
25   significant liability in litigation, and up to
```

86

1  this point, people have focused on the ATA

2  because that's the one point that's at issue

3  here.

4         But I suspect there would be many,

5  many times more defamation suits, discrimination

6  suits, as -- as some of the discussion has been

7  this morning, infliction of emotional distress,

8  antitrust actions.

9         I -- I mean, it -- I guess I'd be

10  interested to understand exactly what the

11  government's position is on the scope of the

12  actions that could be brought and whether or not

13  we ought to be -- I mean, it would seem to me

14  that the terrorism support thing would be just a

15  tiny bit of all the other stuff.  And why

16  shouldn't we be concerned about that?

17         MR. STEWART:  Let me just address the

18  -- the potential causes of action that you

19  mentioned.  For defamation, even if somebody is

20  suing about the recommendation, 230(c)(1) still

21  directs that the platform can't be treated as

22  the publisher or speaker of the underlying

23  content.  And so the question --

24         CHIEF JUSTICE ROBERTS:  Well, right.

25  But it's -- it's -- defamation law is implicated

1    if you repeat libel even though you didn't

2    originally commit defamation.

3         MR. STEWART:  If you repeat it, and so

4    if YouTube circulated videos with a little blurb

5    saying -- and I think one of the amicus briefs

6    describes this hypothetical scenario -- if you

7    repeated it with a little blurb saying this

8    video shows that John Smith is a murderer, then,

9    yes, there would be liability.  But --

10        CHIEF JUSTICE ROBERTS:  But there

11   wouldn't be if you just repeated it without any

12   commentary?  Normally, it would be if you're the

13   newspaper and you just publish something, so and

14   so's a shoplifter, the newspaper would be liable

15   for that.

16        MR. STEWART:  No, we think it should

17   be analyzed as though it were an explicit

18   recommendation.  And so, if Google had posted a

19   message that said we recommend that you watch

20   this video, now the recommendation would be its

21   own content.  But, in answering the question can

22   it be held liable for defamation, you would ask:

23   Can a person under the law of the applicable --

24   of the relevant state be held liable for

25   recommending content that is itself defamatory

Official - Subject to Final Review

1   if the recommender does not repeat the

2   defamatory aspects of that content in the course

3   of the recommendation?

4           And our understanding is that at least

5   under the common law the answer to that would be

6   no, that simply saying you should read this book

7   that turns out to be defamatory would not be a

8   basis for defamation liability.

9           I think the same would basically be

10  true of intentional infliction of emotional

11  distress.  That is, unless you could show that

12  the platform was acting with the intent to cause

13  emotional distress by circulating the video,

14  there would be no liability.  And the fact that

15  the third-party poster may have met the elements

16  of that offense wouldn't carry the day.

17          With respect to antitrust, if you had

18  a claim that a particular search engine had

19  configured its results in such a way as to boost

20  its own products or to diminish the search

21  results for products of the competitor and if

22  that were found to be a viable claim under the

23  antitrust laws, there would be no reason to

24  insulate the provider from liability for that.

25          CHIEF JUSTICE ROBERTS:  Now that's --

1    that's a broad overview of a lot of different

2    areas of law, but, certainly, the law is not

3    established the way you're suggesting, I -- I

4    think, in any of those areas.

5            MR. STEWART:  But I guess the question

6    is, what did Congress intend to do or what did

7    it do when it passed this statute?

8            And Congress didn't create anything

9    that was -- even resembled a -- an all purposes

10   of immunity, immunity for anything it might do

11   in the course of its functions.  It focused very

12   precisely on information provided by another

13   information content provider.

14           CHIEF JUSTICE ROBERTS:  Thank you,

15   thank you.

16           Justice Thomas?

17           Justice Alito?

18           JUSTICE ALITO:  In the government's

19   view, are there any circumstances in which an

20   Internet service provider could be sued for

21   defamatory content in a video that it provides?

22           MR. STEWART:  I think --

23           JUSTICE ALITO:  Third-party video.

24           MR. STEWART:  -- I think the only --

25   given our understanding of the -- the common

Official - Subject to Final Review

90

```
1    law, I think the only way that would happen is

2    if the third-party provider, in circulating the

3    video, added its own comment that incorporated

4    the defamatory gist of the allegations.

5              And as the Chief Justice was pointing

6    out, it is true that under common law, if you

7    repeat somebody else's defamatory statement but

8    say what it is, that you can be held liable for

9    that.

10             JUSTICE ALITO:  I mean, imagine the

11   most defamatory -- terribly defamatory video.

12   So suppose the competitor of a restaurant posts

13   a video saying that this rival restaurant

14   suffers from all sorts of health problems, it --

15   it creates a fake video showing rats running

16   around in the kitchen, it says that the chef has

17   some highly communicable disease and so forth,

18   and YouTube knows that this is defamatory, knows

19   it's -- it's completely false, and yet refuses

20   to take it down.

21             They could not be civilly liable for

22   that?

23             MR. STEWART:  That -- that's our -- I

24   mean, we think that Zeran -- Zeran was not

25   exactly a defamation case, but it fit within --
```

1    pretty closely within that profile.  That is,

2    Zeran was the early Fourth Circuit case in which

3    a person posted a video that purported to be

4    from another person and subjected that other

5    person to complaints and harassment that seemed

6    justified to -- to the people who were doing it.

7             JUSTICE ALITO:  Well, did any -- did

8    any entity have that scope of protection under

9    common law?

10            MR. STEWART:  No, not -- no, I don't

11   believe so.  And that was the point of (c)(1).

12   The point of (c)(1) was to say --

13            JUSTICE ALITO:  Well, it was at least

14   to -- to shield Internet service providers from

15   liability they -- excuse me -- based on their

16   status as a publisher.

17            MR. STEWART:  I -- I wouldn't put it

18   as --

19            JUSTICE ALITO:  But even a distributor

20   wouldn't have immunity if it knew as a matter of

21   fact that this material that it was distributing

22   was defamatory, isn't that right?

23            MR. STEWART:  I mean, that -- that --

24   that is right.  I think we would think of the

25   distributor as a subcategory of publisher, but,

Official - Subject to Final Review

92

1    yes, the bookseller would not be strictly
2    liable.  And, obviously, Justice --
3          JUSTICE ALITO:  You really think that
4    Congress meant to go that far?
5          MR. STEWART:  We -- we do, but,
6    obviously, that is -- if we're arguing about
7    whether the failure to take something down is
8    actionable if it is done knowingly and with an
9    understanding of the contents, then that --
10   that's a very different argument from the one
11   that we've been having up to this point.
12         That -- that would be saying that the
13   statute should be construed --
14         JUSTICE ALITO:  But that is your --
15   but that is your position?
16         MR. STEWART:  Our position --
17         JUSTICE ALITO:  That is the
18   government's position, is it not?
19         MR. STEWART:  -- our position -- yes,
20   our position is that if the -- if the wrong
21   alleged is simply the failure to block or remove
22   the third-party content, that 230(c)(1) protects
23   the platform from liability for that, whether
24   it's based on a strict liability theory or on a
25   theory -- theory of negligence or

Official Subject to Final Review

93

1    unreasonableness in failing to take the material
2    down upon request.
3         JUSTICE ALITO:  The Internet service
4    provider wants to -- really has it in for
5    somebody, wants to harm this person as much as
6    possible, and so posts extraordinarily gruesome
7    videos of a family member who's been involved in
8    an automobile accident or something like that.
9         MR. STEWART:  Well, when you use the
10   verb "posts," that -- that's a different
11   analysis.  That is, if YouTube created --
12        JUSTICE ALITO:  No, it's provided by
13   somebody else, and YouTube knows that it's --
14   knows what it's -- what it is, and yet it puts
15   it up and refuses to take it down.
16        MR. STEWART:  Yes.  Our view is, if
17   the only wrong alleged is the failure to block
18   or remove, that would be protected by 230(c)(1).
19   But -- but that's -- the 230(c)(1) protection
20   doesn't go beyond that.  And the theory of
21   protecting the -- the website from that was that
22   the wrong is essentially done by the person who
23   makes the post.  The website at most allows the
24   harm to continue.
25        And what we're talking about when

1    we're talking about the -- the website's own

2    choices are affirmative acts by the website, not

3    simply allowing third-party material to stay on

4    the platform.

5            JUSTICE ALITO:  So an express

6    recommendation would potentially subject YouTube

7    to civil liabilities.  So they put up -- they

8    say, watch this ISIS video, spectacular, okay,

9    they could be liable there?

10           MR. STEWART:  Yes, if the other

11   elements --

12           JUSTICE ALITO:  If it's expressed.

13   What if it's just implicit?  What if it's the

14   fact that they put this up first and therefore

15   amplify the message of that?

16           MR. STEWART:  Again, you would have to

17   ask -- they -- they could potentially be held

18   liable for that, but you would have to ask

19   whether the elements of the relevant tort have

20   been shown.  And with respect to the ATA, those

21   elements include scienter, causation of the

22   relevant harm, et cetera.

23           If you were looking at another cause

24   of action, you would look at those elements.

25   And I think part of our reason for preferring

1    that most of the work be done at the liability
2    stage rather than the 230(c)(1) stage is, rather
3    than do a kind of undirected inquiry into
4    whether this seems neutral enough, you would be
5    looking at a specific cause of action and asking
6    but for 230(c)(1), would this be an actionable
7    tort under --
8              JUSTICE KAGAN:  Let me just make sure
9    I understand.  Let's talk about defamation and
10   an explicit recommendation, go watch this video,
11   it's the greatest of all time, okay?  But it
12   does not repeat anything about the video.  It
13   just says, go watch this video, it's the
14   greatest of all time.  And the video is terribly
15   defamatory in the way Justice Alito was
16   describing.
17             Now is the provider on the hook for
18   that defamation?
19             MR. STEWART:  The two things I would
20   say are that depends on the defamation law of
21   the relevant state, and, as we say in the brief,
22   you should analyze that as though the platform
23   was recommending in the same terms a video
24   posted on another site.
25             So, if it would give rise to

Official - Subject to Final Review

1    defamation liability under the law of the

2    relevant state to give that sort of glowing

3    recommendation of content posted on a different

4    platform, then there's no reason that YouTube

5    should be off the hook by virtue of the fact

6    that the material was on its own platform.

7              JUSTICE KAGAN:  And -- and now it's --

8              CHIEF JUSTICE ROBERTS:  Thank you.

9              Justice Sotomayor, anything further?

10             JUSTICE SOTOMAYOR:  Let's assume we're

11   looking for a line because it's clear from our

12   questions we are, okay?  And let's assume that

13   we're uncomfortable with a line that says merely

14   recommending something without adornment, you

15   suggest, we -- you're -- you might be interested

16   in this, something neutral, not something like

17   they're right, watch this video, because I could

18   see someone possibly having a defamation action

19   if they said -- if I said that video is right

20   about that person.

21             I could see someone saying that I'm

22   spreading a defamatory statement, correct?

23             MR. STEWART:  I mean, we -- we don't

24   understand the common law to have operated in

25   that way, but, obviously, the laws vary from

Official - Subject to Final Review

97

1    state to state, and a particular law -- state

2    could adopt a law to that effect.

3         JUSTICE SOTOMAYOR:  All right.  How do

4    we draw a line so we don't have to go past the

5    complaint in every case?

6         MR. STEWART:  I mean --

7         JUSTICE SOTOMAYOR:  And I think that's

8    where my colleagues seem to be suffering.

9         And I understand your point, which is

10   there is a line at which affirmative action by

11   an Internet provider should not get them

12   protection under 230(c) because that seems

13   logical.  The -- the example I used earlier, the

14   dating site, they create a search engine that

15   discriminates.  Their action is in creating the

16   search engine.  And I would think they would be

17   liable for that.  So tell -- tell me how we get

18   there.

19        MR. STEWART:  I guess whether they

20   would be liable would depend on the applicable

21   substantive law, which could be a federal law or

22   it could be a state law.  And those questions,

23   obviously, are -- are routinely decided at the

24   motion to dismiss stage.  That is, with respect

25   to the search engine choices that I described

1    earlier, do you include misspellings or not?
2    The plaintiff would still have to identify a law
3    that was violated by the choice that the search
4    engine made and would have to allege facts
5    sufficient to show a violation of law.
6            And -- and suits like that could
7    easily be dismissed at the pleading stage.  But
8    it would at least predominantly be a question of
9    the adequacy of the allegations under the
10   underlying law.
11           CHIEF JUSTICE ROBERTS:  Justice Kagan?
12           JUSTICE KAGAN:  I guess I thought that
13   the claims in these kinds of suits are that in
14   making the recommendation or in presenting
15   something as first, so really prioritizing it,
16   that the -- the provider is -- is amplifying the
17   harm, is creating a kind of harm that wouldn't
18   have existed had the provider made other
19   choices.
20           Are you saying that that -- that is
21   something that could lead to liability or is
22   not?
23           MR. STEWART:  I think it is something
24   that could lead to liability, but, again, it
25   would -- you would have to establish the

```
1    elements of the -- of the substantive law.  And
2    so kind of the hypothetical we're concerned with
3    and the hypothetical that I -- I think would
4    come out in our view as the wrong way under
5    Respondent's theory is imagine a particular
6    platform had been systematically promoting
7    third-party ISIS videos and promoting in the
8    sense of putting them at the top of people's
9    queues, not of adding their own messages, in
10   order to enlist support for ISIS.
11              If that was the motivation and you
12   could show the right causal link to a particular
13   act of international terrorism, then that could
14   give rise to liability under the ATA.
15              JUSTICE KAGAN:  And you're not saying
16   that the motivation matters for 230; you're
17   saying that the motivation matters with respect
18   to the -- the liability question down the road,
19   right?
20              MR. STEWART:  Exactly.  Exactly.
21              CHIEF JUSTICE ROBERTS:  Justice
22   Gorsuch?
23              JUSTICE GORSUCH:  Mr. Stewart, I just
24   again kind of want to make sure I understand
25   your argument, and so I'm going to ask you a
```

Official - Subject to Final Review

1    question similar to what I asked Mr. Schnapper,

2    which is the Ninth Circuit held that any

3    information a company provides using "neutral

4    tools" is protected under 230.  That's at 34a of

5    the -- of the petition.

6            And your argument is that this

7    "neutral tools" test isn't in the statute.  What

8    is in the statute is a distinction on the one

9    hand between interactive computer service and

10   access software providers and on the other hand

11   content providers.

12           And when we look at that, the access

13   software provider is protected for picking,

14   choosing, analyzing, or even digesting content.

15   So 230 protects an access software provider, an

16   interactive computer service provider, who does

17   any of those things, whether using a neutral

18   tool or not.  They -- they can order, they can

19   pick, they can choose, they can analyze, they

20   can digest however they wish and they're

21   protected, even those -- even though those

22   editorial functions we might well think of as

23   some form of content in our First Amendment

24   jurisprudence, but, here, they're shielded by

25   230.

1          And then your argument, I think, goes

2     that none of that means that they're protected

3     for content generated beyond those functions.

4     And it doesn't matter whether that content is

5     generated by neutral rules or not.  That content

6     is actionable whether the -- and one could think

7     of content generated by neutral rules, for

8     example, by artificial intelligence.

9          And another problem also is that it

10    begs the question what a neutral rule is.  Is an

11    algorithm always neutral?  Don't many of them

12    seek to profit-maximize or promote their own

13    products?  Some might even prefer one point of

14    view over another.

15         And because the Ninth Circuit applied

16    the wrong test, this "neutral tools" test,

17    rather than the content test, we should remand

18    the case for reconsideration under the

19    appropriate standard.  Is that a fair summary of

20    your position?  And, if not, what am I missing?

21         MR. STEWART:  I think the thing -- the

22    aspect of that we would disagree with is we

23    don't think that the definition of "access

24    software provider" means that an entity is

25    immune from liability for performing all of

Official - Subject to Final Review

1    those functions.

2            The statute makes clear that even if

3    you perform those sorting, arranging, et cetera,

4    functions, you still fall within the definition

5    of "interactive computer service," and you are

6    still entitled to the protection of (c)(1).

7            But the protection of (c)(1) is

8    protection from liability for the third-party

9    content.  And so, if you perform those sorting

10   functions in a way that was otherwise unlawful,

11   you could be on the hook for that.

12           And that -- that takes me back to the

13   hypothetical about the job placement service

14   that discriminates based on race.  The -- the

15   allegation of the job placement -- of that job

16   placement service is not that it created any of

17   its own content.  The allegation would be that

18   with respect to third-party content provided by

19   the firms that were looking for employees, it

20   had used an impermissibly legal -- a legally

21   impermissible criterion to decide which content

22   would be sent to which users.  And that wouldn't

23   be protected by (c)(1) because imposing

24   liability wouldn't hold the platform -- wouldn't

25   treat the platform as the publisher or speaker

1    of the third-party content.

2             JUSTICE GORSUCH:  Thank you.

3             CHIEF JUSTICE ROBERTS:  Justice

4    Kavanaugh?

5             JUSTICE KAVANAUGH:  First, to follow

6    up on Justice Alito's question, the distributor

7    liability question, my understanding is that

8    issue is not before us at this time, right?

9             MR. STEWART:  That's correct.

10            JUSTICE KAVANAUGH:  And your position,

11   though, or your response to him suggested that

12   if we were addressing that, the reason that

13   falls within 230 is because the distributor at

14   common law or at least by 1996 was treated as a

15   secondary publisher in the circumstances

16   described there.  Is that --

17            MR. STEWART:  That's basically

18   correct, yes.

19            JUSTICE KAVANAUGH:  Okay.  Then

20   focusing on the text of the statute and

21   following up on Justice Gorsuch's question, it

22   seems to me that the key move in your position

23   as I understand it is to treat organization

24   through the algorithms as the same thing as an

25   express recommendation.  Is that accurate?

Official - Subject to Final Review

1          MR. STEWART:  I don't -- I don't think

2     we would put it quite that way.  That is, in

3     some instances, if the operation of the

4     algorithm causes particular content to appear in

5     a particular person's queue that the person

6     hadn't requested, then that person might

7     perceive it to be a recommendation at least to

8     the effect that you will like this based on what

9     you have seen before.

10          So algorithms can't have that effect.

11     I don't know that we would equate the two.  I

12     think we would say more the recommendation is

13     simply one instance of the platform potentially

14     being held liable for its own content rather

15     than the third-party content.

16          JUSTICE KAVANAUGH:  And if the

17     algorithm prioritizes certain content, that

18     becomes the platform's own speech under your

19     theory of 231, correct -- or 230?

20          MR. STEWART:  I don't know that we

21     would call it the platform's own speech, but

22     it's the platform's own conduct, the platform's

23     own choice.  And so, if -- if it violated

24     antitrust law, for instance, to prioritize

25     search results in a particular way, whether or

1    not you thought of that as speech by the -- the

2    platform, it would be the platform's own

3    conduct.  Holding it liable for that sort of

4    ordering wouldn't be treating it as the

5    publisher or speaker of any of the third-party

6    submissions.

7         JUSTICE KAVANAUGH:  So the other side

8    and the amici say that happens -- that's what

9    the -- and Justice Kagan's question, that's

10   happening everywhere.

11        MR. STEWART:  And --

12        JUSTICE KAVANAUGH:  And, therefore,

13   230 really becomes somewhat meaningless, and

14   you've read what makes the definition of

15   "interactive computer service," including

16   organizing, to be a self-defeating provision

17   that really does nothing at all.

18        MR. STEWART:  No, I think -- I mean, I

19   think, if -- if it is happening everywhere, that

20   is, if search engines are using a wide variety

21   of mechanisms to decide how content should be

22   ordered, that --

23        JUSTICE KAVANAUGH:  Do you disagree

24   with that?  I mean, that's all --

25        MR. STEWART:  No, I -- no, I agree

1    with that.

2              JUSTICE KAVANAUGH:  Okay.

3              MR. STEWART:  And I think that's

4    probably because there are very few, if any,

5    laws out there that direct Internet service

6    providers to order the content in a particular

7    way.

8              If a particular legislature wanted to

9    say it will now be a violation of our law to

10   give greater priority to search results of

11   companies that advertise with you, then the

12   question whether that could violate the Commerce

13   Clause, the question whether it could violate

14   the First Amendment, those would be live

15   questions.

16             They wouldn't be 230(c)(1) questions

17   because the state's attempt to impose liability

18   on that rationale would not be an attempt to

19   hold the platform liable as the publisher or

20   speaker of the third-party content.

21             JUSTICE KAVANAUGH:  Thank you.

22             CHIEF JUSTICE ROBERTS:  Justice

23   Barrett?

24             JUSTICE BARRETT:  I want to ask you

25   the question that Mr. Schnapper and I went back

1     and forth about, thumbnails versus screenshots.

2     What would the government's position on that be?

3              So, if there were screenshots on the

4     side, his objection seemed to be that it was

5     Google's content because YouTube creates these

6     thumbnails.

7              MR. STEWART:  And that -- that was one

8     aspect of Mr. Schnapper's theory that we

9     disagreed --

10             JUSTICE BARRETT:  Disagreed.

11             MR. STEWART:  --  with in the brief.

12     That is, we thought that it's basically the same

13     content, the same information either way, even

14     if in the one instance Google is creating a URL

15     and in the other instance it's not.

16             JUSTICE BARRETT:  So, for purposes of

17     this case, is there any difference -- let's

18     imagine that the Google algorithm, when you

19     search for ISIS, prioritizes videos produced by

20     ISIS in search results.  I'm not talking about

21     being on YouTube.  Content produced by ISIS, as

22     opposed to articles, if you're just looking for

23     articles about ISIS, they could be critical of

24     ISIS, they could be all kinds of things, but in

25     the search result rankings, you first get the

 1    article -- the articles written by ISIS, videos

 2    made by ISIS.

 3            Is that the same thing as this case

 4    then?

 5            MR. STEWART:  I think that would be

 6    the same thing as this case because we would say

 7    the fact that the videos appear in that order is

 8    the result of choices made by the platform, not

 9    the choice of any person who posted an ISIS

10    video on the platform.

11            And Congress -- it was very important

12    to Congress to absolve the platforms of

13    liability for the third-party content, but it

14    didn't try to go beyond that.  The likelihood

15    that ISIS would be held liable just for that

16    seems very, very slim, but it would not be a 231

17    -- 230(c)(1) question.  It would be a question

18    under whatever cause of action the plaintiff

19    invoked.

20            JUSTICE BARRETT:  Okay.  And then what

21    about users and retweets and likes, the question

22    I asked Mr. Schnapper about that.  So, you know,

23    I gather 230(c) would protect me from liability

24    if I simply retweeted.

25            On Ms. Blatt's theory, on your theory,

1    if I retweet it, am I doing something different

2    than pointing to third-party content?

3           MR. STEWART:  I mean, I think,

4    honestly, there hasn't been a lot of litigation

5    over the -- the -- the user prong of it, and

6    those are difficult issues.  I think 230(c)(1)

7    at the very least would say just by virtue of

8    having retweeted, you can't be treated as though

9    you had made the original post yourself.

10           But, with respect to you retweet, can

11   the retweet itself be grounds for liability,

12   I -- I'm not sure, and I doubt that there would

13   be much of a common law history to draw upon.

14           JUSTICE BARRETT:  So you -- but the

15   logic of your position, I think, is that

16   retweets or likes or check this out, for users,

17   the logic of your position would be that 230

18   would not protect in that situation either,

19   correct?

20           MR. STEWART:  I -- I think it would --

21   I think more or less the case, the -- the one

22   difference I would point to between the user and

23   the platform is the user is -- who reads a tweet

24   is typically making an individualized choice, do

25   I want to like this tweet, retweet it, or

1    neither, whereas the -- the platform decisions

2    about which videos should wind up in -- in my

3    queue at a particular point in time, there's no

4    live human being making that choice on an

5    individualized basis.  It's being -- that --

6    those choices are being made on a systemic

7    basis.

8              JUSTICE BARRETT:  Thank you.

9              CHIEF JUSTICE ROBERTS:  Justice

10   Jackson?

11             JUSTICE JACKSON:  Yes.  So can -- can

12   you help me to understand whether there really

13   is a difference between the recommendations and

14   what you say is core 230 conduct?

15             I mean, I get -- I get and I'm holding

16   firm in my mind that 230 immunity, Congress

17   intended it to be directed to certain conduct by

18   the platform and that conduct is its failure to

19   block or screen the offensive conduct, so that

20   if the claim is this offensive content is on

21   your website and you didn't block or screen it,

22   230 says you're immune.  I get that.

23             I guess what I'm trying to understand

24   is whether you say and plaintiff says,

25   Petitioner in this case says, well, what they're

1    really doing in the situation in which they

2    display it under a banner that says "Up next" is

3    more than just providing that content and

4    failing to block it.  They are promoting it in

5    some way.

6            And I -- I'm really drilling down on

7    whether or not there is actually a distinction

8    in a world of the Internet where, as Ms. Blatt

9    and others have said, in order to be a platform,

10   what you're doing is you have an algorithm, and

11   in the universe of things that exist, you are

12   presenting it to people so that they can read

13   it.

14           Why -- why is that -- even though

15   it's -- you know, you call it a recommendation

16   or whatever, why is that act any different than

17   being a publisher who has this information and

18   hasn't taken it down?

19           MR. STEWART:  I mean, I think I would

20   say, in -- in the situation that 230(c)(1) was

21   designed to address, the decision whether the

22   material would go up on the platform was not

23   that of the platform itself, it was the decision

24   of the third-party poster.

25           And Congress said, once that has

Official - Subject to Final Review

112

1    happened, you also can't be held liable for

2    failing to take it down.  But, with respect to

3    what prominence you give it, that's the result

4    of your own choice, not the third-party poster.

5           Now, in most circumstances, it won't

6    make a difference because the recommendation

7    won't be actionable.  And so what we are

8    concerned with is the -- the hypothetical that I

9    suggested earlier.  You have --

10    JUSTICE JACKSON:  Yes.  I mean, I get

11    the -- I get the liability piece and all of

12    the -- the parade of horribles will depend on

13    whether or not they can actually be held liable

14    for organizing it in a certain way.  And you say

15    they probably can't.  And others say they might

16    be able to.  And that's a separate issue.

17           Just back on the 230 piece of it, in

18    terms of Congress's intent with respect to the

19    scope of immunity, I'm -- I -- I guess I just

20    want to understand why Google or YouTube, when

21    they have a box that brings up all of the ISIS

22    videos and tees them up and, if you don't do

23    anything, they just keep playing, why that's

24    actually different than the newspaper publisher

25    who gets the offensive content and decides to

113

1    put it on page 1 versus page 20.  It seemed like
2    Congress in its -- in 230 was saying, if you --
3    if -- if under the common law a newspaper
4    publisher would be liable for having put it on
5    page 1 or whatever and given it to people, we
6    don't want that to be the case for these
7    Internet service companies.
8            And so I -- I don't know that I
9    understand fully why the fact that it's
10   called -- that you call it a recommendation or
11   whatever is actually any different.
12           MR. STEWART:  I -- I guess one
13   difference I would point to is newspaper
14   publishers can make decisions about what will be
15   on the front page and what'll be in the back,
16   but it's going to be the same for everybody.
17           And one of the things about why we
18   call them targeted recommendations with YouTube
19   is they are being sent differently to different
20   users.  And the situation we're concerned with
21   is what if a platform is able through its
22   algorithms to identify users who are likely to
23   be especially receptive to ISIS's message, and
24   what if it systematically attempts to radicalize
25   them by sending more and more and more and more

Official - Subject to Final Review

114

```
1    extreme ISIS videos, is that the sort of
2    behavior that implicates either the text or the
3    purposes of Section 230(c)(1), and we would say
4    that it doesn't.
5            JUSTICE JACKSON:  Thank you.
6            CHIEF JUSTICE ROBERTS:  Thank you,
7    counsel.
8            MR. STEWART:  Thank you.
9            CHIEF JUSTICE ROBERTS:  Ms. Blatt.
10              ORAL ARGUMENT OF LISA S. BLATT
11                ON BEHALF OF THE RESPONDENT
12           MS. BLATT:  Mr. Chief Justice, and may
13   it please the Court:
14           Section 230(c)(1)'s 26 words created
15   today's Internet.  (c)(1) forbids treating
16   websites as "the publisher or speaker of any
17   information provided by another."  Publication
18   means communicating information.  So, when
19   websites communicate third-party information and
20   the plaintiff's harm flows from that
21   information, (c)(1) bars the claim.
22           The other side agrees Section 230 bars
23   any claim that YouTube aided and abetted ISIS by
24   broadcasting ISIS videos.  So they instead focus
25   on YouTube's organization of videos based on
```

Official - Subject to Final Review

115

1    what's known about viewers, what they call

2    targeted recommendations.  They say that feature

3    can be separated out because it implicitly

4    conveys what viewers should watch or that they

5    might like the content.

6         But accepting that theory would let

7    plaintiffs always plead around (c)(1).  All

8    publishing requires organization and inherently

9    conveys that same implicit message.

10        Plaintiffs should not be able to

11   circumvent (c)(1) by pointing to features

12   inherent in all publishing.  (c)(1) reflects

13   Congress's choice to shield websites for

14   publishing other people's speech, even if they

15   intentionally publish other people's harmful

16   speech.

17        Congress made that choice to stop

18   lawsuits from stifling the Internet in its

19   infancy.  The result has been revolutionary.

20   Innovators opened up new frontiers for the world

21   to share infinite information, and websites

22   necessarily pick, choose, and organize what

23   third-party information users see first.

24        Helping users find the proverbial

25   needle in the haystack is an existential

Official - Subject to Final Review

116

```
1     necessity on the Internet.  Search engines thus

2     tailor what users see based on what's known

3     about users.  So does Amazon, Tripadvisor,

4     Wikipedia, Yelp!, Zillow, and countless video,

5     music, news, job-finding, social media, and

6     dating websites.  Exposing websites to liability

7     for implicitly recommending third-party content

8     defies the text and threatens today's Internet.

