No. 21-16499
Decided June 23, 2023
Owens, Graber & M. Murphy (10th Cir.), JJ.

———————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

ROSEMARIE VARGAS; KISHA SKIPPER; JAZMINE SPENCER;
DEILLO RICHARDS; JENNY LIN, on behalf of themselves individu-
ally, and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

and

NEUHTAH OPIOTENNIONE; JESSICA TSAI,
*Plaintiffs*,

v.

FACEBOOK, INC.,
*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:19-cv-5081 | Hon. William H. Orrick

———————————

## PETITION FOR REHEARING EN BANC
## OR PANEL REHEARING

———————————

Rosemarie T. Ring
Ryan Azad
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200

Theodore J. Boutrous Jr.
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

*Counsel for Defendant-Appellee*
*Facebook, Inc. (now known as Meta Platforms, Inc.)*

# TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 35 STATEMENT ....................................1

BACKGROUND ........................................................................4

REASONS FOR GRANTING THE PETITION........................................8

I.    Rehearing Is Needed Because the Court's Cases Are Divided over Whether *Twombly-Iqbal* Applies in Assessing the Sufficiency of Allegations of Article III Standing............................8

II.   Rehearing Is Warranted to Address the Scope of *Havens Realty* in Light of Subsequent Supreme Court Decisions. ............13

III.  Rehearing Is Needed to Ensure the Uniform Application of This Court's Section 230 Precedent. .............................................17

CONCLUSION ........................................................................22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acheson Hotels, LLC v. Laufer*,
  143 S. Ct. 1053 (2023) ........................................................ 3, 13, 16, 17

*Apple Inc. v. Vidal*,
  63 F.4th 1 (Fed. Cir. 2023) .................................................. 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................ 11

*Ass'n of Am. Physicians & Surgeons v. U.S. FDA*,
  13 F.4th 531 (6th Cir. 2021) ........................................... 11, 12

*Barger v. Hanson*,
  426 F.2d 640 (9th Cir. 1970) ................................................ 9

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ............................................ 18

*Brintley v. Aeroquip Credit Union*,
  936 F.3d 489 (6th Cir. 2019) .............................................. 16

*Calcano v. Swarovski N. Am. Ltd.*,
  36 F.4th 68 (2d Cir. 2022) .................................................. 12

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) ............................................ 18

*Carello v. Aurora Policeman Credit Union*,
  930 F.3d 830 (7th Cir. 2019) .............................................. 16

*COPE v. Kan. State Bd. of Educ.*,
  821 F.3d 1215 (10th Cir. 2016) .......................................... 12

*Ctr. for Bio. Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ....................................... 2, 10, 11

iii

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019)................................................... 3, 18, 19

*Earl v. Boeing Co.*,
    53 F.4th 897 (5th Cir. 2022) ............................................................. 12

*Fair Hous. Council of San Fernando Valley v.*
    *Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc).................... 4, 7, 8, 18, 20, 21

*Gonzalez v. Google LLC*,
    143 S. Ct. 1191 (2023)....................................................................... 22

*Greenwood v. FAA*,
    28 F.3d 971 (9th Cir. 1994)................................................................. 9

*Grimm v. City of Portland*,
    971 F.3d 1060 (9th Cir. 2020)........................................................... 22

*Harty v. W. Point Realty, Inc.*,
    28 F.4th 435 (2d Cir. 2022)............................................................... 15

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).........................................2, 3, 7, 13, 14, 15, 16, 17

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ............................................................. 12

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) .......................................................... 12

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016)........................................................... 18

*Laufer v. Acheson Hotels, LLC*,
    50 F.4th 259 (1st Cir. 2022).............................................................. 16

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ........................................................... 15

*Laufer v. Mann Hosp., LLC*,
   996 F.3d 269 (5th Cir. 2021)............................................................... 15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................... 12, 13

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011)........................................................ 2, 10

*McGee v. S-L Snacks Nat'l*,
   982 F.3d 700 (9th Cir. 2020)............................................................. 10

*In re Schering Plough Corp. Intron/Temodar
   Consumer Class Action*,
   678 F.3d 235 (3d Cir. 2012) .............................................................. 12

*Silha v. ACT, Inc.*,
   807 F.3d 169 (7th Cir. 2015)........................................................ 11, 12

*So. Walk at Broadlands Homeowner's Ass'n v.
   OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013).............................................................. 12

*Stalley v. Cath. Health Initiatives*,
   509 F.3d 517 (8th Cir. 2007).............................................................. 12

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)...................................................... 3, 14, 15, 16

*Tsao v. Captiva MVP Rest. Partners, LLC*,
   986 F.3d 1332 (11th Cir. 2021).......................................................... 12

*Warth v. Seldin*,
   422 U.S. 490 (1975)........................................................................... 11

**Briefs**

Opposition to Suggestion to Mootness, *Acheson Hotels,
   LLC v. Laufer*, No. 22-429 (U.S. July 28, 2023),
   https://tinyurl.com/mpdpfd58 ........................................................... 17