9               I welcome your questions.

10              JUSTICE THOMAS:  Ms. Blatt, is --

11    could you give me an example of not a

12    recommendation but an endorsement similar to

13    this that would take you beyond 230?

14              MS. BLATT:  Sure.  So whenever you

15    have something that's going beyond the implicit

16    features of publishing and you have an express

17    statement, you have a continuum, and this

18    continuum is this:  You have something that's

19    the functional equivalent of an implicit

20    message, basically, a topic heading or "Up

21    next," all the way to the other extreme of an

22    endorsement of the content such that the website

23    is adopting the content as its own.

24              Now, when you have that situation, the

25    claim is fairly treating the website for
```

117

1    publishing its own speech, and you can separate

2    that out from the harm that's just coming from

3    the information provided by another.

4           And the danger which your

5    hypotheticals has raised with express speech is

6    where on that continuum any express speech may

7    go because, unlike Google and YouTube, which are

8    the two world's largest sites, we don't have a

9    lot of endorsements and that kind of stuff, but

10   other websites and other users use a myriad of

11   topic headings and emojis that have different

12   meanings that I'm not prepared and you would

13   have to know what they mean, like kinds of

14   checkmarks and, I don't know, high fives and all

15   kinds of things.

16          But the basic features of topic

17   headings, "Up next," "Trending now," those kinds

18   of things we would say are core, inherent --

19   they're no different than expressing what is

20   implicit in any publishing, which is we hope you

21   read this.

22          CHIEF JUSTICE ROBERTS:  Well, it seems

23   to me that the language of the statute doesn't

24   go that far.  It says that -- their claim is

25   limited, as I understand it, to the

1    recommendations themselves.  In other words,

2    this -- this is the list of things that you

3    might like.

4              But that information, the

5    recommendation, is not provided -- under the

6    words of the statute, it's not provided by

7    another information content provider.  It's

8    provided by YouTube or -- or Google.

9              And so, although whatever the

10   liability issue may be, there's some issue

11   tomorrow and there are a lot of others, the

12   presence of an immunity under 230(c), it seems

13   to me, is just not directly applicable.

14             MS. BLATT:  Well, that's incorrect

15   because of the word "recommendation."  There is

16   no word called "recommendation" on YouTube's

17   website.  It is videos that are posted by third

18   parties.  That is solely information provided by

19   another.

20             You could say any posting is a

21   recommendation.  Anytime anyone publishes

22   something, you could be said, it's a

23   recommendation.  Anything.

24             CHIEF JUSTICE ROBERTS:  Well, the --

25   well, the videos just don't appear out of thin

Official - Subject to Final Review

1    air.  They appear pursuant to the algorithms

2    that your clients have.  And those algorithms

3    must be targeted to something.  And they're

4    targeted -- that targeting, I think, is fairly

5    called a recommendation, and that is Google's.

6    That's not the -- the -- the provider of the

7    underlying information.

8              MS. BLATT:  So nothing in the statute

9    or in the common law of defamation turns on the

10   degree of tailoring or how you organized it.

11   There's no distinct actionable message.  If you

12   say I think my readers would all be interested

13   in this or I think the readers in ZIP code 2005

14   would be interested in it or if you walk up to

15   someone and say I'm going to defame someone

16   because I thought you might be interested in it,

17   it's still publishing.

18              And the other side gives you no line

19   and no way to say in some way that would be

20   workable or give websites or users any clarity

21   of how you would organize the world's

22   information.  Just think about search.  There

23   are 3.5 billion searches per day.  All of those

24   are displays of other people's information.  And

25   you could call all of them a recommendation that

1    are tailored to the user because all search

2    engines take user information into account.

3    They take the location, the language, and what

4    have you.

5              And I can give the example of

6    football.  Football -- the same two users will

7    enter the word "football" and get radically

8    different results based on the user's past

9    search history and their location and their

10   language because most of the world thinks of

11   football as soccer, not the way we do.

12             And so, if you go down this road of

13   did you target it, then you have to say how

14   much?  Was the topic hitting too much?  Was it

15   okay to have a violence channel?  Was it okay to

16   have a sex channel?  Was it okay to have, you

17   know, what have you, some other channel about

18   skinny models that you could say, well, that

19   just kept repeating the -- the channel and that

20   made me crazy.  So --

21             JUSTICE JACKSON:  But, Ms. -- Ms.

22   Blatt, Mr. Stewart suggests that all of those

23   kinds of questions in terms of the extent of

24   liability for this kind of organization would be

25   addressed in the context of liability, not -- by

1    that, I mean each state -- when somebody tried

2    to claim that YouTube had, you know, done

3    something improper in terms of pulling up those

4    kinds of videos, that each state would then look

5    and determine based on their own, you know,

6    common law whether or not you were liable.  And

7    he posits that that wouldn't happen very often.

8    But we don't know.

9         My question is, isn't there something

10   different to what Congress was trying to do with

11   230?  Isn't it true that that statute had a more

12   narrow scope of immunity than is -- than courts

13   have, you know, ultimately interpreted it to

14   have and that what YouTube is arguing here today

15   and that it really was just about making sure

16   that your platform and other platforms weren't

17   disincentivized to block and screen and remove

18   offensive conduct -- content?

19        And so, to the extent that the

20   question today is, well, can we be sued for

21   making recommendations, that's just not

22   something the statute was directed to.

23        MS. BLATT:  So can I take this in two

24   parts?  Because I -- I feel like your first part

25   of your question is addressing what the dispute

1    is between the parties, and the second part of

2    your question goes most deeper and which is, you

3    know, beyond the question presented.

4              But just on your first question about

5    why not -- why do you need an immunity as

6    opposed to liability, and in our view, that's

7    like saying -- I mean, that's death by a

8    thousand cuts, and the Internet would have never

9    gotten off the ground if anybody could sue every

10   time and it was left up to 50 states' negligence

11   regime.

12             And let me give you an example.  A

13   website could put something alphabetical in

14   terms of reviews, and every Young, Williams, and

15   Zimmerman, i.e., X, Y, Z, could say, well, that

16   was negligent because you should have rated it

17   somewhere else.

18             JUSTICE JACKSON:  No, I totally

19   understand that.  But I think my things are not

20   actually different.

21             What I'm saying is that problem that

22   you identify, which is a real problem, the

23   Internet never would have gotten off the ground

24   if everybody would have sued, was not what

25   Congress was concerned about at the time it

1    enacted this statute.

2            MS. BLATT:  Well, so I -- that's

3    correct -- I mean, that's incorrect for a number

4    of reasons.  And we can talk about what two

5    choices you're talking about.  There's only two

6    arguments on the table for what you could think

7    that (c)(1) does.

8            And that is it simply says, you know,

9    no Internet -- interactive computer service

10   shall be treated as a publisher.  And you could

11   think, well, there are two -- two ways of

12   looking at that.  One is that you need an

13   external law that has publication as an element,

14   and then, second, which I think that your

15   question may be going to, is it only directed to

16   eliminating forms of strict liability across all

17   causes of action?  And so both -- both of those

18   ways are highly problematic and also inaccurate

19   given what was happening in 1996.

20           In terms of just looking at this as is

21   this just talking about defamation, it plainly

22   can't be because the statute would be a dead

23   letter upon inception because any defamation

24   cause of action can be replead as negligence or

25   intentional infliction of emotional distress.

Official - Subject to Final Review

124

1          So we think the word "treat," which

2     means to regard, applies whenever the claim is

3     treating the -- or imposing liability because --

4     by virtue of publishing.  In other words --

5          JUSTICE JACKSON:  But what do you do

6     with the -- what do you do with the title and

7     the content and the context, right?  The title

8     of Section 230 is "Protection for Private

9     Blocking and Screening of Offensive Material."

10          MS. BLATT:  So let me just pinpoint

11     then the second one, which hopefully I won't --

12     we'll get to on Section (e), which is all the

13     exceptions.

14          But, in terms of the title, Stratton

15     Oakmont and restrictions, (c)(1) and (c)(2) are

16     a pair.  So what you have is (c)(2) is -- and --

17     and they work together, and if you -- every time

18     you weaken (c)(1), you make (c)(2) useless and

19     defeats the whole point of this statute at least

20     in terms of cleaning up the Internet.

21          (c)(2) is just a safe harbor and

22     directs what happens when you take stuff down.

23     It says nothing about what happens to the

24     content that's left up.  And so the more any

25     website removes material, it perversely is

1    showing that it has knowledge or should have
2    known or could have known about the content that
3    was left up.

4         And so you have one of two things
5    happen -- that -- that would happen and would
6    have happened then and would happen now.  The
7    first is websites just won't take down content.
8    And that just defeats the whole point, and you
9    basically have the Internet of filth, violence,
10    hate speech, and everything else that's not
11    attractive.

12         And the second thing which I think a
13    lot of the briefs are worried about in terms of
14    free speech is you have websites taking
15    everything down and leaving up -- you know,
16    basically, you take down anything that anyone
17    might object to, and then you basically have --
18    and I'm speaking figuratively and not literally
19    -- but you have the Truman Show versus a horror
20    show.

21         You have only anodyne, you know,
22    cartoon-like stuff that's very happy talk, and
23    otherwise you just have garbage on the Internet.
24    And Congress would not have achieved its purpose
25    of -- and, remember, it had in all those

Official - Subject to Final Review

126

1   findings only three of which are addressing the

2   harmful content.  Most of it is dealing with

3   having free speech flourish on the Internet,

4   jump-starting a new industry.

5            And it's inconceivable that any

6   website would have started in -- I mean, one

7   lawsuit freaked out the Congress, and they --

8            JUSTICE KAGAN:  Ms. Blatt?

9            MS. BLATT:  Yes.  Sorry.

10           JUSTICE KAGAN:  Just suppose that this

11   were a pro-ISIS algorithm.  In other words, it

12   was an algorithm that was designed to give

13   people ISIS videos, even if they hadn't

14   requested them or hadn't shown any interest in

15   them.

16           Still the same answer, that -- that --

17   that a claim built on that would get 230

18   protection?

19           MS. BLATT:  Yes, except for the way

20   Justice Sotomayor raised it, which is material

21   support.  So, if there's any -- I mean, there's

22   a criminal exception.  So, if you have material

23   supporting collusion with ISIS, that's excepted

24   from the statute.

25           But, if I can just take the notion of

1    algorithms, either they're raising --

2            JUSTICE KAGAN:  But -- but -- but what

3    I take you to be saying is that in general --

4    and this goes back to Justice Thomas's very

5    first question --

6            MS. BLATT:  Yes.

7            JUSTICE KAGAN:  -- in general, whether

8    it's neutral or whether it's not neutral,

9    whether it is designed to push a particular

10    message, does not matter under the statute and

11    you get protection either way?

12            MS. BLATT:  That's correct.  And just

13    referring -- I agree with what Justice Gorsuch

14    said, except for he was saying that somehow the

15    Ninth Circuit was at fault because it recognized

16    this was an easy case.

17            It's not the Ninth Circuit's fault

18    that the complaint said there's nothing wrong

19    with your algorithm.  You just kept repeating

20    the same information, independent of any

21    content.

22            And so we shouldn't be faulted because

23    his complaint doesn't allege anything wrongful.

24            JUSTICE KAGAN:  No --

25            MS. BLATT:  But, in your hypothetical,

1    where someone could say -- and, again, this is

2    always going to turn on the claim.  But let's

3    just think of -- I don't know what your

4    hypothetical would be about tortious speech, but

5    the bookstore example, you could decide that you

6    want to put the adult bookstore -- book -- adult

7    book section separated from the kids section.

8    That's a "biased" choice, and I'm doing scare

9    quotes for the transcript, but --

10            JUSTICE KAGAN:  Yeah, or -- or have an

11   algorithm that looks for defamatory speech and

12   puts it up top, right, and you're still saying

13   230 protection?

14            MS. BLATT:  So our test, when you look

15   at the claim, and so, if you have a claim for

16   defamation, is always going to look at the claim

17   and say is the harm flowing from the third-party

18   information or from the website's own conduct or

19   speech.

20            And so, if I can mention the race

21   example, that's an excellent example of the

22   claim has nothing to do with the content of the

23   third-party information.  It can be --

24            JUSTICE KAGAN:  Right.  But this is

25   the claim would have something to do with the

Official, Subject to Final Review

1    content of the information.  It would say, you

2    know, my complaint is that you just made

3    defamatory speech available to millions of

4    people who otherwise would never have seen it.

5    And you are on the hook for that.  That was your

6    choice.  That's your responsibility.

7              Why doesn't -- why -- why -- why

8    should there be protection for that?

9              MS. BLATT:  Well, so, if there was

10   some sort of misrepresentation or some sort of

11   terms of service that you weren't going to do

12   that, but let me give you an example where this

13   opens up a can of worms is because you could say

14   that about any content, that you elevated the

15   most recent content.

16             I mean, search engines of all kinds,

17   including Google Search, but all the amici

18   briefs are telling you they have to make

19   choices.  They've got an undescribable amount of

20   content, and it has to be based on something,

21   whether it's relevance to a user request, a

22   search history.  If it says headache, the

23   Microsoft example, do you want something from

24   the 18 -- you know, the 1300s, or do you want

25   something that's a little more recent?  Do you

Official - Subject to Final Review

                                                          130

1      --

2                  JUSTICE BARRETT:  Okay.  But what if

3      -- what if -- I'm sorry, but I just want to make

4      sure in Justice Kagan's example, what if the

5      criteria, the sorting mechanism, was really

6      defamatory or pro-ISIS?

7                  I guess I don't see analytically why

8      your argument wouldn't say, as Justice Kagan

9      said, that, yeah, 230 applies to that.

10                 MS. BLATT:  Well, I mean, it's similar

11     to your -- your 303 case.  You can make a

12     distinction between content choices in terms of

13     how you would organize or deal with any kind of

14     publication, whether it's a book, a newspaper, a

15     television channel, that kind of stuff, and that

16     is inherent to all publishing.  But you --

17                 JUSTICE KAGAN:  Right.  So you're

18     saying 230 does apply to that?

19                 MS. BLATT:  Yes.

20                 JUSTICE KAGAN:  230 gives protection

21     regardless?

22                 MS. BLATT:  Yes.  I hope I didn't say

23     something incorrect.

24                 JUSTICE KAGAN:  230 gives protection

25     --

131

```
1              MS. BLATT:  Yes.

2              JUSTICE KAGAN:  -- regardless, whether

3    it's like put the defamatory stuff up top, put

4    the pro-ISIS stuff on top, or whether it's, you

5    know, what -- what people might consider a more

6    content-neutral principle.

7              MS. BLATT:  Correct.  And let me just

8    say you have websites that are hate speech, so

9    they may be elevating more racist speech as

10   opposed to some other speech that talks about

11   how the equality of the races.

12             You might have a speech devoted to,

13   you know, an interest of a certain community,

14   like an ethnic community.  So they may be

15   saying, you know what, we don't want to put some

16   other kind of content, we may want to publish

17   it, but we may want to put it further down on

18   our algorithm.  And if you said -- again, this

19   is a content distinction.

20             If you have a claim that --

21             JUSTICE KAGAN:  So I can't imagine

22   that -- and, you know, we're in a predicament

23   here, right, because this is a statute that was

24   written at a different time when the Internet

25   was completely different, but the problem that
```

1    the statute is trying to address is you're being

2    held responsible for what is another person's

3    defamatory remark.

4           Now, in my example, you're not being

5    held responsible for another person's defamatory

6    remark.  You're being held responsible for your

7    choice in broadcasting that defamatory remark to

8    millions and millions of people who wouldn't

9    have seen it otherwise through this

10   pro-defamatory algorithm.

11          MS. BLATT:  I mean --

12          JUSTICE KAGAN:  And the question is,

13   you know, should 230 really be taken to go that

14   far?

15          MS. BLATT:  The question is can you

16   carve out pro-defamatory as opposed to pro

17   anything else, pro some other type of content

18   that someone may be suing over over negligence.

19          If I can just give you an example of a

20   TV channel.  When you broadcast an excessively

21   violent TV channel, you're giving it a new

22   audience that they wouldn't otherwise have.

23   It's still inherent to publishing.  And if you

24   decide to run reruns of the most sexually

25   explicit and violently explicit, you could say

```
1    that's a bad thing, and it may be, but on your
2    choice -- but it would be protected under 230.
3             In terms of what was happening in
4    1996, I strongly disagree with the notion that
5    algorithms weren't present based on targeted
6    recommendations.  The Center For Democracy and
7    Technology has this wonderful history lesson of
8    what was happening in '92 through '94 on how
9    targeted recommendations developed.
10            And you had something called news
11   groups, which were for anyone using the
12   Internet, that was sort of what people did.
13   They signed up for a news group, and those news
14   groups adopted the technology that is the
15   technology that is alleged in this case.
16            They looked at what the user was
17   looking at.  Say the user was looking at science
18   news.  And they thought, oh, that also user is
19   looking at some other kind of news, maybe on
20   psychology or something.  And so they would make
21   recommendations based on your user history and
22   that of others.
23            Amazon two months into 1997 introduced
24   its famous feature, if you buy X, you might like
25   Y based on that technology.  So this technology
```

Official - Subject to Final Review

134

1    was present starting in '92.

2             And '92 through '96, the Internet was

3    definitely different, but it was kind of a mess.

4    You still had to organize it.  So there were

5    search engines.  There was all kinds of features

6    that were organizing content because even then

7    it was massive.  It's just now on, like, an

8    exponentially greater scale.

9             JUSTICE JACKSON:  Ms. Blatt, I guess

10   my concern is that your theory that 230 covers

11   the scenario that Justice Kagan pointed out

12   seems to bear no relationship in my view to the

13   text --

14             MS. BLATT:  Okay.

15             JUSTICE JACKSON:  -- of the actual

16   statute.

17             MS. BLATT:  Sure.

18             JUSTICE JACKSON:  I mean, the -- the

19   -- when we look at 230(c), it says, "Protection

20   for 'Good Samaritan' blocking and screening of

21   offensive material," suggesting that Congress

22   was really trying to protect those Internet

23   platforms that were in good faith blocking and

24   screening offensive material.

25             Yet, if we take Justice Kagan's

Official - Subject to Final Review

135

1    example, you're saying the protection extends to

2    Internet platforms that are promoting offensive

3    material.  So it suggests to me that it is

4    exactly the opposite of what Congress was trying

5    to do in the statute.

6         MS. BLATT:  Well, I think promoting --

7    I think a lot of things are offensive that other

8    people might think are entertaining, and so --

9         JUSTICE JACKSON:  No, it's not about

10   -- it's not about whether -- let's take as a

11   given we're talking about offensive material

12   because that's all through the statute, right?

13   You don't -- you don't disagree that Congress

14   was focused on offensive material, that that's

15   sort of the basis of the whole statutory scheme.

16        So, if we take as a given that we're

17   talking about offensive material, it looks to me

18   from the text of the statute that Congress is

19   trying to immunize those platforms that are

20   taking it down, that are doing things to try to

21   clean up the Internet.

22        And in the hypothetical that was just

23   presented, we have a platform that is not only

24   not taking it down in the way that the statute

25   is focused on, it is creating a separate

Official - Subject to Final Review

1    algorithm that pushes to the front so that more

2    people would see than otherwise the offensive

3    material.

4              So how is that even conceptually

5    consistent with what it looks as though this

6    statute is about?

7              MS. BLATT:  Well, so just a couple

8    things.  And, again, I -- we're on this

9    defamatory material.  The website itself does

10   something defamatory that's not -- it's

11   independent of the third-party content.  It's

12   not protected.

13             But that same hypothetical could be

14   said if it was on the front -- the home page as

15   opposed to you had to do a search engine first.

16   And I don't see anything in the statute that

17   protects it.

18             In terms of what I think your deeper

19   section is -- deeper concern is, the reading of

20   the statute, I don't think it's coterminous with

21   (c)(2), which is dealing with the type of

22   offensive material, which, by the way, doesn't

23   mention defamation.

24             In terms of (c), we talked about how

25   they work together.  We talked about how it

Official Transcript, Subject to Final Review

1    could be easily overrode if it had just

2    publication.  The one thing we didn't talk about

3    was the structure in Section (e).  (e) is a

4    laundry list -- a laundry list of a variety of

5    exceptions under federal law to which (c)(1)

6    does not apply as well as (c)(2).  And those

7    exceptions make very little sense if (c)(1) is

8    read the way you're reading it.  It would almost

9    never apply to (c)(2).

10            And let's just take federal criminal

11    laws.  It would make very little sense because

12    those laws -- almost none of them have strict

13    liability as an element, and vanishingly few

14    would have publication or speaking as an

15    element.  It's in there for no other reason

16    other than that (c)(1) would otherwise apply to

17    the -- the -- the -- the information provided by

18    another.

19            And in terms of just the pure text,

20    when you keep saying its failure to take down,

21    I'm hearing you say what Congress wrote was

22    treatment as a publisher.  That means

23    dissemination.  That means publishing.

24            JUSTICE JACKSON:  So Congress didn't

25    say that.

Official - Subject to Final Review

```
 1          MS. BLATT:  You cannot be held liable
 2     for publishing.
 3          JUSTICE JACKSON:  If you look at the
 4     statute, it says, "Protection for 'Good
 5     Samaritan' blocking and screening."  If you take
 6     into account Stratton Oakmont, if -- those
 7     things I thought were like a given, what -- what
 8     the people who were crafting this statute were
 9     worried about was filth on the Internet and the
10     extent to which, because of that court case and
11     -- and perhaps others, the platforms were not
12     being incentivized to take it down, because if
13     they were trying to take it down like Prodigy,
14     they were going to be slammed because they were
15     going to be treated as a publisher.
16          And so the statute is like we want you
17     to take these things down, and so here's what
18     we're going to do.  We're going to say that just
19     because they're on your -- your -- your website,
20     it doesn't mean you're going to be held
21     automatically liable for it.  And that's (c)(1).
22     And to the extent you're in (c)(2), you're
23     trying to take it down, but you don't get them
24     all, we're not going to hold you liable for it.
25          That seems to me to be a very narrow
```

Official - Subject to Final Review

```
 1    scope of immunity that doesn't cover whether or
 2    not you're making recommendations or promoting
 3    or doing anything else.
 4            MS. BLATT:  Well, I mean, that -- that
 5    is -- what I understand the government and the
 6    Petitioner to be saying is that disseminating --
 7    even 24/7 disseminating of ISIS videos is
 8    protected.  The only thing that's not protected
 9    is whether you can tease out something about the
10    organization and call it a recommendation when
11    there is no express speech recommending it.
12    It's just the placement of where in the order in
13    which content appears.
14            And that same complaint could be made
15    about search engines.  So I think, under your
16    view, search engines would not be covered
17    because they are taking user information,
18    targeting recommendations in the sense of
19    they're saying we think you would be interested
20    in the first content as opposed to the content
21    on, you know, 1,000,692 sections.  I mean, they
22    have millions and millions of hits for any
23    search result.
24            And if you think those are
25    recommendations and the other side gives you no
```

1    basis for distinguishing between search engines,

2    then the statute is just very different than I

3    think the one that Congress was talking about,

4    because, again, if you're going to look at

5    findings and history and policy, this is about

6    diversity of viewpoints, jump-starting an

7    industry, having information flourishing on the

8    Internet, and free speech.

9        JUSTICE BARRETT:  Ms. Blatt, what

10    about Justice Sotomayor's dating hypothetical?

11    The discrimination, like, oh, we're only going

12    to -- we're not going to match black people and

13    white people, et cetera.  What about that?  Is

14    that given 230's shield?

15        MS. BLATT:  Absolutely not, because

16    any disparate treatment claim or race

17    discrimination is saying you're treating people

18    different regardless of the content.

19        So, if I'm -- I'm going to use it like

20    with an advertising, like I don't know, whether

21    I'm a woman of 10 or -- I mean, that was a bad

22    example -- a woman of 30 or whatever, and

23    whether I live somewhere, it really doesn't

24    matter in terms of the law that's prohibiting

25    discrimination.  The law is indifferent to what

Official - Subject to Final Review

141

1    the content is.  It's just very unhappy about

2    any kind of status-based distinction.

3              So we think -- and the -- the harm

4    that would flow is not the third-party

5    information.  It's the website's conduct,

6    whether you want to call it speech or conduct,

7    that's based on status.

8              JUSTICE BARRETT:  But what about the

9    dating profile?  I mean, isn't that part of the

10   content?  Isn't that part of the third-party

11   information?

12             MS. BLATT:  Sure.  And it's just --

13   you could put it a bunch of different ways.  You

14   could say, even before the profiles go up,

15   there's a complete harm, or even if the profiles

16   go up, it doesn't matter.  We would distinguish

17   between the way dating sites work, which don't

18   work based on status but based on criteria

19   that's uploaded, and those are, you know, you're

20   matching with somebody else.  The website is not

21   saying you should only date a white person.

22             JUSTICE BARRETT:  Okay.  Then what

23   about news?  What about an algorithm that says,

24   you know, you are a white person, you're only

25   going to be interested in news about white

Official Subject to Final Review

142

```
1    people, and it will screen out anything that is

2    a story featuring racial justice issues.