Petition for Certiorari, *Acheson Hotels, LLC v. Laufer*,
No. 22-429 (U.S. Nov. 4, 2022), 2022 WL 16838117 .......................... 16

**Other Authorities**

Eric Goldman, *Uh-Oh, the Ninth Circuit Is Messing Again
with Its Roommates Ruling*, Tech. & Mktg. L. Blog
(June 26, 2023), https://tinyurl.com/2fsehjut ..................................... 19

Tony Phillips, *One to Watch: Has the Ninth Circuit Turned
on Section 230?*, Pillsbury (July 20, 2023),
https://tinyurl.com/4ad8ejhc .............................................................. 18

Wright & Miller, Fed. Prac. & Proc. Civ.
(4th ed. Apr. 2023 update) ................................................................. 11

## INTRODUCTION AND RULE 35 STATEMENT

The Court should grant rehearing of the panel's 2-1 opinion to address two important, recurring Article III issues that have divided courts, and to ensure the uniform application of this Court's precedent interpreting section 230 of the Communications Decency Act.

This case tests the boundaries of Article III standing. Plaintiffs claim that Facebook's audience-selection tools—which allow (but do not require) third-party advertisers to target their ads toward audiences they believe are most likely to care about them—enabled unidentified advertisers to exclude them from ads for housing matching their preferred price, size, and location. But plaintiffs alleged practically nothing in support of that theory. Although they alleged what housing they were hoping for (e.g., a three-bedroom apartment in lower Manhattan for $1,700 a month), they did not allege that such housing actually existed, was on the market for rent, and was being advertised via paid Facebook ads. They also did not allege that even a single advertiser actually used the tools in the discriminatory way they posited. Plaintiffs' allegations of injury are the definition of "possible, not plausible"—which is why the district court dismissed the complaint for lack of Article III standing.

1

The panel reversed, and the split between the majority and Judge Owens's dissent underscores two Article III issues that warrant rehearing.

The first is whether the *Twombly-Iqbal* plausibility standard applies in considering the sufficiency of allegations of Article III standing. Some of this Court's decisions have held it does not, *e.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1067-68 (9th Cir. 2011), and the panel majority relied on that rule. But other decisions of this Court have held that *Twombly-Iqbal* does apply to Article III standing, *e.g.*, *Ctr. for Bio. Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019), and applying that standard led Judge Owens to dissent from the majority's ruling. The standard that governs challenges to the sufficiency of allegations of Article III standing is often outcome-determinative, and this Court's precedent should not point in opposite directions on that question. Rehearing is particularly appropriate because the view the panel majority endorsed conflicts with decisions from all twelve of this Court's sister circuits.

The second is whether the panel majority's expansive reading of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), can be reconciled with subsequent Supreme Court decisions. *Havens Realty* formed the

backbone of plaintiffs' theory of standing, and it was the panel majority's principal basis for finding standing. A few circuits have continued applying *Havens Realty* even after decisions like *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), made clear that statutory violations alone are insufficient to satisfy Article III. But most have recognized that *Havens Realty* represents an outmoded vision of standing that the Supreme Court has since rejected. That division led the Court to grant certiorari in *Acheson Hotels, LLC v. Laufer*, 143 S. Ct. 1053 (2023). Given this conflict, the Court should grant rehearing, or at least vacate the panel decision and hold this case until *Acheson* is decided.

Rehearing is justified for a third reason: the panel majority's conclusion that section 230 does not bar plaintiffs' claims cannot be reconciled with this Court's precedent. Plaintiffs sued Facebook for providing neutral tools that unidentified third-party advertisers allegedly chose to misuse. The nature of those claims should have made this case easy under this Court's section 230 case law, which holds that an interactive computer service provider cannot be held liable when it gives users of the service neutral tools they can use to communicate information. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096-99 (9th Cir.

3

2019). But the majority disagreed, without addressing any of the Court's recent decisions applying section 230 to similar claims. Instead, it cited only *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc), and although it observed (correctly) that Facebook differs from Roommates.com in several ways, it then dismissed those differences as irrelevant. The Court should grant rehearing on this case-dispositive issue and reject the panel's maneuver to sidestep Circuit precedent via an unpublished opinion.

## BACKGROUND

**1.** Facebook is the world's largest social-media service. 2-ER-242. It generates revenue by selling space for ads to third-party advertisers. 2-ER-243-44. Facebook gives advertisers many tools they can use in reaching their target audiences; those tools are available to advertisers across "many industries," including (but not limited to) housing. 2-ER-245.

One of those tools allows, but does not require, advertisers to select eligible audiences for their ads. 2-ER-248-49. That audience-selection tool enables targeting of ads in various contexts—for example, advertisers promoting back-to-school items might select users with an interest in

parenting. 2-ER-249. But the default audience for any ad is all adult Facebook users. 2-ER-249-50. A narrower target audience will be selected only if a third-party advertiser chooses to do so. *Id.* Facebook's policies, moreover, forbid advertisers to use the audience-selection tools to discriminate based on protected characteristics. 2-ER-170, -173.