3            MS. BLATT:  Yeah, again, anything

4    based on status, because the harm is complete,

5    independent of the information, but if a website

6    wants to say we're going to celebrate Black

7    History Month, no, a white person or a black

8    person is not going to be able to complain and

9    say, well, I didn't get enough white history

10   month on your website.  Those are claims that

11   are core within treating them as publishing of

12   the information --

13           JUSTICE BARRETT:  Yeah, but I guess

14   I'm -- don't you think you're just fighting on

15   the liability?

16           MS. BLATT:  No.

17           JUSTICE BARRETT:  I mean, it seems to

18   me that you're kind of going back to liability,

19   because all of those are choices that are made

20   independently, right?  I mean, we've been

21   talking about the distinction between -- or --

22   or the lack of distinction in your view between

23   the content itself and the website's choice of

24   how to publish it.

25           I guess I don't see why --
```

1          MS. BLATT:  So here's --

2          JUSTICE BARRETT:  -- for 230 purposes.

3          MS. BLATT:  -- here's our test, and

4    it's the test the Fourth Circuit recently took

5    in Henderson, and it's the test the Ninth

6    Circuit took.

7          Let me give you an example that I

8    think may help with the ad revenue sharing.  So

9    this was an allegation that YouTube was giving

10   money to ISIS.  Now this was in connection with

11   third-party videos, third-party information.

12   But the court said, no, that is not within

13   Section 230 because that's independent of the

14   information, that's giving money to ISIS.  That

15   kind of, whatever you think about its validity

16   under the statute, you're not treating them as a

17   publisher; you're treating them as a financer.

18         And it's just -- and that's the test

19   of the Fourth Circuit too.  The Fourth Circuit

20   is looking -- in that case, it was about -- you

21   know, all kinds of things were happening with

22   third-party information, and they were trying to

23   tease out is it the credit report, did they

24   contribute to the credit report, was it based on

25   the website's failure to -- to notify the

1    employee.

2            And what the Fourth Circuit said is
3    the exact same thing we said, and it's the exact
4    same thing the plaintiff has said on four pages
5    of its brief or four times in its brief, that
6    you're looking for the harm.  What is the harm
7    caused?  And this case is the perfect example.
8    The plaintiffs suffered a terrible fate, and
9    their argument is it's because people were
10   radicalized by ISIS.

11           And if you start with the concession
12   that the dissemination of those ISIS videos are
13   -- and a claim based on that is barred, the
14   question is, is what additional comes from the
15   way it was organized?

16           The government just says, I don't
17   know, let some state figure it out.  That's not
18   very helpful to Internets that have to work on a
19   national level and are posting and sorting and
20   organizing billions upon billions upon billions
21   of piece of -- pieces of information.

22           JUSTICE BARRETT:  So, just to clarify,
23   this is my last point, you're happy with the
24   Henderson test, the Fourth Circuit test?

25           MS. BLATT:  Yes.  I would say

Official - Subject to Final Review

145

1    Henderson is like 96 percent correct.  I got a
2    little lost when they were going down the common
3    law on publication, but the result was great.  I
4    just thought they got a little weird on the
5    publication.
6            But, yeah, no, their test is correct,
7    and it's also the Ninth Circuit's test on the
8    ISIS revenue.  It's the exact same test we quote
9    in our brief, and it's the exact same test
10   Petitioner did.
11           And what that harm test is doing, if I
12   could just explain it because it sounds kind of
13   shorthand, but if you take the -- which I'm not
14   sure Justice Jackson agrees with, but if you
15   take the underlying notion that this bars
16   treatment as a publisher, and you're saying,
17   well, can they get around it by the way they're
18   pleading it, you're just looking to the harm, so
19   you're saying you can't really say that's
20   negligence or intentional infliction because the
21   harm is coming from the publishing of the
22   defamatory content.
23           And so what I think all these cases
24   where the courts are correctly saying 230 does
25   not apply to the claim is they're isolating the

146

1   harm and saying that's independent of the

2   third-party information.  It's either based on

3   the website's own speech or it's website's own

4   conduct that's independent of the harm flowing

5   from the third-party information.

6          JUSTICE ALITO:  If YouTube labeled

7   certain videos as the product of what it labels

8   as responsible news providers, that would be --

9   that would be Google's own content, right?

10         MS. BLATT:  Yes.  Yes.  And can --

11         JUSTICE ALITO:  And --

12         MS. BLATT:  Yes.  Can I say one thing

13  just because --

14         JUSTICE ALITO:  Yeah.  Sure.

15         MS. BLATT:  -- I forgot to mention

16  thumbnails?  Sorry.  Thumbnails aren't mentioned

17  in the complaint, so I was literally trying to

18  figure out what he was talking about when I was

19  up there because it's just not something in the

20  complaint.  But that is a screenshot of the

21  information being provided by another.  It's the

22  embedded third-party speech.  Okay.  Sorry.

23  Keep going.

24         JUSTICE ALITO:  All right.  So if --

25  but then, if I do a search for today's news in

1    YouTube -- in fact, I did that yesterday -- and

2    all the top hits were very well-known news

3    sources.  Those are not recommendations.  That's

4    not YouTube's speech?  The fact that YouTube put

5    those at the top, so those are the ones I'm most

6    likely to look at, that's not YouTube's speech?

7           MS. BLATT:  Right.  But, I mean, all

8    search engines work the same way.  If you type

9    in whatever you type in, there is a algorithm

10   that's deciding what content to display.  It has

11   to be displayed somehow.

12          And what I think is going on on

13   YouTube or it's certainly going on on Google

14   Search is they're not going to -- they're

15   looking at what did other users look, how

16   popular was it, that kind of thing.  You know,

17   is it -- is that news source, you know, from

18   Russia?  Probably not going to get on the top

19   list.

20          So, yeah, they're having to make

21   choices because there could be over a billion

22   hits from yours, and there are a -- a billion

23   hours of videos watched each day on YouTube and

24   500 hours uploaded every minute, so it's a lot

25   of content on YouTube.  So some of it's based on

1    channels, and some of it's based on searches.

2    But they have to organize it somehow.

3         But that is what's going on, I think,

4    on your top searches, is they're -- in most

5    search engines too, and you can look at the

6    Microsoft brief, they're basing it on what --

7    time spent on those news sites, how many users

8    are looking at them, how relevant it is, if

9    it's -- if you're -- if you're typing in the

10   Turkey earthquake, they might be elevating some

11   stuff that's featuring that because it, you

12   know, seems more relevant.

13        If there's a recent election, they

14   might feature that.  So all these kinds of

15   decisions are being made by websites every day.

16        JUSTICE ALITO:  Would -- would the --

17   would Google collapse and the Internet be

18   destroyed if YouTube and, therefore, Google were

19   potentially liable for posting and refusing to

20   take down videos that it knows are defamatory

21   and false?

22        MS. BLATT:  Well, I don't think Google

23   would.  I think probably every other website

24   might be because they're not as big as Google.

25   But here's what happens.

```
 1              I mean, you do have that situation in
 2      Europe, but there -- there's not class actions.
 3      There's not plaintiffs' lawyers.  There's not
 4      the tort system.  So what you would have is a
 5      deluge of people saying, you know, my -- that
 6      restaurant review was -- you know, you say my
 7      restaurant review, I didn't like it.
 8              I think Yelp! does an amazing job on
 9      this, about how much they got hit and had to
10      spend, you know, almost crushing litigation
11      because they were being accused of being, you
12      know, biased on reviewers.  And everyone -- no
13      matter what -- they couldn't win for losing or
14      lose for winning, whatever the phrase is,
15      because whoever they -- whoever got reviewed,
16      somebody was upset.
17              And so I think those websites, they
18      never would have happened, and they probably
19      would collapse.
20              CHIEF JUSTICE ROBERTS:  Thank you,
21      counsel.
22              Justice Thomas, anything further?
23              Justice Alito?
24              Justice Sotomayor?
25              Justice Kagan?
```

```
 1              Justice Gorsuch?
 2              JUSTICE GORSUCH:  Ms. Blatt, I -- I
 3   kind of want to return to some of the questions
 4   I asked earlier.  It seems to me inherent in
 5   (c)(1) is a distinction between those who are
 6   simply interactive computer services and those
 7   who are information content providers.
 8              And so, when we flip over to (f), the
 9   distinction I -- I -- I glean from that is that
10   if you're picking, choosing, analyzing, or
11   digesting content, which is the bulk of what you
12   -- how you describe Google's activities in -- in
13   the search engine context, are -- are protected
14   and that content must be something more than
15   that, providing content must be something more
16   than that.
17              Is -- is that right in your view?
18              MS. BLATT:  I -- I thought you were
19   absolutely correct.  And I think some of the
20   amicus briefs do this.  In terms of if you're
21   looking at what is information being created or
22   developed, there is that distinction.  It can't
23   be that you -- by sorting, you created or
24   partially developed the information.
25              So I think you had it exactly right.
```

Official - Subject to Final Review

1    I got a little upset when you talked about a

2    remand that somehow the Ninth Circuit got it

3    wrong.

4         JUSTICE GORSUCH:  Well, let's -- let's

5    go there next then, because it seems to me that

6    even under that understanding of the statute,

7    there is some residual content for which an

8    interactive computer service can be liable.

9         You'd agree with that, that that's

10   possible?

11        MS. BLATT:  Not on this complaint

12   because --

13        JUSTICE GORSUCH:  No, no, no, of

14   course, not on this complaint, but in the

15   abstract, it -- it's possible?

16        MS. BLATT:  Absolutely correct.

17        JUSTICE GORSUCH:  Okay.  And then,

18   when -- when it comes to what the Ninth Circuit

19   did, it applied this "neutral tools" test, and I

20   guess my problem with that is that language

21   isn't anywhere in the statute, number one.

22        Number two, you can use algorithms as

23   well as persons to generate content, so just

24   because it's an algorithm doesn't mean it

25   doesn't -- can't generate content, it seems to

1    me.

2          And third, that I'm not even sure any

3    algorithm really is neutral.  I'm not even sure

4    what that test means because most algorithms are

5    designed these days to maximize profits.

6          There are other examples -- Justice

7    Kagan offered some, the solicitor general

8    offered some -- where an algorithm might be --

9    contain a -- a point of view and even a

10   discriminatory one.

11         So I -- I guess I'm not sure I

12   understand why the Ninth Circuit's test was the

13   appropriate one and why a remand wouldn't be

14   appropriate to have it apply the test that we

15   just discussed.

16         MS. BLATT:  Because it's not -- I

17   don't think that was the Ninth Circuit's test.

18   It was one sentence that -- maybe I think it

19   mentioned it twice -- that's basically, you

20   know, almost making fun of the complaint.

21         The complaint doesn't --

22         JUSTICE GORSUCH:  Oh, oh, okay.  Okay.

23   So we're just disagreeing over how we read the

24   Ninth Circuit's opinion, but if I read it that

25   way, then would a remand be appropriate?

Official Subject to Final Review

1          MS. BLATT:  Well, I'm -- I'm going to

2    say no because I don't understand how -- how

3    somehow that they have a bad complaint means the

4    Ninth Circuit's worse off when the Ninth Circuit

5    said over and over and over you haven't -- this

6    is just the way you're organizing it.

7          And the complaint never alleges there

8    was something independently wrongful about the

9    content.  It never says these were colloquial

10   recommendations.  It just says because you

11   previously liked this content.

12         And one other thing.  The complaint

13   never even alleges that YouTube ever recommended

14   to any -- in terms of even displaying an ISIS

15   video, to anybody who wasn't looking for it.  I

16   don't even know how you could get ISIS on your

17   YouTube system unless you were searching for it.

18   And the one --

19         JUSTICE GORSUCH:  I certainly

20   understand your -- your -- your complaints about

21   the complaint.  But, if I -- if -- if you --

22   you -- you don't think neutral tools -- you're

23   not defending the neutral tools principle either

24   as I understand it.

25         MS. BLATT:  I'm defending it with

Official - Subject to Final Review

154

1  respect to Justice Kagan's question, absolutely,

2  because she's concerned about biased algorithms,

3  and she doesn't have to worry about that in this

4  case because they have neutral algorithms they

5  don't allege.  And what they mean by neutral

6  algorithms is neutral with respect to content.

7  So there's no --

8        JUSTICE GORSUCH:  Thank you.

9        MS. BLATT:  Okay.

10        JUSTICE GORSUCH:  Thank you.

11        MS. BLATT:  Thank you.

12        CHIEF JUSTICE ROBERTS:  Justice

13  Kavanaugh?  No?

14        Justice Barrett?

15        Justice Jackson?

16        JUSTICE JACKSON:  So I understood you

17  to say that 230 immunizes platforms for

18  treatment as a publisher, which you take to mean

19  if they are acting as a publisher in the sense

20  that they are organizing and editing and -- not

21  editing, but organizing and -- content.

22        MS. BLATT:  Communicating,

23  broadcasting, which includes how it's displayed.

24        JUSTICE JACKSON:  And -- and would

25  that include -- I -- I just want to go back to

1    Justice Alito's point.  Would that include the

2    home page of the YouTube website that has a

3    featured video box and the featured video is the

4    ISIS video?

5            MS. BLATT:  Right.

6            JUSTICE JACKSON:  That is -- is

7    covered?

8            MS. BLATT:  Well, maybe not because

9    that gets into my continuum question.  If you

10   think that feature is some sort of endorsement

11   such that the claim is actually treating the

12   website as -- and that the harm is flowing from

13   that -- the word feature, then that's out of 2

14   -- 230.

15           I think you would --

16           JUSTICE JACKSON:  No, I'm sorry, why?

17   Why -- why is that out of 230?

18           MS. BLATT:  So the whole point about

19   what we're saying is making sure that if you

20   start with the assumption that the dissemination

21   of YouTube -- I'm sorry -- of ISIS videos, you

22   can't hold the YouTube liable for that, then the

23   only question that we're concerned about and

24   which is so destabilizing is if you can just

25   plead around it by pointing to anything inherent

Official - Subject to Final Review

156

1     in the publication.

2              And the government never said what

3     websites are supposed to do.

4              JUSTICE JACKSON:  No, but this is not

5     inherent in the publication.

6              MS. BLATT:  Exactly, it's featured.

7              JUSTICE JACKSON:  So -- so -- so this

8     is helpful, I mean, if --

9              MS. BLATT:  Yes.

10             JUSTICE JACKSON:  -- we -- we have

11    a -- a home page on YouTube and it has Featured

12    as the little title and a box, and let's say the

13    algorithm randomly selects videos from their

14    content and puts them up for a week at a time,

15    and the random video that's selected is the

16    YouTube -- is the ISIS video, and it runs when

17    you open up YouTube for a week.

18             MS. BLATT:  Right.

19             JUSTICE JACKSON:  Covered or not

20    covered?

21             MS. BLATT:  Well, it depends on

22    whether you think it's an endorsement of -- I

23    mean, if it said this is the Library of Congress

24    and we feature this because we want to show you

25    how bad ISIS is, you know, I don't know.

Official - Subject to Final Review

1        The reason why I care so much about

2    this is because, like I said, Google and YouTube

3    don't do this, but all the other amicus briefs

4    are talking about they do things like that and

5    they might have a little emoji.

6        JUSTICE JACKSON:  No, I guess I'm just

7    trying -- I don't understand.  I just want to

8    know whether the -- put -- putting on the home

9    page of YouTube, the decision to have an

10   algorithm that puts on its home page various

11   videos, third-party content, and it turns out

12   that one of those videos is an ISIS video and

13   the person is radicalized and they harm the

14   Petitioner's family.

15       MS. BLATT:  Yes.  So that is inherent

16   to publishing the home page.  The word

17   "Feature,"  actually using the express statement

18   of feature, it -- first of all, is not -- the

19   website didn't have to do it.  The owner --

20       JUSTICE JACKSON:  So I'm sorry,

21   inherent to publishing, it's covered?

22       MS. BLATT:  The home page.

23       JUSTICE JACKSON:  It's covered?

24       MS. BLATT:  Absolutely, because no

25   website -- how are you supposed to -- how are

        1    you supposed to operate a website unless you put
        2    a home page on, and so they have to do
        3    something.
        4            And if you could always say, well, the
        5    home page -- you know, unless you're just going
        6    to do it alphabetically or reverse chronological
        7    order, a website is always going to be sued for
        8    negligence.
        9            JUSTICE JACKSON:  All right.  So, if
       10    I -- if I disagree with you and I -- and I'm --
       11    about the meaning of the statute, all right,
       12    focusing in on the meaning of the statute, you
       13    say, if you're making editorial judgments about
       14    how to organize things, then you're a publisher
       15    and you're covered.
       16            If I think that the statute really
       17    only provides immunity if the claim is that the
       18    platform has this ISIS video there and it can be
       19    accessed and it hasn't taken it down, do you
       20    have an argument that the recommendations that
       21    they're talking about is -- is tantamount to the
       22    same thing?
       23            MS. BLATT:  Yes, because the only
       24    basis for saying recommendations are not covered
       25    is -- that I saw is the government saying is it

1    conveys a distinct implicit message that you

2    might be interested.  That is a distinct

3    implicit message that can only -- it happens

4    every time you publish.

5              If you publish one thing on the

6    Internet, it conveys a distinct message of dear

7    reader, we sat around and thought you might be

8    interested --

9              JUSTICE JACKSON:  And you're saying --

10             MS. BLATT:  -- or we want to make

11   money --

12             JUSTICE JACKSON:  -- you're saying

13   that -- that there's no -- that organizational

14   choices that put that content on the front page,

15   on the first thing, when you open it up without

16   typing in anything, cannot be isolated and that

17   it's the same thing as it appears on the

18   Internet anywhere such that 230 applies?

19             MS. BLATT:  Yes, and I'll use the

20   government's own words.  They said, if you hold

21   them liable for topic headings, you render the

22   statute a dead letter because you have to

23   organize the content.  So, if you think the

24   topic headings are conveying some implicit

25   message you can target out, the government said

1    then the web can't function.

2            And I think we care about it because

3    we're big websites that have lots of

4    information.  Other websites, and all the amici

5    briefs are saying, is our whole business is

6    organizing to make it useful.  If you need a

7    job, you're going to organize it by location --

8            JUSTICE JACKSON:  Are you aware of any

9    defamation claim in any state or jurisdiction in

10   which you would be held liable, you would -- you

11   would actually be liable for organizational

12   choices like this?

13           MS. BLATT:  No, I'm not worried about

14   the defamation claim.  I'm worried for a

15   products liability claim or what the government

16   kept saying, your design choices.  Those could

17   just be a product liability claim or a

18   negligence claim.  You negligently went

19   alphabetical or you negligently featured

20   whatever you featured that made my, you know,

21   kid addicted to whatever it was.  And that --

22   those kind of claims happen because they're

23   publishing.  And the whole point of getting this

24   statute was to protect against publishing.  So

25   whatever is publishing, inherent to publishing,

Official - Subject to Final Review

161

1    yeah, has to be covered.

2              JUSTICE JACKSON:  Thank you.

3              CHIEF JUSTICE ROBERTS:  Thank you,

4    counsel.

5              Rebuttal, Mr. Schnapper?

6              REBUTTAL ARGUMENT OF ERIC SCHNAPPER

7                ON BEHALF OF THE PETITIONERS

8              MR. SCHNAPPER:  Thank you, Mr. Chief

9    Justice, and may it please the Court:

10             If I might start with my colleague's

11   reference to things inherent in publishing, I

12   would just offer a cautionary note, and review

13   of the transcript will support this.  That --

14   that has been given an extraordinarily expansive

15   account here.

16             So topic headings were characterized

17   as inherent in publishing.  You know, a topic

18   heading could be how Bob steals things all the

19   time.  That's not -- shouldn't be protected.

20   She mentioned "Trending now" as inherent in

21   publishing, but that's like "Featured today."

22   You could run -- you could have a site that

23   didn't use the words "Trending now."  Autoplay

24   certainly isn't inherent in publication.

25             And she mentioned home pages, and you

1    have to have a home page, and that's fair, but
2    you don't have to have on the home page selected
3    things that you're drawing people's attention
4    to.  The home page that I have on my desktop for
5    Google is a box and those charming little
6    cartoons, and there isn't anything featured
7    there.  One could have a -- a website home page
8    for YouTube that wasn't promoting particular
9    things.  That's just how they've chosen to do
10   it.
11              With regard to neutral tools, and this
12   goes back to a point a number of you made about
13   race, a neutral algorithm can end up creating
14   very non-neutral rules.  It's not hard to
15   imagine that an algorithm might conclude that
16   most people who -- who went to Spelman and
17   Morehouse now live in Prince George's County
18   and, therefore, in showing you videos, people
19   who ask for videos about places to live near
20   Washington, if they're black, they'll be shown
21   Prince George's County; if they'll be -- if
22   they're white, they'll be shown Montgomery
23   County.
24              The algorithms can create those kinds
25   of rules.  Whether -- characterizing that as

163

1    neutral loses its force once the defendant knows
2    it's happening.  You know, to some extent,
3    algorithms and computer functions can run amok,
4    but you can't call it neutral once the defendant
5    knows that its algorithm is doing that.  And
6    this runs a little bit into the issue that we'll
7    be talking about tomorrow.
8             Two short points and then one closing
9    item.  With regard to Rule -- Section (f)(4), I
10   said this before, I just want to reiterate it,
11   Section (f)(4) does not apply to systems or to
12   information services.  It only applies to
13   software providers.  The language of the statute
14   is very specific.
15            And with the question about the
16   possible implications of the decision in -- in
17   Taamneh, it -- it is fair -- it is normal
18   practice in the district court when there's a
19   motion to dismiss to permit the plaintiff to
20   amend to deal with the relevant standard, and
21   that's exactly what we ought to be afforded an
22   opportunity to do.
23            Thank you very much.
24            CHIEF JUSTICE ROBERTS:  Thank you,
25   counsel.  The case is submitted.

Official, Subject to Final Review

```
 1                    (Whereupon, at 12:44 p.m., the case
 2      was submitted.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Official - Subject to Final Review

**1**

**1** [3] 36:6 113:1,5
**1,000,692** [1] 139:21
**10** [1] 140:21
**10:03** [2] 1:15 3:2
**101** [1] 51:13
**114** [2] 2:11
**12:44** [1] 164:1
**1300s** [1] 129:24
**161** [1] 2:14
**18** [1] 129:24
**1996** [12] 10:19 46:19 47:15 53:12,13,22,25 62:24 79:9 103:14 123:19 133:4
**1997** [1] 133:23

**2**

**2** [2] 36:7 155:13
**2.3** [1] 45:7
**20** [1] 113:1
**2005** [1] 119:13
**2023** [1] 1:11
**21** [1] 1:11
**21-1333** [1] 3:4
**21st-century** [1] 27:25
**230** [51] 10:7,9 16:6 24:23 33:3 38:23 42:14,17 52:8 58:15 59:2,25 60:10,12,23 62:2 64:14 66:8 99:16 100:4,15,25 103:13 104:19 105:13 109:17 110:14,16,22 112:17 113:2 114:22 116:1 121:11 124:8 126:17 128:13 130:9,18,20,24 132:1 133:22 134:10 143:2,13 145:24 154:17 155:14,17 159:18
**230's** [1] 140:14
**230(c** [4] 97:12 108:23 118:12 134:19
**230(c)(1** [25] 3:11,17 4:2, 13 71:24 73:5,13 75:12 76:21 77:22 80:5,16 85:13,16 86:20 92:22 93:18,19 95:2, 6 106:16 108:17 109:6 111:20 114:3
**230(c)(1)'s** [2] 65:4 114:14
**230(f)(4** [1] 48:1
**231** [3] 4:2 104:19 108:16
**24/7** [1] 139:7
**26** [1] 114:14
**26-word** [2] 17:19,19
**267** [1] 52:19

**3**

**3** [1] 2:4
**3.5** [1] 119:23
**30** [1] 140:22
**303** [1] 130:11
**34a** [1] 100:4

**5**

**50** [1] 122:10
**500** [1] 147:24

**7**

**70** [1] 2:8

**9**

**92** [3] 133:8 134:1,2
**94** [1] 133:8
**96** [2] 134:2 145:1

**A**

**a.m** [2] 1:15 3:2
**abandoned** [1] 19:16
**abandoning** [1] 20:7
**abet** [1] 25:5
**abetted** [1] 114:23
**abetting** [23] 9:7 20:8,9 22:3 24:13 25:1,14,15,17,24 30:15 31:11,14 32:3,6,11 33:19 41:6 59:5,25 64:21 66:1 80:20
**ability** [1] 16:9
**able** [4] 112:16 113:21 115:10 142:8
**above-entitled** [1] 1:13
**absolutely** [6] 51:16 140:15 150:19 151:16 154:1 157:24
**absolve** [1] 108:12
**abstract** [2] 42:9 151:15
**accept** [4] 24:9 40:8 46:2,3
**accepting** [2] 40:22 115:6
**access** [12] 13:15 16:18 17:23 18:22 48:1,24 52:23 53:2 100:10,12,15 101:23
**accessed** [1] 158:19
**accesses** [1] 59:13
**accessing** [2] 59:16,23
**accident** [1] 93:8
**according** [1] 49:18
**account** [6] 10:3 54:16,17 120:2 138:6 161:15
**accurate** [1] 103:25
**accused** [1] 149:11
**achieved** [1] 125:24
**acknowledges** [1] 76:19
**across** [5] 5:16,18 8:16,17 123:16
**act** [7] 24:22 51:13 73:12 80:18 85:12 99:13 111:16
**acting** [11] 4:14 8:4 24:2,6 34:12,16,22 36:11 66:24 88:12 154:19
**action** [19] 3:24 15:6,10,13, 14,15 57:10 73:1 78:10 85:20 86:18 94:24 95:5 96:18 97:10,15 108:18 123:17,24
**actionable** [2] 9:9 12:25
**13:2 19:9 57:9,20 72:14 92:8 95:6 101:6 112:7 119:11**
**actions** [5] 16:18 33:10 86:8,12 149:2
**active** [1] 40:23
**activities** [2] 8:19 150:12
**activity** [3] 4:20 49:1 53:19