**2.** In 2019, Facebook made industry-leading changes by eliminating certain audience-selection tools for housing ads. 2-ER-203, -248 n.15. Soon after, plaintiffs, five Facebook users, sued Facebook, alleging claims under the Fair Housing Act and related state statutes on the theory that the audience-selection tools "enable[d] housing advertisers to steer advertisements" away from certain groups. 2-ER-234-36.

Plaintiffs allege they used Facebook to search for housing but did not see ads for housing of their preferred size, price, and location. 2-ER-255-65. (Vargas, for instance, wanted a "three-bedroom apartment located in lower Manhattan" for "$1,700.00 per month." 2-ER-255.) Plaintiffs do not allege that any housing satisfying their criteria was on the market, much less being advertised via paid Facebook ads for which the audience-selection tools were available, at the time. Yet plaintiffs assert

that they must have been "prevented from" seeing such ads because unidentified advertisers used Facebook's tools to exclude them. 2-ER-257.

**3.** The district court dismissed plaintiffs' complaint on two grounds. *First*, it ruled that plaintiffs lacked Article III standing. It noted that plaintiffs failed to allege "that housing was generally available in their desired markets" matching their criteria, much less that ads for that housing "were being placed [o]n Facebook." 1-ER-6 (emphasis omitted). And although Vargas alleged that she and a white friend "sat side-by-side" and conducted similar searches but received different results (2-ER-257), Vargas did not allege that any ads her friend saw were *paid* ads (which were subject to audience-selection tools) rather than "consumer-placed ads" (which were not). 1-ER-6-7. The district court concluded that plaintiffs "*assume* (but plead no facts to support)" that "unidentified advertisers theoretically used [the audience-selection tools] to exclude them" from seeing paid ads "that they assume (again, with no facts alleged in support) were available and would have otherwise met their criteria." 1-ER-7-8.

*Second*, the court ruled that even if plaintiffs had alleged standing, their claims were barred under section 230 of the Communications Decency Act. 2-ER-8-10. It explained that Facebook's audience-selection tools are "neutral" because they provide "a framework that could be utilized for proper or improper purposes" depending on the independent choices of third-party advertisers. 2-ER-10 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008) (en banc)).

**4.** A divided panel reversed.

The majority first reasoned that "'*Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context'" and that plaintiffs need allege only "'general factual allegations of injury'" at the pleading stage. Mem. 2. Applying that lenient standard, it ruled that plaintiffs had alleged Article III standing under the framework in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Mem. 3-4.

Judge Owens dissented, taking the view that the *Twombly-Iqbal* plausibility standard applies to Article III standing. Dissent 1. And under that standard, plaintiffs do not "allege facts supporting an inference that housing discrimination . . . is plausibly the reason [they] failed to

7

find housing ads meeting their respective search criteria," including be-
cause plaintiffs "alleged nothing to exclude the possibility that suitable
housing was not available or not advertised on Facebook." *Id.* at 1-2.

On section 230, the majority ruled that plaintiffs' claims "challenge
Facebook's conduct as a co-developer of content and not merely as a pub-
lisher of information" provided by third-party advertisers. Mem. 5. Alt-
hough it recognized that Facebook's tools "allowed advertisers to target
specific audiences," it concluded that "Facebook's own actions" "contrib-
ute[d] materially to the alleged illegality of the conduct." *Id.* (quoting
*Roommates*, 521 F.3d at 1168). The majority acknowledged that "three
primary aspects of this case" distinguished Facebook from Room-
mates.com but was "unpersuaded" those distinctions were relevant.
Mem. 6-8.

### REASONS FOR GRANTING THE PETITION

**I.    Rehearing Is Needed Because the Court's Cases Are Di-
vided over Whether *Twombly-Iqbal* Applies in Assessing
the Sufficiency of Allegations of Article III Standing.**

The panel split over whether the *Twombly-Iqbal* plausibility-plead-
ing standard applies in assessing pleadings-stage challenges to Arti-
cle III standing. *Compare* Mem. 2 ("'*Twombly* and *Iqbal* are ill-suited

to . . . the constitutional standing context'"), *with* Dissent 1 (applying those decisions). That divide reflects a stark conflict in this Court's cases. Because this issue is exceptionally important and frequently recurring, the Court should grant rehearing to resolve it—particularly because, if the majority's view were correct, this Court would be on the wrong side of a 12-1 circuit conflict.

**1.** Courts should proceed cautiously in resolving issues for which they have not "received the benefit of careful adversary briefing." *Barger v. Hanson*, 426 F.2d 640, 641 n.1 (9th Cir. 1970). This case illustrates why. Throughout the briefing, the parties agreed that the *Twombly-Iqbal* plausibility standard applied. *E.g.*, AOB 26; Facebook's Br. 24, 31; Reply 3, 10. At no point did plaintiffs suggest some lesser standard applied.

Plaintiffs' failure to present that argument means it was forfeited. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). Instead, by "manufactur[ing] arguments for [plaintiffs]," *id.*, the majority wandered into territory the parties had not briefed.