**acts** [1] 94:2
**actual** [3] 8:11 80:6 134:15
**actually** [15] 6:12 29:6,8 63:15 64:18 67:10 68:4 111:7 112:13,24 113:11 122:20 155:11 157:17 160:11
**ad** [1] 143:8
**added** [1] 90:3
**addicted** [1] 160:21
**adding** [1] 99:9
**addition** [1] 13:3
**additional** [2] 11:10 144:14
**address** [5] 25:18 46:20 86:17 111:21 132:1
**addressed** [2] 36:18 120:25
**addressing** [4] 70:19 103:12 121:25 126:1
**adequacy** [1] 98:9
**adequate** [1] 22:24
**administration** [1] 74:10
**adopt** [5] 4:23 31:2 47:1 55:18 97:2
**adopted** [1] 133:14
**adopting** [1] 116:23
**adornment** [1] 96:14
**adult** [2] 128:6,6
**advance** [1] 20:4
**advanced** [1] 63:12
**advancing** [3] 61:17 66:13, 15
**advertise** [1] 106:11
**advertising** [1] 140:20
**affirmative** [3] 34:2 94:2 97:10
**affirmatively** [2] 33:15,21
**afforded** [1] 163:21
**afoul** [2] 23:25 57:15
**afraid** [1] 34:4
**agree** [7] 48:12 58:4 81:24 82:1 105:25 127:13 151:9
**agreement** [1] 82:25
**agrees** [2] 114:22 145:14
**ahead** [7] 11:23 27:7,12,18 45:5 62:25 80:11
**aid** [1] 25:4
**aided** [1] 114:23
**aiding** [24] 9:7 20:7,9 22:2 24:12 25:1,14,15,17,23 30:15 31:10,14 32:3,6,11 33:18 41:5 58:4 59:5,25 64:21 66:1 80:20
**aiding-and-abetting** [3] 25:22 33:11 58:13
**air** [1] 119:1
**AL** [1] 1:3
**al-Baghdadi's** [2] 31:12 32:2
**algorithm** [62] 5:12,14,16, 18,22,24 6:23 7:11,17,25 8:15,19 9:25 10:15,15 11:1,9, 12,13 12:14,17 18:10 21:25 24:15,19,25 25:11 40:**

**16,17,20 41:1,5,12,16,20, 23 42:23 51:10 69:3 78:23 101:11 104:4,17 107:18 111:10 126:11,12 127:19 128:11 131:18 132:10 136:1 141:23 147:9 151:24 152:3,8 156:13 157:10 162:13,15 163:5**
**algorithms** [23] 6:17 9:23 10:13 11:6,25 18:14 50:10 55:25 81:2 103:24 104:10 113:22 119:1,2 127:1 133:2 151:22 152:4 154:2,4,6 162:24 163:3**
**ALITO** [43] 13:10,17,20,23 14:2,7,13,16 15:2 34:3,4, 21 35:5,13,20 36:3,10,16 37:5,12,16 46:18 89:17,18, 23 90:10 91:7,13,19 92:3, 14,17 93:3,12 94:5,12 95:15 146:6,11,14,24 148:16 149:23**
**Alito's** [2] 103:6 155:1**
**allegation** [4] 76:21 102:15,17 143:9**
**allegations** [4] 73:7,10 90:4 98:9**
**allege** [3] 98:4 127:23 154:5**
**alleged** [3] 92:21 93:17 133:15**
**alleges** [2] 153:7,13**
**allowing** [2] 73:14 94:3**
**allows** [3] 37:1,7 93:23**
**almost** [6] 32:23 75:8 137:8,12 149:10 152:20**
**alphabetical** [2] 122:13 160:19**
**alphabetically** [1] 158:6**
**alter** [1] 7:18**
**alternative** [1] 50:19**
**although** [2] 70:7 118:9**
**amazing** [1] 149:8**
**Amazon** [2] 116:3 133:23**
**ambiguity** [1] 84:4**
**amend** [2] 58:22 163:20**
**Amendment** [3] 48:6 100:23 106:14**
**amendments** [1] 79:7**
**amici** [6] 54:6 79:14,19 105:8 129:17 160:4**
**amicus** [8] 1:22 2:7 55:8, 14 70:15 87:5 150:20 157:3**
**amok** [1] 163:3**
**among** [1] 48:2**
**amount** [1] 129:19**
**amounts** [1] 32:11**
**amplify** [2] 76:3 94:15**
**amplifying** [2] 42:24 98:16**
**analogies** [1] 78:15**
**analogous** [3] 26:10 29:7 51:12**
**analogy** [6] 26:3,19,22,24**

**27:8 79:1**
**analysis** [6] 51:2 80:15,17, 18 85:18 93:11**
**analytically** [1] 130:7**
**analyze** [2] 95:22 100:19**
**analyzed** [2] 85:3 87:17**
**analyzing** [6] 48:3,7,23 49:2,5,22 100:14 150:10**
**anodyne** [1] 125:21**
**another** [21] 4:4 30:18 38:1 48:5 69:25 75:15 84:7 89:12 91:4 94:23 95:24 101:9, 14 114:17 117:3 118:7,19 132:2,5 137:18 146:21**
**answer** [8] 28:23 44:9,13, 18 47:8 67:2 88:5 126:16**
**answered** [1] 37:17**
**answering** [4] 28:4 32:14 63:19 87:21**
**answers** [2] 38:20 39:12**
**Anti-Terrorism** [4] 73:12 80:18 81:7 85:12**
**antitrust** [4] 86:8 88:17,23 104:24**
**anybody** [5] 9:24 24:19 61:6 122:9 153:15**
**anytime** [3] 61:3 76:9 118:21**
**apart** [1] 6:6**
**app** [1] 41:22**
**appeals** [2] 54:2,22**
**appear** [4] 104:4 108:7 118:25 119:1**
**APPEARANCES** [1] 1:17**
**appears** [2] 139:13 159:17**
**appendix** [1] 52:19**
**applicable** [5] 77:22 78:7 87:23 97:20 118:13**
**applicants** [1] 77:6,13,14**
**application** [5] 5:12 7:11, 18**
**applied** [2] 101:15 151:19**
**applies** [11] 4:13 7:21 9:19, 20 12:23 13:9 74:16 124:2 130:9 159:18 163:12**
**apply** [15] 4:6 13:7 31:7 46:15 48:18 52:13 53:2 71:9 130:18 137:6,9,16 145:25 152:14 163:11**
**applying** [1] 81:2**
**appreciate** [2] 45:4 76:5**
**appropriate** [4] 101:19 152:13,14,25**
**area** [1] 46:7**
**areas** [2] 89:2,4**
**aren't** [5] 13:1 24:14 31:2 57:9 146:16**
**argue** [1] 18:3**
**arguing** [11] 15:25 20:10, 12,16 31:5 35:6 69:19,22 73:10 92:6 121:14**
**argument** [11] 1:14 2:2,5,9, 12 3:4,7 12:6 15:23 34:5 35:6 49:14 61:9,17 63:8,**

Heritage Reporting Corporation

Official - Subject to Final Review

10 64:10 65:11 69:9 70:14
76:16 80:12 92:10 99:25
100:6 101:1 114:10 130:8
144:9 158:20 161:6
arguments [2] 65:8 123:6
arise [1] 4:1
arising [1] 64:11
around [7] 15:23 46:21 90:
16 115:7 145:17 155:25
159:7
arranging [1] 102:3
article [1] 108:1
articles [3] 107:22,23 108:
1
articulate [2] 66:12 68:13
artificial [6] 49:17,19 50:10
73:22 74:8 101:8
Asian [1] 41:25
aspect [2] 101:22 107:8
aspects [1] 88:2
assert [1] 15:10
asserts [1] 15:15
assess [1] 82:20
assessment [1] 83:12
Assume [7] 38:17 40:11
49:24 83:2,3 96:10,12
assuming [2] 18:3 77:21
assumption [1] 155:20
ATA [4] 85:19 86:1 94:20
99:14
attempt [2] 106:17,18
attempts [1] 113:24
attention [1] 162:3
attractive [1] 125:11
audience [1] 132:22
authentically [1] 83:16
automated [1] 10:23
automatic [1] 61:1
automatically [5] 23:22
25:12 30:7 36:23 138:21
automobile [1] 93:8
Autoplay [1] 161:23
available [1] 129:3
aware [1] 160:8

**B**

back [21] 10:18 15:21 24:
13 30:25 43:4 47:12 53:22
54:7,20 57:25 62:22 64:24
84:23 102:12 106:25 112:
17 113:15 127:4 142:18
154:25 162:12
backdrop [1] 68:6
background [1] 65:10
bad [5] 82:19 133:1 140:21
153:3 156:25
banner [1] 111:2
barred [1] 144:13
Barrett [42] 57:23,24 58:8,
12,25 59:19 60:3,7,11 61:7,
14,22 62:5,12,18 63:2,14,
20 64:1,4 83:23,25 84:10,
11 85:4,21 106:23,24 107:
10,16 108:20 109:14 110:8

12,25 128:14 129:9 130:10,
19,22 131:1,7 132:11,15
134:9,14,17 135:6 136:7
138:1 139:4 140:9,15 141:
12 142:3,16 143:1,3 144:
25 146:10,12,15 147:7 148:
22 150:2,18 151:11,16 152:
6 153:1,25 154:9,11,22
155:5,8,18 156:6,9,18,21
157:15,22,24 158:23 159:
10,19 160:13
Blatt's [2] 46:2 108:25
block [14] 16:3,10 18:20,23
65:6,14,21 66:6 92:21 93:
17 110:19,21 111:4 121:17
blocked [1] 18:13
blocking [6] 18:5 68:16
119:24 134:20,23 138:5
blurb [2] 87:4,7
board [2] 5:16,20
Bob [1] 161:18
body [2] 54:20 55:2
book [26] 5:7 57:11 60:
17 71:1,4,5,10,10,11,23 72:
14 88:6 128:6 147:14
books [9] 26:5,9 29:14,16,
16,25 71:5 72:11 73:4
bookseller [5] 26:8 71:6,
22 72:9 92:1
booksellers [1] 70:25
bookstore [3] 29:13 128:5,
6
boost [1] 88:19
borderline [1] 78:5
both [6] 58:12 85:10,11
123:17,17
box [6] 39:12 112:21 155:3
156:12 162:5
boy [1] 46:4
break [1] 19:10
brief [15] 11:5,5 15:25 31:
18 51:9 65:3,8 68:13 76:
20 95:21 107:11 144:5,5
145:9 148:6
Briefly [1] 48:15
briefs [12] 4:22 55:9,14 56:
15 63:4 69:18 87:5 125:13
129:18 150:20 157:3 160:
5
bring [1] 53:8
brings [1] 112:21
broad [2] 54:1 89:1
broadcast [1] 132:20
broadcasting [3] 114:24
132:7 154:23
broaden [1] 47:13
broader [1] 37:14
broadly [1] 59:9
brought [2] 65:18 86:12
built [1] 126:17
bulk [1] 150:11
bunch [4] 10:20 28:15,20
141:13
burden [1] 82:12

business [2] 35:15 160:5
buy [2] 17:22 133:24

**C**

c)(1 [22] 38:5,6 68:14,19 91:
11,12 102:6,7,23 114:15,
21 115:7,11,12 123:7 124:
15,18 137:5,7,16 138:21
150:5
c)(2 [10] 68:19,25 124:15,
16,18,21 136:21 137:6,9
138:22
cahoots [1] 24:18
call [17] 20:17 27:2,2 31:12,
13 55:1 75:4 83:17 104:21
111:15 113:10,18 115:1
119:25 139:10 141:6 163:
4
called [6] 31:25 32:1 113:
10 118:16 119:5 133:10
came [1] 1:13 77:10
candidates [1] 52:21
cannot [2] 138:1 159:16
cards [1] 10:20
care [2] 157:1 160:2
carefully [1] 71:17
carry [1] 88:16
cartoon-like [1] 125:22
cartoons [1] 162:6
carve [1] 132:16
carves [1] 49:2
Case [56] 3:4 4:22 5:13 7:9
15:5 17:15,18 20:19,23 21:
14 28:15,18 33:13 47:24
50:13 55:4 58:2,4,7,8,9,9,
18,21,23 63:4 64:15 66:7
69:7 75:4,23 76:7 80:11
81:1 82:19,24 83:18 90:25
91:2 97:5 101:18 107:17
108:3,6 109:21 110:25
113:6 127:16 130:11 133:
15 138:10 143:20 144:7
154:4 163:25 164:1
cases [8] 7:23 46:21 71:16
78:5,5 79:17 85:10 145:23
cat [4] 28:10,12,15 81:4
catalogue [5] 29:12,15,25
30:2 51:11
category [1] 32:12
cats [1] 81:6
causal [1] 99:12
causation [1] 94:21
cause [14] 15:6,10,12,14,
15 55:10 57:10 72:25 78:9
88:12 94:23 95:5 108:18
123:24
caused [1] 144:7
causes [3] 86:18 104:4
123:17
cautionary [1] 161:12
celebrate [1] 142:6
Center [1] 133:6
cert [1] 85:10
certain [12] 9:11 42:20,21,

24 46:22 67:4 76:3 104:17
110:17 112:14 131:13 146:
7
Certainly [7] 43:14 81:15
85:2 89:2 147:13 153:19
161:24
cetera [3] 94:22 102:3 140:
13
challenge [2] 54:4 56:9
change [2] 10:24 82:13
changed [1] 79:6
channel [7] 120:15,16,17,
19 130:15 132:20,21
channels [1] 148:1
characterization [1] 82:
23
characterized [1] 161:16
characterizing [2] 66:16
162:25
charming [1] 162:5
chat [2] 20:14 47:14
cheapest [1] 11:7
check [3] 61:11 62:1 109:
16
checkmarks [1] 117:14
chef [1] 90:16
CHIEF [40] 3:3,9 8:6 25:25
26:16 27:1,11,15,17 28:14
29:22 30:3 34:3 37:18 42:
11 47:20 51:21 57:22 64:5
70:11,17 71:2 78:13 79:12
85:22 86:24 87:10 88:25
89:14 90:5 96:8 98:11 99:
21 103:3 106:22 110:9
114:6,9,12 117:22 118:24
149:20 154:12 161:3,8
163:24
Chief's [1] 82:10
choice [25] 53:4 74:4,9,11
75:6,13,24 77:1 78:8 79:
11,13,15 98:3 104:23 108:
9 109:24 110:4 112:4 115:
13,17 128:8 129:6 132:7
133:2 142:23
choices [21] 72:3,4 73:18
75:10,11,20,23 76:2,11,24
77:17 79:5 83:1 84:9 94:2
97:25 98:19 108:8 110:6
123:5 129:19 130:12 142:
19 147:21 159:14 160:12,
16
choose [2] 100:19 115:22
chooses [1] 52:4
choosing [9] 48:3,7,22 49:
5,9,22 50:6 100:14 150:10
chosen [1] 162:9
chronological [1] 158:6
Circuit [16] 3:21 17:17 50:
12 91:2 100:2 101:15 127:
15 143:4,6,19,19 144:2,24
151:2,18 153:4
Circuit's [4] 49:15 50:7
127:17 145:7 152:12,17,24
153:4

Official - Subject to Final Review

**circulated** [1] 87:4
**circulating** [2] 88:13 90:2
**circumstances** [11] 4:9
  13:1 14:19 32:18 50:9 57:
  19 74:17 79:6 89:19 103:
  15 112:5
**circumvent** [1] 115:11
**civil** [1] 94:7
**civilly** [1] 90:21
**claim** [63] 3:24 4:7 5:11 6:6
  8:5 9:1,3,5,9 16:8,8,13,21
  17:1,5,7 18:9,19 20:5,7 25:
  17,22 33:11,20 34:11 42:8
  63:12 64:17 65:12,12,15
  66:6 71:15 73:11 84:18,25
  88:18,22 110:20 114:21,23
  116:25 117:24 121:2 124:
  2 126:17 128:2,15,15,16,
  22,25 131:20 140:16 144:
  13 145:25 155:11 158:17
  160:9,14,15,17,18
**claiming** [2] 20:15 21:14
**claims** [8] 3:12,14,18 57:16
  65:21 98:13 142:10 160:
  22
**clarify** [1] 85:11 144:22
**clarity** [1] 119:20
**class** [1] 149:2
**Clause** [1] 106:13
**clean** [1] 135:21
**cleaner** [1] 39:2
**cleaning** [1] 124:20
**clear** [8] 5:10 18:18 55:15
  65:1 78:7 82:5 96:11 102:
  2
**clearer** [1] 5:23
**clearly** [3] 6:5 21:23 84:5
**clerks** [1] 10:19
**click** [6] 6:15 23:21 30:12,
  13,17,19 43:23 44:4
**clicked** [2] 23:14 44:8
**clients** [1] 119:2
**close** [3] 51:8 55:14 83:17
**closely** [2] 67:12 91:1
**closing** [1] 163:8
**code** [1] 119:13
**collapse** [2] 148:17 149:19
**colleague's** [1] 161:10
**colleagues** [1] 97:8
**colloquial** [1] 153:9
**colloquy** [1] 73:6
**collusion** [3] 40:19,23 126:
  23
**come** [4] 30:25 46:25 55:1
  99:4
**comes** [9] 15:1 26:6 31:11
  39:20,21 41:22 43:4 144:
  14 151:18
**coming** [3] 64:23 117:2
  145:21
**comment** [2] 30:11 90:3
**commentary** [1] 87:12
**Commerce** [1] 106:12
**commit** [1] 87:2

**common** [12] 3:20 88:5 89:
  25 90:6 91:9 96:24 103:14
  109:13 113:3 119:9 121:6
  145:2
**communicable** [1] 90:17
**communicate** [1] 114:19
**communicating** [2] 114:
  18 154:22
**community** [2] 131:13,14
**companies** [4] 32:20 47:4
  106:11 113:7
**company** [2] 3:13 100:3
**company's** [1] 3:14
**competition** [1] 45:9
**competitor** [2] 88:21 90:
  12
**compilation** [2] 51:12,14
**complain** [1] 142:8
**complaining** [1] 42:16
**complaint** [34] 19:11 21:23
  22:19,23,24 23:1 28:16 38:
  22 58:1,2,3,6,22 73:8,9 77:
  23 78:1 85:5,7 97:5 127:
  18,23 129:2 139:14 146:17,
  20 151:11,14 152:20,21
  153:3,7,12,21
**complaints** [2] 91:5 153:
  20
**complete** [2] 141:15 142:4
**completely** [3] 34:5 90:19
  131:25
**complex** [1] 70:9
**complicated** [1] 28:11
**components** [1] 70:7
**CompuServe** [1] 53:14
**computer** [8] 4:15,16,18
  24:3,7 33:22 37:24 40:2
  41:1 52:3,7,16,20 53:9 59:
  18,22 66:25 70:3 100:9,16
  102:5 105:15 123:9 150:6
  151:8 163:3
**computers** [2] 18:21 33:
  23
**concede** [1] 58:16
**conceivable** [1] 75:13
**conceivably** [1] 72:13
**conceiving** [1] 66:10
**concepts** [1] 64:12
**conceptually** [1] 136:4
**concern** [5] 15:4 45:15 77:
  3 134:10 136:19
**concerned** [9] 26:21 30:14
  86:16 99:2 112:8 113:20
  122:25 154:2 155:23
**concerns** [2] 54:13,13
**concession** [1] 144:11
**conclude** [1] 162:15
**concludes** [1] 3:23
**conduct** [23] 3:15 4:20 8:1
  9:10 16:2 34:2 45:18 67:5
  68:17,22 80:4 81:21 104:
  22 105:3 110:14,17,18,19
  121:18 128:18 141:5,6
  146:4

**configured** [1] 88:19
**conflating** [2] 64:13,25
**confused** [3] 34:5 64:8 72:
  9
**confusion** [2] 64:10 67:24
**Congress** [36] 46:10,11 47:
  1,13 53:5,25 54:13 62:24
  68:15 79:6,11,13,14 82:12,
  12 89:6,8 92:4 108:11,12
  110:16 111:25 113:2 115:
  17 121:10 122:25 125:24
  126:7 134:21 135:4,13,18
  137:21,24 140:3 156:23
**Congress's** [3] 53:4 112:
  18 115:13
**connection** [1] 143:10
**consensus** [1] 54:5
**consequence** [1] 71:21
**consider** [3] 50:13 82:13
  131:5
**consistent** [2] 54:21 136:5
**constitute** [2] 13:21 41:5
**construed** [1] 92:13
**consumers** [1] 54:11
**contain** [1] 152:9
**content** [177] 3:13,19,25 4:
  1,4,5,8,10 6:20 8:9 9:3 11:
  10 12:1,3,4 13:8 14:24 15:
  7 16:4,10,10,17 17:3,6 21:
  20,22 23:13 29:3,5,18,20,
  24 33:16 35:3,3,4,9 36:13,
  14 38:1 39:8 44:15 48:4,7,
  8,23 49:3,5,10,18,21,23 50:
  4,11 51:18 52:4 56:17 57:
  2 59:7 60:4 61:10 62:3,5,6,
  17 63:9,16,17 64:24 65:7,
  14 66:22 69:23,25 71:1,18,
  19,23 72:6 73:17,22 74:20
  75:20,22,24 76:9 77:17,24
  78:3 80:2 82:8 84:8 86:23
  87:21,25 88:2 89:13,21 92:
  22 96:3 100:11,14,23 101:
  3,4,5,7,17 102:9,17,18,21
  103:1 104:4,14,15,17 105:
  21 106:6,20 107:5,13,21
  108:13 109:2 110:20 111:
  3 112:25 115:5 116:7,22,
  23 118:7 121:18 124:7,24
  125:2,7 126:2 127:21 128:
  22 129:1,14,15,20 130:12
  131:16,19 132:17 134:6
  136:11 139:13,20,20 140:
  18 141:1,10 142:23 145:22
  146:9 147:10,25 150:7,11,
  14,15 151:7,23,25 153:9,
  11 154:6,21 156:14 157:11
  159:14,23
**content's** [1] 66:22
**content-neutral** [1] 131:6
**contention** [6] 17:24 23:
  15 24:6 36:20 66:12,14
**contents** [3] 71:10 73:4 92:
  9
**context** [9] 33:8 48:10,11

**53:1 62:21 79:2 120:25
  124:7 150:13
**contexts** [1] 28:2
**continually** [1] 53:24
**continue** [3] 45:2 47:7 93:
  24
**continuum** [4] 116:17,18
  117:6 155:9
**contribute** [1] 143:24
**conversation** [1] 62:22
**convey** [1] 4:11
**conveying** [1] 159:24
**conveys** [5] 60:15 115:4,9
  159:1,6
**cooking** [5] 5:15,25 6:1,25
  7:3
**Copyright** [1] 51:13
**copyrightable** [1] 51:15
**core** [3] 110:14 117:18 142:
  11
**correct** [23] 7:16 19:19 20:
  10,11 38:5,6 39:24 42:3
  51:1 62:21 63:10 96:22
  103:9,18 104:19 109:19
  123:3 127:12 131:7 145:1,
  6 150:19 151:16
**correctly** [2] 3:21 145:24
**cost** [1] 50:22
**costs** [1] 45:18
**coterminous** [1] 136:20
**couldn't** [1] 149:13
**counsel** [2] 26:1 70:12 85:
  23 114:7 149:21 161:4
  163:25
**count** [1] 59:22
**countless** [2] 10:3 116:4
**country** [2] 55:11 78:17
**County** [3] 162:17,21,23
**couple** [6] 7:22 55:13 56:
  14 69:20 76:14 136:7
**course** [4] 85:20 88:2 89:
  14 151:14
**COURT** [29] 1:1,14 3:10 4:
  17,23 5:2,4 31:2 45:14,22
  46:11,15 55:15,18 70:18
  71:15 78:10 82:5 83:13,17,
  18,19 85:9,13 114:13 138:
  10 143:12 161:9 163:18
**Court's** [4] 5:8 72:7 74:25
  83:5
**courts** [7] 7:22 54:2,21 65:
  5 68:5 82:25 121:12 145:
  24
**cover** [2] 62:25 139:1
**covered** [13] 16:6 17:8 18:
  4 67:7 139:16 155:7 156:
  19,20 157:21,23 158:15,24
  161:1
**covers** [3] 17:1 18:5 134:
  10
**crafting** [1] 138:8
**crash** [1] 54:10
**crazy** [1] 120:20
**create** [15] 12:2 20:13 34:

**18 41:1,23 51:10,11,17 54:
  8 59:7 69:23 76:4 89:8 97:
  14 162:24
**created** [20] 3:13 4:8 6:20
  21:11 29:13,17,20 35:3,17
  38:12 39:2 60:3 62:4,6 66:
  22 93:11 102:16 114:14
  150:21,23
**creates** [3] 62:10 90:15
  107:5
**creating** [11] 24:15 61:10
  63:16 64:24 73:22 76:8 97:
  15 98:17 107:14 135:25
  162:13
**creation** [3] 34:18 40:20
  62:6
**credit** [2] 143:23,24
**criminal** [2] 126:22 137:10
**criteria** [6] 77:19 78:2,6,11
  130:5 141:18
**criterion** [1] 102:21
**critical** [1] 107:23
**crushing** [1] 149:10
**curiae** [3] 1:22 2:8 70:15
**cuts** [1] 122:8

**D**

**D.C** [3] 1:10,21,24
**damages** [1] 56:23
**danger** [1] 117:4
**date** [1] 141:21
**dating** [6] 41:22 97:14 116:
  6 140:10 141:9,17
**day** [7] 57:6 78:17,19 88:16
  119:23 147:23 148:15
**days** [1] 152:5
**dead** [2] 123:2 159:22
**deal** [4] 59:12 71:24 130:13
  163:20
**dealing** [2] 126:2 136:21
**dear** [1] 159:6
**death** [1] 122:7
**decide** [3] 78:2 102:21 105:
  21 128:5 132:24
**decided** [2] 58:19 97:23
**decides** [1] 112:25
**deciding** [1] 147:10
**decision** [10] 3:21 5:1 55:4,
  4 75:14 85:15 111:21,23
  157:9 163:16
**decisions** [10] 55:3 56:15
  73:23,25 76:16,20,20 78:16
  110:1 113:14 148:15
**decline** [1] 5:4
**deeper** [3] 122:2 136:18,19
**defamation** [22] 12:14 46:
  21 60:24 86:5,19,25 87:2,
  22 88:8 90:25 95:9,18,20
  96:1,18 119:9 123:21,23
  128:16 136:23 160:9,14
**defamatory** [13] 3:21,23
  13:6 43:24 44:9 57:12 59:
  18 61:4 78:24 81:18 87:25
  88:2,7 89:21 90:4,7,11,11,

Official - Subject to Final Review

18 **91**:22 **95**:15 **96**:22 **128**:
11 **129**:3 **130**:6 **131**:3 **132**:
3,5,7 **136**:9,10 **145**:22 **148**:
20