**2.** That territory proved difficult to navigate because this Court's cases point in conflicting directions.

In *Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011), the Court held it is "inappropriate[]" to apply the *Twombly-Iqbal* plausibility framework to a motion to dismiss for lack of Article III standing. *Id.* at 1067-68. The majority relied on *Maya*, explaining that, in its view, because *Twombly-Iqbal* plausibility is "'ill-suited to application in the constitutional standing context,'" "the bar to allege standing is not high." Mem. 2. That allowed the majority to rely on cases predating *Twombly* and *Iqbal* holding that "'general allegations'" of injury are enough even without the "'specific facts . . . necessary to support the[m].'" *Id.*

Judge Owens, however, applied *Twombly-Iqbal* in assessing the standing allegations. Dissent 1. That was consistent with more recent decisions of this Court. For example, in *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019), the Court held that to "satisfy the requirements of Article III," a plaintiff must "'nudge[]' its claim of injury 'across the line from conceivable to plausible.'" *Id.* at 560; *accord, e.g.*, *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 708-10 (9th Cir. 2020).

Given this inconsistency, other circuits have reached differing conclusions over the governing standard in this Circuit. The Seventh Circuit, citing *Maya*, deemed this Court's rule to be that the plausibility

standard does not apply to Article III standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). But after *Bernhardt*, the Sixth Circuit concluded that this Circuit "ha[s] extended *Twombly*'s plausibility test to th[e] standing context." *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 544 (6th Cir. 2021).

It's hard to overstate the importance of this issue. Article III standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). So the standard for analyzing allegations of standing is vital. As this case illustrates, that standard will often be dispositive—after all, *Twombly* and *Iqbal* "represent[ed] a significant transformation in federal pleading practices." 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1216 (4th ed. Apr. 2023 update). That is particularly true in light of *Twombly-Iqbal*'s rule that, even if "consistent with" unlawful conduct, allegations do not plausibly suggest liability if they fail to foreclose an "'obvious alternative explanation' for" the conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 681-82 (2009). That rule played a major part in Judge Owens's dissent (at 1-2) but went unaddressed in the majority's opinion.

11

**3.** Every other circuit has held that when a defendant challenges the sufficiency of allegations of Article III standing, *Twombly-Iqbal* plausibility applies. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730-31 (1st Cir. 2016); *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243-44 (3d Cir. 2012); *So. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013); *Earl v. Boeing Co.*, 53 F.4th 897, 903 (5th Cir. 2022); *Ass'n of Am. Physicians*, 13 F.4th at 543-44 (6th Cir.); *Silha*, 807 F.3d at 174 (7th Cir.); *Stalley v. Cath. Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007); *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220-21 (10th Cir. 2016); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337-38 (11th Cir. 2021); *Kareem v. Haspel*, 986 F.3d 859, 865-66 (D.C. Cir. 2021); *Apple Inc. v. Vidal*, 63 F.4th 1, 16 (Fed. Cir. 2023).

As those courts have explained, *e.g.*, *Hochendoner*, 823 F.3d at 730-31, the plausibility standard's application to Article III standing flows from Supreme Court precedent. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Court explained that because standing is "an indispensable part of the plaintiff's case," a plaintiff seeking relief in federal

court must support standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. At the pleadings stage, what is required is plausible allegations, and that standard must apply equally to the merits of a plaintiff's claim as to her assertion of Article III injury.

The Court should grant rehearing and join its sister circuits in holding that the plausibility standard applies to Article III.

## II. Rehearing Is Warranted to Address the Scope of *Havens Realty* in Light of Subsequent Supreme Court Decisions.

The majority concluded plaintiffs had standing by analogy to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Mem. 3-4. But just how far *Havens Realty* can be stretched—and whether doing so is consistent with more recent Supreme Court case law on Article III—has sharply divided other courts of appeals. In fact, the Supreme Court recently granted certiorari to review that issue. *Acheson Hotels, LLC v. Laufer*, 143 S. Ct. 1053 (2023). This Court should grant rehearing to address the issue, or vacate the panel decision to await the Supreme Court's opinion.

**1.** Plaintiffs repeatedly invoked *Havens Realty* to defend their allegations of standing. *Havens Realty* held that "testers" told untruthful information about housing had Article III standing to sue under the Fair Housing Act. 455 U.S. at 373-74. Under plaintiffs' telling, *Havens Realty* established a "'very liberal standing requirement'" requiring only general allegations that they may have been denied a "'statutorily created right to truthful housing information.'" AOB 29, 32-34.

The panel likewise focused on *Havens Realty*. Following oral argument, it ordered the parties to submit supplemental letters addressing decisions from other courts of appeals taking contrary positions on the scope of that theory. Dkt. 48 (order); Dkts. 49-51 (letters). And the majority cited *Havens Realty* as the principal support for its conclusion on standing. Mem. 3-4.