**defame** [1] **119**:15

**defeat** [1] **52**:10

**defeats** [2] **124**:19 **125**:8

**defective** [2] **16**:9 **18**:5

**defendant** [13] **3**:18,25 **4**:7,
8,12,14 **6**:20 **10**:14 **39**:21
**66**:23 **70**:2 **163**:1,4

**defendant's** [3] **12**:22 **66**:
20,24

**defending** [2] **153**:23,25

**defense** [12] **4**:6 **7**:20,24
**12**:23 **13**:6,7 **15**:18 **24**:1
**41**:12,18 **58**:20 **64**:17

**defies** [1] **116**:8

**defines** [1] **48**:1

**definitely** [1] **134**:3

**definition** [6] **5**:2 **52**:2 **53**:1
**101**:23 **102**:4 **105**:14

**degree** [1] **119**:10

**delineates** [1] **53**:1

**delivering** [1] **24**:4

**deluge** [1] **149**:5

**Democracy** [1] **133**:6

**Department** [1] **1**:21

**depend** [4] **44**:18 **72**:18 **97**:
20 **112**:12

**depending** [1] **30**:22

**depends** [4] **38**:7,24 **95**:20
**156**:21

**deprive** [1] **72**:4

**Deputy** [1] **1**:20

**describe** [6] **22**:19 **32**:15
**41**:11 **72**:14 **77**:17 **150**:12

**described** [6] **66**:14 **70**:8
**71**:3 **73**:3 **97**:25 **103**:16

**describes** [1] **87**:6

**describing** [1] **95**:16

**design** [2] **83**:1 **160**:16

**designed** [4] **111**:21 **126**:
12 **127**:9 **152**:5

**desirable** [2] **47**:1,10

**desktop** [1] **162**:4

**destabilizing** [1] **155**:24

**destroyed** [1] **148**:18

**detail** [2] **22**:20 **85**:5

**determine** [1] **121**:5

**determining** [1] **78**:11

**developed** [4] **67**:25 **133**:9
**150**:22,24

**devised** [1] **47**:4

**devises** [1] **47**:9

**devoted** [1] **131**:12

**differ** [1] **57**:6

**difference** [9] **8**:7 **43**:12 **56**:
23 **85**:8 **107**:17 **109**:22
**110**:13 **112**:6 **113**:13

**different** [42] **5**:13 **7**:8,14 **8**:
17 **10**:18 **11**:13 **14**:8 **17**:7
**18**:2 **23**:20 **24**:1 **26**:14 **32**:
18,24 **34**:1 **40**:6 **48**:10 **49**:

4 **55**:16 **57**:17 **64**:12,18 **89**:
1 **92**:10 **93**:10 **96**:3 **109**:1
**111**:16 **112**:24 **113**:11,19
**117**:11,19 **120**:8 **121**:10
**122**:20 **131**:24,25 **134**:3
**140**:2,18 **141**:13

**differently** [1] **113**:19

**difficult** [3] **21**:10 **73**:20
**109**:6

**difficulty** [1] **46**:6

**digest** [1] **100**:20

**digesting** [8] **48**:4,7,23 **49**:
5,10,22 **100**:14 **150**:11

**digital** [1] **54**:10

**diminish** [1] **88**:20

**direct** [4] **10**:15 **68**:5 **74**:13
**106**:5

**directed** [3] **110**:17 **121**:22
**123**:15

**directly** [3] **28**:25 **40**:16
**118**:13

**directs** [2] **86**:21 **124**:22

**disagree** [7] **59**:20 **61**:22
**101**:22 **105**:23 **133**:4 **135**:
13 **158**:10

**disagreed** [2] **107**:9,10

**disagreeing** [1] **152**:23

**discriminate** [1] **42**:1

**discriminated** [1] **41**:8

**discriminates** [4] **41**:2,24
**97**:15 **102**:14

**discriminating** [1] **42**:3

**discrimination** [6] **41**:21
**76**:22 **86**:5 **140**:11,17,25

**discriminatory** [1] **152**:10

**discussed** [1] **152**:15

**discussion** [2] **43**:16 **86**:6

**disease** [1] **90**:17

**disincentivize** [1] **68**:16

**disincentivized** [1] **121**:
17

**diskettes** [1] **53**:16

**dislocation** [2] **54**:9 **55**:11

**dismiss** [4] **58**:18,21 **97**:24
**163**:19

**dismissal** [1] **71**:14

**dismissed** [2] **75**:16 **98**:7

**disparate** [1] **140**:16

**display** [3] **13**:11 **111**:2
**147**:10

**displayed** [3] **13**:8 **147**:11
**154**:23

**displaying** [5] **6**:8 **13**:13
**29**:5 **34**:13 **153**:14

**displays** [4] **6**:11,12 **34**:24
**119**:24

**disproportionately** [1] **77**:
13

**dispute** [1] **121**:25

**disregarding** [1] **7**:23

**disseminating** [1] **3**:25
**139**:6,7

**dissemination** [3] **137**:23
**144**:12 **155**:20

**distinct** [5] **51**:14 **119**:11
**159**:1,2,6

**distinction** [20] **3**:15 **8**:25
**9**:16 **17**:11,14 **18**:19 **42**:5
**56**:20 **69**:14 **73**:15 **100**:8
**111**:7 **130**:12 **131**:19 **141**:
2 **142**:21,22 **150**:5,9,22

**distinguish** [4] **16**:16 **22**:
17 **71**:17 **141**:16

**distinguishes** [1] **3**:11

**distinguishing** [2] **56**:16
**140**:1

**distress** [4] **86**:7 **88**:11,13
**123**:25

**distributing** [1] **91**:21

**distributor** [4] **91**:19,25
**103**:6,13

**district** [1] **163**:18

**diversity** [1] **140**:6

**docket** [2] **75**:1,4

**document** [1] **44**:12

**Doe** [5] **43**:22 **44**:12,13 **60**:
18,19

**doing** [24] **4**:19 **10**:25 **11**:
15 **22**:6 **25**:6 **29**:10 **34**:12
**40**:16 **42**:24 **55**:20 **61**:2 **65**:
16 **66**:9 **67**:6,10 **91**:6 **109**:
1 **111**:1,10 **128**:8 **135**:20
**139**:3 **145**:11 **163**:5

**done** [7] **12**:8 **18**:18 **29**:1
**92**:8 **93**:22 **95**:1 **121**:2

**doubt** [1] **109**:12

**doubtless** [1] **6**:12

**down** [30] **10**:9 **17**:4 **19**:10
**61**:2 **71**:17 **81**:13 **90**:20 **92**:
7 **93**:2,15 **99**:18 **111**:6,18
**112**:2 **120**:12 **124**:22 **125**:
7,15,16 **131**:17 **135**:20,24
**137**:20 **138**:12,13,17,23
**145**:2 **148**:20 **158**:19

**download** [1] **38**:4

**dozens** [1] **32**:21

**drafted** [1] **54**:1

**draw** [8] **8**:25 **17**:14 **40**:21
**54**:20 **97**:4 **109**:13

**drawing** [5] **14**:9 **18**:19 **46**:
6 **69**:13 **162**:3

**drawn** [1] **3**:15

**drew** [1] **46**:21

**drilling** [1] **111**:6

**due** [1] **80**:20

**Dyroff** [2] **17**:15 **55**:4

**E**

**e-mail** [11] **17**:15,19 **23**:17
**24**:12 **26**:14 **40**:6 **59**:16 **60**:
18,21 **61**:4,20

**e-mails** [1] **34**:1

**each** [9] **3**:15 **7**:19 **31**:6 **63**:
12 **67**:19,20 **121**:1,4 **147**:
23

**earlier** [9] **30**:25 **40**:15 **53**:
23 **62**:22 **73**:7 **97**:13 **98**:1
**112**:9 **150**:4

**early** [1] **91**:2

**earthquake** [1] **148**:10

**easily** [2] **98**:7 **137**:1

**easy** [2] **28**:15 **127**:16

**economic** [2] **54**:9 **55**:10

**economy** [2] **54**:10 **55**:8

**edge** [1] **83**:16

**editing** [2] **154**:20,21

**editorial** [3] **63**:8 **100**:22
**158**:13

**effect** [3] **97**:2 **104**:8,10

**effects** [1] **54**:11

**eight** [1] **55**:5

**either** [8] **68**:25 **69**:18 **73**:
2 **107**:13 **109**:18 **114**:2
**127**:1,11 **146**:2 **153**:23

**election** [1] **148**:13

**element** [6] **24**:1 **52**:14 **63**:
12 **123**:13 **137**:13,15

**elements** [18] **3**:23 **7**:20 **25**:
16,22 **31**:7 **42**:8 **51**:15 **67**:
20,23 **68**:2,10 **69**:16 **88**:15
**94**:11,19,21,24 **99**:1

**elevated** [1] **129**:14

**elevating** [2] **131**:9 **148**:10

**eliminating** [1] **123**:16

**else's** [1] **90**:7

**embedded** [3] **31**:1 **39**:20
**146**:22

**emoji** [1] **157**:5

**emojis** [1] **117**:11

**emotional** [4] **86**:7 **88**:10,
13 **123**:25

**emphasize** [1] **74**:15

**employee** [1] **144**:1

**employees** [2] **76**:18 **102**:
19

**employers** [1] **77**:7

**employment** [3] **76**:16,20
**78**:16

**enacted** [1] **123**:1

**encourage** [6] **6**:15 **9**:12
**10**:16 **16**:18,22 **23**:13

**encouragement** [1] **9**:7

**encouraging** [6] **9**:6 **14**:6
**15**:11 **17**:6 **19**:1 **31**:9

**end** [3] **57**:6 **61**:3 **162**:13

**endemic** [1] **9**:23

**endorsement** [4] **116**:12,
22 **155**:10 **156**:22

**endorsements** [1] **117**:9

**engage** [1] **14**:6

**engine** [12] **10**:1 **43**:3,15,21
**44**:22 **88**:18 **97**:14,16,25
**98**:4 **136**:15 **150**:13

**engines** [13] **43**:17,18 **49**:
11 **105**:20 **116**:1 **120**:2
**129**:16 **134**:5 **139**:15,16
**140**:1 **147**:8 **148**:5

**enlist** [1] **99**:10

**enormous** [1] **79**:5

**enough** [4] **60**:6,8 **95**:4
**142**:9

**ensures** [1] **41**:21

**enter** [1] **120**:7

**entertaining** [1] **135**:8

**entities** [1] **4**:15

**entitled** [3] **58**:22 **102**:6

**entity** [8] **42**:19 **51**:14 **59**:
13,14,20 **63**:6 **91**:8 **101**:24

**equality** [1] **131**:11

**equate** [1] **104**:11

**equipped** [1] **54**:17

**equivalent** [1] **154**:18

**ERIC** [5] **1**:18 **2**:3,13 **3**:7
**161**:6

**especially** [2] **82**:5 **113**:23

**ESQ** [4] **2**:3,6,10,13

**ESQUIRE** [2] **1**:18,24

**essence** [1] **52**:10

**essentially** [3] **10**:6 **42**:19
**93**:22

**establish** [2] **58**:24 **98**:25

**established** [1] **89**:3

**ET** [3] **1**:3 **94**:22 **102**:3 **140**:
13

**ethnic** [1] **131**:14

**Europe** [1] **149**:2

**European** [1] **45**:7

**euros** [1] **45**:8

**even** [39] **14**:21 **18**:3 **24**:9
**31**:14 **44**:21 **48**:23 **49**:11,
18 **50**:9 **51**:15 **58**:14 **74**:16
**77**:15 **82**:5 **86**:19 **87**:1 **89**:
9 **91**:19 **100**:14,21,21 **101**:
13 **102**:2 **107**:13 **111**:14
**115**:14 **126**:13 **134**:6 **136**:
4 **139**:7 **141**:14,15 **151**:6
**152**:2,3,9 **153**:13,14,16

**event** [1] **56**:5

**everybody** [3] **9**:17 **36**:20
**40**:18 **113**:16 **122**:24

**everyone** [1] **149**:12

**everything** [6] **10**:4 **38**:10
**39**:11 **46**:25 **125**:10,15

**everywhere** [2] **105**:10,19

**evident** [1] **85**:15

**exact** [4] **144**:3,3 **145**:8,9

**exactly** [12] **5**:24 **19**:21 **41**:
7 **75**:5 **86**:10 **90**:25 **99**:20,
20 **135**:4 **150**:25 **156**:6
**163**:21

**example** [27] **5**:23 **11**:6 **12**:
13 **39**:2 **40**:15 **41**:22 **44**:19
**47**:18 **59**:14 **72**:20 **97**:13
**101**:8 **116**:11 **120**:5 **122**:
12 **128**:5,21,21 **129**:12,23
**130**:4 **132**:4,19 **135**:1 **140**:
22 **143**:7 **144**:7

**examples** [1] **152**:6

**excellent** [1] **128**:21

**except** [2] **126**:19 **127**:14

**excepted** [1] **126**:23

**exception** [1] **126**:22

**exceptions** [3] **124**:13 **137**:
5,7

**excessively** [1] **132**:20

**exclusively** [2] **39**:17 **73**:4

Official - Subject to Final Review

excuse [2] 12:23 91:15
exemption [1] 60:23
exist [4] 46:19 62:23 79:8 111:11
existed [1] 98:18
existential [1] 115:25
existing [2] 82:24 83:18
expansive [1] 161:14
experts [1] 45:24
explain [6] 6:5 32:8 48:14 52:13 80:8 145:12
explicit [4] 87:17 95:10 132:25,25
exponentially [1] 134:8
exposed [1] 78:25
Exposing [1] 116:6
express [9] 55:24 56:2 94:5 103:25 116:16 117:5,6 139:11 157:17
expressed [2] 32:5 94:12
expressing [1] 117:19
extend [1] 12:7
extends [1] 135:1
extent [11] 18:9 29:8 64:23 65:15 67:5 82:24 120:23 121:19 138:10,22 163:2
external [1] 123:13
extraordinarily [1] 75:7 93:6 161:14
extreme [5] 38:17 39:6 40:23 114:1 116:21

**F**

f)(2 [3] 52:17,18,19
f)(3 [1] 49:2
f)(4 [6] 48:18 52:15 53:1,18 163:9,11
face [4] 12:18,18 20:21,24
Facebook [5] 21:3,4,6 42:18,20
fact [16] 7:17 11:12 33:21 46:7 62:8 72:3 76:23 81:1 88:14 91:21 94:14 96:5 108:7 113:9 147:1,4
facts [2] 45:6 98:4
failed [2] 17:4 19:14
failing [7] 65:6,13,21 66:6 93:1 111:4 112:2
failure [9] 16:3 18:23 71:15 92:7,21 93:17 110:18 137:20 143:25
Fair [6] 60:7 101:19 162:1 163:17
fairly [5] 15:1,12 22:20 116:25 119:4
faith [1] 134:23
fake [1] 90:15
fall [5] 41:11 42:7 51:19 66:16 102:4
falling [1] 46:3
falls [4] 4:20 29:1 80:4 103:13
false [2] 90:19 148:21
familiar [1] 22:20

family [2] 93:7 157:14
famous [2] 74:19 133:24
far [9] 19:7 21:12 24:23 30:14 32:18 38:23 92:4 117:24 132:14
fare [1] 11:7
fashion [2] 5:2 54:14
fate [1] 144:8
fault [2] 127:15,17
faulted [1] 127:22
feature [11] 21:25 23:19 24:16 115:2 133:24 148:14 155:10,13 156:24 157:17,18
featured [8] 155:3,3 156:6,11 160:19,20 161:21 162:6
features [4] 115:11 116:16 117:16 134:5
featuring [2] 142:2 148:11
February [1] 1:11
federal [3] 97:21 137:5,10
FedEx [2] 59:15,15,17
feed [3] 42:21,22 43:1
feel [2] 64:25 121:24
feeling [1] 64:11
few [5] 47:2 50:2 57:16 106:4 137:13
fighting [1] 142:14
figuratively [1] 125:18
figure [4] 9:18 26:17 144:17 146:18
figured [1] 10:21
file [1] 10:20
filters [1] 52:3
filth [2] 125:9 138:9
final [2] 36:17 75:2
financer [1] 143:17
find [8] 21:10 24:20 39:18,24 40:2 59:18 75:3 115:24
finding [1] 46:9
findings [2] 126:1 140:5
finds [1] 81:20
fine [3] 19:8 45:7 83:8
finish [2] 11:3 84:1
firm [1] 110:16
firms [1] 102:19
First [25] 3:17 43:6 44:2,7 48:6 52:24 55:13 69:20 76:14 83:5 94:14 98:15 100:23 103:5 106:14 107:25 115:23 121:24 122:4 125:7 127:5 136:15 139:20 157:18 159:15
fit [10] 9:10 27:5 43:19 47:5,11,16 67:11 68:10 79:1 90:25
fits [1] 47:24
fives [1] 117:14
flip [1] 150:8
Florida [1] 17:22
flourish [1] 126:3
flourishing [1] 140:7
flow [1] 141:4
flowing [1] 128:17 146:1

155:12
flows [1] 114:20
focus [5] 5:7 9:8 11:21:22 53:24 56:6 114:24
focused [6] 8:18 84:5 86:1 89:11 135:14,25
focuses [2] 67:4 73:3
focusing [8] 21:18 33:14,20 63:5,7,9 103:20 158:12
follow [2] 14:24 103:5
following [1] 103:21
football [4] 120:6,6,7,11
forbids [1] 114:15
Force [2] 55:5 163:1
forced [1] 70:5
forgot [1] 146:15
form [2] 15:12 100:23
forms [3] 49:17 50:11 123:16
forth [3] 36:7 90:17 107:1
forward [1] 73:15
found [2] 75:3 88:22
four [9] 21:10 27:6 29:21 41:11 47:6,11 53:9 144:4,5
Fourth [3] 3:21 91:2 143:4,19,19 144:2,24
framed [2] 20:1 37:15
Frank [1] 12:20
freaked [1] 126:9
free [4] 58:20 125:14 126:3 140:8
friend [1] 26:3
front [4] 113:15 136:1,14 159:14
frontiers [1] 115:20
fully [1] 113:9
fun [1] 152:20
function [6] 33:14 37:7 56:18 75:1 160:1
functional [1] 116:19
functions [6] 37:13 63:8 89:11 100:22 101:3 102:1,4,10 163:3
further [7] 30:5 37:21,22 85:18 96:9 131:17 149:22

**G**

garbage [1] 125:23
gather [1] 108:23
gave [2] 40:14 44:1
gears [1] 59:1
General [6] 1:20 4:23 77:16 127:3,7 152:7
generate [6] 6:17 11:9 49:17 50:4,10 151:23,25
generated [3] 101:3,5,7
generates [3] 12:17 49:20,20
generically [1] 7:12
George's [2] 162:17,21
gets [9] 26:13,17 42:14 45:16,19 61:17 62:21 112:25 155:9

getting [3] 83:6 160:23
giant [1] 43:5
gist [1] 90:4
give [52] 5:23 11:13 27:12 28:15 31:13 32:2 36:2 38:3,8,9,11,19 39:4 42:13 52:15 75:9 80:6 81:6 83:19 95:25 96:2 99:14 106:10 112:3 116:11 119:20 120:5 122:12 126:12 129:12 132:19 143:7
given [12] 28:21 48:21,25 49:6 89:25 113:5 123:19 135:11,16 138:7 140:14 161:14
gives [8] 43:22 52:21 60:23 64:19 119:18 130:20,24 139:25
giving [4] 80:21 132:21 143:9,14
glad [1] 22:22
glean [1] 150:9
glowing [1] 96:2
GONZALEZ [4] 1:3 3:4 85:3,17
GOOGLE [30] 1:6 3:5 8:8 10:11 13:10 16:7 45:7 46:9 48:22 64:17 65:12 66:1 74:18,21 75:1,5 87:18 107:14,18 112:20 117:7 118:8 129:17 147:13 148:17,18,22,24 157:2 162:5
Google's [5] 21:11 107:5 119:5 146:9 150:12
Gorsuch [22] 47:21,22 48:15,19 49:8 50:21,25 51:5,20 99:22,23 103:2 127:13 150:1,2 151:4,13,17 152:22 153:19 154:8,10
Gorsuch's [3] 51:24 73:21 103:21
got [14] 17:16 29:15 49:8,12 52:22 67:22 75:2 129:19 145:1,4 149:9,15 151:1,2
gotten [3] 68:9 122:9,23
government [9] 4:12 32:20 73:9 139:5 144:16 156:2 158:25 159:25 160:15
government's [7] 84:21,25 86:11 89:18 92:18 107:2 159:20
granted [1] 85:9
great [2] 44:3 145:3
greater [5] 79:10 106:10 134:8
greatest [5] 45:23 95:11,14
ground [3] 58:16 122:9,23
grounds [3] 56:14 58:19 109:11
group [2] 28:3 133:13
groups [2] 133:11,14
gruesome [1] 93:6

guess [3] 10:7 11:19 18:2 24:24 49:25 61:7,8 64:7,8 86:9 89:5 97:19 98:12 110:23 112:19 113:12 130:7 134:9 142:13,25 151:20 152:11 157:6

**H**

hand [3] 45:21 100:9,10
handed [1] 29:17
happen [8] 47:3,7 90:1 121:7 125:5,5,6 160:22
happened [6] 29:6 44:19 47:3 112:1 125:6 149:18
happening [5] 7:8 25:16,21 26:11 29:10 53:12,20 65:23 105:10,19 123:19 133:3,8 143:21 163:2
happens [8] 30:22 43:9 47:8 105:8 124:22,23 148:25 159:3
happy [2] 125:22 144:23
harassment [1] 91:5
harbor [1] 124:21
hard [5] 30:8,8 33:8 42:9 162:14
hard-working [1] 11:14
harder [2] 8:21 71:16
harm [23] 4:1 15:1 76:4 93:5,24 94:22 98:17,17 114:20 117:2 128:17 141:3,15 142:4 144:6,6 145:11,18,21 146:1,4 155:12 157:13
harmed [1] 64:3
harmful [3] 78:25 115:15 126:2
harms [1] 12:8
hate [2] 125:10 131:8
haystack [1] 115:25
headache [1] 129:22
heading [2] 116:20 161:18
headings [5] 117:11,17 159:21,24 161:16
health [1] 90:14
hear [2] 3:3 9:4
hearing [1] 137:21
heartland [1] 18:25
held [17] 8:22 70:25 87:22,24 90:8 94:17 100:2 104:14 108:15 112:1,13 132:2,5,6 138:1,20 160:10
help [3] 15:22 110:12 143:8
helped [1] 34:17
helpful [5] 22:17 26:4 85:11 144:18 156:8
Helping [1] 115:24
Henderson [4] 3:21 143:5 144:24 145:1
heroin [1] 17:22
hewing [1] 67:11
high [1] 117:14
high-paying [1] 77:12
highly [5] 47:1,5,10 90:17 123:18

Official - Subject to Final Review

hire [1] 76:18
Hispanics [1] 42:1
history [9] 69:6 109:13 120:
9 129:22 133:7,21 140:5
142:7,9
hit [1] 149:9
hits [3] 139:22 147:2,22
hitting [1] 120:14
hold [9] 3:12 29:4 55:16 61:
3 102:24 106:19 138:24
155:22 159:20
holding [5] 23:2 29:4 65:5
105:3 110:15
home [4] 136:14 155:2
156:11 157:8,10,16,22 158:
2,5 161:25 162:1,2,4,7
honestly [1] 109:4
honing [1] 63:15
Honor [4] 10:12 27:12
hook [4] 95:17 96:5 102:11
129:5
hope [3] 31:15 117:20 130:
22
hopefully [1] 124:11
horrible [1] 19:6
horribles [1] 112:12
horror [1] 125:19
host [1] 81:21
hosting [1] 69:10
hours [2] 147:23,24
however [1] 100:20
human [1] 110:4
hundreds [1] 78:18
hypothetical [15] 14:23 70:
20 73:2,21 77:5 87:6 99:2,
3 102:13 112:8 127:25
128:4 135:22 136:13 140:
10
hypotheticals [3] 65:17,
25 117:5

**I**

i.e [1] 122:15
idea [2] 27:18 51:24
identify [4] 67:18 98:2 113:
22 122:22
illicit [1] 78:2
illustrated [1] 17:15
illustrates [1] 70:21
image [1] 59:23
imagine [6] 16:8 62:7 70:
23 77:4 90:10 99:5 107:18
131:21 162:15
immune [3] 76:25 101:25
110:22
immunity [23] 16:8 64:16,
17 65:3,12 66:5 71:8,14,22
73:2,16 81:12 84:15 89:10,
10 91:20 110:16 112:19
118:12 121:12 122:5 139:
1 158:17
immunize [2] 67:14 135:
19
immunizes [1] 154:17

impermissible [1] 102:21
impermissibly [1] 102:20
implement [1] 41:14
implicate [1] 75:12
implicated [1] 86:25
implicates [1] 114:2
implications [7] 55:7,7 57:
18 82:14 83:7 84:14 163:
16
implicit [8] 94:13 115:9
116:15,19 117:20 159:1,3,
24
implicitly [2] 115:3 116:7
implied [1] 56:1
important [2] 42:6 108:11
impose [2] 68:5 106:17
imposing [2] 102:23 124:3
improper [1] 121:3
impropriety [7] 77:19 80:11
inaccurate [1] 123:18
inaction [3] 33:5,17,18
inadequate [1] 18:20
incentivized [1] 138:12
inception [1] 123:23
include [3] 13:4 94:21 98:1
154:25 155:1
includes [4] 48:2 154:23
including [2] 105:15 129:
17
inconceivable [2] 75:8
126:5
incorporated [1] 90:3
incorrect [3] 118:14 123:3
130:23
Indeed [1] 77:5
independent [6] 127:20
136:11 142:5 143:13 146:
1,4
independently [2] 142:20
153:8
indifferent [1] 140:25
indistinguishable [1] 58:
3
individual [3] 17:20 74:7
individualized [2] 109:24
110:5
individuals [1] 9:11
industry [5] 45:17,19 47:
12 126:4 140:7
inevitably [1] 47:3
infancy [1] 115:19
infinite [1] 115:21
infliction [4] 86:7 88:10
123:25 145:20
information [65] 4:3,11 12:
20 13:14 18:10,13,15 32:1,
25 37:25 38:1,4,8,12 39:22
40:5 52:22 53:3,6 69:24
78:25 84:7,7 89:12,13 100:
3 107:13 111:17 114:17,18,
19,21 115:21,23 117:3 118:
4,7,18 119:7,22,24 120:2
127:20 128:18,23 129:1
137:17 139:17 140:7 141:

5,11 142:5,12 143:11,14,
22 144:21 146:2,5,21 150:
7,21,24 160:4 163:12
inherent [4] 115:12 117:
18 130:16 132:23 150:4
inherently [3] 4:25 41:24
115:8
injury [1] 14:23
innocuous [2] 71:12 78:5
Innovators [1] 115:20
inquiries [1] 78:19
inquiry [3] 39:12 60:6 95:3
insofar [5] 4:6,14 15:14 19:
1 28:9
instance [8] 15:3 74:18 76:
22 77:1 104:13,24 107:14,
15
instances [4] 15:3,5 80:6
104:3
instead [3] 5:5 30:7 114:24
insulate [1] 88:24
intelligence [6] 49:17,19
50:11 73:22 74:8 101:8
intend [1] 89:6
intended [2] 6:15 110:17
intent [4] 25:3,4 88:12 112:
18
intentional [4] 24:22 88:10
123:25 145:20
intentionally [1] 115:15
interactive [19] 4:17 24:2,
7 37:23 52:2,7,16,20 53:6,
9 66:24 70:3 100:9,16 102:
5 105:15 123:9 150:6 151:
8
interconnection [1] 33:13
interest [8] 32:6,10 73:13
81:4,5 83:20 126:14 131:
13
interested [18] 5:25 6:2,3,
24,25 7:3,3 10:21 29:14
86:10 96:15 119:12,14,16
139:19 141:25 159:2,8
interesting [1] 12:19
internalize [1] 45:18
international [1] 99:13
Internet [45] 3:12 4:14,16 9:
23,25 22:11 24:17 38:4 40:
15 42:2 45:24 60:20 65:20
72:1 78:19 79:15 89:20 91:
14 93:3 97:11 106:5 111:8
113:7 114:15 115:18 116:
1,8 122:8,23 123:9 124:20
125:9,23 126:3 131:24
133:12 134:2,22 135:2,21
138:9 140:8 148:17 159:6,
18
Internets [1] 144:18
interpretation [1] 54:18
interpreted [1] 121:13
interpreting [2] 5:6 15:20
interpretive [1] 83:14

interprets [1] 3:22
introduced [1] 133:23
invitation [1] 1:5:5
inviting [1] 55:18
invoked [1] 108:19
invokes [1] 78:9
involve [3] 6:19,19 78:15
involved [3] 8:22 9:25 93:7
involves [3] 4:23 10:4 34:
19 35:16
involving [1] 36:22
ISIS [69] 6:1,2 7:13 9:6,7 10:
16 14:24 19:14 22:8,10 24:
16,18,22,25 26:11 26:11 28:
19,20,25 29:11 31:15 32:
12 33:16 34:8,9,14,15 36:6,
6,7 38:3 40:16 51:11 59:4
62:13 69:10 81:3,4 94:8
99:7,10 107:19,20,21,23,
24 108:1,2,9,15 112:21
114:1,23,24 126:13,23 139:
7 143:10,14 144:10,12 145:
8 153:14,16 155:4,21 156:
16,25 157:12 158:18
ISIS's [1] 113:23
ISIS-related [1] 40:19
isn't [20] 13:13 14:4,8 25:
13 26:10 46:9,10 55:1 57:
4 82:10 84:24 91:22 100:7
121:9,11 141:9,10 151:21
161:24 162:6
isolated [1] 159:16
isolating [1] 145:25
issue [14] 6:10,10,18 20:19
31:17 53:24 54:25 85:16
86:2 103:8 112:16 118:10,
10 163:6
issues [2] 109:6 142:2
it'll [1] 39:19
item [8] 8:13,14,14 43:6,7
163:9
items [3] 42:20,20 75:3
itself [10] 4:1,12 12:24 13:5
14:4 15:16 25:13 36:14 52:
10 56:19 71:18 77:24 80:2
87:25 109:11 111:23 136:
9 142:23