In recent years, *Havens Realty* has come under increasing scrutiny. The decision assumed that plaintiffs who claim infringement of the Fair Housing Act's "right to truthful information" have standing to sue. 455 U.S. at 373-74. But since then, the Court has recognized that Article III demands more than "an injury in law." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). Rather, Article III requires that plaintiffs suffer

14

an injury *in fact*—i.e., that they be "*concretely harmed*" by a statutory violation. *Id.* And the Court has rejected the mode of analysis on which *Havens Realty* depended, holding that a statutory right "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *Id.*

Many courts have recognized that *Havens Realty*, particularly when taken to its limits, conflicts with recent decisions like *TransUnion*. In *Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022), a plaintiff who used a wheelchair sued an inn because its website lacked statutorily required accessibility information. *Id.* at 874-75. The plaintiff, who had no plans to book a room, argued she nonetheless had standing under *Havens Realty*. The Tenth Circuit disagreed, explaining that the plaintiff had identified only an "amorphous interest in receiving unusable housing information," not any actual concrete injury suffered as a result. *Id.* at 879-80. The Tenth Circuit reasoned that any broader view of standing would flout *TransUnion*. *Id.* at 880-81.

Many circuits have agreed with the Tenth Circuit's view on *Havens Realty*'s limits. *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 n.3 (2d Cir. 2022); *Laufer v. Mann Hosp., LLC*, 996 F.3d 269, 272-73 (5th Cir.

15

2021); *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494-95 (6th Cir.
2019); *Carello v. Aurora Policeman Credit Union*, 930 F.3d 830, 833-35
(7th Cir. 2019).  As the Sixth Circuit put it, "the Supreme Court's recent
standing jurisprudence has only further 'tightened the hatches' on what
qualifies as injury in fact."  *Brintley*, 936 F.3d at 495.  But a minority of
other circuits have disagreed, finding standing under *Havens Realty* even
in cases without any concrete injury in fact.  *E.g.*, *Laufer v. Acheson Ho-*
*tels, LLC*, 50 F.4th 259, 268-69 (1st Cir. 2022).

In *Acheson,* the Supreme Court granted certiorari to resolve this
conflict, 143 S. Ct. at 1053, and is poised to provide long-awaited guid-
ance on the "tension between *Havens Realty* and modern standing cases
like *TransUnion*."  Petition for Certiorari at 26, *Acheson* (No. 22-429),
2022 WL 16838117.

**2.**  As the district court concluded (1-ER-7-8, -18), plaintiffs asked
the court to leap from the mere *possibility* that unidentified advertisers
used Facebook's audience-selection tools in discriminatory ways to the
conclusion that plaintiffs themselves were denied housing information
because of that practice.  Facebook's Br. 27-38; *see* Dissent 1-2 (detailing
deficiencies in plaintiffs' complaint).  Yet relying on *Havens Realty*, the

majority considered it enough that plaintiffs had made allegations about "the magnitude of paid advertising" generally on Facebook. Mem. 3-4.

Unlike other circuits, this Court has said little about the ongoing vitality of *Havens Realty* in light of more recent case law. Given the importance of the decision to the majority's analysis, the Court should grant rehearing to address whether expansive readings of *Havens Realty* are appropriate in light of subsequent Supreme Court decisions. At a minimum, the Court should vacate the panel's decision and hold the case for the decision in *Acheson*.[1]

## III. Rehearing Is Needed to Ensure the Uniform Application of This Court's Section 230 Precedent.

Rehearing is also warranted because the majority's conclusion that section 230 does not bar plaintiffs' claims conflicts with this Court's precedent and "introduce[s] meaningful ambiguity in [this] Circuit's Sec-

---

[1] The plaintiff in *Acheson* has recently argued in the Supreme Court that the case is moot, but the defendant disputes that view. *See* Opposition to Suggestion of Mootness, *Acheson* (No. 22-429), https://tinyurl.com/mpdpfd58. In the event *Acheson* is dismissed, that would only be more reason for this Court to grant rehearing to address this unresolved and important issue.

tion 230 jurisprudence." Tony Phillips, *One to Watch: Has the Ninth Circuit Turned on Section 230?*, Pillsbury (July 20, 2023), https://tinyurl.com/4ad8ejhc.

**1.** Section 230 provides "robust" protection to interactive computer services like Facebook. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). It bars claims that seek to hold services liable based on their exercise of "'traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content,'" *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003)—as well as any "content-neutral tools" the services offer "to facilitate communications," *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019).

A website does not lose section 230 protection merely because it had some role in contributing to third-party content. *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269-70 (9th Cir. 2016). It likewise remains protected even if it provided "tools meant to facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098. To shed its protection under section 230, a website must have been responsible for "contribut[ing] materially to the alleged illegality of the conduct." *Fair Hous. Council of San*

*Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc).

Those decisions cannot be reconciled with the majority's ruling. The majority reasoned, for example, that Facebook was a creator of content because it "created the categories, used its own methodologies to assign users to the categories, and provided [tools] to allow housing advertisers to exclude protected categories of persons." Mem. 6. But *Dyroff* rejected such reasoning: plaintiffs "cannot plead around Section 230 immunity by framing these website features"—which "facilitate[d] the communication and content of [third-party advertisers]"—"as content." 934 F.3d at 1098. By failing to grapple with this Court's precedent, the panel applied the wrong standard and "open[ed] up a Pandora's box of potential Section 230 exclusions." Eric Goldman, *Uh-Oh, the Ninth Circuit Is Messing Again with Its Roommates Ruling*, Tech. & Mktg. L. Blog (June 26, 2023), https://tinyurl.com/2fsehjut.