**J**

JACKSON [44] 15:19 16:
14,20,24 17:12 18:1 64:6,7
66:18 67:1,22 70:10 81:11
110:10,11 112:10 114:5
120:21 122:18 124:5 134:
9,15,18 135:9 137:24 138:
3 145:14 154:15,16,24 155:
6,16 156:4,7,10,19 157:6,
20,23 158:9 159:9,12 160:
8 161:2
Jackson's [1] 84:15
Jacksonville [1] 17:22
JASTA [8] 9:3 10:17 15:11
33:3 57:13 58:18 59:24 60:
6

jazz [1] 7:1
job [11] 18:20 77:5,6,11,11,
25 102:13,15,15 149:8 160:
7
job-finding [1] 116:5
jobs [2] 77:12,14
John [6] 43:22 44:12,12 60:
18,19 87:8
join [1] 31:15
joint [2] 34:18 39:18
judgment [1] 82:17
judgments [2] 82:15 158:
13
judicial [1] 5:2
jump-starting [2] 126:4
140:6
jurisdiction [1] 160:9
jurisprudence [2] 48:6
100:24
Justice [352] 1:21 3:3,9 5:9,
19,21 6:21 8:6,16 9:14,22
11:2,17,18,20,21,23,24 13:
10,17,20,23 14:2,7,13,16
15:2,19 16:14,20,24 17:12
18:1 19:10,19,23 20:2,6,11,
20,22 21:1,5,8,13,17,21 22:
5,14,22 23:5,9 24:8,13 25:
3,8,25 26:16 27:1,11,15,17
28:14 29:22 30:3,5,6,19
31:19,22,25 33:1,4 34:3,3,
4,21 35:5,13,20 36:3,10,16
37:5,12,16,18,18,20 38:9,
13,16 39:9,14,23 40:1,8,11,
14 41:7,15,19 42:10,11,11,
12 44:1,21 45:1,4,10,13 46:
1,18 47:19,20,20,22 48:15,
19 49:8 50:21,25 51:5,20,
21,21,23,24 53:21,22 55:6,
22 56:5,8,12,22 57:1,5,21,
22,22,24,25 58:8,12,25 59:
19 60:3,7,11 61:7,14,22 62:
5,12,18 63:2,14,20 64:1,4,
5,5,7 66:18 67:1,22 70:10,
11,18 71:2 72:8,16 73:19,
21 75:17 78:13,20 79:12
80:7,23 81:8,11,15,18,23
82:9 83:2,23,25 84:10,11,
14 85:4,21,22 86:24 87:10
88:25 89:14,16,17,18,23
90:5,10 91:7,13,19 92:2,3,
14,17 93:13 94:5,12 95:8,
15 96:7,8,9,10 97:3,7 98:
11,11,12 99:15,21,21,23
103:2,3,3,5,6,10,19,21 104:
16 105:7,9,12,23 106:2,21,
22,22,24 107:10,16 108:20
109:14 110:8,9,9,11 112:
10 114:5,6,9,12 116:10
117:22 118:24 120:21 122:
18 124:5 126:8,10,20 127:
2,4,7,13,24 128:10,24 130:
2,4,8,17,20,24 131:2,21
132:12 134:9,11,15,18,25
135:9 137:24 138:3 140:9,

Official - Subject to Final Review

10 141:8,22 142:2,13,17
143:2 144:22 145:14 146:
6,11,14,24 148:16 149:20,
22,23,24,25 150:1,2 151:4,
13,17 152:6,22 153:19 154:
1,8,10,12,12,14,15,16,24
155:1,6,16 156:4,7,10,19
157:6,20,23 158:9 159:9,
12 160:8 161:2,3,9 163:24
**Justices** [1] 55:5
**justified** [1] 91:6

## K

**KAGAN** [39] 9:14 11:18,21,
24 42:11,12 44:1,21 45:1,4,
10,13 46:1 47:19 75:17 78:
20 81:15 95:8 96:7 98:11,
12 99:15 126:8,10 127:2,7,
24 128:10,24 130:8,17,20,
24 131:2,21 132:12 134:11
149:25 152:7
**Kagan's** [3] 52:3 105:9
130:4 134:25 154:1
**Kavanaugh** [30] 51:22,23
53:21 55:6,22 56:5,8,12,22
57:1,5,21 80:7,23 81:8,18,
23 82:9 83:2 103:4,5,10,19
104:16 105:7,12,23 106:2,
21 154:13
**keep** [8] 23:22 51:2 64:23
80:23 82:11 112:23 137:
20 146:23
**keeping** [1] 18:21
**kept** [3] 120:19 127:19 160:
16
**key** [1] 103:22
**kid** [1] 160:21
**kids** [1] 128:7
**kind** [26] 16:2 46:22 57:17
67:4 77:19 80:20 83:14 84:
18 95:3 98:17 99:2,24 117:
9 120:24 130:13,15 131:16
133:19 134:3 141:2 142:
18 143:15 145:12 147:16
150:3 160:22
**kinds** [18] 18:4 22:18 42:13
52:16 55:16 57:19 98:13
107:24 117:13,15,17 120:
23 121:4 129:16 134:5
143:21 148:14 162:24
**kitchen** [1] 90:16
**knife's** [1] 83:16
**knowingly** [1] 92:8
**knowledge** [4] 25:4,5,15
125:1
**known** [4] 115:1 116:2 125:
2,2
**knows** [9] 74:21,22 90:18,
18 93:13,14 148:20 163:1,
5

## L

**label** [1] 31:16
**labeled** [1] 146:6

**labels** [1] 146:7
**lack** [1] 142:22
**language** [15] 5:6 29:2 40:
2 43:20 47:24 48:17 67:21
70:6,9 83:15 117:23 120:3,
10 151:20 163:13
**larger** [1] 10:24
**largest** [1] 117:8
**last** [2] 63:2 144:23
**laudable** [1] 47:5
**Laughter** [5] 26:23 27:10
31:24 45:25 50:18
**laundry** [2] 137:4,4
**law** [44] 2:20 12:5 70:24 77:
2,22 78:8,9,12 82:24 83:3,
18 85:11 86:25 87:23 88:5
89:2,2 90:1,6 91:9 95:20
96:1,24 97:1,2,21,21,22 98:
2,5,10 99:1 103:14 104:24
106:9 109:13 113:3 119:9
121:6 123:13 137:5 140:
24,25 145:3
**laws** [8] 88:23 96:25 106:5
137:11,12
**lawsuit** [3] 75:14 78:22
126:7
**lawsuits** [1] 76:9 81:15,24
82:2 83:9,10 115:18
**lawyers** [1] 149:3
**lead** [4] 24:22 33:10 98:21,
24
**leads** [1] 27:14
**learn** [1] 32:17
**least** [10] 15:22 69:5 85:11
88:4 91:13 98:8 103:14
104:7 109:7 124:19
**leaving** [1] 125:15
**led** [1] 45:7
**left** [4] 75:2 122:10 124:24
125:3
**legal** [2] 75:9 102:20
**legally** [1] 102:20
**legislature** [1] 106:8
**less** [4] 56:21 81:6,8 109:
21
**lesson** [1] 133:7
**letter** [2] 123:23 159:22
**level** [2] 77:16 144:19
**liabilities** [1] 94:7
**liability** [54] 16:16 56:17,23
64:20,20 68:5,6,21 71:18,
19 72:5,25 75:9 76:7 80:6
81:7,10 84:6,15 85:25 87:
9 88:8,14,24 91:15 92:23,
24 95:1 96:1 98:21,24 99:
14,18 101:25 102:8,24 103:
3 106:17 108:13,23 109:11
112:11 116:6 118:10 120:
24,25 122:6 123:16 124:3
137:13 142:15,18 160:15,
17
**liable** [52] 3:13 16:11 18:7
19:13 22:9,11 23:2 25:23
29:4,24,25 38:5 39:15 41:

9 43:24 44:7,14,17,23 59:
24 65:6 70:25 80:1,8,19
87:14,22,24 90:8,21 92:2
94:9,18 97:17,20 104:14
105:3 106:19 108:15 112:
1,13 113:4 121:6 138:1,21,
24 148:19 151:8 155:22
159:21 160:10,11
**libel** [2] 60:16 87:1
**Library** [1] 156:23
**lies** [3] 27:7,11,17
**light** [3] 7:1 69:5 77:10
**likelihood** [2] 82:4 108:14
**likely** [5] 80:19 81:6,9 113:
22 147:6
**likes** [2] 108:21 109:16
**limited** [7] 3:17 4:3 12:7 57:
18,20 67:3 117:25
**limiting** [2] 21:2,2
**limits** [1] 70:21
**line** [4] 4:20 14:9 40:9,12,
21,24 96:11,13 97:4,10
119:18
**line-drawing** [1] 46:13
**lines** [3] 46:6,21 54:15
**link** [1] 99:12
**LISA** [3] 1:24 2:10 114:10
**list** [8] 30:7 43:22 52:14 66:
2 118:2 137:4,4 147:19
**listening** [2] 19:15 20:8
**listings** [1] 77:8
**literal** [1] 74:23
**literally** [5] 29:9 53:15 68:3
125:18 146:17
**litigation** [4] 59:10 85:25
109:4 149:10
**little** [21] 6:13 15:22 26:20
28:11 32:15 45:20 78:6 80:
11 84:4 87:4,7 129:25 137:
7,11 145:2,4 151:1 156:12
157:5 162:5 163:6
**live** [5] 106:14 110:4 140:
23 162:17,19
**LLC** [1] 1:6
**located** [1] 40:3
**location** [3] 120:3,9 160:7
**logic** [2] 109:15,17
**logical** [1] 97:13
**logically** [1] 61:9
**long** [4] 7:25 28:1 60:24 61:
4
**longer** [2] 24:6 85:13
**longstanding** [1] 55:2
**look** [36] 9:2,6,13 10:16 15:
11 16:19 17:6 19:2 22:23
23:13,17 27:18,23,24 39:
18 40:18 43:6,7 54:14 57:
11 59:17 67:10 68:18 80:
11 83:6 94:24 100:12 121:
4 128:14,16 134:19 138:3
140:4 147:6,15 148:5
**looked** [2] 6:13 133:16
**looking** [21] 22:10 26:7 69:
5 83:15 94:23 95:5 96:11

**102:**19 **107:**22 **123:**12,20
**133:**17,17,19 **143:**20 **144:**6
**145:**18 **147:**15 **148:**8 **150:**
21 **153:**15
**looks** [4] 9:24 128:11 135:
17 136:5
**loosely** [1] 66:16
**lose** [6] 58:14,16,19 59:25
84:22 149:14
**loses** [2] 52:8 163:1
**losing** [1] 149:13
**lost** [3] 40:12 71:22 145:2
**lot** [22] 10:19 11:14,25 21:
11 43:16 46:4 54:9 55:8,
10 59:10 62:8 72:17 81:10,
19 82:2 89:1 109:4 117:9
118:11 125:13 135:7 147:
24
**lots** [4] 74:20 81:23 82:1
160:3
**Louisiana** [1] 7:6
**lower** [1] 7:22
**lower-paying** [1] 77:14
**lying** [1] 9:21

## M

**made** [8] 17:2 27:20 46:18
53:11 65:13 66:6 74:11 75:
10,11,20 78:8,16,19 98:4,
18 108:2,8 109:9 110:6
115:17 120:20 129:2 139:
14 142:19 148:15 160:20
162:12
**main** [1] 79:18
**major** [1] 6:9
**majority** [1] 19:12
**MALCOLM** [3] 1:20 2:6 70:
14
**manner** [3] 3:22 4:9 6:11
**manually** [1] 10:20
**many** [10] 28:2 78:16 79:4
80:6 83:8,9 86:4,5 101:11
148:7
**margins** [1] 84:5
**Maris** [3] 26:7 70:20 71:4
**massive** [1] 134:7
**match** [3] 41:25 77:8 140:
12
**matching** [2] 77:5 141:20
**material** [22] 10:5 39:17 81:
19 85:8 91:21 93:1 94:3
96:6 111:22 124:9,25 126:
20,22 134:21,24 135:3,11,
14,17 136:3,9,22
**materially** [1] 58:2
**materials** [7] 34:19 35:17
38:19,25 39:2,4 56:18
**matter** [14] 1:13 27:22 31:8
38:20 47:7 52:9 72:24 73:
1 91:20 101:4 127:10 140:
24 141:16 149:15
**matters** [3] 8:18 99:16,17
**maximize** [1] 152:5
**mean** [78] 8:7 10:6,9 15:21

**17:**14 **21:**3 **22:**6 **24:**16 **26:**
13 **27:**4,8 **28:**5 **31:**25 **33:**1
**35:**5,11 **37:**10 **45:**21 **49:**19
**52:**5,7 **55:**12,24 **57:**10 **60:**
14 **61:**8,10 **63:**9 **65:**22 **67:**
23 **70:**5 **72:**12 **73:**24 **76:**6,
8,25 **79:**3,13 **81:**8 **84:**24
**85:**20 **86:**9,13 **90:**10,24 **91:**
23 **96:**23 **97:**6 **105:**18,24
**109:**3 **110:**15 **111:**19 **112:**
10 **117:**13 **121:**1 **122:**7
**123:**3 **126:**6,21 **129:**16
**130:**10 **132:**11 **134:**18 **138:**
20 **139:**4,21 **140:**21 **141:**9
**142:**17,20 **147:**7 **149:**1
**151:**24 **154:**5,18 **156:**8,23
**meaning** [9] 18:6 40:5 61:
19 68:1 69:19 70:1,4 158:
11,12
**meaningful** [1] 82:21
**meaningless** [1] 105:13
**meanings** [1] 117:12
**means** [11] 52:3,20 63:5
101:2,24 114:18 124:2
137:22,23 152:4 153:3
**meant** [2] 10:22 92:4
**mechanism** [2] 77:11 130:
5
**mechanisms** [1] 105:21
**media** [2] 32:21 116:5
**member** [1] 93:7
**mention** [3] 128:20 136:23
146:15
**mentioned** [5] 86:19 146:
16 152:19 161:20,25
**mere** [3] 33:17,18 44:5
**merely** [2] 40:25 96:13
**merits** [1] 75:16
**mess** [1] 134:3
**message** [13] 75:3 76:3 87:
19 94:15 113:23 115:9
116:20 119:11 127:10 159:
1,3,6,25
**messages** [4] 42:25,25 76:
4 99:9
**met** [1] 88:15
**Microsoft** [2] 129:23 148:6
**might** [50] 4:24 6:8 8:21 12:
12 15:6 22:1,2 23:17 27:
23 29:8 30:25 33:18 36:14,
14 37:14 39:22 45:2 46:17,
25 48:5,14 57:8 71:12 72:
23 74:24 77:1 79:17 89:10
96:15 100:22 101:13 104:
6 112:15 115:5 118:3 119:
16 125:17 131:6,13,22 133:
24 135:8 148:10,14,24 152:8
157:5 159:2,7 161:10 162:
15
**millions** [6] 78:18 129:3
132:8,8 139:22,22
**mind** [4] 15:23 49:4 77:4
110:16
**minds** [1] 79:9

**minimizes** [1] 46:14
**minimizing** [1] 75:18
**minute** [3] 26:18 48:20 147:24
**misrepresentation** [1] 129:10
**missing** [1] 101:20
**misspell** [1] 74:19
**misspellings** [1] 98:1
**mistaken** [1] 50:8
**misunderstanding** [2] 79:21,22
**misunding** [1] 79:22
**mode** [1] 75:14
**model** [1] 35:15
**models** [1] 120:18
**modes** [1] 75:6
**moment** [1] 19:11
**money** [4] 57:6 143:10,14 159:11
**Montgomery** [1] 162:22
**Month** [2] 142:7,10
**months** [1] 133:23
**Morehouse** [1] 162:17
**morning** [3] 4:4 86:7
**Most** [20] 4:15 13:1 57:3,9 65:4 74:17 79:19 90:11 93:23 95:1 112:5 120:10 122:2 126:2 129:15 132:24 147:5 148:4 152:4 162:16
**motion** [3] 58:18 97:24 163:19
**motivation** [3] 99:11,16,17
**move** [2] 58:21 103:22
**Ms** [76] 36:19 46:2 50:20 76:19 108:25 111:8 114:9,12 116:10,14 118:14 119:8 120:21,21 121:23 123:2 124:10 126:8,9,19 127:6, 12,25 128:14 129:9 130:10, 19,22 131:1,7 132:11,15 134:9,14,17 135:6 136:7 138:1 139:4 140:9,15 141:2 142:3,16 143:1,3 144:25 146:10,12,15 147:7 148:22 150:2,18 151:11,16 152:6 153:1,25 154:9,11,22 155:5,8,18 156:6,9,18,21 157:15,22,24 158:23 159:10,19 160:13
**much** [14] 46:18 58:11 66:9 80:19 81:6,8 82:4 93:5 109:13 120:14,14 149:9 157:1 163:23
**multiple** [1] 44:6
**mundane** [1] 74:17
**murderer** [1] 87:8
**music** [1] 116:5
**must** [8] 3:24 4:1 8:4,4,5 119:3 150:14,15
**myriad** [1] 117:10

**N**

**name** [2] 74:18,19

**namely** [1] 79:21
**narrow** [2] 121:12 138:25
**narrowly** [1] 65:20
**national** [1] 144:19
**naturally** [1] 65:5
**nature** [1] 10:25
**near** [1] 162:19
**necessarily** [3] 28:4 82:1 115:22
**necessity** [1] 116:1
**need** [4] 47:13 122:5 123:12 160:6
**needle** [1] 115:25
**negligence** [7] 92:25 122:10 123:24 132:18 145:20 158:8 160:18
**negligent** [1] 122:16
**negligently** [2] 160:18,19
**neither** [2] 83:21 110:1
**networking** [1] 32:21
**neutral** [36] 6:5 7:2,11,17, 25 24:25 32:4 40:20 49:15, 18 50:8,9 81:2 95:4 96:16 100:3,7,17 101:5,7,10,11, 16 127:8,8 151:19 152:3 153:22,23 154:4,5,6 162:11,13 163:1,4
**neutrality** [2] 80:15,16
**never** [10] 37:10 122:8,23 129:4 137:9 149:18 153:7, 9,13 156:2
**new** [11] 17:21 23:18 47:9, 10 59:7 60:3 61:10 62:23 115:20 126:4 132:21
**news** [14] 42:21 116:5 133:10,13,13,18,19 141:23,25 146:8,25 147:2,17 148:7
**newspaper** [6] 87:13,14 112:24 113:3,13 130:14
**Next** [8] 21:24 22:15 23:19 50:5 111:2 116:21 117:17 151:5
**nine** [1] 45:23
**Ninth** [17] 17:17 49:15 50:7, 11 100:2 101:15 127:15,17 143:5 145:7 151:2,18 152:12,17,18 153:4,4
**nobody** [1] 60:22
**non-neutral** [1] 162:14
**none** [3] 45:16 101:2 137:12
**nonstop** [1] 81:16
**normal** [2] 31:6 163:17
**normally** [2] 48:25 87:12
**note** [1] 161:12
**notes** [1] 4:12
**nothing** [8] 32:23 50:23 71:24 105:17 119:8 124:23 127:18 128:22
**notify** [1] 143:25
**notion** [4] 64:24 126:25 133:4 145:15
**number** [12] 4:22 11:6 12:8 31:12,14 32:2,25 79:5 123:

3 151:21,22 162:12

**O**

**Oakmont** [5] 65:9 68:7 69:7 124:15 138:6
**object** [1] 125:17
**objection** [2] 28:21 107:4
**obligation** [1] 33:9
**obviously** [5] 71:12 92:2,6 96:25 97:23
**occurred** [1] 71:3
**offense** [1] 88:16
**offensive** [19] 16:4 17:2 18:6 68:17,22 110:19,20 112:25 121:18 124:9 134:21,24 135:2,7,11,14,17 136:2,22
**offer** [1] 161:12
**offered** [2] 152:7,8
**office** [3] 11:15 59:15,15
**officials** [1] 32:21
**often** [2] 4:4 121:7
**Okay** [40] 16:14 22:6,12 23:7 24:14 30:3 35:13 36:16 37:12 38:21 45:1,10 48:21 49:5,7,25 58:25 60:7 62:6 63:2 64:1 83:5 85:21 94:8 95:11 96:12 103:19 106:2 108:20 120:15,15,16 130:2 134:14 141:22 146:22 151:17 152:22,22 154:9
**once** [6] 46:8 79:23,24 111:25 163:1,4
**one** [5] 5:14 7:19 12:7 16:2 23:21,22 26:2 30:17,18 32:25 36:17 41:8 42:8,15 43:5,23 44:4 46:14,20 52:3,15,22,24 55:14 56:14 58:10 59:12 71:20 75:14 78:21 84:16,21 86:2 87:7 91:4 94:10 98:18 100:10 105:7 107:15 114:22 115:14,15 116:21 117:10,10 118:1 119:18,24 120:17 121:16 124:4 126:11 131:10,16 132:17 133:19 135:7 137:15,16 139:25 147:15 148:23 152:6 153:12 157:3 160:4
**online** [1] 53:13
**only** [29] 4:13 17:1 18:4 20:9 22:24 52:15 53:1,8,8 59:2 65:11 67:4 89:24 90:1 93:17 123:5,15 125:21 126:1 135:23 139:8 140:11 141:21,24 155:23 158:17,23 159:3 163:12
**open** [2] 156:17 159:15
**opened** [1] 115:20
**opens** [1] 129:13
**operate** [2] 35:18 76:17 158:1
**operated** [1] 96:24
**operating** [1] 75:7
**operation** [4] 39:18 74:3 75:15 104:3
**opinion** [1] 152:24

**opportunity** [1] 163:22
**opposed** [6] 107:22 122:6 131:10 132:16 136:15 139:20
**opposite** [1] 135:4
**options** [1] 50:3
**oral** [7] 1:13 2:2,5,9 3:7 70:14 114:10
**order** [9] 75:4 76:17 99:10 100:18 106:6 108:7 111:9 139:12 158:7
**ordered** [1] 105:22
**ordering** [1] 105:4
**organization** [12] 12:9 52:1 72:17,19 103:23 114:25 115:8 120:24 139:10
**organizational** [7] 72:3,4 73:23,25 76:24 159:13 160:11
**organize** [1] 36:4 38:21 72:21 115:22 119:21 130:13 134:4 148:2 158:14 159:23 160:7
**organized** [3] 4:10 119:10 144:15
**organizes** [1] 52:4
**organizing** [11] 10:4 13:14 72:18 105:16 112:14 134:6 144:20 153:6 154:20,21 160:6
**original** [2] 67:13 109:9
**originally** [1] 87:2
**other** [63] 4:8,11,16,19 7:5 10:3 12:5 16:5 24:21 25:21 26:3,9 32:19 34:20 36:3 39:6 40:23 42:25 45:17, 21 48:2 54:6 69:4 71:5,20, 20 72:10 77:2 79:17 86:15 91:4 94:10 98:18 100:10 105:7 107:15 114:22 115:14,15 116:21 117:10,10 118:1 119:18,24 120:17 121:16 124:4 126:11 131:10,16 132:17 133:19 135:7 137:15,16 139:25 147:15 148:23 152:6 153:12 157:3 160:4
**others** [5] 111:9 112:15 118:11 133:22 138:11
**otherwise** [7] 102:10 125:23 129:4 132:9,22 136:2 137:16
**ought** [4] 78:8,10 86:13 163:21
**out** [40] 9:18 10:21 17:5 23:6 26:17 40:7 42:5 43:23 44:9 45:9 49:2 51:9 61:12 62:1 68:9,23 70:1,4 81:15, 19 88:7 90:6 99:4 106:5 109:16 115:3 117:2 118:25 126:7 132:16 134:11 139:9 142:1 143:23 144:17 146:18 155:13,17 157:11 159:25

**outcome** [1] 79:17
**outcome-determinative** [1] 85:17
**outside** [18] 4:20,21 8:1 11:8 17:25 18:22 19:2 30:15, 24 41:11,18 42:8 59:13 60:10,11 65:18 66:17 80:5
**over** [18] 26:8 45:14 54:2 67:25 71:4,11,21 72:10 101:14 109:5 132:18,18 147:21 150:8 152:23 153:5,5,5
**overall** [1] 70:7
**overlapping** [1] 84:16
**overrode** [1] 137:1
**overstated** [1] 54:19
**overstates** [1] 82:24
**overview** [1] 89:1
**own** [33] 3:14 50:4 51:10 72:7 73:18 74:4,10 77:8 80:4 84:8 87:21 88:20 90:3 94:1 96:6 99:9 101:12 102:17 104:14,18,21,22,23 105:2 112:4 116:23 117:1 121:5 128:18 146:3,3,9 159:20
**owner** [1] 157:19

**P**

**p.m** [1] 164:1
**PAGE** [20] 2:2 52:19 113:1, 1,5,15 136:14 155:2 156:11 157:9,10,16,22 158:2,5 159:14 162:1,2,4,7
**pages** [2] 144:4 161:25
**pair** [1] 124:16
**pan** [1] 81:14
**parade** [1] 112:12
**paragraph** [3] 19:12,12,13
**paraphrasing** [1] 12:15
**parse** [2] 69:25 70:4
**part** [17] 6:9 8:15 20:15 22:5 31:1 35:17 46:5 67:24, 24 69:18 80:16,17 94:25 121:24 122:1 141:9,10
**partially** [1] 150:24
**particular** [29] 5:12 8:13 9:3 27:20,22 35:15 36:22 67:21 70:23 73:14 74:5,6,14 79:2,2,25 80:11 88:18 97:1 99:5,12 104:4,5,25 106:6,8 110:3 127:9 162:8
**particularized** [2] 67:18 70:9
**parties** [4] 39:3 74:12 118:18 122:1
**parts** [1] 121:24
**party** [3] 34:19 39:20 75:11
**pass** [1] 45:19
**passed** [1] 89:7
**past** [2] 97:4 120:8
**pedantry** [1] 71:13
**people** [47] 5:25 6:1,2 9:6 10:16 11:15 13:14 14:6 15:

11 17:6 19:1 20:14 21:7 23:13,13 24:21 28:3 41:2, 8,21,24,25,25 44:5 67:17 81:3,5 86:1 91:6 111:12 113:5 126:13 129:4 131:5 132:8 133:12 135:8 136:2 138:8 140:12,13,17 142:1 144:9 149:5 162:16,18
people's [6] 79:9 99:8 115: 14,15 119:24 162:3
per [1] 119:23
perceive [2] 85:8 104:7
perceived [1] 83:18
percent [1] 145:1
perfect [2] 47:18 144:7
perform [2] 102:3,9
performing [1] 101:25
perhaps [3] 22:17 27:6 138:11
permissible [1] 85:19
permit [1] 163:19
person [22] 27:20 34:11 41: 1 71:3 74:19,21 80:19 87: 23 91:3,4,5 93:5,22 96:20 104:5,6 108:9 141:21,24 142:7,8 157:13
person's [3] 104:5 132:2,5
persons [1] 151:23
perspective [1] 65:2
persuasive [1] 79:16
perversely [1] 124:25
petition [2] 52:19 100:5
Petitioner [3] 110:25 139:6 145:10
Petitioner's [1] 157:14
Petitioners [6] 1:4,19 2:4, 14 3:8 161:7
phone [4] 31:12,12,13 32: 25
phrase [1] 149:14
phrased [1] 28:22
pick [6] 11:7 23:21 51:23 53:22 100:19 115:22
picking [9] 48:3,6,22 49:4, 9,22 50:6 100:13 150:10
picks [1] 52:4
picture [2] 39:19 82:10
pictures [1] 6:13
piece [5] 81:10,12 112:11, 17 144:21
pieces [1] 144:21
pilaf [4] 7:4,5,12 8:20
pinpoint [1] 124:10
pitching [1] 27:19
place [4] 7:5 28:1 54:8 61: 18
placement [4] 102:13,15, 16 139:12
places [1] 162:19
plain [1] 83:15
plainly [1] 123:21
plaintiff [8] 15:6,15 78:9 98:2 108:18 110:24 144:4 163:19

plaintiff's [1] 114:20
plaintiffs [4] 84:22 115:7, 10 144:8
plaintiffs' [1] 149:3
plans [1] 54:12
platform [35] 68:20 74:2,3, 10 75:7 76:23 77:20 78:1 82:25 84:6 86:21 88:12 92: 23 94:4 95:22 96:4,6 99:6 102:24,25 104:13 105:2 106:19 108:8,10 109:23 110:1,18 111:9,22,23 113: 21 121:16 135:23 158:18
platform's [8] 73:18 74:4 84:8 104:18,21,22,22 105: 2
platforms [12] 65:21 67:14 68:16 75:10 79:4 108:12 121:16 134:23 135:2,19 138:11 154:17
play [3] 28:24,25
played [3] 30:17 42:5 80: 15
playing [1] 112:23
plays [1] 25:12
plead [2] 115:7 155:25
pleading [2] 98:7 145:18
please [5] 3:10 70:18 83: 25 114:13 161:9
poetry [1] 49:20
point [30] 5:23 11:22,25 27: 4 37:15 40:22 46:17 56:9 62:7 72:13 76:1 78:4 86:1, 2 91:11,12 92:11 97:9 101: 13 109:22 110:3 113:13 124:19 125:8 144:23 152: 9 155:1,18 160:23 162:12
pointed [1] 134:11
pointing [4] 90:5 109:2 115:11 155:25
points [3] 11:5 84:15 163:8
polemics [1] 49:20
policy [1] 140:5
popular [1] 147:16
position [10] 8:8 37:21 52: 5 54:24 70:21,22 71:7,24 72:1 75:19 79:21,23 80:3, 4 84:21,25 85:2,6 86:11 92:15,16,18,19,20 101:22 103:10,22 107:2 109:15,17
posits [1] 121:7
possibility [4] 50:12 64:11 71:16 78:22
possible [5] 85:20 93:6 151:10,15 163:16
possibly [1] 96:18
post [5] 74:12 77:6,7 93:23 109:9
post-algorithm [2] 9:20 49:16
posted [9] 15:7 17:21 74: 12 87:18 91:3 95:24 96:3 108:9 118:17
poster [3] 88:15 111:24

112:4
posting [3] 118:20 144:19 148:19
postings [1] 77:25
posts [3] 90:12 93:6,10
potential [2] 77:7 86:18
potentially [4] 94:6,17 104: 13 148:19
practice [4] 6:8 19:9 47:10 163:18
practices [6] 22:18 37:3 42:13,15 43:13 47:4
pre-algorithm [2] 9:16,19
precedent [2] 17:16 55:3
precise [2] 53:24 82:17
precisely [2] 28:4 89:12
precision [1] 28:24
predicament [1] 131:22
predictions [1] 54:18
predictive [2] 82:14,17
predominantly [1] 98:8
prefer [1] 101:13
preferences [2] 36:25,25
preferring [1] 94:25
premises [1] 49:6
prepared [1] 117:12
presence [2] 77:25 118:12
present [8] 5:24 25:23 34: 6 38:25 39:5 75:22 133:5 134:1
presentation [3] 75:25 76: 2 80:14
presentational [1] 76:10
presented [11] 4:10 14:20 18:16 20:1 26:3 36:23 37: 8 39:1,7 122:3 135:23
presenting [4] 13:14 63: 16 98:14 111:12
presents [1] 18:10
preserving [1] 73:15
presumably [2] 75:15 85:9
Pretty [2] 58:11 91:1
prevailing [1] 82:4
previously [1] 153:11
primary [1] 80:21
Prince [2] 162:17,21
principle [2] 131:6 153:23
prior [1] 44:5
priorities [1] 69:3
prioritization [5] 44:23 45: 8 75:25 76:3,11
prioritize [2] 44:17 104:24
prioritized [2] 42:21,22 44: 3
prioritizes [3] 42:19 104: 17 107:19
prioritizing [2] 10:5 98:15
priority [2] 66:2 106:10
Private [1] 124:8
pro [2] 132:16,17
pro-defamatory [2] 132: 10,16
pro-ISIS [4] 12:1 126:11 130:6 131:4

probably [11] 32:14,16 36: 18 41:5,9 69:18 106:4 112: 15 147:18 148:23 149:18
problem [19] 6:10 12:2 14: 10,13 23:20,20 33:6 35:4, 25 36:9 41:3 60:5 75:18 78:14 101:9 122:21,22 131:25 151:20
problematic [1] 123:18
problems [4] 46:13,20 54: 18 90:14
Prodigy [3] 10:19 53:15 138:13
produce [2] 12:1,3,4
produced [2] 107:19,21
produces [1] 12:14
product [2] 146:7 160:17
products [4] 88:20,21 101: 13 160:15
professional [1] 77:12
profile [2] 91:1 141:9
profiles [2] 141:14,15
profit-maximize [1] 101: 12
profits [1] 152:5
prohibit [1] 65:5
prohibiting [1] 140:24
projection [1] 79:20
prominence [2] 79:10 112: 3
promote [1] 101:12
promoting [7] 99:6,7 111: 4 135:2,6 139:2 162:8
prong [1] 109:5
prospect [1] 85:24
protect [8] 46:24 47:14 59: 6 65:20 108:23 109:18 134:22 160:24
protected [31] 4:25 38:15 39:7 43:9,10,10,11,19 46:9, 22 47:2 48:11 49:1,23 55: 17,19 60:16 61:4 62:22 93: 18 100:4,13,21 101:2 102: 23 133:2 136:12 139:8,8 150:13 161:19
protecting [3] 77:23 84:6 93:21
protection [30] 8:2 17:25 19:3 35:8,21 42:14,17 45: 17 52:8 54:3 60:1 72:5 73: 16,17 91:8 93:19 97:12 102:6,7,8 124:8 126:18 127:11 128:13 129:8 130: 20,24 134:19 135:1 138:4
protective [1] 70:24
protects [5] 59:2,17 92:22 100:15 136:17
proverbial [1] 115:24
provide [2] 35:7 54:3
provided [16] 4:3 24:18 37: 25 69:24 84:7 89:12 93:12 102:18 114:17 117:3 118: 5,6,8,18 137:17 146:21
provider [34] 4:4 12:10 24:

17 37:23 38:1,5 40:15 42: 2 48:2,24 49:3 52:23,25 53:2,11 63:10 69:25 72:2 84:8 88:24 89:13,20 90:2 93:4 95:17 97:11 98:16,18 100:13,15,16 101:24 118:7 119:6
providers [10] 20:13 22:11 59:2 91:14 100:10,11 106: 6 146:8 150:7 163:13
provides [3] 89:21 100:3 158:17
providing [6] 30:2,7 32:24 48:8 111:3 150:15
provision [4] 43:17 53:18 77:2 105:16
psychology [1] 133:20
pub [1] 60:15
publication [13] 4:3 14:18, 21 114:17 123:13 130:14 137:2,14 145:3,5 156:1,5 161:24
publish [9] 3:20 29:19 63: 24 87:13 115:15 131:16 142:24 159:4,5
published [1] 39:3
publisher [36] 3:19 8:5 34: 13,17,22 36:11 37:25 63:6, 6,23 66:21 67:5 68:5,6 69: 20,23 82:7 86:22 91:16,25 102:25 103:15 105:5 106: 19 111:17 112:24 113:4 114:16 123:10 137:22 138: 15 143:17 145:16 154:18, 19 158:14
publishers [1] 113:14
publishes [1] 118:21
publishing [31] 13:21,25, 25 14:17 16:2 35:1 36:13 44:15 115:8,12,14 116:16 117:1,20 119:17 124:4 130:16 132:23 137:23 138: 2 142:11 145:21 157:16,21 160:23,24,25,25 161:11,17, 21
pull [1] 54:7
pulling [1] 121:3
punished [1] 68:21
pure [2] 62:16,18 137:5
purely [4] 13:12,13 14:20 29:3
purported [1] 91:3
purpose [2] 70:8 125:24
purposely [1] 24:15
purposes [7] 15:4 69:6 73: 2 89:9 107:16 114:3 143:2
pursuant [1] 119:1
push [1] 127:9
pushes [1] 136:1
put [26] 13:18 20:14 28:18 36:6 38:3,18 41:17 43:3 82:12 91:17 94:7,14 104:2 113:1,4 122:13 128:6 131: 3,3,15,17 141:13 147:4

Official - Subject to Final Review

157:8 158:1 159:14
**puts** [6] 7:25 34:8 93:14
128:12 156:14 157:10
**putting** [8] 28:3 33:7 59:6
62:8 72:16 81:10 99:8 157:
8

## Q

**qualifications** [2] 77:7,15
**qualify** [1] 55:20
**question** [68] 9:22 10:12,
13 11:11 12:24 14:8 17:21
20:1 24:14,24 25:18 26:2
28:3,5 31:1 35:2 36:17,18
37:15,17 43:19 44:16 49:
25 50:14 56:6 58:15 60:9
63:3 64:18,22 65:4 69:15
82:10 83:14 84:13 85:19
86:23 87:21 89:5 98:8 99:
18 100:1 101:10 103:6,7,
21 105:9 106:12,13,25 108:
17,17,21 121:9,20,25 122:
2,3,4 123:15 127:5 132:12,
15 144:14 154:1 155:9,23
163:15
**questions** [20] 5:8 23:4,8
27:2 44:7 51:24 53:23 58:
1 63:19 64:15 65:25 72:7
80:13 96:12 97:22 106:15,
16 116:9 120:23 150:3
**queue** [3] 74:6 104:5 110:3
**queues** [1] 99:9
**quibble** [1] 71:13
**quite** [2] 66:13 104:2
**quo** [2] 83:3,4
**quote** [1] 145:8
**quotes** [1] 128:9
**quoting** [2] 60:25 61:5

## R

**race** [4] 102:14 128:20 140:
16 162:13
**races** [1] 131:11
**racial** [1] 142:2
**racing** [2] 6:2,3
**racist** [1] 131:9
**radicalize** [1] 113:24
**radicalized** [2] 144:10 157:
13
**radically** [1] 120:7
**raised** [2] 117:5 126:20
**raising** [1] 127:1
**random** [5] 13:12,13 14:20,
22 156:15
**randomly** [1] 156:13
**rankings** [1] 107:25
**rare** [2] 76:25 84:18
**rated** [1] 122:16
**rather** [8] 42:25 62:24 75:
15 81:11 95:2,2 101:17
104:14
**rationale** [2] 74:16 106:18
**rats** [1] 90:15
**re** [1] 60:15

**reach** [1] 58:15
**read** [20] 15:24 16:25 17:20
19:7 38:6 52:10 54:2 59:8
60:17 65:5,8,9 68:12 88:6
105:14 111:12 117:21 137:
8 152:23,24
**reader** [1] 159:7
**readers** [2] 119:12,13
**reading** [3] 55:14 136:19
137:8
**reads** [2] 68:4 109:23
**real** [2] 46:14 122:22
**really** [47] 7:23 10:9 16:2
18:1,11 24:17 27:25 30:10,
11 35:6 44:3 45:22 54:3
19 55:3 63:7,9,15 65:19
68:14,15 69:1,9 72:18 76:
9 77:22 81:14 82:18 83:8,
9 84:3 92:3 93:4 98:15
105:13,17 110:12 111:1,6
121:15 130:5 132:13 134:
22 140:23 145:19 152:3
158:16
**reason** [8] 80:9,10 88:23
94:25 96:4 103:12 137:15
157:1
**reasons** [1] 23:4
**REBUTTAL** [3] 2:12 161:5,
6
**receives** [1] 72:5
**recent** [3] 129:15,25 148:
13
**recently** [1] 143:4
**receptive** [1] 113:23
**recipients** [1] 74:14
**recognized** [1] 127:15
**recognizing** [1] 27:21
**recommend** [1] 87:19
**recommendation** [43] 4:
25 5:3 12:17 19:8 20:10
31:16 33:5,14 43:5 50:5
55:20,23,24 56:1,2,18 57:2,
20 69:2 82:6 86:20 87:18,
20 88:3 94:6 95:10 96:3
98:14 103:25 104:7,12
111:15 112:6 113:10 116:
12 118:5,15,16,21,23 119:
5,25 139:10
**recommendations** [32] 8:
12 30:10 31:3 50:1 51:25
55:1,19 57:4,9,14 59:3 65:
16 66:3,16 69:9 74:2 84:
19 110:13 113:18 115:2
118:1 121:21 133:6,9,21
139:2,18,25 147:3 153:10
158:20,24
**recommended** [1] 153:13
**recommender** [1] 88:1
**recommending** [1] 19:5
33:15,22 67:6 87:25 95:23
96:14 116:7 139:11
**recommends** [3] 21:6 25:
11 79:23
**reconsideration** [1] 101:

18
**recruiting** [1] 24:20
**reduces** [1] 18:12
**refer** [2] 48:17 52:1
**reference** [1] 161:11
**referred** [5] 4:5,24 6:14 12:
13 78:23
**referring** [1] 51:3 127:13
**refers** [2] 52:15 70:2
**reflects** [1] 115:12
**refuses** [2] 90:19 93:15
**refusing** [1] 148:19
**regard** [5] 54:25 69:15 124:
2 162:1 163:9
**regardless** [4] 36:24 130:
21 131:2 140:18
**regime** [1] 122:11
**regular** [1] 43:2
**regulatory** [1] 47:2
**reiterate** [1] 163:10
**related** [2] 36:24 66:7
**relationship** [1] 134:12
**relevance** [1] 129:21
**relevant** [8] 87:24 94:19,22
95:21 96:2 148:8,12 163:
20
**relying** [1] 58:13
**remand** [6] 50:13 85:18
101:17 151:2 152:13,25
**remark** [3] 132:3,6,7
**remember** [1] 125:25
**remove** [7] 65:6,14,22 66:7
92:21 93:18 121:17
**removes** [1] 124:25
**render** [1] 159:21
**repeat** [5] 87:1,3 88:1 90:7
95:12
**repeated** [2] 87:7,11
**repeatedly** [1] 32:20
**repeating** [2] 120:19 127:
19
**replead** [1] 123:24
**report** [2] 143:23,24
**request** [4] 27:20,21 93:2
129:21
**requested** [3] 29:2 104:6
126:14
**requesting** [1] 79:25
**require** [1] 5:1
**requirement** [1] 14:18
**requirements** [1] 7:24
**requires** [3] 7:19 25:15
115:8
**reruns** [1] 132:24
**resembled** [1] 89:9
**residual** [1] 151:7
**resolves** [1] 85:14
**respect** [14] 8:19 34:23 72:
24 82:23 88:17 94:20 97:
24 99:17 102:18 109:10
112:2,18 154:1,6
**respond** [2] 36:15 73:21
**Respondent** [5] 1:7,25 2:
11 11:5 114:11

**Respondent's** [1] 99:5
**responding** [1] 28:13
**response** [5] 41:13 52:11,
12 55:13 103:11
**responses** [2] 78:18 84:16
**responsibility** [1] 129:6
**responsible** [9] 8:9,12,23
12:22 68:24 132:2,5,6 146:
8
**responsive** [2] 31:21,23
**restaurant** [4] 90:12,13
149:6,7
**restrictions** [1] 124:15
**result** [7] 11:14 107:25 108:
8 112:3 115:19 139:23
145:3
**results** [6] 88:19,21 104:25
106:10 107:20 120:8
**retirement** [1] 54:11
**return** [2] 46:17 150:3
**retweet** [7] 59:4,23 61:25
109:1,10,11,25
**retweeted** [3] 61:11 108:
24 109:8
**Retweeting** [1] 61:1
**retweets** [2] 108:21 109:16
**revenue** [2] 143:8 145:8
**reverse** [1] 158:6
**review** [3] 149:6,7 161:12
**reviewed** [1] 149:15
**reviewers** [1] 149:12
**reviews** [1] 122:14
**revolutionary** [1] 115:19
**REYNALDO** [1] 1:3
**rice** [1] 7:4
**rightly** [1] 16:7
**rise** [6] 64:19 75:9 80:6 81:
6 95:25 99:14
**rival** [1] 90:13
**road** [6] 10:9 61:2 71:17 81:
14 99:18 120:12
**ROBERTS** [40] 3:3 8:6 25:
25 26:16 27:1,11,15,17 28:
14 29:22 30:3 34:3 37:18
42:11 47:20 51:21 57:22
64:5 70:11 78:13 79:12 85:
22 86:24 87:10 88:25 89:
14 96:8 98:11 99:21 103:3
106:22 110:9 114:6,9 117:
22 118:24 149:20 154:12
161:3 163:24
**Roger** [3] 26:7 70:20 71:4
**role** [1] 80:14
**rooms** [2] 20:14 47:15
**routinely** [1] 97:23
**routing** [1] 77:11
**rule** [6] 4:23 31:2 49:15 55:
18 101:10 163:9
**rules** [5] 49:18 101:5,7 162:
14,25
**run** [4] 57:15 132:24 161:
22 163:3
**running** [1] 90:15
**runs** [3] 23:25 156:16 163:

6
**Russia** [1] 147:18

## S

**safe** [1] 124:21
**Samaritan'** [2] 134:20 138:
5
**same** [37] 5:15,17,22,24 8:
16 10:22 11:16 18:11 23:
16 58:4,13 61:17 69:9 73:
8 76:16 77:15 88:9 95:23
103:24 107:12,13 108:3,6
113:16 115:9 120:6 126:
16 127:20 136:13 139:14
144:3,4 145:8,9 147:8 158:
22 159:17
**sat** [1] 159:7
**satisfied** [1] 14:18
**satisfy** [2] 25:13 58:23
**saw** [3] 12:24 77:18 158:25
**saying** [53] 5:11 14:17 18:
12,25 19:16 21:24 23:1,17
26:15 52:2 54:15 55:23 56:
1 67:9 69:10 71:21 76:5
81:12 87:5,7 88:6 90:13
92:12 96:21 98:20 99:15,
17 113:2 122:7,21 127:3,
14 128:12 130:18 131:15
135:1 137:20 139:6,19
140:17 141:21 145:16,19,
24 146:1 149:5 155:19
158:24,25 159:9,12 160:5,
16
**says** [35] 8:3,4,14 12:19 19:
13 21:25 26:6,8 31:11 41:
23 43:18 50:5 52:19 60:17,
19 63:5 69:17 81:15 90:16
95:13 96:13 110:22,24,25
111:2 117:24 123:8 124:
23 129:22 134:19 138:4
141:23 144:16 153:9,10
**scale** [2] 10:24 134:8
**scare** [1] 128:8
**scenario** [4] 49:2 71:2 87:
6 134:11
**scenarios** [1] 17:1
**scheme** [2] 47:2 135:15
**SCHNAPPER** [150] 1:18 2:
3,13 3:6,7,9 5:10,17,20 6:
7 7:15 8:24 9:15 10:11 11:
4 12:12 13:16,18,22,24 14:
3,11,15,21 15:9 16:12,15,
22 17:10,13 18:17 19:18,
21,25 20:4,11,18,21,24 21:
3,6,9,15,19 22:4,12,16 23:
3,7,10 25:2,7,10 26:12,20,
24 27:3,13,16 28:6,23 30:1,
16,21 31:20 32:13 33:2,12
34:16,25 35:10,14,24 36:8,
12 37:2,9,13 38:7,11,14,24
39:13,16,25 40:4,10,13 41:
4,10,17 42:4,12 43:14 44:5,
25 45:2,6,11 46:12 47:22
48:13,16 49:7 50:16,19,23

51:4,7 52:12 54:23 55:12
56:4,7,10,13,24 57:3,8,25
58:6,11,17 59:8 60:2,5,9,
13 61:13,16 62:3,11,16,20
63:11,18,21 64:2 66:11,19
67:16 69:12 73:6 85:7 100:
1 106:25 108:22 161:5,6,8
Schnapper's [2] 80:14
107:8
science [1] 133:17
scienter [1] 94:21
scope [14] 4:21 10:17 11:8
13:19 15:17 33:3 51:19 65:
18 67:13 86:11 91:8 112:
19 121:12 139:1
screen [8] 16:3,10 17:4 68:
23 110:19,21 121:17 142:1
screening [6] 18:6 68:17
124:9 134:20,24 138:5
screens [1] 52:1
screenshot [3] 62:13,13
146:20
screenshots [2] 107:1,3
search [47] 10:1 28:21 34:
14 38:19,20 43:3,3,15,16,
18,21 44:22 49:11 74:18,
23 75:1 77:11 88:18,20 97:
14,16,25 98:3 104:25 105:
20 106:10 107:19,20,25
116:1 119:22 120:1,9 129:
16,17,22 134:5 136:15 139:
15,16,23 140:1 146:25 147:
8,14 148:5 150:13
searches [4] 36:21 119:23
148:1,4
searching [1] 153:17
Seattle [1] 1:18
Second [10] 4:2 42:18 43:1,
7,9 77:3 122:1 123:14 124:
11 125:12
secondary [1] 103:15
Secondly [1] 44:11
Section [28] 3:11,17 4:2,13
16:6 47:25 48:18 51:13 58:
15 59:1 60:22 62:2 64:14
65:4 66:7 85:12 114:3,14,
22 124:8,12 128:7,7 136:
19 137:3 143:13 163:9,11
sections [2] 3:16 139:21
see [29] 6:16 7:7,20 14:11,
11,12,14 24:17,23 25:12
30:9,9,18 32:3 50:2 61:8
65:1 67:1,23 68:2,2 96:18,
21 115:23 116:2 130:7
136:2,16 142:25
seek [2] 3:12 101:12
seem [8] 11:17 19:15 71:13
78:6 79:17 81:9 86:13 97:
8
seemed [3] 91:5 107:4 113:
1
seems [20] 48:8 53:23 58:1
62:7 63:4 84:16 85:15 95:
4 97:12 103:22 108:16

117:22 118:12 134:12 138:
25 142:17 148:12 150:4
151:5,25
seen [4] 37:11 104:9 129:4
132:9
selected [2] 156:15 162:2
selection [2] 8:11,22
selects [1] 156:13
self-defeating [1] 105:16
sell [1] 53:16
seller [1] 26:5
selling [2] 45:12 53:17
sells [1] 71:1
send [7] 10:8 30:23 33:24,
25 60:18 61:4 84:23
sending [7] 23:16,23 24:5,
9 26:14 34:1 113:25
sends [1] 79:24
sense [8] 30:7 2 53:11
99:8 137:7,11 139:18 154:
19
sensitive [1] 50:12
sent [3] 15:17 102:22 113:
19
sentence [3] 68:3,3 152:18
separate [6] 23:6 60:6 75:
19 112:16 117:1 135:25
separated [2] 115:3 128:7
separately [1] 62:10
separation [1] 66:9
serious [1] 54:12
seriously [1] 55:9
server [1] 59:13
servers [1] 59:23
service [33] 4:15,18 24:3,7
37:24 52:3,7,20,22 53:3,6,
7,10 59:21,21 66:25 70:3
72:2 77:5 89:20 91:14 93:
3 100:9,16 102:5,13,16
105:15 106:5 113:7 123:9
129:11 151:8
services [4] 4:16 52:16
150:6 163:12
set [4] 6:6 51:9 62:19 72:20
setting [1] 36:25
sex [1] 120:16
sexually [1] 132:24
shaky [1] 78:6
shall [3] 37:24 70:25 123:
14
share [1] 115:21
sharing [1] 143:8
she's [1] 154:2
shield [3] 91:14 115:13
140:14
shielded [1] 76:21 100:24
shoplifter [4] 44:13 60:18,
19 87:14
short [2] 26:2 163:8
shorthand [1] 145:13
shouldn't [7] 35:20,22 73:
1 77:22 86:16 127:22 161:
19
show [13] 28:10,11,12,19

29:9 30:23 34:8 88:11 98:
5 99:12 125:19,20 156:24
showing [6] 22:14 24:21
81:2 90:15 125:1 162:18
shown [7] 9:12 81:3,5 94:
20 126:14 162:20,22
shows [1] 87:8
side [8] 26:3 54:6 69:18
105:7 107:4 114:22 119:
18 139:25
sign [1] 53:14
signed [1] 133:13
significant [2] 8:15 85:25
similar [7] 7:13 22:15 24:
10 37:8 100:1 116:12 130:
10
simple [1] 68:12
simply [11] 34:13 74:2 81:2
82:2 88:6 92:21 94:3 104:
13 108:24 123:8 160:6
site [4] 10:2 95:24 97:14
161:22
sites [3] 117:8 141:17 148:
7
situation [9] 54:4 57:17 59:
12 109:18 111:1,20 113:20
116:24 149:1
skinny [1] 120:18
sky [1] 46:2
slammed [1] 138:14
slightly [1] 74:20
slim [1] 108:16
smarter [1] 74:21
Smith [1] 87:8
Snapper [1] 5:9
snippet [3] 13:4,5 44:11
so's [1] 87:14
soccer [1] 120:11
social [2] 20:16 116:5
software [13] 48:2,24 51:
16 52:23,25 53:2,10,17
100:10,13,15 101:24 163:
13
solely [1] 118:18
Solicitor [1] 1:20 152:7
somebody [12] 26:6 28:5
37:6 60:25 61:5 86:19 90:
7 93:5,13 121:1 141:20
149:16
somehow [6] 68:8 127:14
147:11 148:2 151:2 153:3
someone [3] 3:13 23:16
31:11 34:7 41:20,22 47:9
57:11 59:14 63:5 96:18,21
119:15,15 128:1 132:18
somewhat [2] 67:17 105:
13
somewhere [5] 10:19 11:
15 40:24 122:17 140:23
sorry [16] 11:3 35:11 39:25
45:5 56:24 58:7 83:25 84:
10,12 126:9 130:3 146:16,
22 155:16,21 157:20
sort [15] 54:3 65:10 67:9,11