**2.** The majority did not address this Court's recent cases on section 230. Instead, it relied exclusively on *Roommates*. But as the majority recognized, there are at least "three primary aspects of this case that

arguably differ from the facts in [*Roommates*].” Mem. 6. The attempts to explain those distinctions away are unpersuasive.

Unlike Roommates.com, which specifically required all potential subscribers to select protected characteristics from drop-down menus, *Roommates*, 521 F.3d at 1161-62, “Facebook does not require users to select directly from a list of [protected characteristics],” Mem. 7. The panel saw “little meaningful difference” between the two cases because Facebook allegedly “use[d] its own algorithms to categorize the user.” *Id.* But that reasoning cannot be squared with *Roommates*, which emphasized that its holding rested on the fact that the website “*requir[ed]* subscribers to provide the information” that was allegedly unlawful. 521 F.3d at 1166.

Section 230 also did not protect Roommates.com because the website required users to provide information about protected characteristics “as a condition of accessing [it].” *Roommates*, 521 F.3d at 1165-66. But as the majority acknowledged, Facebook is different: “[a]n advertiser . . . may opt not to exclude any categories of persons” from an ad’s target audience. Mem. 8. By default, all adult Facebook users are eligible to receive any ad. 2-ER-249-50. The majority deemed this distinction

"weak" merely because users of Roommates.com "could select the option that corresponded to all persons of a particular category." Mem. 8 (emphasis omitted). But this Court rejected that very line of reasoning in *Roommates*, sending a "clear" "message to website operators": if they do not "design [their] website to *require* users to input illegal content, [they] will be immune." 521 F.3d at 1175 (emphasis added).

*Roommates* also explained that the website was not protected under section 230 because its tools necessarily "subject[ed] subscribers to allegedly discriminatory housing practices." 521 F.3d at 1172. But as the majority again recognized, Facebook's tools are different: "they are offered to all advertisers, not just housing advertisers, and the use of the tools in some contexts is legal." Mem. 8. The majority dismissed this distinction because it believed a website's tools "do[] not become 'neutral' . . . simply because [they are] offered to others." *Id.* at 9. But that novel conclusion again contravenes *Roommates*: a website does not lose section 230 protection when it "provide[s] a framework that could be utilized for proper or improper purposes." 521 F.3d at 1172.

The majority's reasoning boils down to a disagreement with this Court's section 230 precedent. By issuing an unpublished decision, the

21

panel advanced its own novel view of how section 230 ought to be interpreted. But that is not the function of unpublished decisions, which should contain "no new legal holdings, just applications of established law to facts." *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th Cir. 2020). That is particularly true after *Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023), in which the Supreme Court declined to disturb this Court's longstanding interpretation of section 230. *Id.* at 1192 (per curiam). The Court should grant rehearing to ensure the uniform application of that precedent.

## CONCLUSION

The Court should grant panel rehearing or rehearing en banc.

Dated: August 7, 2023              Respectfully submitted,

                                   /s/ Theodore J. Boutrous Jr.

Rosemarie T. Ring                  Theodore J. Boutrous Jr.
Ryan Azad                          Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP        Matt Aidan Getz
555 Mission Street, Suite 3000     GIBSON, DUNN & CRUTCHER LLP
San Francisco, CA 94105            333 South Grand Avenue
Telephone: (415) 393-8200          Los Angeles, CA 90071
                                   Telephone: (213) 229-7000

*Counsel for Defendant-Appellee*
*Facebook, Inc. (now known as Meta Platforms, Inc.)*

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Circuit Rules 35-4 and 40-1(a) because it contains 4,086 words, excluding portions exempted under Federal Rule of Appellate Procedure 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5)(A) and (a)(6) because it has been prepared in 14-point New Century Schoolbook type.

Dated: August 7, 2023                    Respectfully submitted,

                                            s/ Theodore J. Boutrous Jr.
                                         Theodore J. Boutrous Jr.

                                         *Counsel for Defendant-Appellee*
                                         *Facebook, Inc. (now known as Meta*
                                         *Platforms, Inc.)*

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ROSEMARIE VARGAS; et al., | No.  21-16499 |
| Plaintiffs-Appellants, | D.C. No. 3:19-cv-05081-WHO |
| and | |
| NEUHTAH OPIOTENNIONE; JESSICA TSAI, | MEMORANDUM* |
| Plaintiffs, | |
| v. | |
| FACEBOOK, INC., | |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted July 28, 2022
Withdrawn January 9, 2023
Resubmitted June 20, 2023
San Francisco, California

Before:  M. MURPHY,** GRABER, and OWENS, Circuit Judges.
Dissent by Judge OWENS.

---

*        This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

**        The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

Plaintiffs Rosemarie Vargas, Jazmine Spencer, Kisha Skipper, Deillo Richards, and Jenny Lin appeal from the dismissal of their Third Amended Class Action complaint against Defendant Facebook, Inc. We review the dismissal de novo, <u>Meland v. Weber</u>, 2 F.4th 838, 843 (9th Cir. 2021), and reverse and remand for further proceedings.