68:11,12 74:7 96:2 105:3
114:1 129:10,10 133:12
135:15 155:10
sorting [5] 102:3,9 130:5
144:19 150:23
sorts [6] 19:6 26:25 27:9
54:10 76:24 90:14
SOTOMAYOR [48] 11:2,17,
20,23 19:10,19,23 20:2,6,
12,20,22 21:1,5,8,13,17,21
22:5,14,22 23:5,9 24:8 25:
3,8 37:19,20 38:9,13,16 39:
9,14,23 40:1,8,11,14 46:7,
15,19 42:10 96:9,10 97:3,7
120:20 149:24
Sotomayor's [2] 57:25
140:10
sounds [1] 145:12
source [2] 33:5 147:11
sources [1] 147:3
speaker [7] 37:25 82:8 86:
22 102:25 105:5 106:20
144:16
speaking [4] 84:13,20 125:
18 137:14
special [1] 80:21
specific [9] 5:6 20:25 33:
10 43:17 46:20 56:21 67:
20 95:5 163:14
spectacular [1] 94:8
speech [28] 12:9,10 104:18,
21 105:1 115:14,16 117:1,
5,6 125:10,14 126:3 128:4,
11,19 129:3 131:8,9,10,12
139:11 140:8 141:6 146:3,
22 147:4,6
spell [1] 75:5
Spelman [1] 162:16
spend [1] 149:10
spent [1] 148:7
sports [6] 26:5,9 29:14,16,
16 71:5
spreading [1] 96:22
stability [1] 83:20
stage [4] 95:2,2 97:24 98:7
standard [4] 32:9 58:23
101:19 163:20
standards [1] 31:6
stark [1] 77:19
start [7] 24:4 43:15 47:25
61:2 144:11 155:20 161:
10
started [2] 38:2 126:6
starting [1] 134:1
Stat [1] 68:7
state [14] 70:23 71:15 73:
11 87:24 95:21 96:2 97:1,
1,1,22 121:1,4 144:17 160:
9
state's [1] 106:17
statement [8] 68:1 71:7,9,
11 90:7 96:22 116:17 157:
17
statements [1] 71:19

68:11,12 74:7 96:2 105:3

STATES [5] 1:1,15,22 2:7
70:15
states' [1] 122:10
status [6] 83:3,4 91:16 141:
7,18 142:4
status-based [1] 141:2
statute [121] 3:16,19,22 4:
21 5:1,7 7:18,19 8:2,3,4,
25 9:15,17,18,19,20 10:22
11:8 12:2,7 13:9,19 15:21,
24 16:1,25,25 17:9,25 18:4,
25 19:3,8 21:11 23:16 27:
6 29:2,21 30:15,24 35:7,22
40:5 43:18,20 46:15,19 47:
6,12,14 48:8 51:19,25 52:1,
10 57:13,15 59:6,17 60:14
61:19 62:25 65:19,19 66:4,
17 67:3,4,8,13,20 68:1,13,
14 69:5,21 70:6 71:9 73:3
79:7 83:15 89:7 92:13 100:
7,8 102:2 103:20 117:23
118:6 119:8 121:11,22
123:1,22 124:19 126:24
127:10 131:23 132:1 134:
16 135:5,12,18,24 136:6,
16,20 138:4,8,16 140:2
143:16 151:6,21 158:11,12,
16 159:22 160:24 163:13
statute's [1] 36:1
statutes [1] 47:16
statutory [9] 4:6 13:6 24:1
47:24 48:10 51:2 63:3 84:
3 135:15
stay [1] 94:3
steals [1] 161:18
STEWART [66] 1:20 2:6 70:
13,14,17 72:12,23 73:24
75:18 76:13 79:3,18 80:9,
25 81:17,22,25 82:22 83:
13,23,24 84:2 85:2,5 86:17
87:3,16 89:5,22,24 90:23
91:10,17,23 92:5,16,19 93:
9,16 94:10,16 95:19 96:23
97:6,19 98:23 99:20,23
101:21 103:9,17 104:1,20
105:11,18,25 106:3 107:7,
11 108:5 109:3,20 111:19
113:12 114:8 120:22
stifling [1] 115:18
still [21] 6:8 13:9 18:6,14
27:3,5 72:8 73:25 74:3,20
76:8 82:7 86:20 98:2 102:
4,6 119:17 126:16 128:12
132:23 134:4
stock [1] 81:10
stop [1] 115:17
stopped [1] 19:5
stories [1] 43:22
story [1] 142:2
straight [1] 44:22
straightforward [1] 68:12
Stratton [5] 65:9 68:7 69:7
124:14 138:6
strict [5] 68:6,21 92:24 123:

Official - Subject to Final Review

16 137:12
**strictly** [1] 92:1
**strongly** [1] 133:4
**structural** [1] 52:9
**structure** [2] 41:20 137:3
**stuff** [15] 18:7 19:3,6 33:24,
25 45:16 46:3 86:15 117:9
124:22 125:22 130:15 131:
3,4 148:11
**subcategory** [1] 91:25
**subject** [5] 8:17 27:22 36:
22 76:11 94:6
**subjected** [2] 74:1 91:4
**submissions** [1] 105:6
**submitted** [2] 163:25 164:
2
**substance** [1] 35:8
**substantially** [1] 76:15
**substantive** [3] 9:5 34:10
72:25 97:21 99:1
**successful** [2] 57:7 83:9
**sudden** [1] 46:8
**suddenly** [1] 32:11
**sue** [2] 82:3 122:9
**sued** [7] 34:12 71:6 72:2
89:20 121:20 122:24 158:
7
**suffered** [1] 144:8
**suffering** [1] 97:8
**suffers** [1] 90:14
**sufficient** [2] 73:11 98:5
**suggest** [4] 48:9 74:24 79:
14 96:15
**suggested** [3] 78:20 103:
11 112:9
**suggesting** [5] 8:17 31:4
33:16 89:3 134:21
**suggestion** [3] 9:22 32:5
39:12
**suggestions** [5] 30:9,20,
21 31:3 56:21
**suggests** [3] 6:24 120:22
135:3
**suing** [2] 86:20 132:18
**suit** [6] 35:8 71:14 73:14 74:
1 76:12,25
**suits** [6] 76:1 82:3 86:5,6
98:6,13
**summary** [1] 101:19
**sunk** [1] 79:16
**support** [5] 16:1 86:14 99:
10 126:21 161:13
**supporting** [4] 1:22 2:8 70:
16 126:23
**Suppose** [5] 13:10 36:5 77:
10 90:12 126:10
**supposed** [3] 156:3 157:
25 158:1
**SUPREME** [2] 1:1,14
**Surely** [1] 6:7
**survive** [3] 22:24 38:22,22
**suspect** [1] 86:4
**switching** [1] 59:1
**system** [11] 43:5 44:23 46:

10 52:23 53:3,7 60:21 68:
19,20 149:4 153:17
**systematically** [2] 99:6
113:24
**systemic** [1] 110:6
**systems** [1] 163:11

**T**

**Taamneh** [2] 58:9 163:17
**table** [6] 26:5,9 27:23 71:5
72:10 123:6
**tailor** [1] 116:2
**tailored** [2] 65:20 120:1
**tailoring** [1] 119:10
**talked** [3] 136:24,25 151:1
**talks** [1] 131:10
**tantamount** [2] 18:12 158:
21
**target** [2] 120:13 159:25
**targeted** [3] 113:18 115:2
119:3,4 133:5,9
**targeting** [2] 119:4 139:18
**task** [1] 46:15
**teaching** [1] 40:17
**tease** [2] 139:9 143:23
**teased** [1] 68:9
**tech** [1] 45:19
**technical** [2] 36:8,18
**technically** [1] 4:17
**technology** [6] 62:23 133:
7,14,15,25,25
**teed** [1] 25:20
**tees** [1] 112:22
**television** [1] 130:15
**tells** [3] 39:23 40:1,3
**term** [1] 48:1
**terms** [23] 31:10 51:2 66:
10 67:13 74:23 95:23 112:
18 120:23 121:3 122:14
123:20 124:14,20 125:13
129:11 130:12 133:3 136:
18,24 137:19 140:24 150:
20 153:14
**terrible** [1] 144:8
**terribly** [2] 90:11 95:14
**terrorism** [2] 86:14 99:13
**terrorist** [1] 8:19
**test** [22] 50:8 100:7 101:16,
16,17 128:14 143:3,4,5,18
144:24,24 145:6,7,8,9,11
151:19 152:4,12,14,17
**text** [18] 8:10 13:5 15:24 52:
13 54:1,1,21,24 63:3 65:4
69:16 84:3 103:20 114:2
116:8 134:13 135:18 137:
19
**textual** [1] 52:9
**textually** [1] 71:8
**themselves** [3] 36:4 75:10
118:1
**theory** [19] 29:23 50:17 58:
13 59:5,24 62:1 70:25 74:
16 92:24,25,25 93:20 99:5
104:19 107:8 108:25,25

115:6 134:10
**there's** [32] 8:21 17:2,20
18:6 40:19 42:23 43:16,17
50:23 59:9 66:2 68:8 71:8
75:24 81:19 82:6 96:4 110:
3 118:10 119:11 123:5
126:21,21 127:18 141:15
148:13 149:2,3,3 154:7
159:13 163:18
**therefore** [5] 51:18 94:14
105:12 148:18 162:18
**they'll** [6] 12:3,4 58:20 162:
20,21,22
**they've** [6] 29:1 35:3,17 39:
3 129:19 162:9
**thin** [1] 118:25
**thinking** [2] 59:3 71:16
**thinks** [3] 60:22 79:6 120:
10
**Third** [12] 4:13 34:19 39:3,
20 43:2,10 44:16 62:18 74:
12 75:11 118:17 152:2
**third-party** [57] 3:19,25 4:5,
10 13:8 29:3 35:2 36:13
39:4,8,17 44:15 51:18 56:
17 57:1 60:16 62:17 63:16
65:7,14 66:21 72:6 74:11
77:25 81:21 82:8 88:15 89:
23 90:2 92:22 94:3 99:7
102:8,18 103:1 104:15
105:5 106:20 108:13 109:
2 111:24 112:4 114:19
115:23 116:7 128:17,23
136:11 141:4,10 143:11,11,
22 146:2,5,22 157:11
**third-party-provided** [1]
35:9
**THOMAS** [19] 5:9,19,21 6:
21 8:16 30:5,6,19 31:19,22,
25 33:1,4 72:8,16 73:19
89:16 116:10 149:22
**Thomas's** [3] 9:22 24:13
127:4
**thoroughly** [1] 64:8
**though** [11] 14:8 42:6 68:4
87:1,17 95:22 100:21 103:
11 109:8 111:14 136:5
**thousand** [1] 122:8
**threatens** [1] 116:8
**three** [10] 3:16 23:3,7 42:13
43:8 44:6 52:15,21 55:3
67:19,23 68:2,10 69:16 70:
7 126:1
**thumbnail** [16] 12:18,25
14:1,4,25,25 15:3 24:11
34:18,23 39:11,16,19 62:
14 63:25 64:3
**thumbnails** [33] 6:9,14,18,
19,22 7:1 9:12 13:1,3,11
14:19 23:12,15 29:12 30:
23 34:8,14,22 35:1,2,6,21
23 36:5,23 39:10 40:22 47:
17 62:9 107:1,6 146:16,16
**thumbs-up** [1] 59:7

**tied** [1] 67:20
**tiny** [1] 86:15
**title** [4] 124:6,7,14 156:12
**today** [12] 4:19 19:15 33:20
49:20 56:16 63:14 64:15
66:7 79:4 121:14,20 161:
21
**today's** [3] 114:15 116:8
146:25
**together** [5] 20:14,15 28:3
124:17 136:25
**tomorrow** [16] 9:4,8 19:6
25:13,18 32:14,18 33:19
57:14 58:14,20,24 80:12
84:22 118:11 163:7
**tomorrow's** [5] 20:22 58:4,
8,18 64:21
**took** [5] 12:25 44:12 143:4,
6
**tool** [1] 100:18
**tools** [10] 49:15 50:8,9 100:
4,7 101:16 151:19 153:22,
23 162:11
**top** [8] 99:8 128:12 131:3,4
147:2,5,18 148:4
**topic** [6] 116:20 117:11,16
120:14 159:21,24 161:16,
17
**tort** [5] 34:11 72:14 94:19
95:7 149:4
**tortious** [1] 128:4
**totally** [1] 122:18
**track** [1] 69:17
**traditional** [1] 63:8
**transcript** [2] 128:9 161:13
**transmitted** [1] 8:10
**treat** [5] 3:18 8:5 63:5,6 69:
19 102:25 103:23 124:1
**treated** [9] 37:24 63:23 66:
20 82:7 86:21 103:14 109:
8 123:10 138:15
**treating** [9] 105:4 114:15
116:25 124:3 140:17 142:
11 143:16,17 155:11
**treatment** [5] 80:21 137:22
140:16 145:16 154:18
**Trending** [3] 117:17 161:
20,23
**tried** [2] 31:18 121:1
**Tripadvisor** [1] 116:3
**true** [6] 65:24 79:4 83:22
88:10 90:6 121:11
**Truman** [1] 125:19
**trustworthy** [3] 72:11,15,
22
**try** [11] 15:22 23:10 29:3 54:
14 58:22 64:9,9 68:23,23
108:14 135:20
**trying** [25] 7:9 9:17 16:15,
21 17:13 18:2 29:4 32:8
67:14,17 68:4,10,15 75:19
110:23 121:10 132:1 134:
22 135:4,19 138:13,23 143:
22 146:17 157:7

**Tuesday** [1] 1:11
**Turkey** [1] 148:10
**turn** [5] 6:8,19 12:12 33:22
128:2
**turned** [1] 44:8
**turning** [1] 63:3
**turns** [4] 43:23 88:7 119:9
157:11
**TV** [2] 132:20,21
**tweet** [3] 60:15 109:23,25
**tweets** [1] 42:22
**twice** [1] 152:19
**Twitter** [19] 10:2 29:8 39:1
42:18,22 58:9 61:21,24,24,
25 73:9,10 80:12 84:23 85:
6,14
**two** [24] 3:23 22:18 23:6 46:
20 49:6 52:24 56:25 64:12,
25 75:6 85:8 95:19 104:11
117:8 120:6 121:23 123:4,
5,11,11 125:4 133:23 151:
22 163:8
**type** [8] 26:11 29:11 36:5
39:10 132:17 136:21 147:
8,9
**typed** [1] 75:1
**types** [1] 22:7
**typically** [5] 13:4 14:25 49:
11 53:14 109:24
**typing** [2] 148:9 159:16

**U**

**ubiquitous** [1] 10:13
**ultimately** [2] 85:16 121:
13
**unanimously** [1] 54:2
**uncertainty** [1] 46:4
**unclear** [1] 45:20
**uncomfortable** [1] 96:13
**uncommon** [1] 15:12
**under** [39] 12:2,25 14:18
23:16 29:23 33:18 35:22
38:5 51:12 59:24 72:25 73:
11 78:20 81:7 87:23 88:5,
22 90:6 91:8 95:7 96:1 97:
12 98:9 99:4,14 100:4 101:
18 104:18 108:18 111:2
113:3 118:5,12 127:10
133:2 137:5 139:15 143:
16 151:6
**underlying** [9] 5:5 34:10
72:25 73:17 82:8 86:22 98:
10 119:7 145:15
**underneath** [1] 9:21
**understand** [31] 6:23 16:
24 21:23 31:23 32:4,7 33:
7,9 47:23 49:12 61:8,9 64:
9 86:10 95:9 96:24 97:9
99:24 103:23 110:12,23
112:20 113:9 117:25 122:
19 135:9 152:12 153:2,20,
24 157:7
**understanding** [7] 54:21
67:12 88:4 89:25 92:9 103:

Official - Subject to Final Review

7 151:6
understood [1] 154:16
undescribable [1] 129:19
undirected [1] 95:3
unhappy [1] 141:1
uniform [1] 83:19
Union [1] 45:7
UNITED [5] 1:1,14,22 2:7 70:15
universe [1] 111:11
unlawful [2] 76:22 102:10
Unless [7] 14:16,19 69:8 88:11 153:17 158:1,5
unlike [1] 117:7
unlikely [2] 75:8 80:5
unreasonableness [1] 93:1
unrequested [1] 24:10
until [1] 23:12
unusual [1] 57:14
unusually [1] 70:24
up [53] 15:21 16:10 21:25 23:12,19 25:20 27:12,14 50:5 51:23 53:14,22 61:3 62:19 65:2,18 74:6 75:4 77:9 85:25 92:11 93:15 94:7,14 103:6,21 110:2 111:2, 22 112:21,22 115:20 116: 20 117:17 119:14 121:3 122:10 124:20,24 125:3,15 128:12 129:13 131:3 133: 13 135:21 141:14,16 146: 19 156:14,17 159:15 162: 13
uploaded [2] 141:19 147: 24
upset [2] 149:16 151:1
urge [1] 4:23
urging [1] 55:15
URL [7] 17:23,23 34:20 39: 21,23 40:1 107:14
useful [1] 160:6
useless [1] 124:18
user [24] 6:24 22:7 37:23 41:9 59:9,11,16,22 60:14 61:18,23 79:25,25 109:5, 22,23 120:1,2 129:21 133: 16,17,18,21 139:17
user's [2] 36:24 120:8
users [19] 9:20 14:9 59:2 77:18 78:2 102:22 108:21 109:16 113:20,22 115:23, 24 116:2,3 117:10 119:20 120:6 147:15 148:7
uses [8] 3:20 10:15 11:6 12:11 34:21 36:21 37:6 59: 14
using [17] 5:13,14,15 14:5 35:16 36:4 47:17 59:21 60: 20,20 61:24 77:20 100:3, 17 105:20 133:11 157:17
Uzbekistan [1] 7:4

V

vacate [2] 85:18
vacatur [3] 1:23 2:8 70:16
validity [1] 143:15
vanishingly [1] 137:13
varied [2] 37:3,14
variety [4] 55:16 66:15 105: 20 137:4
various [1] 157:10
vary [1] 96:25
vast [1] 19:11
vehicle [1] 22:10
verb [1] 93:10
version [1] 28:1
versus [3] 5:3 31:3 107:1
viable [1] 88:22
video [54] 6:16 12:23 13:4 15:7,12,16 22:8,15 23:14, 18,21 25:11 28:25 29:1,11 30:17 36:6,7,13,21 59:4 63:24 74:6 79:24,24 80:2 87:8,20 88:13 89:21,23 90: 3,11,13,15 91:3 94:8 95:10, 12,13,14,23 96:17,19 108: 10 116:4 153:15 155:3,3,4 156:15,16 157:12 158:18
videos [55] 5:15,25 6:1,2, 11 7:13 8:9 9:6,13 10:16 23:23 24:16,21 28:12,16, 19,20 34:8,9,14,15 36:6 37: 8 51:11 69:10 74:13 81:3, 5 87:4 93:7 99:7 107:19 108:1,7 110:2 112:22 114: 1,24,25 118:17,25 121:4 126:13 139:7 143:11 144: 12 146:7 147:23 148:20 155:21 156:13 157:11,12 162:18,19
view [18] 7:16 23:25 31:17 60:13 63:22 68:4 78:21 80: 15 89:19 93:16 99:4 101: 14 122:6 134:12 139:16 142:22 150:17 152:9
viewed [2] 22:1 24:11
viewer [2] 6:15 22:10
viewers [2] 115:1,4
viewpoints [1] 140:6
views [1] 63:12
violate [4] 78:7,12 106:12, 13
violated [2] 98:3 104:23
violates [3] 12:4 77:2,21
violation [2] 98:5 106:9
violence [2] 120:15 125:9
violent [1] 132:21
violently [1] 132:25
virtually [1] 32:10
virtue [3] 96:5 109:7 124:4

W

wait [1] 79:14
walk [1] 119:14
walls [7] 21:10 27:6 29:21 41:12 47:6,11 53:9

wanted [2] 53:13 106:8
wants [3] 93:4,5 142:6
warranted [1] 79:8
Washington [5] 1:10,18, 21,24 162:20
watch [4] 87:19 94:8 95:10, 24 117:1 115:4
watched [1] 147:23
way [62] 6:6 7:13 9:1 14:5 15:20 18:9,15 19:25 24:15 28:21 36:1,3 37:15 41:14 42:5 44:17,21 46:5,16,24 61:1 64:13 65:1,20 66:14 67:18,19 68:12 71:8 79:7 81:20 82:11,21 85:14 88: 19 89:3 90:1 95:15 96:25 99:4 102:10 104:2,25 106: 7 107:13 111:5 112:14 116:21 119:19,19 120:11 126:19 127:11 135:24 136: 22 137:8 141:17 144:15 145:17 147:8 152:25 153: 6
ways [6] 10:4 12:10 43:4 123:11,18 141:13
weaken [1] 124:18
web [1] 160:1
website [39] 4:18 17:3,19 18:7,14 19:7,14,17 52:6 60:24 65:6 68:22 69:11 74: 25 77:8 82:6 93:21,23 94: 2 110:21 116:22,25 118:17 122:13 124:25 126:6 136: 9 138:19 141:20 142:5,10 148:23 155:2,12 157:19,25 158:1,7 162:7
website's [7] 94:1 128:18 141:5 142:23 143:25 146: 3,3
websites [18] 16:17 81:20 114:16,19 115:13,21 116:6, 6 117:10 119:20 125:7,14 131:8 148:15 149:17 156: 3 160:3,4
week [2] 156:14,17
weight [3] 62:8 72:17 83: 20
weird [1] 145:4
welcome [3] 5:8 72:7 116: 9
well-established [1] 55:2
well-known [1] 147:2
what'll [1] 113:15
whatever [20] 13:5 34:5 55: 19 58:23 64:19 67:7 78:17, 24 108:18 111:16 113:5,11 118:9 140:22 143:15 147: 9 149:14 160:20,21,25
whatnot [1] 64:25
whenever [2] 116:14 124: 2
whereas [1] 110:1
Whereupon [1] 164:1
whether [53] 10:1,1 12:25

24:11 31:16 51:1,5 60:5 64:16,16,19 66:5 69:1,2 72:24 74:1 75:21 78:7 84: 22 86:12 92:7,23 94:19 95: 4 97:19 100:17 101:4,6 104:25 106:12,13 110:12, 24 111:7,21 112:13 121:6 127:7,8,9 129:21 130:14 131:2,4 135:10 139:1,9 140:20,23 141:6 156:22 157:8 162:25
white [9] 41:25 77:13 140: 13 141:21,24,25 142:7,9 162:22
who's [4] 27:20 53:3 60:14 93:7
who've [2] 81:3,5
whoever [3] 22:7 149:15, 15
whole [9] 55:25 62:8 76:1 124:19 125:8 135:15 155: 18 160:5,23
wide [2] 55:16 105:20
widely [1] 37:14
width [1] 40:12
Wikipedia [1] 116:4
will [21] 6:11 8:8 10: 2 13:11,15 21:24 22:19 23: 22 28:9 29:10 30:6 32:9, 19 33:24 34:7,12,21 36:21, 25 37:1,6,10 42:15 50:3 52:24 59:13 61:20 62:10, 19 74:13 75:21 76:17 79: 23,24 80:1 81:1 87:4 90: 18 93:11,13 94:6 96:4 107: 5,21 112:20 113:18 114:23 117:7 118:8 121:2,14 143: 9 146:6 147:1,4,13,23,25 148:18 153:13,17 155:2,21, 22 156:11,16,17 157:2,9 162:8
YouTube's [8] 5:11 50:1 74:10 80:4 114:25 118:16 147:4,6

Z

Zeran [3] 90:24,24 91:2
Zillow [1] 116:4
Zimmerman [1] 122:15
ZIP [1] 119:13

8 115:20 120:10
world's [2] 117:8 119:21
worms [1] 129:13
worried [4] 125:13 138:9 160:13,14
worry [4] 82:18 83:6 84:17 154:3
worse [1] 153:4
write [6] 41:8,12,15,19 44: 14 62:24
writes [1] 40:6
writing [1] 41:4
written [4] 47:3 6:1 46:16, 19,24,24 108:1 131:24
wrongdoing [1] 80:22
wrongful [2] 127:23 153:8
wrote [4] 29:16 39:6 47:14 137:21

Y

years [1] 54:3
Yelp [2] 116:4 149:8
yesterday [1] 147:1
yield [1] 11:13
Young [1] 122:14
yourself [2] 24:25 109:9
YouTube [70] 6:11 8:8 10: 2 13:11,15 21:24 22:19 23: 22 28:9 29:10 30:6 32:9, 19 33:24 34:7,12,21 36:21, 25 37:1,6,10 42:15 50:3 52:24 59:13 61:20 62:10, 19 74:13 75:21 76:17 79: 23,24 80:1 81:1 87:4 90: 18 93:11,13 94:6 96:4 107: 5,21 112:20 113:18 114:23 117:7 118:8 121:2,14 143: 9 146:6 147:1,4,13,23,25 148:18 153:13,17 155:2,21, 22 156:11,16,17 157:2,9 162:8

Williams [1] 122:14
win [3] 50:22 69:8 149:13
wind [2] 74:6 110:2
winning [1] 149:14
wipe [1] 45:9
wish [1] 100:20
within [23] 8:1 9:10 10:17 13:19 15:16,17 21:10 27:5 29:1,20 40:5 43:19 47:5, 11,16 53:9 61:19 90:25 91: 1 102:4 103:13 142:11 143:12
without [8] 32:15 36:4 59: 25 75:22 79:25 87:11 96: 14 159:15
woman [2] 140:21,22
wonderful [1] 133:7
word [8] 59:9,11 118:15,16 120:7 124:1 155:13 157: 16
words [20] 4:7 16:6 69:21 114:14 118:1,6 124:4 126: 11 159:20 161:23
work [10] 7:19 33:18 67:19 95:1 124:17 136:25 141: 17,18 144:18 147:8
workable [1] 119:20
workers [1] 54:11
working [1] 40:15
works [2] 7:11,12
world [10] 9:20 24:19 45:15 48:5 49:16 68:9 76:8 111:

Heritage Reporting Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, I electronically filed the foregoing document APPELLANTS' RULE 28(j) LETTER  with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 26, 2023                Respectfully,

/s/   Michael D. Seplow
Michael D. Seplow
*Counsel for Appellants.*