1. The district court erred by dismissing the operative complaint for failure to allege a concrete injury sufficient to confer Article III standing. Under Federal Rule of Civil Procedure 12, the bar to allege standing is not high. <u>See</u> <u>Maya v. Centex Corp.</u>, 658 F.3d 1060, 1068 (9th Cir. 2011) (holding that "<u>Twombly</u> and <u>Iqbal</u> are ill-suited to application in the constitutional standing context"); <u>see also</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (brackets omitted) (citation and internal quotation marks omitted)). And we must accept all factual allegations as true. <u>See</u> <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

The operative complaint alleges that Facebook's "targeting methods provide

2

tools to exclude women of color, single parents, persons with disabilities and other protected attributes," so that Plaintiffs were "prevented from having the same opportunity to view ads for housing" that Facebook users who are not in a protected class received.

Plaintiff Vargas provides an example. She alleges that she is a disabled female of Hispanic descent and a single parent living in New York City with her two minor children and that she is a frequent Facebook user who has posted photos of herself and her children. Because of her use of Facebook, the platform knew that she was "a single parent, disabled female of Hispanic descent." She sought housing from August 2018 through April 2019 and was ready, willing, and able to move. In an effort to find housing, she accessed the Facebook Marketplace. Although she sought housing in Manhattan, her Facebook searches yielded no ads for housing in Manhattan. After receiving unsatisfactory search results, in early 2019, Plaintiff Vargas sat side by side with a Caucasian friend "and conducted a search for housing through Facebook's Marketplace, both using the same search criteria . . . . [The Caucasian friend] received more ads for housing in locations that were preferable to Plaintiff Vargas. Plaintiff Vargas did not receive the ads that [the friend] received." Third Am. Compl. at 24 (emphases added). In other words, her Caucasian friend saw more, and more responsive, ads than Plaintiff Vargas received even though they used identical search criteria. See Havens

3

Realty Corp. v. Coleman, 455 U.S. 363, 373–74 (1982) (holding that racially diverse "testers" attempting to obtain truthful information about available housing had standing to sue under the Fair Housing Act of 1968).

The district court faulted the complaint for not identifying specific ads that Plaintiff Vargas did not see. But Plaintiffs' very claim is that Facebook's practices concealed information from housing-seekers in protected classes. And nothing in the case law requires that a plaintiff identify specific ads that she could not see when she alleges that an ad-delivery algorithm restricted her access to housing ads in the first place.

The district court also relied on the fact that only paid ads used Facebook's targeting methods, and Plaintiffs do not specify whether the ads that Plaintiff Vargas's Caucasian friend saw (and that Plaintiff Vargas did not) were paid ads. The operative complaint alleges that Facebook hosts a vast amount of paid advertising but does not allege that all ads on the Marketplace are paid ads. Nonetheless, given the allegations concerning the magnitude of paid advertising, it is plausible to infer that one or more of the ads that Plaintiff Vargas could not access because of Facebook's methods was paid. If Plaintiff Vargas cannot prove that she was denied access to one or more paid ads, then her claims will fail on the merits—but they do not fail for lack of standing. See Cath. League for Religious & Civil Rts. v. City & County of San Francisco, 624 F.3d 1043, 1049 (9th Cir.

4

2010) (en banc) ("Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true."). Plaintiff Vargas alleges a concrete and particularized injury—deprivation of truthful information and housing opportunities—whether or not she can establish all the elements of her claims later in the litigation.

2. The district court also erred by holding that Facebook is immune from liability pursuant to 47 U.S.C. § 230(c)(1). "Immunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a [federal or] state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" Dyroff v. Ultimate Software Grp., 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009)). We agree with Plaintiffs that, taking the allegations in the complaint as true, Plaintiffs' claims challenge Facebook's conduct as a co-developer of content and not merely as a publisher of information provided by another information content provider.

Facebook created an Ad Platform that advertisers could use to target advertisements to categories of users. Facebook selected the categories, such as sex, number of children, and location. Facebook then determined which categories applied to each user. For example, Facebook knew that Plaintiff Vargas fell within

5

the categories of single parent, disabled, female, and of Hispanic descent. For some attributes, such as age and gender, Facebook requires users to supply the information. For other attributes, Facebook applies its own algorithms to its vast store of data to determine which categories apply to a particular user.

The Ad Platform allowed advertisers to target specific audiences, both by including categories of persons and by excluding categories of persons, through the use of drop-down menus and toggle buttons. For example, an advertiser could choose to exclude women or persons with children, and an advertiser could draw a boundary around a geographic location and exclude persons falling within that location. Facebook permitted all paid advertisers, including housing advertisers, to use those tools. Housing advertisers allegedly used the tools to exclude protected categories of persons from seeing some advertisements.

As the website's actions did in Fair Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008) (en banc), Facebook's own actions "contribute[d] materially to the alleged illegality of the conduct." Id. at 1168. Facebook created the categories, used its own methodologies to assign users to the categories, and provided simple drop-down menus and toggle buttons to allow housing advertisers to exclude protected categories of persons. Facebook points to three primary aspects of this case that arguably differ from the facts in Roommates.com, but none affects our conclusion

6

that Plaintiffs' claims challenge Facebook's own actions.

First, in Roommates.com, the website required users who created profiles to self-identify in several protected categories, such as sex and sexual orientation.  Id. at 1161.  The facts here are identical with respect to two protected categories because Facebook requires users to specify their gender and age.  With respect to other categories, it is true that Facebook does not require users to select directly from a list of options, such as whether they have children.  But Facebook uses its own algorithms to categorize the user.  Whether by the user's direct selection or by sophisticated inference, Facebook determines the user's membership in a wide range of categories, and Facebook permits housing advertisers to exclude persons in those categories.  We see little meaningful difference between this case and Roommates.com in this regard.  Facebook was "much more than a passive transmitter of information provided by others; it [was] the developer, at least in part, of that information."  Id. at 1166.  Indeed, Facebook is more of a developer than the website in Roommates.com in one respect because, even if a user did not intend to reveal a particular characteristic, Facebook's algorithms nevertheless ascertained that information from the user's online activities and allowed advertisers to target ads depending on the characteristic.

Second, Facebook emphasizes that its tools do not require an advertiser to discriminate with respect to a protected ground.  An advertiser may opt to exclude

only unprotected categories of persons or may opt not to exclude any categories of persons. This distinction is, at most, a weak one. The website in Roommates.com likewise did not require advertisers to discriminate, because users could select the option that corresponded to all persons of a particular category, such as "straight or gay." See, e.g., id. at 1165 ("Subscribers who are seeking housing must make a selection from a drop-down menu, again provided by Roommate[s.com], to indicate whether they are willing to live with 'Straight or gay' males, only with 'Straight' males, only with 'Gay' males or with 'No males.'"). The manner of discrimination offered by Facebook may be less direct in some respects, but as in Roommates.com, Facebook identified persons in protected categories and offered tools that directly and easily allowed advertisers to exclude all persons of a protected category (or several protected categories).

Finally, Facebook urges us to conclude that the tools at issue here are "neutral" because they are offered to all advertisers, not just housing advertisers, and the use of the tools in some contexts is legal. We agree that the broad availability of the tools distinguishes this case to some extent from the website in Roommates.com, which pertained solely to housing. But we are unpersuaded that the distinction leads to a different ultimate result here. According to the complaint, Facebook promotes the effectiveness of its advertising tools specifically to housing advertisers. "For example, Facebook promotes its Ad Platform with 'success

stories,' including stories from a housing developer, a real estate agency, a mortgage lender, a real estate-focused marketing agency, and a search tool for rental housing." A patently discriminatory tool offered specifically and knowingly to housing advertisers does not become "neutral" within the meaning of this doctrine simply because the tool is also offered to others.

**REVERSED and REMANDED.**

FILED

JUN 23 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Vargas v. Facebook, Inc.*, No. 21-16499
OWENS, Circuit Judge, dissenting:

      I respectfully dissent.  Each of Plaintiffs' theories of injury—denial of truthful information, denial of the opportunity to obtain a benefit, denial of the social benefit of living in an integrated community, and stigmatic injury—depends on Plaintiffs having been personally discriminated against by at least one housing advertiser that used Facebook's Ad Platform.  Thus, to survive a motion to dismiss, Plaintiffs would need to plausibly allege that a housing ad that would otherwise have appeared in their News Feeds or in their search results on Facebook Marketplace did not appear because the advertiser used Facebook's Ad Platform to exclude their protected class.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

      As to each named plaintiff, the Third Amended Complaint ("TAC") does not identify any such ad or advertiser.  Nor does it allege facts supporting an inference that housing discrimination (even if the identities of the ads and advertisers are unknown) is plausibly the reason Plaintiffs failed to find housing ads meeting their respective search criteria.  Plaintiffs have alleged nothing to exclude the possibility that suitable housing was not available or not advertised on Facebook.  *See Iqbal*, 556 U.S. at 682 (finding that an allegation of discrimination was not plausible in view of one "obvious alternative explanation").

1

Although Vargas alleges in Paragraph 95 of the TAC that her Caucasian friend, while using the same search criteria, received ads on Facebook Marketplace that she did not, she does not specify whether the ads her Caucasian friend saw were user-generated or paid (i.e., created using the Ad Platform and its audience selection tools). Users can distinguish paid ads from user-generated ads by the label "Sponsored." *See* Andrew Hutchinson, *Facebook Provides New Option to Boost Marketplace Posts, and Marketplace Ads for Businesses*, SocialMediaToday (June 7, 2018), https://www.socialmediatoday.com/news/facebook-provides-new-option-to-boost-marketplace-posts-and-marketplace-ad/525158/. Only paid ads are relevant to Vargas's housing discrimination claims.

Accordingly, I would affirm the district court's dismissal for failure to allege a concrete injury sufficient to confer standing.